Julian Hammond (SBN 268489)
jhammond@hammondlawpc.com
Polina Brandler (SBN 269086)
pbrandler@hammondlawpc.com
Ari Cherniak (SBN 290071)
acherniak@hammondlawpc.com
HAMMONDLAW, PC
11780 W. Sample Road, Suite 1103
Coral Springs, FL 33065
Tel:  (310) 601-6766
Fax:  (310) 295-2385

*Attorneys for Plaintiffs and the Putative Classes*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MADALYN BROWN, COLE MCDOWELL, CHRISTY BROCKINGTON, and DEREK DAWES, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br>vs.<br><br>ACCELLION, INC., a Delaware Corporation,<br><br>    Defendant. | Case No.: 5:21-CV-01155<br><br>**AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>1.  Negligence;<br>2.  Violation of Washington State Consumer Protection Act, RCW 19.86.010;<br>3.  Violation of the California Consumer Privacy Act, Cal. Civ. Code § 1798.150<br>4. Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*<br>5. Violation of Oklahoma Consumer Protection Act, 15 Okl. Stat. Ann. § 751, *et seq.*<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Madalyn Brown, Cole McDowell, Christy Brockington, and Derek Dawes ("Plaintiffs"), individually, and on behalf of the Classes defined below, complain and allege, upon information and belief and investigation, review and analysis by their counsel, except as to their own actions:

## OVERVIEW OF CLAIMS

1. Plaintiffs bring this class action, under Federal Rule of Civil Procedure 23, against Accellion, Inc. ("Accellion" or "Defendant") on behalf of individuals whose private information, including names, dates of birth, Social Security numbers, driver's license numbers and/or state identification numbers, bank account information, and employment information (collectively "Personally Identifiable Information" or "PII") was exposed in as a result of unauthorized access that began in December 2020 and continued into January 2021 (the "Data Breach") because of Defendant's failure to safeguard and protect their sensitive information.

2. Accellion is a cloud computing company focused on file sharing and collaboration solutions. Accellion developed, marketed, and sold a file sharing transfer product called "File Transfer Appliance" ("FTA"). FTA, which was released in May 2005, was a physical device a company would implement within their server room. The purpose of FTA was to facilitate the secure, encrypted sharing of files that exceeded limits imposed on the size of email attachments.[1] Rather than transferring documents by email, the intended recipient would receive a link to files hosted on Accellion's FTA, which could then be viewed or downloaded. The FAC was used by hundreds of companies and government and private organizations across the United States, and abroad.

3. According to its website, "Accellion FTA helps worldwide enterprises… transfer large and sensitive files securely using a 100% private cloud, on-premises or hosted."[2]

4. On or about December 16, 2020, however, Accellion learned of two exploits that allowed unauthorized attackers to assume full control over the FTA device and exfiltrate information from the devices.

5. Accellion knew or should have known of the inherent risks in storing the PII and of the critical important of adequately securing such information. As of 2020, however, FTA was an outdated

---

[1] https://www.bankinfosecurity.com/blogs/accellion-mess-what-went-wrong-p-2989
[2] https://www.accellion.com/products/fta/

product "nearing end-of-life."[3] Nevertheless, Accellion continued to market and sell the FTA product to various companies and organizations, including SAO and Kroger for use in transferring files containing PII.  Further, in 2016, similar vulnerabilities to those used in the breach at issue were identified.  However, a full audit was not conducted in 2016.  Had a full audit been conducted in 2016, it may have prevented the data breach at issue.

6. On or about January 12, 2021, almost one month after first learning of the breach of the FTA system, Accellion announced that unauthorized individuals gained access to its legacy file transfer software ("FTA").

7. At the time of the data breach, Accellion provided services, *inter alia*, to the Washington State Auditor's Office (the "SAO"), and to a grocery chain Kroger Family of Companies ("Kroger"). As part of the breach, unauthorized individuals gained access to SAO files and to Kroger files by exploiting a vulnerability in Accellion's FTA. The SAO files contained the PII of 1.6 million Washington residents who filed unemployment insurance claims in 2020. In addition, the compromised files may have included the PII of other Washington residents whose information was contained in state agency and/or local government files.  The Kroger files contained the PII of Kroger's current and former employees employed across the country.  The Kroger compromised files may have included names, email address and other contact information, date of birth, Social Security number, and certain salary information, such as net and gross pay and withholdings.

8. On or about February 19, 2021, Kroger confirmed that PII belonging to its current and former employees was compromised as a result of the Data Breach.  Other information that may have been compromised as part of the breach includes certain pharmacy records, and certain money services records.

9. At the time of the Data Breach, the SAO was using Accellion's FTA product to transfer and/or receive files and Accellion knew that SAO was using the FTA product to transfer and/or receive files containing PII. At the time of the Data Breach, Kroger was using Accellion's FTA product to transfer and/or receive files and Accellion knew that Kroger was using the FTA product to transfer and/or receive files containing PII.

---

[3] https://www.accellion.com/company/press-releases/accellion-provides-update-to-recent-fta-security-incident

10. Accellion's failure to ensure that the FTA product provided adequate security protocols exposed the PII of more than one million Washington residents, thousands of Kroger current and former employees. As a result of Defendant's conduct, the PII of Plaintiffs Brown, McDowell, Brockington, and Dawes and the Classes they seek to represent was compromised and their PII was disclosed to unknown and unauthorized third parties without their consent.

11. Armed with the PII acquired in this type of cyberattack, threat actors can commit a variety of crimes including, e.g., opening new financial accounts in class members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, and obtaining driver's licenses in Class Members' names but with another person's photograph. This risk is not theoretical. Attackers were able to decrypt and download all files stored on the FTA device. CI0p leaks group has been active in making exfiltrated files available for purchase on the dark web. The group has created for each compromised company its own page detailing the amount of information available for purchase, and screenshots of samples of files.

12. As a result of the Data Breach, Plaintiffs and the Class Members have and will continue to incur out of pocket costs and expenses for, among other things, purchasing credit monitoring services, credit freezes, credit reports, and/or other protective measures to deter and detect identity theft. Plaintiffs and the Class Members have and will continue to spend time, resources, and money in order to mitigate their damages from the Data Breach.

13. As a result of the Data Breach, Plaintiffs and the Class Members are at a heightened and imminent risk of fraud and identity theft. Plaintiffs and the Class Members must now and in the future closely monitor their bank accounts and credit card accounts to guard against the risk of identity theft.

14. Plaintiffs bring this class action lawsuit on behalf of themselves and all those similarly situated to address Accellion's inadequate safeguarding of Class Members' PII.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million exclusive of interest and costs. At least one Plaintiff and one Defendant are citizens of different states. There are more than 100 putative Class Members.

16. This Court has personal jurisdiction over Defendant because its principal place of business is in California and has sufficient contacts in this District.

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant conducts substantial business in this District and California is the principal place of business for Defendant.

## PARTIES

18. Plaintiff Madalyn Brown is an adult individual who resides, and at all relevant times, has resided in Eatonville, Washington. Plaintiff Madalyn Brown filed an unemployment claim with the State of Washington in 2020 and her PII was exposed in the Data Breach.

19. Plaintiff McDowell is an adult individual who resides, and at all relevant times, has resided in Fullerton, California. Plaintiff McDowell was employed by Kroger in California during the relevant time period.

20. Plaintiff Brockington is an adult individual who resides, and at all relevant times, has resided in San Diego, California. Plaintiff Brockington was employed by Kroger in Oklahoma since approximately August 2001.

21. Plaintiff Derek Dawes is an adult individual who resides, and at all relevant times, has resided in Broken Arrow, Oklahoma. Plaintiff Dawes was employed by Kroger in Oklahoma from approximately 2017 to March 2021. Plaintiff Dawes' PII was exposed in the Data Breach.

22. Accellion, Inc. is a Delaware Corporation with headquarters in Palo Alto, California.

## FACTUAL ALLEGATIONS

23. Accellion is a Palo Alto, California-based private cloud solutions company focused on secure file sharing and collaboration.[4] Users of Accellion's file transfer products can access, edit, and share enterprise content from any device while maintaining compliance and security. *Id.*

24. Accellion markets its products as way to safely transfer sensitive information via file sharing. With regard to file sharing, Accellion's website states in relevant part:

**Shared Files and Folders | Secure File Sharing**

- Give users a simple, secure, private way to share confidential information
- Provide the same ease of use found in consumer cloud file sharing apps
- Designated business users give external parties access privileges to folders and individual files, such as watermarked view-only, download, and upload/edit
- Designated business users request files from external partners so they can upload sensitive content in compliance

---

[4] https://en.wikipedia.org/wiki/Accellion

- Ensure productivity with tight integration to email, mobile, office and enterprise apps[5]

25. According to its website, the Accellion enterprise content firewall "prevents data breaches and compliance violations from third party cyber risk. CIOs and CISOs rely on the Accellion platform for complete visibility, security and control over the communication of IP, PII, PHI, and other sensitive content across email, file sharing, mobile, enterprise apps, web portals, SFTP, and automated inter-business workflow…When employees click the Accellion button, they know it's the safe, secure way to share sensitive information with the outside world."[6] Accellion boasts that "Accellion FTA helps worldwide enterprises… transfer large and sensitive files securely using a 100% private cloud, on-premises or hosted."[7]

26. With regard to the FTA product, Acccellion's website states that "in today's breach-filled, over-regulated world, you need even broader protection and control. Protect all your external file sharing – no matter what the source, device or location – with the industry-leading governance and security of Accellion's new platform." *Id*.

27. However, Accellion was aware that its FTA program was inadequate to keep file transfer secure. By the end of 2020, Accellion's product was nearing "end of life."[8] In fact, in a recent interview, Joel York, Accellion's chief marketing officer, said the data breach involved the company's 20-year-old "legacy product," known as FTA, which the company has been encouraging customers to stop using. With regard to the FTA product, Mr. York stated, "It just wasn't designed for these types of threats."[9] It was only after the data breach that Accellion announced the FTA device would be moved to end-of-life effective April 30, 2021 and clients would be migrated to Kiteworks, which was introduced first in January 2014, and was a complete rewrite of the FTA software that did not require a physical device and included many additional features.

28. In mid-December 2020, Accellion was made aware of a "zero-day vulnerability" in its legacy FTA software.[10] A zero-day vulnerability is a software security flaw that is known to the software

---

[5] https://www.accellion.com/platform/simple/secure-file-sharing/
[6] https://www.accellion.com/company/
[7] https://www.accellion.com/products/fta/
[8] https://www.accellion.com/company/press-releases/accellion-provides-update-to-recent-fta-security-incident
[9] https://www.seattletimes.com/seattle-news/politics/personal-data-of-1-6-million-washington-unemployment-claimants-exposed-in-hack-of-state-auditor/
[10] https://www.accellion.com/company/press-releases/accellion-provides-update-to-recent-fta-security-

vendor but does not have a patch in place to fix the flaw. It has the potential to be exploited by cybercriminals.

29. On or about December 16, 2020 Accellion was notified by one affected customer that the customer noticed an alert from the FTA internal anomaly detector and forwarded details of the alert to Accellion. In the days that followed, Accellion identified two vulnerabilities used to compromise the FTA devices. The first vulnerability was "an SQL injection" that allowed attackers to exfiltrate any data contained with the FATA internal database and contained storage derives. The SQL injection expose a secret token that allowed the attackers to utilize a second vulnerability – an "OS Command Execution," which allowed the attackers to execute arbitrary instructions on the FTA device. With the ability to execute arbitrary commands on the FTA device, attackers further exploited and exfiltrated information from the FTA devices.

30. Accellion attempted to patch the vulnerability, however, its efforts fell short. The patch was released on December 20, 2020, with a further patch released on December 24, 2020. Because the patches were released close to the Christmas holiday, a time when system administrators are not monitoring emails or actively monitoring patch releases, there was a delay in the application of the patch, which provided additional time for the attackers to utilize the vulnerabilities. Further, Accellion did not publish patch notes for its firmware update, and did not immediately assign CVE security bug identifiers to the vulnerabilities it patched, which is standard practice for breaches of this natures to ensure timely dissemination of information.

31. The Data Breach began in December 2020 and continued into January 2021, as cyber attackers repeatedly exploited vulnerabilities in the FTA product.

32. During the Data Breach, threat actors were able to exploit a software vulnerability in Accellion's FTA product and gain access to files that were being transferred using Accellion's service. SAO and Kroger were among Accellion's customers targeted in the attack along with more than 100 others.

33. At the time of the Data Breach, the SAO and Kroger were both using Accellion's FTA product to transfer and/or receive files and Accellion knew that SAO and Kroger were using the FTA product to transfer and/or receive files containing PII.

---

incident/

34. SAO determined that data files from the Employment Security Department (ESD) were impacted. These ESD data files contained unemployment compensation claim information including the person's name, social security number and/or driver's license or state identification number, date of birth, bank account number and bank routing number, and place of employment.[11] In addition, the SAO determined that data files from some local governments and other state agencies were also affected. SAO is reviewing all potentially accessed data files to identify which agencies' and local governments' files were impacted. *Id.*

35. Washington State Auditor Pat McCarthy has stated that Washington paid an annual subscription fee for the service for the past 13 years and relied on it to be safe, stating, "We believed that we were getting a secure system and we expected that — and the citizens of Washington state should expect that as well." *Id.*

36. Kroger determined that data files of current and former employees, as well as files from Kroger's Health and Money Services were impacted. The impacted employee data files contained names, email addresses and contact information, date of birth, Social Security numbers, and for some employees certain salary information. Other impacted records included certain pharmacy records and certain money services records.

37. Recently, Accellion issued and announcement advising consumers of the "end of life for its legacy FTA software effective April 30, 2021." Accellion has stated that it will continue to "provide support and honor its FTA contracts for the duration of its existing License Terms."[12]

38. Plaintiff Madalyn Brown applied for unemployment benefits from the State of Washington in 2020. As part of her application, Plaintiff Brown was required to provide sensitive personal information, including her social security number and banking information. Given the highly sensitive nature of the information stolen in the Data Breach, Plaintiff Madalyn Brown suffered damages including but not limited to out-of-pocket losses, time and effort spent mitigating her damages and dealing with the fall-out from the Data Breach, damage to her credit score, and the loss of the value of her PII.

39. Specifically, with respect to damages, Plaintiff Madalyn Brown had to close her primary bank account and reopen a new account. While waiting for her funds to become available, Plaintiff

---

[11] https://sao.wa.gov/breach2021

[12] https://www.accellion.com/sites/default/files/resources/fta-eol.pdf

Madalyn Brown was compelled to borrow money from family members in order to pay for certain necessities. Unauthorized activity was detected on her credit card account, resulting in a reduction in her credit score.  Plaintiff Madalyn Brown spent time and resources sending correspondence to three major credit bureaus explaining what occurred.   In addition, Plaintiff Madalyn Brown placed freezes on her credit so that no one could open new accounts in her name. She spent time updating automatic bill pay with her new bank account number.  Lastly, the launch of a new business was placed on hold.

40. Plaintiff McDowell was employed by Kroger in California. As a result of being a Kroger employee, Plaintiff McDowell was required to provide sensitive personal information, including his contact information, his social security number, and Kroger was in possession of his earnings information.  Given the highly sensitive nature of the information stolen in the Data Breach, Plaintiff McDowell suffered damages including but not limited to time and effort spent mitigating his damages and dealing with the fall-out from the Data Breach, including by reviewing and monitoring his bank and credit card statements, damage to his credit score, and the loss of the value of his PII.

41. Plaintiff Brockington was employed by Kroger in California since approximately August 2001.  As a result of being a Kroger employee, Plaintiff Brockington was required to provide sensitive personal information, including her contact information, her social security number, and Kroger was in possession of her earnings information.  Given the highly sensitive nature of the information stolen in the Data Breach, Plaintiff Brockington suffered damages including but not limited to time and effort spent mitigating her damages including carefully reviewing her bank account statements, emails, and text messages/phone calls, damage to her credit score, and the loss of the value of her PII.

### Plaintiffs and the Class Members Suffered Damages

42. Plaintiffs and the Class Members' PII is private and sensitive in nature and was left inadequately protected by Defendant. Defendant did not obtain Plaintiffs and the Class Members' consent to disclose their PII to any other person or entity, as required by applicable law and industry standards.

43. The Data Breach was a direct and proximate result of Defendant's failure to properly safeguard and protect Plaintiffs and the Class Members' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law, including Defendant's failure to establish and implement appropriate technical safeguards to ensure the security and confidentiality of Plaintiff and the Class members' PII to protect against reasonably foreseeable threats to the security or integrity of such information.

44. As a direct and proximate result of Defendant's wrongful actions and inaction and the resulting Data Breach, Plaintiffs and the Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, changing the information used to verify their identity to information not subject to this Data Breach, and filing police reports. This time has been lost forever and cannot be recaptured. In all manners of life in this country, time has constantly been recognized as compensable.

45. Defendant's wrongful actions and inaction directly and proximately caused the theft and dissemination to an unknown third party of Plaintiffs' PII, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

(a) theft of their PII;

(b) costs for credit monitoring services;

(c) unauthorized charges on their debit and credit card accounts; the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their credit/debit card and PII being placed in the hands of criminals and already misused via the sale of Plaintiff and Class members' PII on the internet black market;

(d) the improper disclosure of their data;

(e) loss of privacy;

(f) ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach;

(g) ascertainable losses in the form of deprivation of the value of their PII, for which there is a well-established national and international market; ascertainable losses in the form of the loss of cash back or other benefits as a result of their inability to use certain accounts and cards affected by the Data Breach;

(h) loss of use of, and access to, their account funds and costs associated with the inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit including adverse credit notations; and

(i) the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of

withdrawal and purchase limits on compromised accounts, changing the information used to verify their identity to information not subject to this data breach, and the stress, nuisance and annoyance of dealing with all such issues resulting from the data breach.

## CLASS ACTION ALLEGATIONS

46. Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action pursuant to Federal Rules of Civil Procedure, Rule 23.

47. Plaintiffs propose the following Class definitions, subject to amendment as appropriate:

> All residents of the United States whose Personally Identifiable Information was accessed, compromised, stolen or acquired by unauthorized persons as a result of the Data Breach

48. Additionally, Plaintiff Brown brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on her own behalf and on behalf of all persons similarly situated with the state of Washington ("Washington Class"), defined as follows:

> All residents of the State of Washington whose Personally Identifiable Information was accessed, compromised, stolen or acquired by unauthorized persons as a result of the Data Breach.

49. Plaintiffs McDowell and Brockington bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and on behalf of all persons similarly situated with the state of California ("California Class"), defined as follows:

> All residents of the State of California whose Personally Identifiable Information was accessed, compromised, stolen or acquired by unauthorized persons as a result of the Data Breach.

50. Plaintiff Dawes brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on his own behalf and on behalf of all persons similarly situated with the state of Oklahoma ("Oklahoma Class"), defined as follows:

> All residents of the State of Oklahoma whose Personally Identifiable Information was accessed, compromised, stolen or acquired by unauthorized persons as a result of the Data Breach.

51. This action has been brought and may properly be maintained as a class action under Federal Rules of Civil Procedure, Rule 23, because there is a well-defined community of interest in the litigation, the proposed class is easily ascertainable, and Plaintiff is a proper representative of the Class.

52. Excluded from the above Class is Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives,

heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned, as well as his or her judicial staff and immediate family members.

53. The proposed Class meet the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

54. Numerosity. The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, the Washington Class consists of approximately 1,600,000 individuals whose PII was compromised in the Data Breach. Upon information and belief, the Oklahoma Class consists of more than 1,000 individuals whose PII was compromised in the Data Breach.

55. Commonality. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a. Whether Defendant engaged in the conduct alleged herein;

    b. Whether Defendant's conduct constituted an unfair trade practice (as defined below) actionable under the applicable consumer protection laws;

    c. Whether Defendant had a legal duty to adequately protect Plaintiffs' and Class Members' personal information;

    d. Whether Defendant breached its legal duty by failing to adequately protect Plaintiffs' and Class Members' personal information;

    e. Whether Defendant failed to implement and maintain reasonable security measures appropriate to the nature and scope of the information compromised in the Data Breach;

    e. Whether and when Defendant knew or should have known that Plaintiffs' and Class Members' personal information was vulnerable to attack;

    f. Whether Plaintiffs and Class Members are entitled to recover actual damages and/or statutory damages; and

    g. Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

56. Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII, like that of every other Class Member, was compromised in the Data Breach.

57. Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions, including data breach class actions.

58. Predominance. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, including members of each state Class, in that all the Plaintiffs' and Class Members' PII was exposed via Defendant's FTA product and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

59. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

60. Class certification also is appropriate under Fed. R. Civ. P. 23(b)(2). Defendant has acted or have refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

61. Finally, all Members of the proposed Class, and of each state Class, are readily ascertainable. Defendant and/or the SAO and Kroger has access to addresses and other contact information for the members of the Class, which can be used to identify Class Members, including members of each state Class.

62. Plaintiffs reserve the right to add Class representatives, provided Defendant is afforded an opportunity to conduct discovery as to those representatives.

///

///

///

# FIRST CAUSE OF ACTION

## Negligence

### (*On Behalf of the Nationwide Class*)

63. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

64. Plaintiffs allege this claim individually and on behalf of the Class.

65. Defendant owed a duty to Plaintiffs and the Class to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the PII in their possession from being compromised, stolen, lost, accessed, misused and/or disclosed to unauthorized recipients.

66. Defendant also had the duty to implement processes that would detect a breach of its security in a timely manner and to timely act upon warnings and alerts.

67. Defendant owed Plaintiffs and the Class a duty to exercise reasonable care in the acquisition, maintenance, and storage of their PII. Such duty includes the implementation of adequate security infrastructure and protocols to protect that PII.

68. Defendant owed a duty to timely disclose the material fact that their data security practices were inadequate to safeguard individuals' PII.

69. Defendant breached these duties by the conduct alleged in the Complaint, including without limitation: (a) failing to protect the PII; (b) failing to maintain adequate data security practices to safeguard the PII; and (c) failing to disclose the material fact that Defendant's' data security practices were inadequate to safeguard the PII.

70. The conduct alleged herein caused Plaintiffs and Class Members to be exposed to fraud and be harmed as detailed herein. Plaintiffs and Class Members were foreseeable victims of Defendant's inadequate data security practices and in fact suffered damages caused by Defendant's breaches of their duties.

71. Defendant knew of the serious harms that could result through the wrongful disclosure of the PII of Plaintiffs and the Class.

72. Defendant's failure to comply with industry standards further demonstrates their negligence in failing to exercise reasonable care in safeguarding and protecting the PII of Plaintiffs and the Class.

73. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and the Class, their PII would not have been compromised. Defendant's negligence was a direct and legal cause of the exposure of Plaintiffs' and the Class's PII and all resulting damages.

74. The injury and harm suffered by Plaintiffs and the Class were a reasonably foreseeable result of Defendant's failure to cure those numerous vulnerabilities or, at a minimum, exercise reasonable care in safeguarding and protecting the PII of Plaintiffs and the other Class Members.

75. As a result of Defendant's misconduct, the PII of Plaintiffs and the Class was compromised and their PII was disclosed to third parties without their consent, placing them at a greater risk of identity theft. Plaintiffs and the Class have also suffered out of pocket losses related to identity theft losses or protective measures.

76. Defendant's misconduct alleged herein was carried out with a willful and conscious disregard of the rights or safety of Plaintiffs and the Class and subjected Plaintiff and the Class to unjust hardship in conscious disregard of their rights.

77. Plaintiffs, on behalf of themselves and all other Class Members, request relief as described below.

## SECOND CAUSE OF ACTION

### Violation of the CCPA, Cal. Civ. Code § 1798.150

(*On Behalf of the California Class*)

78. Plaintiffs McDowell and Brockington re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

79. Defendant violated § 1798.150 of the CCPA by failing to prevent Plaintiffs' and class members' nonencrypted and nonredacted personal information from unauthorized access and exfiltration, theft, or disclosure as a result of Defendant's violations of their duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information.

80. Defendant has more than $25 million in annual revenues and/or receive the personal information of more than 50,000 consumers in California each year. They are therefore subject to the CCPA.

81. Defendant collects consumers' personal information as defined in Cal. Civ. Code § 1798.140. Defendant has a duty to implement and maintain reasonable security procedures and practices to protect this personal information. As identified herein, Defendant failed to do so. As a direct and

proximate result of Defendant's acts, Plaintiffs' and class members' unencrypted personal and financial information was subjected to unauthorized access and exfiltration, theft, or disclosure.

82. Plaintiffs and Class Members seek injunctive or other equitable relief to ensure Defendant adequately safeguards customers' PII going forward, by implementing reasonable security procedures and practices. This relief is particularly important because Defendant continues to hold Plaintiffs' and Class Members' PII, and PII of other individuals. Plaintiffs and Class Members have an interest in ensuring that their PII is reasonably protected, and Defendant has demonstrated a pattern of failing to adequately safeguard this information.

83. On March 10, 2021, Plaintiffs sent a notice letter to Defendant's registered service agents via overnight post. Assuming Defendant cannot cure the issues raised within 30 days, and Plaintiffs believe such cure is not possible under these facts and circumstances, then Plaintiffs intend to promptly amend this Complaint to seek actual and statutory damages as permitted by the CCPA.

## THIRD CAUSE OF ACTION

### Violation of the UCL, Cal. Bus. & Prof. Code § 17200

(***On Behalf of the California Class***)

84. Plaintiffs McDowell and Brockington re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

85. Defendant engaged in unlawful and unfair business practices in violation of Cal. Bus. & Prof. Code § 17200, et seq.

86. As alleged herein, at minimum, Defendant engaged in the following unlawful and/or unfair conduct: (i) violation of the CCPA; and (ii) negligence.

87. As also alleged herein, Plaintiffs and Class Members were directly and proximately harmed in several ways because of Defendant's unlawful and/or unfair conduct.

88. Defendant is liable to Plaintiffs and Class Members for those damages.

## FOURTH CAUSE OF ACTION

### Violation of the Washington State Consumer Protection Act, RCW 19.86.010, et seq.

(***On Behalf of the Washington Class***)

89. Plaintiff Brown re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

90. The Washington State Consumer Protection Act, RCW 19.86.020 (the "CPA") prohibits any "unfair or deceptive acts or practices" in the conduct of any trade or commerce as those terms are described by the CPA and relevant case law.

91. Defendant is a "person" as described in RCW 19.86.010(1).

92. Defendant engages in "trade" and "commerce" as described in RCW 19.86.010(2) in that it engages in the sale of services and commerce directly and indirectly affecting the people of the State of Washington.

93. By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Defendant engaged in unlawful, unfair and fraudulent practices within the meaning, and in violation of, the CPA, in that Defendant's practices were injurious to the public interest because they injured other persons, had the capacity to injure other persons, and have the capacity to injure other persons.

94. In the course of conducting their business, Defendant committed "unfair or deceptive acts or practices" by, inter alia, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class Members' Private Information, and violating the common law alleged herein in the process. Plaintiff and Class Members reserve the right to allege other violations of law by Defendant constituting other unlawful business acts or practices. Defendant's above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

95. Defendant's above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair or deceptive acts or practices" in violation of the CPA in that Defendant's wrongful conduct is substantially injurious to other persons, had the capacity to injure other persons, and has the capacity to injure other persons.

96. The gravity of Defendant's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendant's legitimate business interests other than engaging in the above-described wrongful conduct.

97. As a direct and proximate result of Defendant's above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Cyber-Attack and its violations of the CPA, Plaintiff and Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, inter alia, (1) an imminent, immediate

and the continuing increased risk of identity theft, identity fraud—risks justifying expenditures for protective and remedial services for which he or she is entitled to compensation; (2) invasion of privacy; (3) breach of the confidentiality of his or her Private Information; (5) deprivation of the value of his or her Private Information, for which there is a well-established national and international market; and/or (v) the financial and temporal cost of monitoring credit, monitoring financial accounts, and mitigating damages.

98.     Unless restrained and enjoined, Defendant will continue to engage in the above-described wrongful conduct and more data breaches will occur. Plaintiff, therefore, on behalf of herself, Class Members, and the general public, also seeks restitution and an injunction prohibiting Defendant from continuing such wrongful conduct, and requiring Defendant to modify its corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the Private Information entrusted to it.

99.     Plaintiff Brown, on behalf of herself and the Washington Class Members, also seeks to recover actual damages sustained by each Class Member together with the costs of the suit, including reasonable attorney fees. In addition, Plaintiff Brown, on behalf of herself and the Washington Class Members, requests that this Court use its discretion, pursuant to RCW 19.86.090, to increase the damages award for each class member by three times the actual damages sustained not to exceed $25,000.00 per Class Member.

## FIFTH CAUSE OF ACTION

**Violation of Oklahoma Consumer Protection Act, 15 OKL. STAT. ANN. § 751,** *et seq.*
*(On Behalf of the Oklahoma Class)*

100.    Plaintiff Dawes re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

101.    Plaintiff Dawes and Oklahoma Class Members are "persons" under 15 Okla. St. § 752(1).

102.    Oklahoma's Consumer Protection Act (the "OCPA") prohibits Deceptive or Unfair Trade Practices in the course of a person's business. 15 Okla. St. § 753 Okla. St. § 753(20).

103.    The OPCA defines a deceptive trade practice as "a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that persons." 15 Okla. St. § 752(13). "Such a practice may occur before, during or after a consumer transaction is entered into an may be written or oral." Id.

104. The OCPA defines an unfair trade practice as "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." 15 Okla. St. § 752(14).

105. Accellion while engaged in business in Oklahoma, engaged in deceptive or unfair trade practices, in violation of 15 Okla. St. § 753(20). Accellion's deceptive and unfair practices include but are not limited to the following:

   a. Accellion failed to enact adequate privacy and security measures to protect the Oklahoma Class members' PII from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Data Breach;

   b. Accellion failed to take proper action following known security risks and prior cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

   c. Accellion knowingly and fraudulently misrepresented that they would maintain adequate data privacy and security practices and procedures to safeguard the Oklahoma Class members' PII from unauthorized disclosure, release, data breaches, and theft;

   d. Accellion knowingly omitted, suppressed, and concealed the inadequacy of their privacy and security protections for Oklahoma Class Members' PII;

   e. Accellion knowingly and fraudulently misrepresented that they would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the Oklahoma Class Members' PII, including but not limited to duties imposed by the FCRA, 15. U.S.C.§ 1681e, the FTC Act, the GLBA, 15 U.S.C. § 6801 et seq., 15 Okla. Stat. § 751 et seq., and 24 Okla. St. § 161 et seq.

   f. Accellion failed to disclose the Data Breach to the Plaintiff Dawes, Oklahoma Class Members, and, upon information and belief, to Kroger in a timely and accurate manner, in violation of Oklahoma's Security Breach Notification Act, 24 Okla. St. § 163.

106. Plaintiff Dawes and Oklahoma Class Members have suffered the ascertainable losses described herein. These include the loss of the property interest in their private PII as a result of Accellion's violation of 15 Okla. St. § 753.

107. Plaintiff and Oklahoma Class Members have also suffered ascertainable monetary losses or are at imminent risk of monetary losses, as a result of Accellion's violation of 15 Okla. St. § 753.

108. The Court is empowered to order restoration of money and property lost as a result of Defendant's violations of the OCPA. Plaintiff Dawes is entitled also to reasonable costs and attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes described above, seek the following relief:

a. An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Classes as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representative of the Classes requested herein;

b. Judgment in favor of Plaintiffs and the Classes awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, attorney's fees, statutory costs, and such other and further relief as is just and proper;

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Classes as requested herein;

d. An order requiring Defendant to pay the costs involved in notifying the Class Members about the judgment and administering the claims process;

e. A judgment in favor of Plaintiffs and the Classes awarding them pre-judgment and post judgment interest, reasonable attorneys' fees, costs and expenses as allowable by law; and

f. An award of such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the Class Members hereby demand a jury trial on all causes of action and claims with respect to which they have a right to jury trial.

Dated: March 10, 2021

Respectfully submitted,

HAMMONDLAW, P.C.

/s/ Julian Hammond
Julian Hammond

*Attorney for Plaintiffs and the Putative Classes*