TINA WOLFSON (SBN 174806)
*twolfson@ahdootwolfson.com*
ROBERT AHDOOT (SBN 172098)
*rahdoot@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Telephone: 310.474.9111
Facsimile:  310.474.8585

ANDREW W. FERICH (*pro hac vice*)
*aferich@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone: 310.474.9111
Facsimile:  310.474.8585

BEN BARNOW (*pro hac vice*)
*b.barnow@barnowlaw.com*
ANTHONY L. PARKHILL (*pro hac vice*)
*aparkhill@barnowlaw.com*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Telephone: 312.621.2000

*Attorneys for Plaintiffs and the Proposed Class*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ACCELLION, INC. DATA BREACH LITIGATION | Case No. 5:21-cv-01155-EJD |
| This Document Relates to: | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| *Fehlen, et al. v. Accellion, Inc.* Case No. 5:21-cv-01353-EJD | |
| | DATE:      December 8, 2022 |
| | TIME:       9:00 a.m. |
| | JUDGE:    Hon. Edward J. Davila |
| | CTRM:     4, 5th Floor |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on December 8, 2022 at 9:00 a.m. in Courtroom 4 of the United States District Court for the Northern District of California, Robert F. Peckham Federal Building & United States Courthouse, 280 South 1st Street, San Jose, CA 95113, the Honorable Edward J. Davila presiding, Plaintiffs will and hereby do move for an Order granting Preliminary Approval of the Class Action Settlement in this matter.

This motion is based upon this Notice of Motion and Motion, the supporting Memorandum set forth below, the attached exhibits and declarations, the pleadings and records on file in this Action, and other such matters and argument as the Court may consider at the hearing of this motion.

Respectfully submitted,

DATED: June 13, 2022

*/s/ Tina Wolfson*
TINA WOLFSON (SBN 174806)
*twolfson@ahdootwolfson.com*
ROBERT AHDOOT (SBN 172098)
*rahdoot@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Telephone: 310.474.9111
Facsimile:  310.474.8585

ANDREW W. FERICH (*pro hac vice*)
*aferich@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone: 310.474.9111
Facsimile:  310.474.8585

BEN BARNOW (*pro hac vice*)
*b.barnow@barnowlaw.com*
ANTHONY L. PARKHILL (*pro hac vice*)
*aparkhill@barnowlaw.com*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Telephone: 312-621-2000
Facsimile: 312-641-5504

*Attorneys for Plaintiffs and the Proposed Class*

- 2 -

# TABLE OF CONTENTS

**Page**

I.     STATEMENT OF THE ISSUES TO BE DECIDED ........................................................ 1

II.    INTRODUCTION .......................................................................................................... 1

III.   BACKGROUND ........................................................................................................... 3

    A.    The FTA Data Breach and Subsequent Litigation .................................................. 3

    B.    Mediation and Settlement Negotiations ................................................................. 4

    C.    Information Learned Prior to the Mediation and Through Confirmatory
           Discovery ............................................................................................................... 6

IV.    TERMS OF THE SETTLEMENT ................................................................................. 9

    A.    The Class Definition .............................................................................................. 9

    B.    The Release ............................................................................................................ 9

    C.    The Settlement Benefits ......................................................................................... 9

          1.    Credit Monitoring and Insurance Services.................................................. 9

          2.    Documented Loss Payment ....................................................................... 10

          3.    Cash Fund Payments ................................................................................. 10

          4.    Prospective Relief Attributable to the Settlement ..................................... 11

          5.    The Settlement's Value to Settlement Class Members .............................. 11

    D.    Plan of Distribution ............................................................................................. 11

    E.    Residual ................................................................................................................ 12

    F.    Notice to the Class ............................................................................................... 12

    G.    Proposed Class Representative Service Awards ................................................... 13

    H.    Attorneys' Fees, Costs, and Expenses ................................................................. 14

    I.    The Settlement Administrator .............................................................................. 14

V.    PRELIMINARY APPROVAL OF THE SETTLEMENT SHOULD BE GRANTED .... 15

    A.    The Rule 23 Requirements for Class Certification Are Met................................. 15

          1.    Rule 23(a) Is Satisfied.............................................................................. 15

               i.    The Class Is Sufficiently Numerous ............................................. 15

               ii.    There Are Common Questions of Law and Fact ........................... 15

- i -

iii.    The Class Representatives' Claims Are Typical ........................... 16

iv.    Proposed Class Representatives and Class Counsel Adequately Represent Class Members ............................................... 16

2.    Rule 23(b)(3) Is Satisfied .......................................................... 17

i.    Common Issues of Law and Fact Predominate Over Any Potential Individual Questions ...................................... 18

ii.    A Class Action Is the Superior Method to Fairly and Efficiently Adjudicate the Matter .................................... 18

B.    The Proposed Settlement Is Eminently Fair, an Excellent Result for the Class Members, and Should Be Preliminarily Approved ................................ 19

1.    The Strength of Plaintiffs' Case and Possible Monetary Remedies ........ 21

2.    The Risk, Expense, Complexity, and Potential Class Recovery .............. 21

3.    The Risk of Maintaining Class Status Through Trial .............................. 24

4.    The Amount Offered in Settlement Is Fair, Reasonable, and Adequate ... 25

5.    The Proposed Method of Distribution Is Effective ................................. 27

6.    The Extent of Discovery Completed and the Stage of the Proceedings ... 28

7.    The Experience and Views of Counsel ................................................ 29

8.    The Presence of a Governmental Participant ........................................ 29

9.    The Reaction of Class Members to the Proposed Settlement .................. 29

10.    The Settlement Is the Product of Arm's-Length Negotiations That Were Free of Collusion ................................................................ 30

11.    The Proposed Notice Plan Is Appropriate ................................................ 31

12.    Appointment of Settlement Class Counsel ............................................ 33

C.    Settlement Deadlines and Schedule for Final Approval ....................... 33

VI.    CONCLUSION ............................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abante Rooter & Plumbing, Inc. v. Pivotal Payments Inc.*,
2018 WL 8949777 (N.D. Cal. Oct. 15, 2018) ........................................................................ 18

*Alabsi v. Savoya, LLC*,
2020 WL 587429 (N.D. Cal. Feb. 6, 2020) .......................................................................... 24

*Alvarez v. Sirius XM Radio Inc.*,
2020 WL 7314793 (C.D. Cal. July 15, 2020) ...................................................................... 17

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591, 117 S.Ct. 2231 (1997) ............................................................................. 15, 19

*Campbell v. Facebook, Inc.*,
951 F.3d 1106 (9th Cir. 2020) ............................................................................................. 27

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ............................................................................................... 16

*G. F. v. Contra Costa Cnty.*,
2015 WL 4606078 (N.D. Cal. July 30, 2015) ...................................................................... 30

*Hammond v. The Bank of N.Y. Mellon Corp.*,
2010 WL 2643307 (S.D.N.Y. June 25, 2010) ...................................................................... 22

*In re Anthem, Inc. Data Breach Litigation*,
327 F.R.D. 299 (N.D. Cal. 2018) ......................................................................................... 20

*In re Banner Health Data Breach Litigation*,
No. 2:16-cv-02696-PHX-SRB (D. Ariz. Dec. 5, 2019) ....................................................... 30

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ................................................................................... 20, 30, 31

*In re Emulex Corp. Sec. Litig.*,
210 F.R.D. 717 (C.D. Cal. 2002) ......................................................................................... 17

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
2020 WL 256132 (N.D. Ga. Mar. 17, 2020) ........................................................................ 21

*In re Experian Data Breach Litigation*,
No. 8:15-cv-01592-AG-DFM (N.D. Cal. May 10, 2019) ...................................................... 19

*In re Premera Blue Cross Customer Data Sec. Breach Litig.*,
2019 WL 3410382 (D. Or. July 29, 2019) ........................................................................... 30

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
895 F.3d 597 (9th Cir. 2018) ............................................................................................... 16

*In re Yahoo! Inc. Cust. Data Sec. Breach Litig.*,
No. 5:16-md-02752-LHK (N.D. Cal. July 20, 2019) ........................................................... 19

- iii -

*Johnson v. Serenity Transportation, Inc.*,
   2021 WL 3081091 (N.D. Cal. July 21, 2021) ........................................................ 24

*Just Film, Inc. v. Buono*,
   847 F.3d 1108 (9th Cir. 2017) ............................................................................. 19

*Kent v. Hewlett-Packard Co.*,
   2011 WL 4403717 (N.D. Cal. Sept. 20, 2011) ...................................................... 17

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ............................................................................... 15

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950) ............................................................................................ 31

*Perks v. Activehours, Inc.*,
   2021 WL 1146038 (N.D. Cal. Mar. 25, 2021) ...................................................... 24

*Phillips Co. v. Shutts*,
   472 U.S. 797 (1985) ............................................................................................ 19

*Sandoval v. Roadlink USA Pac., Inc.*,
   2011 WL 5443777 (C.D. Cal. Oct. 9, 2011) ......................................................... 15

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016) ........................................................................................ 18

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002) ............................................................................. 14

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ............................................................................................ 15

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir.) ........................................................................................... 31

*Warner v. Toyota Motor Sales, U.S.A., Inc.*,
   2016 WL 8578913 (C.D. Cal. Dec. 2, 2016) ........................................................ 32

*Wershba v. Apple Computer, Inc.*,
   91 Cal.App.4th 224 (2001) ............................................................................. 31, 32

*Wright v. Linkus Enters., Inc.*,
   259 F.R.D. 468 (E.D. Cal. 2009) ......................................................................... 20

*Yamagata v. Reckitt Benckiser LLC*,
   2021 WL 5909206 (N.D. Cal. Oct. 28, 2021) ...................................................... 24

**Codes**

28 U.S.C.
   § 1407 ................................................................................................................... 4

Cal. Civ. Code
   § 56.10 ................................................................................................................. 23
   § 56.101 ............................................................................................................... 23

§ 56.05......................................................................................................... 23
§ 56.06......................................................................................................... 23
§ 1798.140(c)(1)........................................................................................... 23
§ 1798.150(a)(1)........................................................................................... 23

# Rules

Fed. R. Civ. P.
23................................................................................................................. 15
23, Adv. Comm. Notes to 2018 Amendment................................................ 15
23(b)............................................................................................................. 15
23(b)(3) .................................................................................................. 18, 19
23(c)(2)(B) ............................................................................................. 31, 33
23(e) ....................................................................................................... *passim*
23(e)(2)(C)(ii) .............................................................................................. 27
23(g)(1)(A)(i-iv)........................................................................................... 33
23(g)(1)(B) ................................................................................................... 33

# Other Authorities

4 NEWBERG ON CLASS ACTIONS § 11:53 (4th ed. 2013) ................................ 32
Class Action Fairness Act, 28 U.S.C. § 1715 ................................................ 29
MANUAL FOR COMPLEX LITIGATION § 30.212 (4th ed. 2004)......................... 32

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      STATEMENT OF THE ISSUES TO BE DECIDED**

Whether the proposed Settlement warrants: (a) preliminary approval; (b) certification of a Settlement Class; (c) dissemination of Notice to the Settlement Class Members ("Class Members") of the Settlement's terms in the proposed method using the proposed forms; (d) appointment of Tina Wolfson, Robert Ahdoot, and Andrew W. Ferich of Ahdoot & Wolfson, PC; and Ben Barnow and Anthony L. Parkhill of Barnow and Associates, P.C. as Class Counsel, and appointment of Plaintiffs Douglas Fehlen, Tony Blake, David Artuso, Teresa Bazan, Lorriel Chhay, Samantha Griffith, Allen Chao, and Augusta McCain ("Plaintiffs") as Class Representatives; and (e) setting a Final Approval Hearing for final approval of the Settlement and a hearing to consider any application for Service Awards and a Fee Award and Costs.

**II.     INTRODUCTION**

Plaintiffs request that the Court preliminarily approve a nationwide class action Settlement that would resolve all of the class's claims against Accellion only, on behalf of all natural persons who are residents of the United States whose Personal Information was stored on the FTA systems of Accellion's FTA Customers and was compromised in the Attacks. The exact class size is unknown, but includes approximately 9,200,000 Class Members to whom direct notice is being sent. Under the terms of the Settlement, Accellion will use best efforts to ascertain the number of and contact information for any additional Class Members to whom direct notice may be sent under the Settlement to achieve the best notice practicable, but the Parties do not anticipate this number to increase substantially.

The Settlement establishes a non-reversionary cash fund of $8.1 million to pay for valid claims, notice and administration costs, any Service Awards to the named Plaintiffs, and any Fee Award and Costs awarded by the Court. It requires Accellion to pay $4,600,000 of the Settlement Fund into escrow within ten (10) Business Days of the execution of the Settlement Agreement, with the remaining $3,500,000 to be placed into escrow ten (10) Business Days after the Settlement is preliminarily approved. These escrow payments will secure the Settlement Fund now, eliminating

- 1 -

the risk of nonpayment from Accellion, a small, privately held company without the resources of a large, publicly traded corporation to withstand a larger judgment.

Under the terms of the Settlement, Claimants may elect to receive one of the following: (1) two years of three-bureau Credit Monitoring and Insurance Services ("CMIS"); (2) a payment for reimbursement of Documented Losses of up to $10,000; or (3) a Cash Fund Payment, calculated in accordance with the terms of the Settlement Agreement, estimated at $15 to $50 (at 1% and 3% claims rates respectively). The Settlement also provides robust injunctive relief to be implemented for four years from the Effective Date of the Settlement, including requiring Accellion to fully retire its FTA offering, maintain FedRAMP certification for its newer Kiteworks offering, expand its bug bounty program, provide annual cybersecurity training to all employees, employ personnel with formal responsibilities for cybersecurity, and to periodically confirm compliance with the foregoing measures publicly on Accellion's website.

The Settlement compares favorably with other data breach settlements on a per capita basis, even outside of the unique circumstances surrounding this case. The fact that Class Members can seek additional recovery against the FTA Customers (and in the case of Kroger, Flagstar, and HealthNet, have already secured such potential recovery through pending settlements) further supports approval. There are unique litigation risks that arise from the case against Accellion. Approval is further warranted by the fact that the Settlement secures significant funds from a company that is unlikely to withstand a higher judgment.

The Settlement is the product of arduous, arm's-length negotiations between highly experienced counsel after comprehensive investigation, informal exchange of information, confirmatory discovery, two mediation sessions with the Honorable Judge Jay C. Gandhi (Ret.) of JAMS, and months of additional zealous negotiations between the parties. It delivers tangible and immediate benefits to the Settlement Class that address all the potential harms of the FTA Data Breach suffered by Class Members without protracted class action litigation and the attendant serious inherent risks of such litigation. The Court should preliminarily approve the Settlement.

### III.    BACKGROUND

#### A.    The FTA Data Breach and Subsequent Litigation

In late 2020 and early 2021, Accellion disclosed to its FTA Customers[1] that threat actors had breached Accellion client data via certain vulnerabilities in the FTA software. Second Amended Class Action Complaint ("SAC"), ECF No. 43, ¶ 2. These threat actors were then able to steal sensitive data from many Accellion clients, including corporations, law firms, banks, universities, and other entities. *Id.* ¶¶ 5-11, 40, 44.

On February 24, 2021, this action was commenced with the filing of a class action complaint against Accellion. ECF No. 1. Plaintiffs alleged, among other things, that Accellion: (a) failed to implement and maintain adequate data security practices to safeguard Plaintiffs' and Class Members' Personal Information; (b) failed to prevent the Attacks and the FTA Data Breach; (c) failed to detect security vulnerabilities leading to the Attacks and the FTA Data Breach; and (d) failed to disclose that their data security practices were inadequate to safeguard Class Members' Personal Information. *E.g., id.* ¶¶ 64, 113. Accellion has denied all of the allegations and any liability and maintains that it did not owe a legal duty of care to Plaintiffs and acted reasonably.

Following commencement of this action, counsel for the Parties began a dialogue about case management issues and engaged in multiple meet-and-confer discussions. Declaration of Tina Wolfson ("Wolfson Decl."), ¶ 14; Declaration of Ben Barnow ("Barnow Decl."), ¶ 6. Plaintiffs' counsel already had been engaging in efforts to coordinate all of the class action cases filed in this District relating to the Attacks and the FTA Data Breach, including drafting a stipulation to consolidate those cases and set deadlines for submitting leadership applications. *Id.* When efforts to secure such a stipulation failed, Ahdoot Wolfson filed a motion to consolidate the numerous FTA Data Breach-related class actions pending before this Court, and to set deadlines for filing a Consolidated Complaint and leadership applications. *See Brown, et al. v. Accellion, Inc.*, No. 5:21-cv-01155-EJD, ECF No. 37 (filed April 7, 2021). The motion to consolidate is pending before the Court.

---

[1]   Unless otherwise noted, all capitalized terms not separately defined here have the meaning ascribed to them in the Settlement Agreement. The Settlement Agreement ("SA") is submitted as an Exhibit.

- 3 -

In view of the fact that many cases relating to the FTA Data Breach continued to be filed in multiple courts in the weeks after this action was commenced, Ahdoot Wolfson filed a motion on March 31, 2021 (brought on behalf of another client) for transfer and centralization pursuant to 28 U.S.C. § 1407 with the United States Judicial Panel on Multidistrict Litigation, seeking to transfer numerous FTA Data Breach-related actions in four district courts to this Court for centralized proceedings. *In re Accellion, Inc., Data Breach Litigation*, MDL No. 3002 (J.P.M.L. 2021), at ECF No. 1. While the JPML Motion was pending, the dialogue between counsel for Plaintiffs and counsel for Accellion continued. Wolfson Decl. ¶ 16. On June 7, 2021, the Panel issued an order denying transfer. MDL No. 3002, ECF No. 88. Counsel for Plaintiffs and counsel for Accellion had previously agreed to participate in mediation (further discussed below).

On July 23, 2021, Plaintiffs filed the First Amended Class Action Complaint. ECF No. 35. On January 6, 2022, Plaintiffs filed the operative SAC asserting claims for negligence, negligence per se, invasion of privacy (intrusion upon seclusion), violations of various consumer protection statutes (including the North Carolina Unfair Deceptive Trade Practices Act, the Washington Consumer Protection Act, the California Consumer Privacy Act ("CCPA"), the California Confidentiality of Medical Information Action ("CMIA"), the California Customer Records Act ("CCRA"), and the California Unfair Competition Law ("UCL")), and for declaratory relief, and seeking remedies (including damages and injunctive relief) for the impact and harm they allege were caused by the Attacks. SAC ¶¶ 80-172 . Plaintiffs seek certification of a nationwide class. *Id.* ¶ 72.

Plaintiffs now file this motion seeking preliminary approval of the Settlement, which would resolve all claims alleged against Accellion and not any FTA Customers.

### B.     Mediation and Settlement Negotiations

As stated above, the Parties reached an early agreement to participate in mediation to attempt to resolve this matter. Barnow Decl. ¶ 7; Wolfson Decl. ¶ 17. Prior to mediation, the Parties exchanged information to prepare for and facilitate a productive mediation. Barnow Decl. ¶ 8; Wolfson Decl. ¶ 18. The Parties also exchanged and submitted to the mediator detailed confidential mediation briefs laying out their respective positions on the merits of the case and settlement.

- 4 -

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
No. 5:21-cv-01353-EJD

Barnow Decl. ¶ 8; Wolfson Decl. ¶ 18. Throughout the negotiations, Plaintiffs received and analyzed pre-mediation discovery provided on a voluntary basis by Accellion, including specific information concerning the scope of the FTA Data Breach, Accellion's financial condition, and the steps Accellion took in response to the FTA Data Breach. Barnow Decl. ¶ 8; Wolfson Decl. ¶ 20.

On July 19, 2021, the Parties participated in mediation before Judge Gandhi but were not able to reach resolution. Barnow Decl. ¶ 9; Wolfson Decl. ¶ 21. The Parties continued their dialogue regarding settlement in the following weeks and agreed to go back to mediation. Barnow Decl. ¶ 10; Wolfson Decl. ¶ 21. A second mediation took place on September 7, 2021 but did not result in a settlement. *Id*. Following the second mediation, the Parties continued to work tirelessly over several months to reach a Settlement. Barnow Decl. ¶¶ 10-11; Wolfson Decl. ¶ 21.

Plaintiffs' counsel negotiated an agreement with Epiq Class Action and Claims Solutions, Inc. ("Epiq") to serve as Settlement Administrator, and Epiq estimates that the total administration and notice charges in this matter will be approximately $1,834,421. Wolfson Decl. ¶ 23. This estimate is reasonable in the context of this proposed Settlement and the size of the Settlement Class, and includes all costs associated with providing direct notice, publication notice, class member data management, CAFA notification, telephone support, claims administration, creation and management of the Settlement Website, disbursements and tax reporting, and postage costs. *Id*.

During the settlement negotiation process, the Parties deferred any discussion concerning the maximum Service Awards to be sought by the proposed Class Representatives until after reaching an agreement on all material terms of the Settlement. Barnow Decl. ¶ 15; Wolfson Decl. ¶ 24. There has been no negotiation or agreement regarding the amount of attorneys' fees, costs, and expenses that may be sought by proposed Class Counsel. Barnow Decl. ¶ 15; Wolfson Decl. ¶ 24. The Settlement negotiations were conducted at arm's length, in good faith, and free of any collusion, and the Parties' negotiations and efforts to resolve this litigation were hard fought. Barnow Decl. ¶ 18; Wolfson Decl. ¶ 24.

After protracted comprehensive negotiations and diligent efforts, including two mediation sessions and months of continued negotiations thereafter, the Parties finalized the terms of the Settlement and now seek preliminary approval of the Settlement from the Court.

**C.     Information Learned Prior to the Mediation and Through Confirmatory Discovery**

Plaintiffs conducted a thorough investigation and engaged in detailed confirmatory discovery. As a result of these efforts, Plaintiffs were able to obtain the details surrounding the breach, which confirm the fairness, reasonableness, and adequacy of the proposed Settlement.

The FTA is a software product that Accellion licensed to customers on a subscription basis for their use in file transfers. Wolfson Decl. ¶ 33. Historically, FTA has been adopted by customers in a broad range of industries, including federal and state government agencies, and companies and institutions in the financial services, legal, manufacturing and engineering, healthcare, and higher education fields. *Id.*

FTA Customers are responsible for managing, maintaining, and updating their "instances" of the FTA software. *Id.* ¶ 34. Accellion does not manage its customers' FTA systems, and Accellion does not collect any data on behalf of its FTA Customers. *Id.* Customers' use of FTA does not involve any data flowing through Accellion systems. *Id.* Accellion also does not access the content of information its customers choose to store or transfer with FTA. *Id.*

Accellion did not guarantee the security of the FTA software to customers. *Id.* ¶ 35. Its standard license agreement disclaimed such guarantees and included a broad limitation of liability for any damages resulting from a data breach. *Id.* The license agreement explicitly states that each FTA Customer is "solely responsible and liable for the use of and access to" the FTA software "and for all files and data transmitted, shared, or stored using" FTA. *Id.* With the FTA, customers have exclusive control over the data they are storing or transferring via FTA. *Id.* Accellion provided multiple hosting options for the software that data customers could use for transfer using the FTA, including 1) on customers' own systems ("on-premises"), 2) cloud-based storage arranged by the customer, or 3) cloud storage space within Amazon Web Services. *Id.* Under any of these hosting arrangements, Accellion never had access to the contents of the customers' files. *Id.*

- 6 -

Kiteworks was launched in 2014 as a successor to the FTA. *Id.* ¶ 36. Kiteworks purports to offer enhanced security, functionality, and integration into customers' software and security infrastructures. *Id.* Most of Accellion's legacy FTA Customers had migrated from FTA to Kiteworks by early 2020. *Id.* Prior to the FTA Data Breach Attacks, Accellion encouraged FTA Customers to switch to its newer Kiteworks platform by making it cheaper for FTA Customers to switch to Kiteworks than to stay on FTA and by offering technical support for the transition. *Id.*

Accellion stopped licensing FTA to new customers in 2016, but permitted existing FTA Customers to renew FTA licenses. *Id.* ¶ 37. Prior to the Attacks and the FTA Data Breach, the last security update for FTA was released in February 2019. *Id.* Since that time, five separate security scans and penetration tests (including two in 2020, in April and June) were conducted on the FTA software. *Id.*

In December 2020 and then again in January 2021, cyber-criminals exploited multiple "zero-day" vulnerabilities—vulnerabilities that had never been discovered in FTA's decades of service, despite penetration testing and other monitoring by both Accellion and its customers, as well as scrutiny by external security researchers through Accellion's bug bounty program—in the FTA, allowing the criminals to illegally access information stored on FTA Customers' systems. *Id.* ¶ 38. Not all customers using the FTA were affected by the attacks. *Id.* Accellion employed an "anomaly detector," designed to detect potentially suspicious activity in a customer's FTA system and bring them to the customer's attention, which is how the FTA Data Breach was discovered. *Id.* When Accellion learned of the the December 2020 attack, it patched the vulnerabilities and supported its customers in investigating whether and to what extent they were affected. *Id.* After the second attack in January 2021, Accellion promptly released another patch, and issued a critical security alert advising customers to apply the patch as soon as possible. *Id.*

In addition to issuing patches and a critical safety alert concerning the breach, Accellion took other responsive actions. *Id.* ¶ 39. It engaged Mandiant to investigate and issue a report of its findings. *Id.* Accellion also offered assistance to customers in identifying whether they were impacted by the breach if impacted customers agreed to share system logs and other information

with Accellion. *Id.* Even if customers agreed to do so, Accellion was never able to obtain access to or download the underlying customer files, and Accellion never had any ability to identify what specific data was contained on any customer's compromised files. *Id.* Accellion has limited information as to which of its customers were impacted by the Attacks. For some of these customers, it has limited information concerning the number of files the attackers accessed. *Id.* Accellion never had access to the underlying data that its FTA Customers were transferring and has no knowledge of or reasonable way of knowing whether or which FTA Customers were transferring individuals' Personal Information or whose Personal Information may have been transferred. *Id.*

Accellion maintained records of those customers who provided information to Accellion confirming that they were targeted by the Attacks. *Id.* ¶ 40. Accellion has provided Class Counsel with the list of the impacted FTA Customers. *Id.* Accellion also has identified certain FTA Customers impacted by the Attacks based upon publicly available information. *Id.* ¶ 41.

On February 25, 2021, Accellion announced immediate end of life for FTA, meaning that Accellion will not renew any licenses for existing FTA Customers effective April 30, 2021. *Id.* ¶ 42. The final FTA license for any Accellion customer based in the United States is set to expire on January 31, 2022. *Id.* There is one Accellion customer outside of the United States whose FTA license is set to expire on March 31, 2022. *Id.* No new FTA licenses extend beyond that date. *Id.*

In connection with the Settlement, Accellion will migrate any remaining FTA Customers to Kiteworks or an alternative file transfer solution, which process is to be completed for all U.S.-based customers by January 31, 2022. *Id.* ¶ 43. Accellion has also agreed to maintain Kiteworks' FedRAMP certification (a certification that requires a rigorous annual security audit of the software and company as a whole). *Id.* Accellion intends to continue to comply with FedRAMP's Continuous Monitoring program, which requires (among other things) that Accellion complete an Annual Security Assessment performed by an independent third party to test and evaluate the security of Kiteworks as well as Accellion's security practices and procedures. *Id.* As part of the Settlement, Accellion also has agreed to (i) expand its bug bounty program by increasing the reward offerings for eligible vulnerabilities from $250-$25,000 per eligible vulnerability to $500-$35,000; (ii) provide

- 8 -

1   annual cybersecurity training to all employees, and (iii) continue to employ personnel with formal

2   responsibilities for cybersecurity. *Id.* Accellion will employ these measures for a period of four years

3   following the Effective Date of the Settlement, and will certify compliance once annually for a period

4   of three years. *Id.*; *see also* SA § 2.1.

5   **IV.    TERMS OF THE SETTLEMENT**

6       **A.    The Class Definition**

7       The proposed Settlement Class is defined as follows:

8       "Settlement Class" and "Class" mean all natural persons who are residents of the
    United States whose Personal Information was stored on the FTA systems of FTA

9       Customers and was compromised in the Attacks, including all natural persons who are
    residents of the United States who were sent notice by an FTA Customer that their

10      Personal Information may have been compromised in the Attacks. Excluded from the
    Settlement Class are: (1) the Judges presiding over the Action and members of their

11      families; (2) Accellion, its subsidiaries, parent companies, successors, predecessors,
    and any entity in which Accellion or its parents, have a controlling interest, and its

12      current or former officers and directors; (3) natural persons who properly execute and
    submit a Request for Exclusion prior to the expiration of the Opt-Out Period; and (4)

13      the successors or assigns of any such excluded natural person.

14  SA § 1.46. The proposed Settlement Class is coextensive with the Class defined in the SAC. SAC

15  ¶¶ 72-73.

16      **B.    The Release**

17      In exchange for the benefits provided under the Settlement Agreement, Class Members will

18  release any claims against Accellion and the Released Parties related to or arising from the FTA Data

19  Breach. SA §§ 1.39, 4.1. Class Members are not releasing any claims they may have against

20  Accellion FTA Customers, or any other non-released parties related to the FTA Data Breach. *Id*. The

21  claims sought to be released by the Settlement are coextensive with the claims in the operative SAC.

22      **C.    The Settlement Benefits**

23      The Settlement provides for an $8.1 million pre-funded, non-reversionary Settlement Fund

24  (*id.* §§ 1.47, 3.1) that will be used to provide Participating Class Members, at their choice, with one

25  of the following Settlement Benefits:

26      **1.    Credit Monitoring and Insurance Services**

27      Each Participating Class Member who submits a valid claim may elect to receive two years

28  of CMIS. SA § 3.2(a). If a Participating Class Member chooses CMIS as their respective Settlement

- 9 -

Benefit and already maintains a subscription for a similar product, they will have the option to postpone the commencement of the CMIS by 12 months for no additional charge. SA § 3.2(a).

The CMIS includes up to $1 million of identity theft insurance coverage and three-bureau credit monitoring that provides notice of changes to the Participating Class Member's credit profile. The retail value of this CMIS is $15.00 per month (a total of $360.00 for the entire two-year term) for each subscriber. *See* Declaration of Robert Siciliano ¶¶ 5-6.

### 2. Documented Loss Payment

In the alternative to the CMIS, Class Members may seek reimbursement of up to $10,000 of Documented Losses ("Documented Loss Payment"). Reimbursable Documented Losses include, *inter alia*, unreimbursed fraud losses or charges, charges or losses related to credit freezes, and credit monitoring services purchased prior to the Settlement. SA, Ex. A. To receive a Documented Loss Payment, a Class Member must submit a valid Claim Form with attestation regarding the amount of the loss supported by reasonable documentary proof. SA § 3.2(b).

### 3. Cash Fund Payments

In the alternative to CMIS or a Documented Loss Payment, Participating Class Members may submit a claim to receive a cash Settlement Payment ("Cash Fund Payment"). The amount of the Cash Fund Payment will be calculated per the terms of the Settlement. *Id.* §§ 3.2(c), 3.7.

It is difficult to estimate the amount of Cash Fund Payments, as it will depend on a number of factors. Assuming, however, that the claims rate is between 1% and 3% of the Class Members who will be sent direct notice (concurrently filed Declaration of Cameron R. Azari of Epiq ("Azari Decl.") ¶ 43; *see also infra*, Section V.B.5, previous Data Breach Settlement claims rate chart), Class Counsel's best estimate is that Class Members will receive approximately $50 at 1%, $24 at 2%, and $15 at 3%. Wolfson Decl. ¶ 28. As noted above, this estimate may change as the Parties endeavor to supplement the Class Member list with outreach to FTA Customers, but the Parties do not anticipate any change to be significant.

### 4.      Prospective Relief Attributable to the Settlement

The Settlement also provides significant remedial measures that Accellion will implement for four years as a result of this litigation, which will benefit the Class Members whether or not they submit a claim. Accellion will fully retire its FTA offering, maintain FedRAMP certification for its newer Kiteworks offering, expand its bug bounty program, provide annual cybersecurity training to all employees, employ personnel with formal responsibilities for cybersecurity, and periodically confirm compliance with the foregoing measures publicly on Accellion's website. SA § 2.1. Accellion will annually certify compliance with the security commitments provided for under the Settlement for a period of three years. *Id*. § 2.1(f).

### 5.      The Settlement's Value to Settlement Class Members

The value of the Settlement is significant. The cash fund value of the Settlement is $8,100,000. *Id.* §§ 1.47, 3.1. This does not include the value of the Settlement's prospective relief or the retail value of the CMIS claimed by Participating Class Members.

Accellion will deposit $4,600,000 of the Settlement Fund into escrow within ten Business Days of the execution of the Settlement Agreement. SA § 3.1. The remaining $3,500,000 will be placed into escrow ten Business Days after the Settlement is preliminarily approved. *Id*. These early escrow payments are themselves a substantial additional benefit to the Class. By securing the Settlement Fund now, the Settlement Class will not bear the risk of nonpayment by a privately held Defendant that has no ability to pay a higher judgment based on its current financial situation. The Settlement brings significant additional value by ensuring that all available funds go toward compensating the Class Members, as opposed to litigation that, even if successful for Plaintiffs, is likely to result in non-payment. In addition, the interest that accrues upon the deposited amount will also become part of the Settlement Fund and will benefit the Class. *Id*.

### D.      Plan of Distribution

Subject to the Court's approval, the Settlement Administrator will apply the Net Settlement Fund to make all distributions necessary for the CMIS claimed, Documented Loss Payments, and Cash Fund Payments. The Administrator will first apply the Net Settlement Fund to pay for claimed CMIS and then to pay for any valid claims for Documented Loss. SA § 3.7.

The amount of the Settlement Fund remaining after all payments for CMIS and Documented Loss Payments are applied (the "Post DC Net Settlement Fund") will be used to pay valid claims for Cash Fund Payments. *Id*. § 3.7. The amount of each Cash Fund Payment will be calculated by dividing the Post DC Net Settlement Fund by the number of valid claims submitted. *Id*.

Class Members will have the option to receive any Settlement Payment available to them pursuant to the terms of the Settlement Agreement via a digital payment. *Id*. § 3.3; Azari Decl. ¶ 39. In the event Class Members do not exercise an electronic payment option, they will receive their Settlement Payment via a physical check, which they will have 60 days to deposit or cash following distribution. SA § 3.8.

**E.     Residual**

The Settlement Fund is non-reversionary. To the extent any monies remain in the Net Settlement Fund more than 150 days after the distribution of Settlement Payments, a subsequent Settlement Payment will be evenly made to all Claimants with Approved Claims who cashed or deposited the initial payment they received, assuming such payment is over $3.00. *Id*. § 3.9. In the event such payment is less than $3.00, the remaining funds will be used to extend the term of the CMIS for as long as possible for all Claimants who selected CMIS. *Id*. Any amount remaining thereafter will be paid to the proposed Non-Profit Residual Recipient: the Electronic Frontier Foundation, a 26 U.S.C. 501(c)(3) non-profit organization. *Id*. §§ 1.29, 3.9. The Electronic Frontier Foundation's efforts are directly related to the subject matter of this action. Wolfson Decl. ¶ 29. Proposed Class Counsel have no relationship with the Electronic Frontier Foundation. *Id*.; Barnow Decl. ¶ 23.

**F.     Notice to the Class**

Pursuant to Rule 23(e), the Administrator will provide Class Members with the Summary Notice via email for any Class Member for whom an email address is available, or by postcard through the U.S. mail to those Class Members for whom a physical mailing address but no email address is available. SA § 6.7; Azari Decl. ¶¶ 20-22. If an email notice is returned undeliverable, the Administrator will attempt two other email executions; if unsuccessful, the Administrator will send

- 12 -

a post card Summary Notice via U.S. mail if a current mailing address is available. SA § 6.7(c); Azari Decl. ¶ 22. For Summary Notices returned as undeliverable via U.S. mail, the Administrator will re-mail the notice to any forwarding address identified on the return mail. SA § 6.7.(d); Azari Decl. ¶ 22. To those notified by email who do not submit a Claim Form, the Administrator will periodically transmit reminder emails of the opportunity to submit a Claim Form prior to the Claims Deadline. SA § 6.9; Azari Decl. ¶ 23.

The Administrator will also (i) design and conduct an online digital advertising publication notice program, which will continue through the Claims Deadline (SA § 6.4; Azari Decl. ¶ 25); and (ii) create and maintain a Settlement Website that contains all relevant information and documents regarding the Settlement (including the Long Form Notice, the Claim Form, the Settlement Agreement, Preliminary Approval documents, and the operative Complaint), through which Class Members can submit electronic Claims Forms and Requests for Exclusion (SA § 6.10; Azari Decl. ¶ 35). The Settlement Website will contain a toll-free telephone number and mailing address through which Class Members can contact the Administrator. SA § 6.10; Azari Decl. ¶ 35. The language of all Notice Forms (Summary Notices, Long Form Notice, Claim Form, etc.) is easily understandable and takes into account the education level and language needs of the proposed Class Members. Azari Decl. ¶ 37.

### G.    Proposed Class Representative Service Awards

Plaintiffs have been dedicated and active participants on behalf of the class they seek to represent. They assisted in the investigation of the matter prior to and after retaining counsel, provided relevant information to their counsel, reviewed and approved complaints, kept in close contact with counsel to monitor the progress of the litigation, and reviewed and communicated with their counsel regarding the Settlement. Barnow Decl. ¶ 21; Wolfson Decl. ¶ 49. Their efforts made the recovery possible. Barnow Decl. ¶ 21; Wolfson Decl. ¶ 49. In view of these efforts, on behalf of Plaintiffs, counsel will separately petition the Court for approval of Service Awards for each of the eight Plaintiffs in the amount of up to $1,500 each. SA § 8.1. This amount is consistent with those

approved in other data breach class action settlements. The Settlement is not conditioned upon the Court's award of any Service Awards. *Id.* § 8.3.

### H.     Attorneys' Fees, Costs, and Expenses

As part of the Settlement, Plaintiffs' counsel will separately file a motion for an award of reasonable attorneys' fees and reimbursement of litigation costs and expenses. *Id.* § 9.1. There is no "clear sailing" clause in the Settlement (*id.* §§ 9.1-9.3) and any amount sought for payment of attorneys' fees will be reasonable and consistent with the Ninth Circuit's 25% "benchmark" percentage for such awards. *See, e.g.*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048–50 (9th Cir. 2002). Proposed Class Counsel have in total expended approximately $649,292.00 in lodestar and incurred $36,196.98 in expenses as of January 12, 2022. Barnow Decl. ¶ 36; Wolfson Decl. ¶ 51. Proposed Class Counsel are not yet certain whether, or in what amount, they will seek a multiplier as they expect a number of additional hours to be expended in this matter prior to the filing of a motion for fees, costs, and expenses. In no event will proposed Class Counsel seek more than 25% of the Settlement Fund in attorneys' fees. Proposed Class Counsel also intend to seek reimbursement of all costs and expenses incurred to date. Any approved Fee Award and Costs will be paid out of the Settlement Fund. SA § 9.1. The Settlement is not conditioned upon the Court's award of any attorneys' fees, costs, or expenses. *Id.* § 9.3.

### I.     The Settlement Administrator

The Parties propose that Epiq—a highly experienced and reputable national class action administrator—serve as Administrator to provide notice, administer and make determinations regarding claims, process settlement payments, make distributions and provide other services necessary to implement the Settlement. *See generally* Azari Decl. The costs of the Administrator will be paid out of the Settlement Fund. SA § 3.1.

Epiq was selected because they will provide the most efficient administration option. Wolfson Decl. ¶ 23. Proposed Class Counsel—who have litigated many class actions to settlement—has previously worked with Epiq on different matters, including pending settlements involving three FTA Customers (Kroger, Flagstar, and HealthNet). Wolfson Decl. ¶ 23. Proposed Class Counsel

- 14 -

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
No. 5:21-cv-01353-EJD

scrupulously negotiated the cost for notice and settlement administration and believe that estimated $1,834,421 amount is reasonable. Barnow Decl. ¶ 13; Wolfson Decl. ¶ 23.

The selection of Epiq provides additional benefits to the Class because Epiq will have and use, for the purposes of this Settlement, the class contact lists that had been optimized in the Kroger, Flagstar, and HealthNet settlements (whether by agreement from those Defendants or court order), assuming Flagstar and HealthNet receive preliminary approval. It is anticipated that the Settlement Class could save approximately $276,000 in costs associated with such optimization. Azari Decl. ¶ 19.

## V. PRELIMINARY APPROVAL OF THE SETTLEMENT SHOULD BE GRANTED

### A. The Rule 23 Requirements for Class Certification Are Met

Parties seeking class certification for settlement purposes must satisfy the requirements of Fed. R. Civ. P. 23. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). "A court considering such a request should give the Rule 23 certification factors 'undiluted, even heightened, attention in the settlement context.'" *Sandoval v. Roadlink USA Pac., Inc*., No. EDCV 10-00973, 2011 WL 5443777, at *2 (C.D. Cal. Oct. 9, 2011) (quoting *Amchem*, 521 U.S. at 620). At the preliminary approval stage, "if a class has not [yet] been certified, the parties must ensure that the court has a basis for concluding that it likely will be able, after the final hearing, to certify the class." Fed. R. Civ. P. 23, Adv. Comm. Notes to 2018 Amendment. All the requirements of Rule 23(a) must be met, and "at least one of the three requirements listed in Rule 23(b)." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).

#### 1. Rule 23(a) Is Satisfied

##### i. The Class Is Sufficiently Numerous

The Settlement Class is comprised of, at a minimum, 9.2 million Settlement Class Members. The Rule 23(a)(1) numerosity requirement is readily satisfied.

##### ii. There Are Common Questions of Law and Fact

The commonality requirement is satisfied if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2); *see also Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) (characterizing commonality as a "limited burden," which "only requires a single significant question of law or fact").

- 15 -

Here, numerous common issues of law and fact affect the Class uniformly, including: the nature of Accellion's data security practices, whether Accellion knew or should have known that FTA was unsecure, whether Accellion owed duties of care to Class Members to safeguard their Personal Information, and whether Accellion breached those duties. Resolution of these and other common inquiries can be achieved through common evidence that does not vary from Class Member to Class Member. Commonality is satisfied.

### iii.    The Class Representatives' Claims Are Typical

Rule 23(a)(3) requires that the Class Representatives' claims be typical of those of the Class. "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other Class Members have been injured by the same course of conduct." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (internal quotation marks and citation omitted).

Here, the claims of the Plaintiffs are typical of the claims of the Settlement Class. Plaintiffs are all individuals whose Personal Information was impacted as a result of the FTA Data Breach, as each Plaintiff received notice from an FTA Customer that their Personal Information may have been compromised; the Class Members are also individuals whose Personal Information was impacted by the Attacks and FTA Data Breach. Plaintiffs' and Class Members' claims arise from the same nucleus of facts relating to the FTA Data Breach and Attacks, pertain to common defendant Accellion, and are based on the same legal theories. Plaintiffs thus satisfy the Rule 23(a)(3) typicality requirement.

### iv.    Proposed Class Representatives and Class Counsel Adequately Represent Class Members

Rule 23(a)(4) permits certification of a class action only if "the representative parties will fairly and adequately protect the interests of the class," which requires that the named plaintiffs (1) not have conflicts of interest with the proposed Class; and (2) be represented by qualified and competent counsel. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 895 F.3d 597, 607 (9th Cir. 2018).

Plaintiffs and proposed Class Counsel are adequate. First, the Plaintiffs have demonstrated that they are well-suited to represent the Settlement Class, have actively participated in the litigation, and will continue to do so. Barnow Decl. ¶ 20; Wolfson Decl. ¶ 49. They do not have any conflicts of interest with the absent Class Members, as their claims are coextensive with those of the Class Members. *Id.*; *Kent v. Hewlett-Packard Co.*, No. 5:09-CV-05341, 2011 WL 4403717, at *1 (N.D. Cal. Sept. 20, 2011) (finding class representatives adequate where their claims coextensive were with those of absent class members, and they had no conflicts). Further, the named Plaintiffs represent victims of the FTA Customer-specific data breaches for nearly every FTA Customer that has been sued relating to the FTA Data Breach.

Second, proposed Class Counsel are highly qualified and experienced in class action and complex litigation, with expertise and extensive experience in data breach and data privacy class actions. Barnow Decl. ¶¶ 24-34; Wolfson Decl. ¶¶ 54-69. Proposed Class Counsel have been dedicated to the prosecution of this action and will remain so through final approval. Should appeals be necessary, they are experienced and highly competent in that regard. Among other actions, counsel identified and investigated the claims in this lawsuit and the underlying facts, spoke with numerous Class Members, engaged in multiple mediation sessions and extensive negotiations with Accellion, and successfully negotiated this Settlement. Barnow Decl. ¶ 22; Wolfson Decl. ¶ 13; *see also In re Emulex Corp. Sec. Litig.*, 210 F.R.D. 717, 720 (C.D. Cal. 2002) (a court evaluating adequacy of representation may examine "the attorneys' professional qualifications, skill, experience, and resources . . . [and] the attorneys' demonstrated performance in the suit itself"); *Alvarez v. Sirius XM Radio Inc.*, No. CV 18-8605, 2020 WL 7314793, at *8 (C.D. Cal. July 15, 2020) (adequacy of counsel satisfied where class was "represented by Class Counsel who are experienced in class action litigation"). The adequacy requirement is satisfied.

### 2. Rule 23(b)(3) Is Satisfied

Rule 23(b)(3) requires that (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members of the class," and (2) "that a class

action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Both of these requirements are satisfied.

### i. Common Issues of Law and Fact Predominate Over Any Potential Individual Questions

The Rule 23(b)(3) predominance element requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Here, Plaintiffs' claims depend on whether Accellion had reasonable data security measures in place to protect Plaintiffs' and Class Members' Personal Information, and whether Accellion could have prevented unauthorized exposure or compromise of Plaintiffs' Personal Information, or mitigated its effects with more adequate security practices. These questions can be resolved using the same evidence for all Class Members, including Accellion's internal documents, testimony of its employees, and expert analysis. *Abante Rooter & Plumbing, Inc. v. Pivotal Payments Inc.*, No. 3:16-CV-05486, 2018 WL 8949777, at *5 (N.D. Cal. Oct. 15, 2018) ("Predominance is satisfied because the overarching common question . . . can be resolved using the same evidence for all class members and is exactly the kind of predominant common issue that makes certification appropriate.").

Plaintiffs allege that the FTA Data Breach and Attacks stemmed from the same FTA vulnerabilities and compromised similar types of Personal Information for Plaintiffs and Class Members. The issues presented are susceptible to common proof because they focus on Accellion's class-wide data security policies and practices, and thus are the type of predominant questions that make a class-wide adjudicaeion worthwhile. *Id.*; *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) . . . .'" (citation omitted)). Predominance is satisfied.

### ii. A Class Action Is the Superior Method to Fairly and Efficiently Adjudicate the Matter

Rule 23(b)(3) requires a class action to be "superior to other available methods for the fair and efficient adjudication of the controversy" under following factors:

- 18 -

(A) the class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Where, as here, a court is deciding the certification question in the proposed class action settlement context, it need not consider manageability issues because "the proposal is that there be no trial," and hence manageability considerations are no hurdle to certification for purposes of settlement. *Amchem*, 521 U.S. at 620.

A class action is the only reasonable method to fairly and efficiently adjudicate Class Members' claims against Accellion. *See, e.g.*, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) ("Class actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually . . . [In such a case,] most of the plaintiffs would have no realistic day in court if a class action were not available."). Resolution of the predominant issues of fact and law through individual actions is impracticable: the amount in dispute for individual class members is too small, the technical issues involved are too complex, and the required expert testimony and document review too costly. *Just Film, Inc. v. Buono,* 847 F.3d 1108, 1123 (9th Cir. 2017).

The class device is the superior method of adjudicating claims against Accellion that arise from the FTA Data Breach because it promotes greater efficiency, and no realistic alternative exists. Courts routinely recognize this in other data breach cases where class-wide settlements have been approved. *See, e.g.*, *In re Experian Data Breach Litigation*, No. 8:15-cv-01592-AG-DFM (C.D. Cal. May 10, 2019); *In re Yahoo! Inc. Cust. Data Sec. Breach Litig.*, No. 5:16-md-02752-LHK (N.D. Cal. July 20, 2019).

**B.     The Proposed Settlement Is Eminently Fair, an Excellent Result for the Class Members, and Should Be Preliminarily Approved**

The 2018 revisions to Rule 23 confirm the need for a detailed analysis regarding the fairness of a proposed class settlement. "The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled . . . only with the court's approval." Fed. R. Civ. P. 23(e). Accordingly, a district court may approve a settlement agreement "after a hearing and only on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

- 19 -

In making this decision, Rule 23(e)(2) clarifies that district courts must consider whether:

(A)  the class representatives and class counsel have adequately represented the class;
(B)  the proposal was negotiated at arm's length;
(C)  the relief provided for the class is adequate, taking into account:
    (i)  the costs, risks, and delay of trial and appeal;
    (ii)  the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
    (iii)  the terms of any proposed award of attorney's fees, including timing of payment; and
    (iv)  any agreement required to be identified under Rule 23(e)(3); and
(D)  the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Thus, Rule 23(e) now reflects the factors that courts in this Circuit already considered for settlement approval: "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement." *In re Anthem, Inc. Data Breach Litigation,* 327 F.R.D. 299, 317 (N.D. Cal. 2018) (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)); *see also* United States District Court for the Northern District of California, Procedural Guidance for Class Action Settlements.

Prior to class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement. Accordingly, such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair. *In re Bluetooth Headset*, 654 F.3d at 946.

At the preliminary approval stage, the court "evaluate[s] the terms of the settlement to determine whether they are within a range of possible judicial approval." *Wright v. Linkus Enters., Inc.*, 259 F.R.D. 468, 472 (E.D. Cal. 2009). Ultimately, "[s]trong judicial policy favors settlements." *Churchill Village, L.L.C. v. Gen. Elec.,* 361 F.3d 566, 576 (9th Cir. 2004) (ellipses and quotation marks omitted) (quoting *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)).

- 20 -

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
No. 5:21-cv-01353-EJD

1

**1.      The Strength of Plaintiffs' Case and Possible Monetary Remedies**

2

Plaintiffs believe they have a strong case for liability based on the alleged shortcomings in

3

Accellion's data security measures. Plaintiffs also believe that they would be able to recover damages

4

on behalf of the Class.

5

The range of potential outcomes, however, is wide. The damages available will depend on

6

the scope of class certification, whether various theories of damages would be accepted by the Court

7

(e.g., benefit of the bargain and loss of value of Personal Information), and which causes of action

8

survive. Plaintiffs' best measure of damages (based on black-market rates of at least $5 per individual

9

for Social Security numbers[2]) is $46,000,000 for the approximately 9.2 million Class Members who

10

will be sent direct notice. These amounts are not certain and the claims are subject to numerous risks

11

(*see infra*, Section V.B.2.). Plaintiffs believe that the legal theories behind such damages have merit,

12

but also recognize that there is serious risk.

13

**2.      The Risk, Expense, Complexity, and Potential Class Recovery**

14

The risk, expense, and complexity of this litigation, and the likelihood that, even if successful

15

on the merits, the Class may not see any recovery in light of Accellion's likely inability to pay a

16

larger judgment, weigh heavily in favor of preliminary approval.

17

Data breach cases are, by nature, especially risky, expensive, and innately complex. *See, e.g.,*

18

*In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800, 2020 WL 256132, at *32-

19

33 (N.D. Ga. Mar. 17, 2020) *aff'd in part, rev'd in part and remanded,* 999 F.3d 1247 (11th Cir.

20

2021), *cert. denied sub nom. Huang v. Spector*, No. 21-336, 2021 WL 5043620 (U.S. Nov. 1, 2021)

21

(recognizing the complexity and novelty of issues in data breach class actions). This case is no

22

exception and presents unique risks because of the unique circumstances of the Data Breach.

23

There are many substantial hurdles that Plaintiffs would have to overcome before the Court

24

might find a trial appropriate. Given the early stage of the litigation, the legal sufficiency of

25

Plaintiffs' claims has not been tested by a motion to dismiss.

26

27

28

---

[2]  *See Premera, supra,* ECF No. 156, p. 20 of 24, Motion for Class Certification.

Data breach cases, particularly, face substantial hurdles in surviving past the pleading stage and are among the most risky and uncertain of all class action litigation. *See, e.g.*, *Hammond v. The Bank of N.Y. Mellon Corp.*, No. 08 Civ. 6060, 2010 WL 2643307, at *1 (S.D.N.Y. June 25, 2010) (collecting cases). Here, the different factual scenarios pertaining to each FTA Customer, such as the types of Personal Information compromised, whether hackers demanded a ransom, and whether the Personal Information appeared on the dark web, further complicates the matter. While Plaintiffs are confident that they would prevail on sustaining Article III standing across the board over an anticipated challenge from Accellion, they recognize the additional delay this inquiry could create in the advancement of this litigation.

To the extent the case did survive dismissal, Accellion would oppose certification arguing that too many individual inquiries defeat commonality because the compromised Personal Information is not uniform among Class Members, the proposed class includes too many uninjured class members, and other facts unique to particular FTA Customers. While Plaintiffs are confident that such issues would be fully addressed, they recognize that the manageability inquiry of class certification could be more complicated by the unique circumstances of this case.

Accellion would also challenge liability for negligence on several grounds, including that it owed no legal duty of care to Class Members because it was FTA Customers—not Accellion—who stored and transferred Class Members' data, and chose to do so on FTA. Accellion would further argue that Plaintiffs cannot establish causation, establish any breach of duty on Accellion's part, or recover any tort damages due to the economic loss rule. Any claims based on untimely or defective notice of the FTA Data Breach will also presents risk because Accellion alleges that it promptly notified its FTA Customers of the FTA vulnerabilities and issued patches and will argue that it had no ability or duty to notify Class Members directly.

The California statutory claims as to Accellion also face the risk of dismissal on the pleadings or an unfavorable disposition at summary judgment. The CCPA provides a private right of action to consumers whose personal information "is subject to unauthorized access and exfiltration, theft, or disclosure as a result of [a] business's violation of the duty to implement and maintain reasonable

security procedure and practices[.]" Cal. Civ. Code § 1798.150(a)(1) (emphasis added). Section 1798.150(a)(1) applies exclusively to a "business" regulated by the CCPA, a term that is defined as an entity "that collects consumers' personal information or on the behalf of which that information is collected and that alone, or jointly with others, determines the purposes and means of the processing of consumers' personal information." *Id*. § 1798.140(c)(1) (emphasis added).

Accellion might argue that it is not a "business" under the CCPA with respect to Plaintiffs. Accellion might also argue that it was the FTA Customers who collected data from Plaintiffs in a wide variety of circumstances, and those customers exclusively controlled which of that data was stored or transferred over the Customer's FTA platforms.

Accellion will make similar arguments under the CMIA, which provides that "[a] provider of health care, health care service plan, or contractor shall not disclose medical information" except in certain enumerated circumstances. Cal. Civ. Code § 56.10; see also *id*. § 56.101 (imposing liability on "[a]ny provider of health care, health care service plan, . . . or contractor who negligently creates, maintains, pre- serves, stores, abandons, destroys, or disposes of medical information . . . ."). Accellion will argue that it is neither a "health care provider" nor a "contractor" covered by the statute. The term "provider of healcare" is defined as (a) "any clinic, health dispensary, or health facility" licensed under the California Health and Safety Code; (b) any business "organized for the purpose of maintaining medical information" for purposes of diagnosis, treatment, or management; and (c) any business that "offers software or hardware to consumers . . . that is designed to maintain medical information" for purposes of diagnosis, treatment, or management. and a contractor is a "medical group, independent practice association, pharmaceutical benefits manager, or . . . medical service organization." *Id*. §§ 56.05, 56.06. Accellion will argue that it is not a "clinic, health dispensary, or health facility," is not organized solely "for the purpose of maintaining medical information," and its software is not offered "to consumers" or "designed to maintain medical information" for diagnosis, treatment, or patient management purposes. *Id*.

Were the litigation to proceed, there would be numerous expert reports and costly depositions, which would present significant expenses. It is also not certain that the Court would

- 23 -

approve Plaintiffs' damages theories. As in any data breach class action, establishing causation and damages on a class-wide basis is largely unchartered territory and full of uncertainty. Here, the unique circumstances pertaining to each FTA Customer further could be argued as complicating the causation and class-wide damage inquiries.

Even if Plaintiffs prevail at every turn during the litigation and obtain a judgment in their favor, the likelihood that Accellion would not be able to pay the judgment is high, based on Accellion's financial documents and Plaintiffs' counsels' consultation with an expert. The Settlement, including the early escrow payments, ensures that every available dollar is promptly secured toward relief to the Class Members, and supports preliminary approval. *See City of Seattle,* 955 F.2d 1268 at 1295 ("a settling defendant's ability to pay may be a proper factor to be considered in evaluating a proposed class action settlement"); *Alabsi v. Savoya, LLC*, No. 18-CV-06510, 2020 WL 587429, at *6–7 (N.D. Cal. Feb. 6, 2020) (risk of non-payment, if Plaintiffs prevails on the merits, supports preliminary approval); *Johnson v. Serenity Transportation, Inc.*, No. 15-CV-02004, 2021 WL 3081091, at *4 (N.D. Cal. July 21, 2021) (settlement fair and reasonable because Defendants would be unable to provide a higher settlement due to their financial insolvency); *Yamagata v. Reckitt Benckiser LLC*, No. 3:17-CV-03529, 2021 WL 5909206, at *3 (N.D. Cal. Oct. 28, 2021) (granting final approval of class action settlement, the Court having "considered a number of factors, including . . . the ability of Defendant to withstand a greater judgment . . . ."); *Perks v. Activehours, Inc.*, No. 5:19-CV-05543, 2021 WL 1146038, at *5 (N.D. Cal. Mar. 25, 2021) (defendant's inability to pay a larger settlement weighs in favor of finding the relief to be adequate).

The Settlement avoids the risk of non-recovery from Acccellion both based on the risks of litigation as well as the risk of non-payment even if litigation is successful, and directs all available moneys to bring benefits that address all potential harms of the FTA Data Breach and Attacks to the Class. The Court should grant preliminary approval.

### 3.     The Risk of Maintaining Class Status Through Trial

Plaintiffs' case is still in the pleadings stage, and the Parties have not briefed class certification. Class certification proceedings are far off in the distance in this litigation, and prior to

- 24 -

those proceedings, there is risk of dismissal. Class certification, if and when continued litigation reaches that point, will present substantial risk, particularly given that different types of information were affected for different Class Members, that different FTA Customers were attacked at different times and reacted in different ways, that some FTA Customers were subjected to ransom demands while others were not, that some Class Members' Personal Information was found on the dark web while others' was not, and in light of the fact that class-wide data breach damage models remain largely untested, with little precedent pertaining to class certification in the data breach context. Data breach law is developing, so even if Plaintiffs obtained class certification, there is no guarantee that the class action status would be maintained. Accellion would likely seek a Rule 23(f) appeal of any decision by the Court granting class certification, resulting in additional delay to Class Members. The significant risk of obtaining and maintaining class certification in this case supports preliminary approval.

### 4.     The Amount Offered in Settlement Is Fair, Reasonable, and Adequate

The $8.1 million non-reversionary Settlement Fund is an excellent result for the Class. With this fund, all Class Members will be eligible for a Settlement Payment in the form of distribution for the CMIS, a Documented Loss Payment, or a Cash Fund Payment. SA §§ 3.2(a)-(c). The Settlement Fund will be applied to pay all Administrative Expenses, Notice Expenses, the taxes to the Settlement Fund, any Service Awards, and any payment of a Fee Award and Costs. *Id*. §§ 1.28, 3.1. Any funds remaining in the Net Settlement Fund after distribution(s) to Class Members will be distributed in large part, by way of a subsequent Settlement Payment to Class Members. *Id*. § 3.9.

The Settlement presents a robust relief package and valuable outcome for the Class, particularly in light of the FTA Customer settlements, Accellion's comparative size and financial resources, and the total compensation Class Members may be eligible for as a result of the Attacks. When combined with the three FTA Customer settlements that are currently pending (Kroger, HealthNet, and Flagstar), a total of $29,000,000 will be made available to the approximately 9.2 million Class Members known to be impacted by the FTA Data Breach and related Attacks when these settlements are approved. The average recovery on a per class member basis is $3.15 on the

- 25 -

basis of these four settlements—placing the per Class Member recovery obtained to date on behalf of persons impacted by the FTA Data Breach in the upper range of per capita recovery for similar breaches—and this amount will only increase as future FTA Customer settlements are reached and approved.

Even ignoring the other FTA Customer settlements (Kroger, Flagstar, HealthNet), the Settlement represents an excellent outcome for the Class and compares favorably to other data breach settlements:

| Case Title | No. of Class Members | Settlement Fund | Amount Per Class Member | Credit Monitoring |
|---|---|---|---|---|
| *Target Data Breach Security Litig.* | 97.5M | $10M | $0.10 | Documented Cost Reimbursement |
| *LinkedIn User Privacy Litig.* | 6.4M | $1.25M | $0.20 | N/A |
| *Home Depot Customer Data Breach Litig.* | 40M | $13M | $0.33 | 18 Months |
| *Yahoo! Inc. Customer Data Breach Litig.* | 194M | $117.5M | $0.61 | 2 years |
| *Adlouni v. UCLA Health Systems Auxiliary, et al.* | 4.5M | $2M | $0.44 | 2 years |
| ***Proposed Settlement*** | **9.2M** | **$8.1M** | **$0.88** | **2 years** |
| *Atkinson v. Minted* | 4.1M | $5M | $1.22 | 2 years |
| *Experian Data Breach Litig.* | 16M | $22M | $1.37 | 2 years |
| *Anthem Data Breach Litig.* | 79.2M | $115M | $1.45 | 2 years |
| *Equifax Data Security Breach Litig.* | > 147M | $380.5M | $2.59 | 4 years |
| *21st Century Oncology Customer Data Security Breach Litig.* | 2.2M | 7.85M | 3.57 | 2 years |
| *Premera Blue Cross Data Breach Litig.* | 8.86M | $32M | $3.61 | 2 years |

Wolfson Decl. ¶ 45. In isolation, the Settlement is in the middle range of settlements on a per-capita basis, and the amount supports preliminary approval. The Settlement amount is even stronger in light of the additional risks of litigation based on the unique circumstances of this Data Breach, discussed in Section V.B.2, *supra*.

- 26 -

Furthermore, the substantive and meaningful injunctive relief obtained as part of this Settlement further supports approval. *See e.g., Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1114 (9th Cir. 2020) (inclusion of "enhanced disclosures and practice changes" in settlement agreement supports approval). Notably, many of the same FTA Customers who were affected by the FTA Data Breach have migrated to Accellion's newer Kiteworks product, and the injunctive benefits—which include a requirement that Accellion maintain Kiteworks' FedRAMP certification and implement cybersecurity training and personnel requirements—provide a direct benefit to Class Members whose data is still held by those customers.

### 5.   The Proposed Method of Distribution Is Effective

Rule 23(e)(2)(C)(ii) requires consideration of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e). "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims. A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." *Id.*, Advisory Comm. Note to 2018 amendment.

To file a claim, Class Members need only complete a straightforward Claim Form and, if necessary, submit it along with any documents supporting claimed losses, either through the Settlement Website or by mail. SA §§ 1.10, 3.2, and Ex. A (claim form); Azari Decl. ¶¶ 35. Individuals who did not receive direct Notice of the Settlement, and thus no unique Class Member identifier, but believe themselves to be a Settlement Class Member, may submit a Claim if they can provide Reasonable Documentation evidencing their relationship to one of the affected FTA Customers. SA § 6.8; SA, Ex. A. Epiq will process all Claims. SA §§ 1.44, 3.5. The methods of distributing relief to Class Members include both digital and physical check avenues. *Id.* § 3.3; Azari Decl. ¶ 39.

Based upon Class Counsel's previous experience, Class Counsel expect the claims rate in this Settlement to be between 1-3%. Wolfson Decl. ¶ 27; Azari Decl. ¶ 43. Previous data breach settlements' claims rates support this conclusion:

- 27 -

| Case Title | Class Size (Approx.) | No. of Claims | Claims Rate |
|---|---|---|---|
| *Gordon v. Chipotle Mexican Grill*, No. 1:17-cv-01415 (D. Colo.), ECF 103 at 1 & ECF 124 at ¶ 13 | 10,000,000 | 6,354 | < 0.1% |
| *Target Corp. Customer Data Security Breach Litigation*, MDL No. 14-2522 (D. Minn.), ECF 615 at ¶¶ 4, 14 | 97,447,983 | 225,856 | ~0.2% |
| *The Home Depot Inc. Customer Data Security Breach Litigation*, No. 1:14-md-02583 (N.D. Ga.), ECF 181-1 at 25 & ECF 245-1 at ¶ 3 | 40,000,000 | 127,527 | ~0.3% |
| *Corona v. Sony Pictures Entertainment*, No. 2:14-cv-9600 (C.D. Cal.), ECF 145-1 at 11 n.8 & ECF 164 at 2 | 435,000 | 3,127 | ~0.7% |
| *LinkedIn User Privacy Litig.*, No. 12-cv-03088-EJD (N.D. Cal.), ECF 122 at 2 & ECF 145-2 at ¶ 12 | 6,400,000 | 47,336 | ~0.7% |
| *Banner Health Data Breach Litigation*, No. 2:16-cv-2696 (D. Ariz.), ECF 170 at 1, and ECF 195-3 at ¶ 12 | 2,900,000 | 39,091 | ~1.3% |
| *Anthem, Inc. Data Breach Litig.*, No. 5:15-md-02617-LHK (N.D. Cal.), ECF 1007 at 4 & ECF 1007-6 at ¶ 2 | 79,200,000 | 1,380,000 | ~1.7% |
| *Adlouni v. UCLA Health Systems Auxiliary*, BC589243 (Cal. Sup. Ct.) | 4,500,000 | 108,736 | ~2.4% |
| *Experian Data Breach Litigation*, No. 8:15-cv-01592-JLS-DFM (C.D. Cal.), ECF 286-1 at 20 & ECF 309-3 at ¶ 8 | 14,931,074 | 436,006 | ~2.9% |
| *Sheth v. Washington State University*, No. 3:17-cv-05511 (W.D. Wash.) | 992,327 | 37,712 | ~3.8% |
| *Winstead v. ComplyRight*, No. 1:18-cv-4990 (N.D. Ill.) | 665,680 | 28,073 | ~4.2% |
| *Premera Blue Cross Customer Data Security Breach Litigation*, No. 3:15-md-2633 (D. Or.), ECF 273 at 12-13 & ECF 301 at ¶ 13 | 8,855,764 | 803,710 | ~9.1% |
| *Equifax Inc. Data Security Breach Litigation*, No. 1:17-md-2800 (N.D. Ga.), ECF 739-1 at 20 & ECF 900-4 at ¶ 5 | 147,000,000 | 15,000,000 | ~10.2% |

**6.    The Extent of Discovery Completed and the Stage of the Proceedings**

While this matter is still in its early stages, Plaintiffs have thoroughly investigated and diligently developed the facts and legal claims in this case. Counsel reviewed all publicly available

- 28 -

sources concerning the FTA Data Breach and Attacks, the information Accellion has provided about the breach, and the FTA Customers' data breach notification letters. Barnow Decl. ¶ 22; Wolfson Decl. ¶ 13.

Plaintiffs conducted confirmatory discovery to establish the core facts of the breach and Accellion's liability, Accellion's reaction to the breach, class size, and Accellion's financial ability. Barnow Decl. ¶¶ 2, 12; Wolfson Decl. ¶ 31; *see supra*, Section III.C. Plaintiffs and their counsel have stayed abreast of all developments involving the FTA Data Breach. Barnow Decl. ¶ 22; Wolfson Decl. ¶ 13. Confirmatory discovery further confirms the Settlement as fair, reasonable, and adequate. Barnow Decl. ¶ 12; Wolfson Decl. ¶¶ 30-43. Proposed Class Counsel's knowledge of facts of this case and of the practice area more broadly informed Plaintiffs' clear view of the strengths and weaknesses of the case, the extensive settlement negotiations, and the decision to recommend that the Court grant preliminary approval to the Settlement. Barnow Decl. ¶¶ 19, 35; Wolfson Decl. ¶ 48.

### 7.	The Experience and Views of Counsel

Proposed Class Counsel include attorneys who have substantial experience in complex class action litigation, including in data breach and data privacy cases. Barnow Decl. ¶¶ 24-34, & Ex. 1; Wolfson Decl. ¶¶ 46, 53-69, & Ex. 2. Proposed Class Counsel fully endorse the Settlement as fair, reasonable, and adequate to the Class, and do so without reservation. Barnow Decl. ¶ 35; Wolfson Decl. ¶ 70.

### 8.	The Presence of a Governmental Participant

No governmental agency is involved in this litigation. The Attorney General of the United States and Attorneys General of each State will be notified of the proposed Settlement pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, and will have an opportunity to raise any concerns or objections. SA § 6.13.

### 9.	The Reaction of Class Members to the Proposed Settlement

The Class has yet to be notified of the Settlement and given an opportunity to object, so it is premature to assess this factor. Before the final approval hearing, the Court will receive and be able to review all objections or other comments received from Class Members, along with a full accounting of all opt-out requests.

10.    **The Settlement Is the Product of Arm's-Length Negotiations That Were Free of Collusion**

The Court must be satisfied that "the settlement is not the product of collusion among the negotiating parties." *In re Bluetooth Headset*, 654 F.3d at 946-47 (internal quotation marks, ellipses and citation omitted).

Plaintiffs achieved the Settlement in contested litigation and through arm's-length negotiations that involved two intensive mediation sessions before a highly respected mediator. Plaintiffs undertook substantial investigation of the underlying facts, causes of action, and potential defenses to those claims. Barnow Decl. ¶ 21; Wolfson Decl. ¶¶ 7, 13. When settlement negotiations began, Plaintiffs and their counsel had a clear view of the strengths and weaknesses of their case and were in a strong position to make an informed decision regarding the reasonableness of a potential settlement. The Parties engaged in extensive arm's length negotiations, including two mediation sessions before a mutually agreed upon mediator, the Hon. Jay C. Gandhi (Ret.) on July 19, 2021 and September 7, 2021, as well as months of negotiations between the parties subsequently. Barnow Decl. ¶¶ 8-11, 18; Wolfson Decl. ¶¶ 24, 47, 52.

Judge Gandhi, a highly respected mediator, has extensive experience in class action litigation, both from his time as a magistrate judge in the Central District of California and as a result of mediating many class actions, including multiple data breach cases where a settlement was reached and subsequently approved.[3] His involvement here further confirms the absence of collusion. *G. F. v. Contra Costa Cnty.*, No. 13-cv-03667, 2015 WL 4606078, at *13 (N.D. Cal. July 30, 2015) ("[T]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.") (internal quotation marks and citation omitted).

*In re Bluetooth* identified three "signs" of possible collusion: (1) "'when counsel receive[s] a disproportionate distribution of the settlement'"; (2) "when the parties negotiate a 'clear sailing' arrangement," under which the defendant agrees not to challenge a request for an agreed-upon

---

[3]  *See, e.g., In re Premera Blue Cross Customer Data Sec. Breach Litig.*, No. 3:15-MD-2633, 2019 WL 3410382, at *1 (D. Or. July 29, 2019); *In re Banner Health Data Breach Litig.*, No. 2:16-cv-02696-PHX-SRB (D. Ariz. Dec. 5, 2019), ECF No. 170, at 6 (parties engaged in private mediation with Judge Gandhi).

- 30 -

1   attorney's fee; and (3) when the agreement contains a "kicker" or "reverter" clause that returns

2   unawarded fees to the defendant, rather than the class. *In re Bluetooth, supra,* 654 F.3d at 947

3   (internal citations omitted).

4          None of the *In re Bluetooth* signs are present here. There is no "clear sailing provision" and

5   Class Counsel will not seek fees and expenses that exceed the 25% of the Fund benchmark set by *In*

6   *re Bluetooth*. *Id.* at 942; SA § 11.3; *see supra,* Section IV.H. There is no reversion of the Settlement

7   Fund (SA § 3.13), but rather the Settlement makes every effort to distribute any Residual to the Class

8   (*see id*. § 3.9). Proposed Class Counsel will apply for fees from this non-reversionary Settlement

9   Fund, so that there was every incentive to secure the largest fund possible.

10         There is no indication or existence of collusion or fraud in the settlement negotiations and

11  the Settlement that is being presented to the Court.

12                      **11.      The Proposed Notice Plan Is Appropriate**

13         Rule 23 requires that prior to final approval, "[t]he court must direct notice in a reasonable

14  manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). For

15  classes certified under Rule 23(b)(3), "the court must direct to class members the best notice that is

16  practicable under the circumstances, including individual notice to all members who can be identified

17  through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Rule provides, "notice may be by one

18  or more of the following: United States mail, electronic means, or other appropriate means." *Id*.

19          "The standard for the adequacy of a settlement notice in a class action under either the Due

20  Process Clause or the Federal Rules is measured by reasonableness." *Wal-Mart Stores, Inc. v. Visa*

21  *U.S.A., Inc.*, 396 F.3d 96, 113 (2d Cir. 2005). The best practicable notice is that which is "reasonably

22  calculated, under all the circumstances, to apprise interested parties of the pendency of the action

23  and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust*

24  *Co.*, 339 U.S. 306, 314 (1950); *Wershba v. Apple Comput., Inc.*, 91 Cal. App. 4th 224, 252 (2001)

25  ("As a general rule, class notice must strike a balance between thoroughness and the need to avoid

26  unduly complicating the content of the notice and confusing class members.").

27

28

- 31 -

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
No. 5:21-cv-01353-EJD

The notice should provide sufficient information to allow Class Members to decide whether they should accept the benefits of the settlement, opt out and pursue their own remedies, or object to its terms. *Id.* at 251-52. "[N]otice is adequate if it may be understood by the average class member." *Warner v. Toyota Motor Sales, U.S.A., Inc.*, No. CV 15-2171, 2016 WL 8578913, at *14 (C.D. Cal. Dec. 2, 2016) (quoting 4 NEWBERG ON CLASS ACTIONS § 11:53, at p. 167 (4th ed. 2013)). The Long Form Notice (SA, Ex. D) here is clear, precise, informative, and meets all the necessary standards, allowing Class Members to make informed decisions with respect to whether they remain in or opt out of the Settlement Class, or object to the Settlement.

The Long Form Notice describes the claims, a history of the litigation, the Class itself, the Settlement terms, the released claims, identity of Class Counsel, the maximum amount of attorneys' fees and Service Awards that will be applied for, the Fairness Hearing date, a description of Class Members' opportunity to appear at the hearing, a statement of the procedures and deadlines for requesting exclusion and filing objections, and how to obtain further information. SA, Ex. D; MANUAL FOR COMPLEX LITIGATION § 30.212 (4th ed. 2004) (Rule 23(e) notice should provide a summary of the litigation and the settlement to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings). Further, the Notice describes the plan and priority of distribution and provides for recovery estimates to best inform class members.

The Notice Plan was carefully negotiated and structured. Accellion is required to promptly request contact information for prospective Class Members directly from FTA Customers that Accellion reasonably believes were affected by the FTA Data Breach to facilitate direct notice to those individuals. SA § 6.5. The Notice Plan includes direct notice by emailing or mailing the Summary Notice (SA, Ex. D) to all Class Members who can reasonably be identified in the records of FTA Customers, and reminder emails to those for whom email addresses are available. SA § 6.9; Azari Decl. ¶¶ 21-23. The Administrator will also conduct a comprehensive online digital advertising publication notice program and establish a Settlement Website. SA §§ 6.4, 6.10; Azari Decl. ¶¶ 25-35. The proposed Notice Plan represents the best notice practicable. Azari Decl. ¶ 42. Copies of all

the notice documents are attached as exhibits to the Settlement Agreement; they are clear and concise, and directly apprise Class Members of all the information they need to know to make a claim, opt out, or object. Fed. R. Civ. P. 23(c)(2)(B); *see also* Azari Decl. ¶ 38. The Notice Plan is consistent with, and exceeds, other similar court-approved notice plans (Azari Decl. ¶ 42), the requirements of Fed. Civ. P. 23(c)(2)(B), the Northern District of California Procedural Guidance for Class Action Settlements (Guidance # 3), and the Federal Judicial Center guidelines for adequate notice.

As there is no alternative method of notice that would be practicable here or more likely to notify Class Members, the proposed Notice plan constitutes the best practicable notice to Class Members and complies with the requirements of Due Process.

### 12.    Appointment of Settlement Class Counsel

Under Rule 23, "a court that certifies a class must appoint class counsel [who must] fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In making this determination, courts consider the following attributes: the proposed class counsel's (1) work in identifying or investigating potential claims, (2) experience in handling class actions or other complex litigation, and the types of claims asserted in the case, (3) knowledge of the applicable law, and (4) resources committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i-iv).

Here, proposed Class Counsel have extensive experience prosecuting complex consumer class action cases, including data breach and data privacy cases. Barnow Decl. ¶¶ 24-34, & Ex. 1; Wolfson Decl. ¶¶ 53-69, & Ex. 2. As described above and in Class Counsel's supporting declarations and firm resumes, Proposed Class Counsel meet all Rule 23(g)(1)(A) factors. Accordingly, the Court should appoint Tina Wolfson, Robert Ahdoot, and Andrew W. Ferich of Ahdoot & Wolfson, PC, and Ben Barnow and Anthony L. Parkhill of Barnow and Associates, P.C. as Class Counsel.

### C.    Settlement Deadlines and Schedule for Final Approval

In connection with preliminary approval, the Court must set a final approval hearing date, dates for mailing the Notices, and deadlines for objecting to the Settlement and filing papers in

- 33 -

support of the Settlement. Plaintiffs propose the following schedule, which the parties believe will provide ample opportunity for Class Members to decide whether to request exclusion or object:

| EVENT | DATE |
|---|---|
| Notice Date (U.S. mail and email) | Within **30 Days** from Preliminary Approval Order |
| Deadline to Submit Claim Forms | **90 Days** from Notice Date |
| Deadline to Submit Motion for Fee Award and Costs, and Service Awards | No later than **35 Days** Before Objection Deadline |
| Deadline to Object and/or Comment on Settlement | **75 Days** from Notice Date |
| Deadline to Submit Request for Exclusion | **75 Days** from Notice Date |
| Final Approval Hearing | To be Determined |

## VI.    CONCLUSION

Plaintiffs Douglas Fehlen, Tony Blake, David Artuso, Teresa Bazan, Lorriel Chhay, Samantha Griffith, Allen Chao, and Augusta McCain respectfully request that the Court grant this motion and enter an order: (1) certifying the proposed class for settlement; (2) preliminarily approving the proposed class action Settlement; (3) appointing Plaintiffs as Class Representatives and Tina Wolfson, Robert Ahdoot, and Andrew W. Ferich of Ahdoot & Wolfson, PC, and Ben Barnow and Anthony L. Parkhill of Barnow and Associates, P.C. as Class Counsel; (4) appointing Epiq as the Settlement Administrator; (5) approving the proposed Class Notice Plan and related Settlement administration documents; and (6) approving the proposed class settlement administrative deadlines and procedures, including setting a Final Approval Hearing date, and approving the proposed procedures regarding objections, exclusions and submitting Claim Forms.

Dated: June 13, 2022                                Respectfully submitted,

                                                    */s/ Tina Wolfson*
                                                    TINA WOLFSON (SBN 174806)
                                                    *twolfson@ahdootwolfson.com*
                                                    ROBERT AHDOOT (SBN 172098)
                                                    *rahdoot@ahdootwolfson.com*

- 34 -

**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Telephone: 310.474.9111
Facsimile: 310.474.8585

ANDREW W. FERICH (*pro hac vice*)
*aferich@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone: 310.474.9111
Facsimile: 310.474.8585

BEN BARNOW (*pro hac vice*)
*b.barnow@barnowlaw.com*
ANTHONY L. PARKHILL (*pro hac vice*)
*aparkhill@barnowlaw.com*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Telephone: 312.621.2000

*Attorneys for Plaintiffs and the Proposed Class*