TINA WOLFSON (SBN 174806)
*twolfson@ahdootwolfson.com*
ROBERT AHDOOT (SBN 172098)
*rahdoot@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Tel: 310.474.9111; Fax: 310.474.8585

ANDREW W. FERICH (*pro hac vice*)
*aferich@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Tel: 310.474.9111; Fax: 310.474.8585

*Attorneys for Plaintiffs and the Proposed Class*
*in Beyer, et al. v. Flagstar Bancorp, Inc., et al.,*
No. 5:21-cv-02239-EJD

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE ACCELLION, INC. DATA BREACH LITIGATION<br><br>This Document Relates to:<br><br>*Beyer, et al. v. Flagstar Bancorp, Inc., et al.,* No. 5:21-cv-02239-EJD | Case No. 5:21-cv-01155-EJD<br><br>**PLAINTIFFS GRACE BEYER, CHRISTOPHER HAUSER, CHARLES TYER, AND STEFANIE BURTON'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT WITH FLAGSTAR BANK DEFENDANTS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>DATE:       December 8, 2022<br>TIME:        9:00 A.M.<br>JUDGE:     Hon. Edward J. Davila<br>CTRM:       4, 5th Floor<br><br>[Class Action Settlement Agreement and the Declarations of Cameron Azari, Robert Siciliano, and Tina Wolfson filed concurrently herewith] |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on December 8, 2022, at 9:00 a.m., in Courtroom 4 of the United States District Court for the Northern District of California, Robert F. Peckham Federal Building & United States Courthouse, 280 South 1st Street, San Jose, 95113, the Honorable Edward J. Davila presiding, Plaintiffs Grace Beyer, Christopher Hauser, Charles Tyer, and Stefanie Burton will and hereby do move for an Order granting Preliminary Approval of the Class Action Settlement with the Flagstar Bank Defendants in this matter.

This motion is based upon this Notice of Motion and Motion, the supporting Memorandum set forth below, the attached declarations and exhibits, the pleadings and records on file in this action, and other such matters and argument as the Court may consider at the hearing of this motion.

Respectfully submitted,

Dated: September 6, 2022

By: */s/ Tina Wolfson*
TINA WOLFSON (SBN 174806)
*twolfson@ahdootwolfson.com*
ROBERT AHDOOT (SBN 172098)
*rahdoot@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Tel: 310.474.9111; Fax: 310.474.8585

ANDREW W. FERICH (*pro hac vice*)
*aferich@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Tel: 310.474.9111; Fax: 310.474.8585

*Attorneys for Plaintiffs in Beyer, et al. v. Flagstar Bancorp, Inc., et al.*, No. 5:21-cv-02239-EJD

- 1 -

1

# <u>TABLE OF CONTENTS</u>

2

Page

3

I.    STATEMENT OF THE ISSUES TO DECIDED ......................................................... 1

4

II.   INTRODUCTION ........................................................................................................ 1

III.  BACKGROUND .......................................................................................................... 2

5

      A.    The FTA Data Breach and Subsequent Litigation ........................................... 2

6

      B.    Mediation and Settlement Negotiations ........................................................... 4

7

      C.    Information Obtained Through Confirmatory Discovery ................................... 5

8

      D.    The Related Michigan Litigation Is Stayed Pending This Settlement .................. 8

IV.  TERMS OF THE SETTLEMENT ............................................................................... 9

9

      A.    The Class Definition ....................................................................................... 9

10

      B.    The Release .................................................................................................... 9

11

      C.    The Settlement Benefits .................................................................................. 9

12

            1.    Credit Monitoring and Insurance Services ("CMIS") ............................ 9

            2.    Documented Loss Payment .................................................................. 9

13

            3.    Cash Fund Payments .......................................................................... 10

14

            4.    Prospective Relief and Changes in Business Practices Attributable to
                 the Settlement .................................................................................... 10

15

            5.    The Settlement's Value to Settlement Class Members ........................... 10

16

      D.    Plan of Distribution ...................................................................................... 11

17

      E.    Residual ....................................................................................................... 11

18

      F.    Notice to Class ............................................................................................. 11

19

      G.    Proposed Class Representative Service Payments .......................................... 12

20

      H.    Attorneys' Fees and Expenses ...................................................................... 12

      I.     The Settlement Administrator ........................................................................ 13

21

V.   PRELIMINARY APPROVAL IS APPROPRIATE ...................................................... 13

22

      A.    The Rule 23 Requirements for Class Certification are Met ............................ 13

23

            1.    Rule 23(a) Is Satisfied ....................................................................... 13

24

                 i.    The Class Is Sufficiently Numerous .......................................... 13

                 ii.   There Are Common Questions of Law and Fact ......................... 13

25

                 iii.  The Class Representatives' Claims Are Typical ........................... 14

26

                 iv.  Class Representatives and Proposed Class Counsel Adequately
                     Represent Class Members ......................................................... 14

27

             2.    Rule 23(b)(3) is Satisfied ................................................................... 15

28

MEMORANDUM OF POINTS AND AUTHORITIES ISO PLAINTIFFS BEYER, HAUSER, TYER, AND
BURTON'S MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
No. 5:21-cv-01155-EJD

i.    Common Issues of Law and Fact Predominate Over
      Any Potential Individual Questions ............................................... 15

ii.   A Class Action is the Superior Method to Fairly and Efficiently
      Adjudicate the Matter.................................................................... 16

B.  The Proposed Settlement Is Eminently Fair, an Excellent Result
    for the Class Members, and Should be Preliminarily Approved ........................ 17

1.   The Strength of Plaintiffs' Case and Possible Monetary Remedies ......... 18

2.   The Risk, Expense, Complexity, and Potential Class Recovery.............. 19

3.   The Risk of Maintaining Class Status Through Trial ............................... 20

4.   The Amount Offered in Settlement Is Fair ............................................... 20

5.   The Proposed Method of Distribution Is Effective ................................... 21

6.   The Extent of Discovery Completed and the Stage of the Proceedings ... 21

7.   The Experience and Views of Counsel ..................................................... 22

8.   The Presence of a Governmental Participant ............................................ 22

9.   The Reaction of Class Members to the Proposed Settlement .................. 22

10.  The Settlement Is the Product of Arm's-Length Negotiations that
     Were Free of Collusion .............................................................................. 22

11.  The Proposed Notice Plan is Appropriate ................................................ 23

12.  Appointment of Settlement Class Counsel ............................................... 24

13.  Settlement Deadlines and Schedule for Final Approval .......................... 25

VI.  CONCLUSION ................................................................................................................ 25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abante Rooter & Plumbing, Inc. v. Pivotal Payments Inc.*,
  No. 3:16-CV-05486, 2018 WL 8949777 (N.D. Cal. Oct. 15, 2018).........................................15

*Corcoran et al. v. CVS Health Corporation*,
  No. 4:15-CV-03504 (N.D. Cal. June 24, 2021) ...........................................................................19

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) .......................................................................................................14

*G. F. v. Contra Costa Cnty.*,
  No. 13-cv-03667, 2015 WL 4606078 (N.D. Cal. July 30, 2015)................................................23

*Hammond v. The Bank of N.Y. Mellon Corp.*,
  No. 08 Civ. 6060, 2010 WL 2643307 (S.D.N.Y. June 25, 2010) ...............................................19

*In re Anthem, Inc. Data Breach Litig.*,
  327 F.R.D. 299 (N.D. Cal. 2018) ...........................................................................................15, 17

*In re Banner Health Data Breach Litigation*,
  No. 2:16-cv-02696-PHX-SRB (D. Ariz. Dec. 5, 2019) .............................................................23

*In re Bluetooth Headset Prods. Liab. Litig.*,
  654 F.3d 935 (9th Cir. 2011)..................................................................................17, 18, 22, 23

*In re Experian Data Breach Litigation*,
  No. 8:15-cv-01592-AG-DFM (N.D. Cal. May 10, 2019).........................................................17

*In re Premera Blue Cross Customer Data Sec. Breach Litig.*,
  No. 3:15-MD-2633, 2019 WL 3410382 (D. Or. July 29, 2019) ................................................23

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
  895 F.3d 597 (9th Cir. 2018) .......................................................................................................14

*Just Film, Inc. v. Buono*,
  847 F.3d 1108 (9th Cir. 2017).....................................................................................................16

*Mullane v. Cent. Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950) ....................................................................................................................23

*Phillips Co. v. Shutts*,
  472 U.S. 797 (1985).....................................................................................................................16

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) ................................................................................................................16

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002)....................................................................................................12

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ....................................................................................................................13

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir.)...................................................................................................................23

*Warner v. Toyota Motor Sales, U.S.A., Inc.*,
  No. CV152171FMOFFMX, 2016 WL 8578913 (C.D. Cal. Dec. 2, 2016) ................................24

*Wright v. Linkus Enters., Inc.*,
  259 F.R.D. 468 (E.D. Cal. 2009) ................................................................................................18

1

**Statutes**

2
28 U.S.C.

3
§ 1715 ................................................................................................................................. 22

4

5
**Rules**

6
Fed. R. Civ. P.
23, Adv. Comm. Notes to 2018 Amendment ...................................................................... 13
23(b) ................................................................................................................................... 13
23(b)(3) ......................................................................................................................... 15, 16
23(c)(2)(B) ................................................................................................................... 23, 24
23(e) ....................................................................................................................... 17, 18, 21
23(e)(2) ........................................................................................................................... 2, 17
23(g)(1)(A)(i-iv) ................................................................................................................ 25
23(g)(1)(B) ......................................................................................................................... 24
23(e)(2)(C)(ii) .................................................................................................................... 21

7

8

9

10

11

12

13
**Other Authorities**

14
4 Newberg on Class Actions § 11:53 (4th ed. 2013) ......................................................... 24

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.     STATEMENT OF THE ISSUES TO DECIDED**

3

Whether the proposed $5.9 million non-reversionary Settlement warrants: (a) preliminary

4

approval; (b) certification of a Settlement Class; (c) dissemination of Notice to the Settlement Class

5

Members ("Class Members") of the Settlement's terms; (d) appointment of Tina Wolfson, Robert

6

Ahdoot, and Andrew W. Ferich of Ahdoot & Wolfson, PC as Class Counsel and of Plaintiffs Grace

7

Beyer, Christopher Hauser, Charles Tyer, and Stefanie Burton ("Settling Plaintiffs" or "Plaintiffs")

8

as Class Representatives; and (e) setting a Final Approval Hearing and a hearing to consider any

9

application for Service Payments, attorneys' fees, and reimbursement of expenses.

10

**II.     INTRODUCTION**

11

Settling Plaintiffs request that the Court preliminarily approve the concurrently filed class

12

action Settlement ("Settlement" or "SA") with Defendants Flagstar Bancorp, Inc. and Flagstar

13

Bank, FSB (collectively, "Flagstar") that would resolve all class claims against only Flagstar, on

14

behalf of nearly 1.48 million Class Members relating to Accellion, Inc.'s ("Accellion") File

15

Transfer Appliance ("FTA") Data Breach (the "FTA Data Breach").[1]

16

The Settlement and preliminary approval motion was initially filed on September 3, 2021,

17

and previously set for a hearing for January 20, 2022. *Beyer, et al. v. Flagstar Bancorp, Inc., et al.*,

18

No. 5:21-cv-02239-EJD ("*Beyer*"), ECF Nos. 54, 55. The preliminary approval hearing was

19

subsequently continued to May 19, 2022 (*Beyer,* ECF No. 65), but was vacated when the Court

20

granted a motion to consolidate all Accellion breach cases pending before this Court (ECF No. 91).

21

The Settlement should be approved because it is fair, reasonable, and adequate. The

22

Settlement would establish a non-reversionary cash fund of $5.9 million to pay for valid claims,

23

notice and administration costs, any Service Payments to Class Representatives, and any attorneys'

24

fees and costs awarded by the Court. All Class Members may submit Claims for Benefits. Claimants

25

may elect to receive: (1) three years of Credit Monitoring and Insurance Services ("CMIS"); (2) a

26

payment for reimbursement of Documented Losses of up to $10,000; or (3) a cash payment,

27

---

28

[1] All capitalized terms not separately defined herein have the meaning ascribed to them in the Settlement Agreement.

1   calculated in accordance with the terms of the Settlement Agreement (with double the amount to

2   California residents because of the statutory claims available to them), estimated at $632 to $199

3   for California Claimants, and $316 to $99 for all other Claimants (at 1% to 3% claims rates). The

4   Settlement also provides for five years of robust injunctive relief commencing after the Effective

5   Date. Flagstar has also agreed to certify compliance with these injunctive relief measures.

6         The Settlement is the product of arduous, arms-length negotiations between experienced

7   counsel after comprehensive investigation and exchange of information, two mediation sessions with

8   Judge Jay C. Gandhi (Ret.) of JAMS, substantial discovery, and numerous hours of meet and confers

9   and negotiations undertaken in finalizing the Settlement details.

10        The Settlement (i) resolves claims against the Flagstar Defendants and their Released

11  Parties only, and not Accellion; (ii) delivers tangible benefits that address all potential harms of the

12  FTA Data Breach without protracted litigation and its attendant risks; and (iii) compares favorably

13  to previous settlements and delivers a fair, adequate, and reasonable resolution for the Class. Fed. R.

14  Civ. P. 23(e)(2). Plaintiffs respectfully contend that it should be preliminarily approved.

15  **III.    BACKGROUND**

16        **A.    The FTA Data Breach and Subsequent Litigation**

17        In late 2020 and early 2021, Accellion began disclosing to its FTA clients that threat actors

18  had breached Accellion client data via vulnerabilities in the FTA. Second Amended Class Action

19  Complaint ("SAC"), *Beyer*, ECF No. 50, ¶¶ 2-8. These threat actors were then able to allegedly steal

20  sensitive data from many Accellion clients. *Id.* ¶ 35. During the FTA Data Breach, hackers accessed

21  Flagstar's files containing Plaintiffs' and Class Members' sensitive PII. *Id.* ¶¶ 41-48.

22        On or about March 6, 2021, Flagstar publicly acknowledged that it was one of the Accellion

23  clients impacted by the FTA Data Breach. *Id.* ¶ 43. Flagstar confirmed that the PII of 1,477,411

24  Flagstar customers (including Persons whose mortgages are serviced by Flagstar) and employees

25  was compromised. Concurrently filed Declaration of Tina Wolfson ("Wolfson Decl.") ¶ 28(g). The

26  affected PII included names, home and email addresses, dates of birth, phone numbers, Social

27  Security numbers, passport information, and account information. *Beyer*, ECF No. 50, ¶ 1.

28

*Beyer* was initially filed on March 30, 2021. *Id.*, ECF No. 1. An Amended Complaint was filed on April 23, 2021 (*id.*, ECF No. 24), and the SAC was filed on September 1, 2021 (*id.*, ECF No. 50). All Plaintiffs received Flagstar's notification regarding the compromise of their PII as a result of the FTA Data Breach. *Id.*, ECF No. 50, ¶¶ 13-16. The SAC alleges claims for negligence, negligence per se, breach of contract, invasion of privacy, unjust enrichment, and violations of the California Consumer Privacy Act ("CCPA"), California Customer Records Act, California Unfair Competition Law, California Consumers Legal Remedies Act, Utah Consumer Sales Practices Act, Texas Deceptive Trade Practices Act, and Michigan Consumer Protection Act. *Id.* ¶¶ 84-215.

Following commencement of this action, counsel for the Parties began a dialogue about case management issues and engaged in multiple meet-and-confer discussions. Wolfson Decl. ¶ 13. Settling Plaintiffs' counsel already had been engaging in efforts to coordinate all FTA Data Breach class actions filed in this District. *Id.* When efforts to consolidate by stipulation failed, in an effort to coordinate and organize the FTA Data Breach litigation, Ahdoot & Wolfson filed a motion to consolidate ("Motion to Consolidate") the numerous FTA Data Breach-related class actions pending before this Court. ECF No. 37 (filed April 7, 2021). The Court granted the Motion to Consolidate on March 14, 2022. ECF No. 91.

Prior to the consolidation Order (*id.*), on September 3, 2021, Plaintiffs filed their initial motion for preliminary approval, seeking Court approval of this class action Settlement that would resolve all claims against Flagstar, but not the claims in any other case, or against Accellion or any other defendants related to the FTA Data Breach. *Beyer*, ECF Nos. 54, 55.[2] The initial preliminary approval motion filed in *Beyer* was set for a January 20, 2022 hearing. *Id.,* ECF No. 54.

While preliminary approval was pending in *Beyer*, the Court consolidated the FTA Data Breach cases and vacated all motion hearing dates. ECF No. 91. The Court has now granted a hearing date for this preliminary approval motion for December 8, 2022.

---

[2] The Settlement, if approved, would also release all claims against Flagstar in related cases: (i) *Angus, et al. v. Flagstar Bank, FSB*, No. 2:21-cv-10657-AJT-DRG (E.D. Mich.) ("*Angus*", which was consolidated with three other cases filed against Flagstar in the Eastern District of Michigan— *Garcia v. Flagstar Bank, FSB*, No. 2:21-cv-10671-AJT-DRG, *Burdick v. Flagstar Bank, FSB*, No. 2:21-cv-10786-AJT-DRG, and *Hawkins, et al. v. Flagstar Bank*, No. 2:21-cv-11165-AJT-DRG ("*Hawkins*"); and (ii) *Pollard v. Accellion, Inc., et al.*, No. 5:21-cv-02572-EJD (N.D. Cal.) ("*Pollard*"), pending before this Court.

- 3 -

1

### B.    Mediation and Settlement Negotiations

2          As discussed *supra,* as a result of continued meet-and-confer efforts, the Parties reached

3 an agreement to participate in mediation to attempt to resolve this matter. Wolfson Decl. ¶ 17. Prior

4 to mediation, the Parties exchanged information to prepare for and facilitate a productive mediation.

5 *Id*. ¶ 18. The Parties also exchanged and submitted to the mediator detailed confidential mediation

6 briefs. *Id*. Plaintiffs received and analyzed data from Flagstar relating to the impact of the FTA Data

7 Breach, including specific information concerning the categories of individuals who received breach

8 notification letters from Flagstar (e.g., customers, employees), the nature of the PII impacted, and

9 the number of potential class members impacted. *Id*.

10          On July 13, 2021, the Parties participated in the first mediation session with Judge Gandhi.

11 *Id*. ¶ 19. Counsel for Plaintiffs in the related Michigan action (*see supra*, n.2, and *infra*, Sec. III.D.),

12 *Angus*, attended the mediation. *Id*. The Parties, however, were not able to reach an agreement to

13 settle this matter at this mediation. *Id*. In the weeks following the first mediation session, counsel for

14 the Parties continued their dialogue regarding settlement and ultimately agreed to return to

15 mediation. *Id*.

16          The second mediation took place on July 26, 2021 with Judge Gandhi. *Id*. ¶ 20. Counsel

17 for *Angus* was not invited and did not attend. *Id.* After many hours, Judge Gandhi proposed a double-

18 blind mediator's proposal of a $5.9 million non-reversionary common fund, which the Parties

19 mutually accepted. *Id*. Following the mediation, the Parties continued to negotiate the other myriad

20 terms of the Settlement. *Id*. ¶ 21.

21          Plaintiffs' counsel solicited competing bids and negotiated with three separate third-party

22 administrators for settlement notice and administration. *Id*. ¶ 22. The Parties ultimately agreed on

23 Epiq Class Action and Claims Solutions, Inc. ("Epiq"), which estimates that the total administration

24 and notice charges in this matter will be approximately $442,000 to $475,000. *Id.* This estimate is

25 reasonable in the context of this proposed Settlement, and includes all costs associated with notice

26 and administration of the Settlement. *Id*. Plaintiffs' counsel also solicited competing bids from

27 alternative providers of CMIS. *Id*. ¶ 23 and Ex. 1; *see also* SA § 4.2.1.

28

During the Settlement negotiations, the Parties deferred any discussion concerning the maximum Service Payments to be sought by the proposed Class Representatives until after reaching an agreement on all material terms of the Settlement. Wolfson Decl. ¶ 36. There has been no negotiation and no agreement as to the amount of attorneys' fees and expenses. *Id*. All negotiations were conducted at arm's length, in good faith, free of any collusion, and under the supervision of Judge Gandhi. *Id*. ¶ 32. After comprehensive negotiations and diligent efforts, the Parties finalized the terms of the Settlement, and now seek preliminary approval of the Settlement from the Court.

### C.      Information Obtained Through Confirmatory Discovery

Prior to attending the mediation, Plaintiffs conducted a thorough investigation and received requested information from Flagstar informally.  Wolfson Decl. ¶ 28. The Parties engaged in detailed confirmatory discovery, which established the following facts:

Flagstar is a national, full-service bank that must comply with governing cybersecurity and data privacy regulations, including those from the Office of the Comptroller of the Currency (OCC), the Gramm-Leach-Bliley Act (GLBA), and the Federal Financial Institutions Examinations Council (FFIEC). *Id.* ¶ 28(a). Flagstar entered into an agreement with Accellion in 2015 to license the FTA and renewed the FTA license through 2020. *Id.* ¶ 28(b). Flagstar understood that Accellion's FTA would enable Flagstar to safely and securely transfer large files containing sensitive information, including PII, using industry-standard encryption, and Flagstar knew that many other major businesses, including financial institutions, used the FTA platform. *Id.*

In 2020, Flagstar decided to migrate from the FTA platform to Kiteworks (Accellion's newer FTA product) for the 2021 calendar year. Wolfson Decl., ¶ 28(b). Flagstar states that the decision to migrate to Kiteworks was based on new functionality, and because Accellion informed Flagstar that the FTA platform would eventually be decommissioned, though Accellion did not disclose to Flagstar when that would happen. *Id.* Flagstar also confirmed that Accellion was still supporting FTA under a support contract, and that the migration to Kiteworks was underway on January 20, 2021. *Id.* According to Flagstar, it had no reason to believe the FTA product was not secure or ill-suited for the purpose of providing securing file transfers, or that it was susceptible to a breach. *Id.*

According to Flagstar, in December 2020, threat actors exploited multiple zero-day vulnerabilities in the FTA, but Accellion was able to patch this first attack. Wolfson Decl. ¶ 28(c). On January 12, 2021, Accellion's CISO Frank Balonis confirmed that the December breach was contained, patched, and that Flagstar was not impacted at this juncture. *Id.* Accellion later reported to Flagstar that, on January 20, 2021, threat actors subsequently exploited two more zero-day vulnerabilities as part of a continued attack, enabling the threat actors to exfiltrate data stored on the FTA systems of Accellion's clients. *Id.*

On January 22, Flagstar received a security alert from Accellion, which caused the bank to permanently stop use of the FTA. Wolfson Decl. ¶ 28(d). On January 23, Accellion provided Flagstar with a list of malicious IP addresses, and Flagstar promptly blocked those addresses from its systems. *Id.* On January 24, Accellion confirmed that all four of its servers were compromised by the second exploit. *Id.* At that time, Accellion did not have the tools yet to identify if an actual breach of data had occurred. *Id.* Flagstar engaged a third-party security incident response vendor to conduct additional forensics to determine whether data was exfiltrated. *Id.* Separately, Accellion hired Mandiant, a U.S. based cyber security firm, to conduct a forensic analysis, and later posted its report on the Accellion website.[3] Flagstar's post-breach analyses of the FTA system confirmed that Flagstar was breached between January 20 and 22. *Id.* ¶ 28(d).

Between January 26 and 28, Accellion provided Flagstar with a log of files that had been downloaded from the FTA during the breach, and Flagstar engaged Kroll to investigate the breach and perform a detailed forensic review of the FTA. Wolfson Decl. ¶ 28(e). On January 27, Flagstar's Chief Information Security Officer and Privacy Officer, Zahira Gonzalvo, informed the Office of the Comptroller of Currency (OCC) of the breach and Flagstar's remediation steps. *Id.* That same day, a threat actor demanded a ransom. *Id.* On January 29, Ms. Gonzalvo filed a criminal complaint with the FBI reporting the ransom demand. *Id.* On March 6, after Flagstar's third-party forensic experts determined the extent of the information compromised in the breach, Flagstar publicly

---

[3] ACCELLION, INC., FILE TRANSFER APPLIANCE (FTA) SECURITY ASSESSMENT, (2021), www.accellion.com/sites/default/files/trust-center/accellion-fta-attack-mandiant-report-full.pdf (last accessed Sept. 1, 2022).

1    announced the data breach in an email to customers. *Id*. ¶ 28(f). Flagstar began sending out data

2    breach notification letters to impacted persons in mid-March 2021. *Id*.

3           Flagstar identified and sent notices to 1,477,411 individuals whose PII was compromised

4    in the breach. Wolfson Decl. ¶ 28(g). The PII exposed varies by individual but in many cases

5    included name (all individuals, though some are first name only), Social Security Number

6    (1,463,707 individuals), address (1,343,678 individuals), phone number (932,926 individuals), and

7    account number (628,605 individuals). *Id*. A smaller number of individuals had their email address

8    (13,617 individuals), date of birth (10,129 individuals), credit card number (238 individuals), and

9    passport number (29 individuals) exposed. *Id*. Within California, Flagstar identified and sent notices

10   to 257,660 individuals whose PII was compromised in the breach, which included 256,993

11   individuals whose exposed PII included Social Security Number. *Id*. The overall affected population

12   included approximately 6,901 current and former employees of Flagstar whose PII was exposed

13   from employee data files that were on the Accellion FTA. *Id*. Flagstar secured the services of Kroll

14   to provide identity monitoring services, including credit monitoring, fraud consultation, and identity

15   theft restoration, to affected individuals at no cost for two years. *Id*. ¶ 28(h).

16          In response to the FTA Data Breach and in connection with the proposed Settlement,

17   Flagstar has taken or is taking the following steps to strengthen the security of its systems:

18   confirming termination of the FTA platform, which was discontinued on January 23, 2021;

19   migrating to Kiteworks by February 12, 2021, and soliciting bids for alternative solutions to

20   Accellion's products; implementing additional automated compliance with Flagstar's data retention

21   policies on file-sharing platforms to ensure data will be auto-deleted after 30 days; deploying

22   additional endpoint detection response tools, which provide Flagstar with an added layer of visibility

23   to potential cybersecurity anomalies; and requesting Flagstar's managed security services provider

24   to add at least daily threat-hunting services to detect any Flagstar data exposed on the dark web.

25   Wolfson Decl. ¶ 28(i); *see also* SA § 4.1.

26

27

28

**D.      The Related Michigan Litigation Is Stayed Pending This Settlement**

The related *Angus* litigation, pending in the Eastern District of Michigan, is stayed pending the disposition of this Settlement. *Angus* ECF No. 46.[4]

On June 14, 2021, the attorneys in *Angus* filed a Consolidated Class Action Complaint. *Id.* ECF No. 18. On June 26, 2021, the attorneys in the *Angus* filed a motion pursuant to Rule 23(g), seeking to appoint an 8-firm leadership structure. *Id.*, ECF No. 22. On July 6, 2021, counsel in the later filed Michigan action *Hawkins* filed a motion seeking to consolidate *Angus* and *Hawkins* pursuant to Rule 42(a), and to appoint plaintiffs' counsel in *Hawkins*, also, as interim class counsel pursuant to Rule 23(g). *Id.*, ECF No. 27. The court granted the Rule 23(g) motion of the attorneys in *Angus* at a July 16, 2021 status conference. *Id.*, ECF No. 33.[5]

After this Settlement was filed, Flagstar filed a motion to stay the consolidated *Angus* pending disposition of this Settlement. *Angus*, ECF No. 30. Flagstar's motion to stay *Angus* was granted and the Michigan proceedings were (and remain) stayed. *Id*., ECF No. 46. Months after the Settlement was originally filed in this Court, the *Angus* Plaintiffs' counsel filed a motion seeking to intervene in *Beyer* and opposing preliminary approval. *Beyer*, ECF No. 62. Settling Plaintiffs and Flagstar opposed that motion. *Id*., ECF No. 71, 72. Notably, the motion to intervene and opposition to preliminary approval was filed by some of the same counsel that filed a similar motion in the Kroger FTA Data Breach matter, where this Court denied the motion and granted final approval of that settlement.

---

[4] The *Angus* litigation should not be confused with the separate litigation against Flagstar Bank, also pending in the Eastern District of Michigan, *Angus v. Flagstar Bank, FSB*, No. 4:22-cv-11385-SDK-KGA (E.D. Mich.), which relates to a different, later data breach involving Flagstar's network systems, as opposed to the third-party software breach that is at issue here. Morgan & Morgan represents the same Plaintiff in both *Angus* actions.

[5] Settling Plaintiffs' counsel had filed an action in Michigan on behalf Plaintiffs Charles Tyer and Christopher Hauer. *Tyer, et al. v. Flagstar Bank, FSB, et al.*, No. 2:21-cv-11652-AJT-DRG (E.D. Mich.). Settling Plaintiffs' counsel subsequently voluntarily dismissed the *Tyer* action pursuant to Rule 41 in order to include Plaintiffs Tyer and Hauser in this Settlement.

1

## IV.    TERMS OF THE SETTLEMENT

2

### A.    The Class Definition

3

The proposed Settlement Class is defined as follows:

4

[A]ll residents of the United States who were notified by Flagstar that their PII was compromised as a result of the FTA Data Breach. Excluded from the Settlement Class are: (1) the Judges presiding over the Action and members of their families; (2) Flagstar and Accellion, their subsidiaries, parent companies, successors, predecessors, and any entity in which Flagstar or Accellion, or their parents, have a controlling interest, and their current or former officers and directors; (3) Persons who properly execute and submit a Request for Exclusion prior to the expiration of the Opt-Out Period; and (4) the successors or assigns of any such excluded Persons.

5

6

7

8

9

SA § 1.4.5. The proposed Class is the same as alleged in the SAC. *Beyer*, ECF No. 50, ¶ 77.

10

### B.    The Release

11

In exchange for the benefits provided under the Settlement, Class Members will release

12

any claims against Flagstar and its Released Parties, only, related to or arising from the FTA Data

13

Breach. SA § 3.5.1. The claims released are coextensive with the claims in the SAC.

14

### C.    The Settlement Benefits

15

The Settlement provides for a $5.9 million non-reversionary Settlement Fund (*id.* § 3.6.1)

16

that will be used to provide Participating Class Members with one of the following Benefits:

17

#### 1.    Credit Monitoring and Insurance Services ("CMIS")

18

Each Participating Class Member who submits a valid claim may elect to receive three

19

years of CMIS. SA § 4.2.1; Wolfson Decl. ¶¶ 4, 23 and Ex. 1. If a Class Member chooses CMIS as

20

their respective Settlement Benefit and already maintains a subscription for a similar product, she

21

will have the option to postpone commencement of the CMIS by 12 months for no additional charge.

22

SA § 4.2.1. The retail value of this CMIS is $19.95 per month (total of $718.20 for the entire year

23

term) for each subscriber. Concurrently filed Declaration of Robert Siciliano ¶¶ 5-6.

24

#### 2.    Documented Loss Payment

25

In the alternative to the CMIS, Class Members may seek reimbursement of up to $10,000

26

for Documented Losses. To receive a Documented Loss Payment, a Class Member must submit a

27

verified Claim Form providing the loss amount and reasonable documentary proof. SA § 4.2.3.

28

- 9 -

### 3. Cash Fund Payments

In the alternative to CMIS or a Documented Loss Payment, Class Members may submit a claim to receive a cash Settlement Payment ("Cash Payment"). The amount of the Cash Payment will be calculated in accordance with the terms of the Settlement Agreement. *Id.* §§ 4.2.2, 4.7; *see also, infra*, Sec. IV.D. In view of the heightened protections afforded to California Class Members under the California statutory claims asserted in this lawsuit (i.e., the CCPA), California Class Members who submit valid claims for Cash Fund Payments will receive Settlement Payments that are twice the amount of Settlement Payments made to non-California Class Members. SA § 4.7.2.

It is difficult to estimate the amount of Cash Fund Payments as it will depend on a number of factors. Assuming, however, that the claims rate here is between 1% and 3% (concurrently filed Declaration of Cameron R. Azari of Epiq ("Azari Decl.") ¶ 26; *see also,* Wolfson Decl. ¶ 25; **Appendix B**, previous Data Breach Settlement claims chart), Class Counsel estimate that California Claimants will receive approximately $632 at 1%, $307 at 2%, and $199 at 3%, and non-California Claimants will receive approximately $316 at 1%, $153 at 2%, and $99 at 3%. Wolfson Decl. ¶ 26.

### 4. Prospective Relief and Changes in Business Practices Attributable to the Settlement

As a result of this litigation, the Settlement also provides significant remedial measures (SA §§ 4.1.1-4.1.4) regarding Flagstar's data security practices that will be implemented for a period of five years. If implemented, these measures will benefit all Class Members regardless of whether a claim is filed. In addition, for five years after final approval of the Settlement, Flagstar will continue to monitor the dark web for indications of fraudulent activity with respect to data of Flagstar customers and current and former employees in connection with the FTA Data Breach. *Id.* § 4.1.5. Flagstar will also certify its compliance with these measures. *Id.* § 4.1.6.

### 5. The Settlement's Value to Settlement Class Members

The Settlement's value is significant. The cash fund value of the Settlement is $5,900,000. SA § 3.6. This does not include the value of the prospective relief or the retail value of the CMIS.

### D. Plan of Distribution

Subject to the Court's approval, the Settlement Administrator ("Administrator") will apply the Net Settlement Fund to make all distributions necessary for an election of CMIS, Documented Loss Payments, and Cash Payments. The Administrator will first apply the Net Settlement Fund to pay for claimed CMIS and then to pay for valid claims for Documented Loss. SA § 4.7.1.

The amount of the Settlement Fund remaining after all payments for CMIS and Documented Loss Payments are applied (the "Post DC Net Settlement Fund"), will be used to pay valid claims for Cash Payments. *Id*. § 4.7.2. The amount of each Cash Payment shall be calculated by dividing the Post DC Net Settlement Fund by double the number of valid claims submitted by California residents added to the number of valid claims submitted by non-California residents to determine a "Initial Cash Amount." *Id*. The Cash Fund Payment amount to non-California residents with Approved Claims will be equal to the Initial Cash Amount, and the Cash Fund Payment to California residents with Approved Claims will equal twice the Initial Cash Amount. *Id*.

Class Members will have the option to receive any money available to them via digital payment. *Id*. § 4.3; Azari Decl. ¶ 22. In the event Class Members do not exercise an electronic payment option, they will receive payment via a physical check. SA §§ 4.3, 4.8.

### E. Residual

The Settlement Fund is non-reversionary. To the extent any monies remain in the Net Settlement Fund more than 150 days after the distribution of Settlement Payments, a subsequent Settlement Payment will be evenly made to all Approved Claim Claimants who cashed or deposited the initial payment they received, assuming such payment is over $3.00. SA § 4.9. In the event such a payment is less than $3.00 for each Approved Claim for cash, the remaining funds will be used to extend the three-year term of the CMIS for as long as possible for all Claimants who selected CMIS. *Id*. Any amount remaining thereafter will be paid to the proposed 26 U.S.C. 501(c)(3) recipient: the Electronic Frontier Foundation. *Id*. §§ 1.26, 4.9, 4.11; Wolfson Decl. ¶ 27.

### F. Notice to Class

Pursuant to Rule 23(e), the Administrator will provide Class Members with the Summary Notice via email for any Class Member for whom an email address is available, and via U.S. mail

in postcard form for all others for whom a physical mailing address is available. SA §§ 6.3.1-6.3.2; Azari Decl. ¶¶ 13-14. Undeliverable email notices will result in supplemental email attempts and then a postcard Summary Notice if email is not successful. SA § 6.3.3; Azari Decl. ¶¶ 14-15. For undeliverable mailed Summary Notices, the Administrator will re-mail to any forwarding address identified. SA § 6.3.4; Azari Decl. ¶¶ 14-15. Prior to the Claims Deadline, reminder emails will be sent to Class Members who have not submitted a claim. SA § 6.6; Azari Decl. ¶ 16.

The Administrator also will (i) design and conduct an internet digital advertising publication program, which will continue through the Claims Deadline (SA § 6.4; Azari Decl. ¶ 17), and (ii) create and maintain a Settlement Website that contains all relevant information and documents regarding the Settlement through which Class Members can submit electronic Claims Forms and Requests for Exclusion. SA § 6.7; Azari Decl. ¶ 18. The Settlement Website will also contain a toll-free telephone number and mailing address for the Administrator. SA § 6.7; Azari Decl. ¶ 19. The language of all Notice Forms is easily understandable and takes into account the education level or language needs of the proposed Class Members. Azari Decl. ¶¶ 20-21.

### G.    Proposed Class Representative Service Payments

Each Plaintiff has been a dedicated and active participant on behalf of the proposed Class, and the recovery would not have been possible without their efforts. Wolfson Decl. ¶¶ 34-35. In view of these efforts, on behalf of Plaintiffs, counsel will separately petition the Court for approval of Service Payments in the amount of $1,500 for each of the four Plaintiffs. SA § 10.1. The Settlement is not conditioned upon the Court's award of Service Payments.

### H.    Attorneys' Fees and Expenses

As part of the Settlement, Plaintiffs' counsel will separately file a motion for an award of reasonable attorneys' fees and reimbursement of litigation costs and expenses. *Id*. §§ 11.1-11.3. There is no "clear sailing" clause in the Settlement (*id.*), and any amount sought for payment of attorneys' fees will be reasonable, and consistent with the Ninth Circuit's 25% "benchmark" percentage for such awards. *See, e.g.*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002). As of the time period of the initial Motion for Preliminary Approval, Proposed Class Counsel expended approximately $341,650 in lodestar and incurred $29,749.96 in expenses. Wolfson Decl.

¶ 37. In no event will proposed Class Counsel seek more than 25% of the Settlement Fund in attorneys' fees. Class Counsel will also seek reimbursement of all expenses and costs. Any approved Fee Award and Costs will be paid out of the Settlement Fund. SA § 11.1. The Settlement is not conditioned upon an award of any attorneys' fees, costs, or expenses. *Id.* § 11.3.

### I.      The Settlement Administrator

The Parties propose that Epiq serve as Administrator to provide notice; administer and make determinations regarding claim forms; process settlement payments; make distributions; and provide other services necessary to implement the Settlement. SA § 1.43; *see generally* Azari Decl. The costs of the Administrator will be paid out of the Settlement Fund. SA § 3.8. Epiq was selected following a competitive bidding process to identify the most efficient Settlement administration option. Wolfson Decl. ¶ 22. Proposed Class Counsel has previously worked with Epiq on different matters. *Id*. ¶¶ 22, 24-25. Proposed Class Counsel believe the estimated $442,000 to $475,000 cost for settlement administration is reasonable. *Id*.

## V.      PRELIMINARY APPROVAL IS APPROPRIATE

### A.      The Rule 23 Requirements for Class Certification are Met

At the preliminary approval stage, "if a class has not [yet] been certified, the parties must ensure that the court has a basis for concluding that it likely will be able, after the final hearing, to certify the class." Fed. R. Civ. P. 23, Adv. Comm. Notes to 2018 Amendment. All the requirements of Rule 23(a) must be met, and "at least one of the three requirements listed in Rule 23(b)." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).

#### 1.      Rule 23(a) Is Satisfied

##### i.      The Class Is Sufficiently Numerous

There are approximately 1,477,411 Class Members. Wolfson Decl. ¶ 28(g). The Rule 23(a)(1) numerosity requirement is satisfied.

##### ii.      There Are Common Questions of Law and Fact

The commonality requirement is satisfied if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Here, numerous common issues of law and fact affect the Class uniformly, including: the nature of Flagstar's data security practices, whether Flagstar knew or

- 13 -

1  should have known that Accellion's FTA was unsecure, whether Flagstar owed duties of care to

2  Class Members to safeguard their PII, and whether Flagstar breached those duties. These inquiries

3  will turn on common evidence. Commonality is satisfied.

4            **iii.      The Class Representatives' Claims Are Typical**

5            Rule 23(a)(3) requires that the Class Representatives' claims be typical of those of the

6  Class. "The test of typicality is whether other members have the same or similar injury, whether the

7  action is based on conduct which is not unique to the named plaintiffs, and whether other Class

8  Members have been injured by the same course of conduct." *Ellis v. Costco Wholesale Corp.*, 657

9  F.3d 970, 984 (9th Cir. 2011) (internal quotation marks and citation omitted). Here, the claims of

10 the named Plaintiffs are typical of the claims of the Settlement Class. Class Members, like Plaintiffs,

11 are individuals who were notified by Flagstar that their PII was impacted as a result of the breach.

12 Plaintiffs' and Class Members' claims arise from the same nucleus of facts relating to the FTA Data

13 Breach, pertain to common defendant Flagstar, and are based on the same legal theories. Plaintiffs

14 thus satisfy the Rule 23(a)(3) typicality requirement.

15            **iv.      Class Representatives and Proposed Class Counsel**

16            **Adequately Represent Class Members**

17           Rule 23(a)(4) permits certification of a class action only if "the representative parties will

18 fairly and adequately protect the interests of the class," which requires that the named plaintiffs

19 (1) not have conflicts of interest with the proposed Class; and (2) be represented by qualified and

20 competent counsel. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,

21 895 F.3d 597, 607 (9th Cir. 2018). Plaintiffs and proposed Class Counsel are adequate. First, the

22 proposed Class Representatives have demonstrated that they are well-suited to represent the

23 Settlement Class, have actively participated in the litigation, and will continue to do so. Wolfson

24 Decl. ¶¶ 34-35. They do not have any conflicts of interest with the absent Class Members, as their

25 claims are coextensive with those of the Class Members. *Id.*

26           Second, proposed Class Counsel are highly qualified and experienced in class action and

27 complex litigation, with expertise and extensive experience in data breach and data privacy class

28 actions. Wolfson Decl. ¶¶ 38-52 and Ex. 2. Proposed Class Counsel have been dedicated to the

- 14 -

1   prosecution of this action and will remain so through final approval. *Id.* ¶¶ 12-15, 17-21. The

2   adequacy requirement is satisfied.

3                    **2.        Rule 23(b)(3) is Satisfied**

4          Rule 23(b)(3) requires that (1) "questions of law or fact common to the members of the

5   class predominate over any questions affecting only individual members of the class," and (2) "that

6   a class action is superior to other available methods for the fair and efficient adjudication of the

7   controversy." Fed. R. Civ. P. 23(b)(3). Both of these requirements are satisfied.

8                    **i.        Common Issues of Law and Fact Predominate Over Any**
                                 **Potential Individual Questions**
9

10         The Rule 23(b)(3) predominance element requires that "questions of law or fact common

11  to class members predominate over any questions affecting only individual members." Fed. R. Civ.

12  P. 23(b)(3). Here, Plaintiffs' claims depend on whether Flagstar had reasonable data security

13  measures in place to protect Plaintiffs' and Class Members' PII, and whether Flagstar could have

14  prevented unauthorized exposure of Plaintiffs' PII or mitigated its effects with more adequate third-

15  party risk management practices. These questions can be resolved using the same evidence for all

16  Class Members, including Flagstar's internal documents, testimony of its employees, and expert

17  analysis. *Abante Rooter & Plumbing, Inc. v. Pivotal Payments Inc.*, No. 3:16-CV-05486, 2018 WL

18  8949777, at *5 (N.D. Cal. Oct. 15, 2018) ("Predominance is satisfied because the overarching

19  common question . . . can be resolved using the same evidence for all class members and is exactly

20  the kind of predominant common issue that makes certification appropriate.").

21         Indeed, Plaintiffs allege that the FTA Data Breach affected all Class Members in a uniform

22  fashion, compromising the similar types of PII for Plaintiffs and the Class Members. *In re Anthem,*

23  *Inc. Data Breach Litig.*, 327 F.R.D. 299, 312 (N.D. Cal. 2018) ("Plaintiffs' case for liability depends,

24  first and foremost, on whether Anthem used reasonable data security to protect Plaintiffs' personal

25  information. . . . That question can be resolved using the same evidence for all Class Members

26  because their personal information was all stored on the same Anthem data warehouse that was the

27  subject of the breach.").

28

1        The issues presented are susceptible to common proof because they focus on Flagstar's

2 class-wide data security policies and practices, and thus are the type of predominant questions that

3 make a class-wide adjudication worthwhile. *Id.*; *see also Tyson Foods, Inc. v. Bouaphakeo*, 136 S.

4 Ct. 1036, 1045 (2016) ("When 'one or more of the central issues in the action are common to the

5 class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) . . . .'"

6 (citation omitted)). Predominance is satisfied.

                           **ii.**     **A Class Action is the Superior Method to Fairly and**

7

                                        **Efficiently Adjudicate the Matter**

8

9        Rule 23(b)(3) requires a class action to be "superior to other available methods for the fair

10 and efficient adjudication of the controversy," and sets forth the following factors:

11      The matters pertinent to the findings include: (A) the class members' interest in
     individually controlling the prosecution or defense of separate actions; (B) the
     extent and nature of any litigation concerning the controversy already begun by or
12      against class members; (C) the desirability or undesirability of concentrating the
     litigation of the claims in the particular forum; and (D) the likely difficulties in
13      managing a class action.

14 Fed. R. Civ. P. 23(b)(3).

15        Where, as here, a court is deciding the certification question in the proposed class action

16 settlement context, it need not consider manageability issues because "the proposal is that there be

17 no trial," and hence manageability considerations are no hurdle to certification for purposes of

18 settlement. *Amchem*, 521 U.S. at 620. A class action is the only reasonable method to fairly and

19 efficiently adjudicate Class Members' claims against Flagstar. *See, e.g.*, *Phillips Co. v. Shutts*, 472

20 U.S. 797, 809 (1985) ("Class actions . . . permit the plaintiffs to pool claims which would be

21 uneconomical to litigate individually . . . [In such a case,] most of the plaintiffs would have no

22 realistic day in court if a class action were not available."). Resolution of the predominant issues of

23 fact and law through individual actions is impracticable: the amount in dispute for individual class

24 members is too small, the technical issues involved are too complex, and the required expert work

25 would be very costly. *Just Film, Inc. v. Buono,* 847 F.3d 1108, 1123 (9th Cir. 2017).

26        The class device is the superior method of adjudicating claims against Flagstar because it

27 promotes greater efficiency, and no realistic alternative exists. Courts routinely recognize this in

28

1  other data breach cases where class-wide settlements have been approved. *See, e.g.*, *In re Experian*

2  *Data Breach Litigation*, No. 8:15-cv-01592-AG-DFM (N.D. Cal. May 10, 2019).

3          **B.**       **The Proposed Settlement Is Eminently Fair, an Excellent Result for**
                       **the Class Members, and Should be Preliminarily Approved**

4

5        The 2018 revisions to Rule 23 confirm the need for detailed analysis regarding the fairness

6  of a class settlement. "The claims, issues, or defenses of a certified class—or a class proposed to be

7  certified for purposes of settlement—may be settled . . . only with the court's approval." Fed. R. Civ.

8  P. 23(e). Accordingly, a district court may approve a settlement agreement "after a hearing and only

9  on finding that it is fair, reasonable, and adequate . . . ." Fed. R. Civ. P. 23(e)(2).

10        In making this decision, Rule 23(e)(2) clarifies that district courts must consider whether:

11      (A)   the class representatives and class counsel have adequately represented the
           class;

12      (B)   the proposal was negotiated at arm's length;

13      (C)   the relief provided for the class is adequate, taking into account:
          (i)    the costs, risks, and delay of trial and appeal;

14            (ii)   the effectiveness of any proposed method of distributing relief to the
               class, including the method of processing class-member claims;

15            (iii)  the terms of any proposed award of attorney's fees, including timing
               of payment; and

16            (iv)  any agreement required to be identified under Rule 23(e)(3); and

17      (D)   the proposal treats class members equitably relative to each other.

18  Fed. R. Civ. P. 23(e)(2). Thus, Rule 23(e) now reflects the factors that courts in this Circuit already

19  considered for approval: "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity,

20  and likely duration of further litigation; (3) the risk of maintaining class action status throughout the

21  trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the

22  proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant;

23  and (8) the reaction of the Class Members to the proposed settlement." *Anthem*, 327 F.R.D. at 317

24  (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)).

25        "Prior to formal class certification, there is an even greater potential for a breach of

26  fiduciary duty owed the class during settlement. Accordingly, such agreements must withstand an

27  even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily

28

1  required under Rule 23(e) before securing the court's approval as fair. *In re Bluetooth Headset*
2  *Prods. Liab. Litig.*, 654 F.3d at 946.

3      At the preliminary approval stage, the court "evaluate[s] the terms of the settlement to
4  determine whether they are within a range of possible judicial approval." *Wright v. Linkus Enters.,*
5  *Inc.*, 259 F.R.D. 468, 472 (E.D. Cal. 2009). Ultimately, "[s]trong judicial policy favors settlements."
6  *Churchill Village, L.L.C. v. General Electric,* 361 F.3d 566, 576 (9th Cir. 2003) (ellipses and
7  quotation marks omitted) (quoting *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir.
8  1992)).

9            **1.**    **The Strength of Plaintiffs' Case and Possible Monetary Remedies**

10      Plaintiffs believe they have a strong case for liability based upon alleged shortcomings in
11  Flagstar's data security measures. *Beyer*, ECF No. 50, ¶¶ 27, 30-33, 66-72. Plaintiffs also believe
12  that they would be able to recover damages on behalf of the Class.

13      The range of potential outcomes is large, however. The scope of damages depends in large
14  part on the scope of class certification, whether various theories of damages would be accepted by
15  the Court (i.e., benefit of the bargain, and loss of value of PII), and which causes of action survive.
16  Nonetheless, if applied across all potential class members equally, Plaintiffs' most conservative
17  measure (based on black-market rates of at least $5 per individual for Social Security numbers[6])
18  would yield a figure of approximately $7,350,000, while more expansive measure (based on at least
19  $19.95 of monthly credit monitoring costs) would yield $29,474,349.40 (1,477,411 x $19.95).
20  Assuming the statutory damages available to the 257,660 California Class Members under the CCPA
21  ($100 minimum, $750 maximum per violation), nominal damages to those individuals alone would
22  range from $25,766,000 to $193,245,000.

23      These amounts are not certain, however, and the case is subject to numerous risks (*see,*
24  *infra*, Sec. V.B.2). Plaintiffs believe that the legal theories behind such larger damage figures are
25  meritorious, but also recognize that they are untested. As a practical matter, Plaintiffs' counsel
26  recognize that taking such large numbers to a jury presents substantial strategic risks. Even a number
27  in the mid-hundreds of millions potentially risks offending a jury and leading to a nominal award—

28  [6] *See Premera, supra,* ECF No. 156, p. 20 of 24, Motion for Class Certification.

- 18 -

1  or no monetary award at all. *See, e.g., Corcoran et al. v. CVS Health Corporation*, No. 4:15-CV-
2  03504, ECF No. 611 (N.D. Cal. June 24, 2021) (unanimous defense verdict where Plaintiffs' counsel
3  urged jury to award 6.3 million CVS Pharmacy customers $121 million in generic drug price
4  overcharge suit).

5          **2.      The Risk, Expense, Complexity, and Potential Class Recovery**

6          This factor overwhelmingly weighs in favor of preliminary approval. As stated above,
7  while Plaintiffs believe their case is a strong one, there is substantial risk. Data breach cases are, by
8  nature, especially risky and expensive. Such cases also are innately complex, and this case is no
9  exception.

10         There are numerous substantial hurdles that Plaintiffs would have to overcome before the
11  Court might find a trial appropriate. First, given the early stage of the litigation, the legal sufficiency
12  of Plaintiffs' claims has not been tested by a motion to dismiss, including Article III standing.
13  Establishing a cognizable injury tied to Flagstar's conduct (as opposed to, for instance, another data
14  breach or some other cause) can present challenges.

15         Data breach cases, particularly, face substantial hurdles in surviving even past the pleading
16  stage and are among the most risky and uncertain of all class action litigation. *See, e.g.*, *Hammond*
17  *v. The Bank of N.Y. Mellon Corp.*, No. 08 Civ. 6060, 2010 WL 2643307, at *1 (S.D.N.Y. June 25,
18  2010) (collecting cases). Flagstar likely would argue that it is not liable because it retained Accellion
19  in the first place (a purportedly secure third-party data transferor with a file transfer service), was
20  never informed by Accellion that the FTA product was not secure. *See* Sec. III.C., *supra*. Flagstar
21  likely would argue that Accellion is solely at fault for the FTA Data Breach.

22         Were litigation to proceed, there would be numerous expert reports and costly depositions,
23  which would present significant expenses. As in any data breach class action, establishing causation
24  and damages on a class-wide basis is largely unchartered territory and full of uncertainty.

25         Plaintiffs' California CCPA claim also faces significant risk of dismissal on the pleadings
26  or an unfavorable disposition at summary judgment. The CCPA is relatively new (effective only on
27  January 1, 2020) and remains largely untested. Were this litigation to continue, Flagstar could attack
28  Article III standing as well as the merits of this claim.

- 19 -

Plainly, the Settlement avoids the risk of non-recovery and is a prudent course in view of these high risks. Given that all Class Members will be eligible to elect CMIS or cash payments, the Settlement provides benefits that address all potential harms of a data breach without the substantial risk of continued litigation, which includes the risk of dismissal or judgment against Plaintiffs.

### 3.    The Risk of Maintaining Class Status Through Trial

This case is still in the pleadings stage and the Parties have not briefed class certification. Prior to class certification proceedings, there is risk of dismissal. Class certification, if and when it arrives, will present substantial risk, particularly given that different types of information were affected for different Class Members, and in light of the fact that class wide damage models remain largely untested at litigation. If Plaintiffs obtained class certification, there is no guarantee that the class action status would be maintained. Flagstar would likely seek a Rule 23(f) appeal of any decision by the Court granting class certification, resulting in additional delay. The significant risk of obtaining and maintaining class certification in this case supports preliminary approval.

### 4.    The Amount Offered in Settlement Is Fair

The $5.9 million non-reversionary Settlement Fund is an excellent result for the Class. With this fund, all Class Members will be eligible for a Settlement Payment in the form of distribution for the CMIS, Documented Loss Payment, or a Cash Fund Payment. SA §§ 4.2.1-4.2.3. The Settlement Fund will be applied to pay all Administrative Expenses, Notice Expenses, the taxes to the Settlement Fund, any Service Payments, and any payment of a Fee Award and Costs. *Id*. § 3.8. Any funds remaining in the Net Settlement Fund after distribution(s) to Class Members will be distributed in a subsequent Settlement Payment to Class Members. *Id*. § 4.9.

The Settlement presents a robust relief package and valuable outcome for the Class compared to other recent data breach class action settlements on a per-capita basis. *See* **Appendix A** attached hereto, Data Breach Settlement Comparison Chart; Wolfson Decl. ¶ 30. The Settlement is in the upper range of similar settlements on a per capita basis, and is even stronger in light of the fact that the Settlement does not release claims against Accellion, another potential source of recovery, as well as the additional risks of litigation based on the unique circumstances of this Data Breach, as discussed in Sec. V.B.2, *supra*.

1

## 5.  The Proposed Method of Distribution Is Effective

Rule 23(e)(2)(C)(ii) requires consideration of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e). "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims. A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." *Id.*, Advisory Comm. Note to 2018 amendment.

To file a claim, Class Members need only complete a straightforward Claim Form and, if necessary, submit it along with documents supporting their claimed losses either through the Settlement Website or by mail. SA §§ 4.2.1-4.2.3, 5.1.1, and Ex. A; Azari Decl. ¶ 20. All claims will be processed by Epiq. *Id.* §§ 1.43, 5.1; Azari Decl. ¶¶ 1, 10. The methods of distributing relief to Class Members include both digital and physical check avenues. SA § 4.3; Azari Decl. ¶ 22. Based upon Class Counsel's previous experience and knowledge, Class Counsel expect the claims rate in this Settlement to be between 1-3%. Wolfson Decl. ¶ 25; Azari Decl. ¶ 26; *see* **Appendix B** attached hereto, Data Breach Settlement Claims Rate Comparison Chart.

## 6.  The Extent of Discovery Completed and the Stage of the Proceedings

Plaintiffs have diligently developed the facts and claims in this case. Plaintiffs conducted significant confirmatory discovery to establish, *inter alia*, facts relevant to the breach and Flagstar's liability, Flagstar's reaction to the breach, and class size. Wolfson Decl. ¶¶ 12-15, 17-21, 28; *see* Sec. III.C, *supra*. Plaintiffs and their counsel have stayed abreast of all material developments involving the FTA Data Breach, including those impacting Flagstar. Wolfson Decl. ¶ 12.

The Parties engaged in discovery to confirm the Settlement as fair, reasonable, and adequate. During settlement negotiations, the Parties engaged in confirmatory discovery to verify the relevant facts and the fairness of the Settlement. *Id*. ¶¶ 18, 28. Counsel's knowledge of facts of this case and of the practice area more broadly informed Plaintiffs' clear view of the strengths and weaknesses of the case, the decision to twice go to mediation with Flagstar, and the decision to recommend that the Court grant preliminary approval to the Settlement. *Id*. ¶¶ 31-33, 53.

- 21 -

### 7.    The Experience and Views of Counsel

Proposed Class Counsel include attorneys who have substantial experience in complex class action litigation, including in data breach and data privacy cases. *Id*. ¶¶ 38-52 and Ex. 2. Proposed Class Counsel fully endorse the Settlement as fair, reasonable, and adequate to the Class, and do so without reservation. *Id*. ¶¶ 6, 29, 53.

### 8.    The Presence of a Governmental Participant

No governmental agency is involved in this litigation. The Attorney General of the United States and Attorneys General of each State will be notified of the proposed Settlement pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, and will have an opportunity to raise any concerns or objections. Azari Decl. ¶¶ 21, 27.

### 9.    The Reaction of Class Members to the Proposed Settlement

The Class has not yet been notified of the Settlement or had an opportunity to object. It is premature to assess this factor. Prior to final approval, the Court will be able to review all objections or comments received from Class Members, along with a full accounting of all opt-out requests.

### 10.    The Settlement Is the Product of Arm's-Length Negotiations that Were Free of Collusion

The Court must be satisfied that "the settlement is not the product of collusion among the negotiating parties." *In re Bluetooth Headset*, 654 F.3d at 946-47 (internal quotation marks, ellipses and citation omitted). Plaintiffs achieved the Settlement in contested litigation and through arm's-length negotiations that involved two mediation sessions before a highly respected mediator. Plaintiffs undertook substantial investigation of the underlying facts, causes of action, and potential defenses to those claims. Wolfson Decl. ¶¶ 12, 18, 28. The Parties engaged in extensive arm's-length negotiations, including two mediation sessions before a mutually agreed upon mediator, the Hon. Jay C. Gandhi (Ret.) on July 13 and July 26, 2021. *Id*. ¶¶ 31-33.

Judge Gandhi, a highly respected and experienced mediator, has extensive experience in class action litigation, both from his time as a magistrate judge in the Central District of California and as a result of mediating many class actions, including multiple data breach cases where a

settlement was reached and subsequently approved.[7] His involvement here further confirms the absence of collusion. *G. F. v. Contra Costa Cnty.*, No. 13-cv-03667, 2015 WL 4606078, at *13 (N.D. Cal. July 30, 2015) ("[T]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.") (internal quotation marks and citation omitted).

*Bluetooth* identified three "signs" of possible collusion: (1) "when counsel receive[s] a disproportionate distribution of the settlement"; (2) "when the parties negotiate a 'clear sailing arrangement,'" under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee; and (3) when the agreement contains a "kicker" or "reverter" clause that returns unawarded fees to the defendant, rather than the class. 654 F.3d at 947 (internal citations omitted).

None of the *Bluetooth* concerns are present here. There is no "clear sailing provision" and Class Counsel will not seek fees that exceed the 25% of the Fund benchmark set by *Bluetooth*. *Id.* at 942; SA § 11.3; *see* Sec. IV.H, *supra*. There is no reversion of the Settlement Fund (SA § 4.11), but rather the Settlement makes every effort to distribute any Residual to the Class (*see id.* §§ 4.9, 4.11). Proposed Class Counsel will apply for fees from this non-reversionary Settlement Fund, so that there was every incentive to secure the largest fund possible. There is no indication or existence of collusion or fraud in the negotiations and the Settlement that is being presented to the Court.

### 11.    The Proposed Notice Plan is Appropriate

For classes certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). "The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 113 (2d Cir. 2005). The best notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

---

[7]   *See, e.g., In re Premera Blue Cross Customer Data Sec. Breach Litig.*, No. 3:15-MD-2633, 2019 WL 3410382, at *1 (D. Or. July 29, 2019); *In re Banner Health Data Breach Litigation*, No. 2:16-cv-02696-PHX-SRB (D. Ariz. Dec. 5, 2019), ECF No. 170, at 6 (parties engaged in private mediation with Judge Gandhi).

Notice should provide sufficient information to allow Class Members to decide whether they should accept the benefits of the settlement, opt out and pursue their own remedies, or object to its terms. *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 251-52. "[N]otice is adequate if it may be understood by the average class member." *Warner v. Toyota Motor Sales, U.S.A., Inc.*, No. CV 15-2171, 2016 WL 8578913, at *14 (C.D. Cal. Dec. 2, 2016) (quoting 4 NEWBERG ON CLASS ACTIONS § 11:53, at p. 167 (4th ed. 2013)). The Long Form Notice (SA, Ex. D) here is clear, precise, informative, and meets all the necessary standards, allowing Class Members to make informed decisions with respect to whether they remain in or opt out of, or object to, the Settlement.

The Notice Plan includes direct notice by emailing or mailing the Summary Notices (SA, Ex. F) to all Class Members, and reminder emails to those for whom email addresses are available. SA §§ 6.3-6.8; Azari Decl. ¶¶ 13-16. The Administrator will design and conduct an internet digital advertising publication notice program and Settlement Website, which will continue through the Claims Deadline. SA §§ 6.4, 6.7; Azari Decl. ¶¶ 17-18. Copies of all the notice documents are attached as exhibits to the Settlement Agreement; they are clear and concise, and directly apprise Class Members of all the information they need to know to make a claim, opt out, or object. Fed. R. Civ. P. 23(c)(2)(B); *see also* Azari Decl. ¶¶ 21, 23. The Notice Plan is consistent with, and exceeds, other similar court-approved notice plans, the requirements of Fed. Civ. P. 23(c)(2)(B), the Northern District of California Procedural Guidance for Class Action Settlements (Guidance # 3), and the Federal Judicial Center ("FJC") guidelines for adequate notice.

As there is no alternative method of notice that would be practicable here or more likely to notify Class Members, the proposed Notice plan constitutes the best practicable notice to Class Members and complies with the requirements of Due Process.

### 12.    Appointment of Settlement Class Counsel

Under Rule 23, "a court that certifies a class must appoint class counsel [who must] fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In making this determination, courts consider the following attributes: the proposed class counsel's (1) work in identifying or investigating potential claims, (2) experience in handling class actions or other complex litigation, and the types of claims asserted in the case, (3) knowledge of the applicable law,

- 24 -

and (4) resources committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i-iv). Here, proposed Settlement Class Counsel have extensive experience prosecuting complex consumer class action cases, and specifically data breach and data privacy cases. Wolfson Decl. ¶¶ 38-52 and Ex. 2. As described above and in Ms. Wolfson's supporting declaration and AW's firm resume, Proposed Class Counsel meet all Rule 23(g)(1)(A) factors. Accordingly, the Court should appoint Tina Wolfson, Robert Ahdoot, and Andrew W. Ferich of Ahdoot & Wolfson, PC as Class Counsel.

### 13.    Settlement Deadlines and Schedule for Final Approval

In connection with preliminary approval, the Court must set a final approval hearing date, dates for mailing the Notices, and deadlines for objecting to and filing papers in support of the Settlement. Plaintiffs propose the following schedule, which the parties believe will provide ample opportunity for Class Members to decide whether to request exclusion or object:

| EVENT | DATE |
|---|---|
| Notice Date (U.S. Mail and email) | Within **30 Days** from the Preliminary Approval Order |
| Deadline to Submit Claim Forms | **90 Days** from the Notice Date |
| Deadline to Submit Motion for Attorneys' Fees, Costs and Service Payments | At Least **35 Days** Before the Objection Deadline |
| Deadline to Object and Comment to the Settlement | **75 Days** from the Notice Date |
| Deadline to Submit Request for Exclusion | **75 Days** from the Notice Date |
| Final Fairness Hearing | To be Determined |

## VI.    CONCLUSION

Plaintiffs Grace Beyer, Christopher Hauser, Charles Tyer, and Stefanie Burton respectfully request that this motion be granted and that the Court enter an order: (1) certifying the proposed class for settlement; (2) preliminarily approving the proposed class action Settlement; (3) appointing Plaintiffs as Class Representatives and Ahdoot & Wolfson, PC as Class Counsel; (4) appointing Epiq as the Settlement Administrator; (5) approving the proposed Class Notice Plan and related Settlement administration documents; and (6) approving the proposed class settlement administrative deadlines and procedures, including setting a Final Approval Hearing date.

1    Dated: September 6, 2021                 Respectfully submitted,

2                                              */s/ Tina Wolfson*
                                              TINA WOLFSON (SBN 174806)
3                                              *twolfson@ahdootwolfson.com*
                                              ROBERT AHDOOT (SBN 172098)
4                                              *rahdoot@ahdootwolfson.com*
                                              **AHDOOT & WOLFSON, PC**
5                                              2600 W. Olive Avenue, Suite 500
                                              Burbank, CA 91505-4521
6                                              Tel:  310.474.9111; Fax: 310.474.8585

7                                              ANDREW W. FERICH (*pro hac vice*)
                                              *aferich@ahdootwolfson.com*
8                                              **AHDOOT & WOLFSON, PC**
                                              201 King of Prussia Road, Suite 650
9                                              Radnor, PA 19087
                                              Tel:  310.474.9111;Fax: 310.474.8585
10

11                                             *Attorneys for Plaintiffs and the Proposed Class*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## APPENDIX A: DATA BREACH SETTLEMENT COMPARISON CHART

| Case Title | No. of Class Members | Settlement Fund | Amount Per Class Member | Credit Monitoring |
|---|---|---|---|---|
| ***Beyer, et al. v. Flagstar Bank*** | **1.48M** | **$5.9M** | **$3.99** | **3 years** |
| *In re Target Corp. Customer Data Breach Security Litigation* | 97.5M | $10M | $0.10 | Documented Cost Reimbursement |
| *In re LinkedIn User Privacy Litig.* | 6.4M | $1.25M | $0.20 | N/A |
| *In re The Home Depot Inc. Customer Data Security Breach Litig.* | 40M | $13M | $0.33 | 18 Months |
| *In re Yahoo! Inc. Customer Data Breach Litigation* | 194M | $117.5M | $0.61 | 2 years |
| *Adlouni v. UCLA Health Systems Auxiliary, et al.* | 4.5M | $2M | $0.44 | 2 years |
| *Atkinson, et al. v. Minted, Inc.* | 4.1M | $5M | $1.22 | 2 years |
| *In re Experian Data Breach Litigation* | 16M | $22M | $1.37 | 2 years |
| *In re Anthem, Inc. Data Breach Litigation* | 79.2M | $115M | $1.45 | 2 years |
| *In re Equifax Inc. Data Security Breach Litigation* | > 147M | $380.5M | $2.59 | 4 years |
| *In re Premera Blue Cross Customer Data Security Breach Litigation* | 8.86M | $32M | $3.61 | 2 years |

## APPENDIX B: DATA BREACH SETTLEMENT CLAIMS RATE COMPARISON CHART

| Case Title | Approx. Class Size | No. of Claims | Claims Rate |
|---|---|---|---|
| *Gordon, et al. v. Chipotle Mexican Grill, Inc.*, No. 1:17-cv-01415 (D. Colo.), ECF 103 at 1 & ECF 124 at ¶ 13 | 10,000,000 | 6,354 | < 0.1% |
| *In re Target Corp. Customer Data Security Breach Litigation*, MDL No. 14-2522 (D. Minn.), ECF 615 at ¶¶ 4, 14 | 97,447,983 | 225,856 | ~0.2% |
| *In re The Home Depot Inc. Customer Data Security Breach Litigation*, No. 1:14-md-02583 (N.D. Ga.), ECF 181-1 at 25 & ECF 245-1 at ¶ 3 | 40,000,000 | 127,527 | ~0.3% |
| *Corona v. Sony Pictures Entertainment, Inc.*, No. 2:14-cv-9600 (C.D. Cal.), ECF 145-1 at 11 n.8 & ECF 164 at 2 | 435,000 | 3,127 | ~0.7% |
| *In re LinkedIn User Privacy Litig.*, No. 12-cv-03088-EJD (N.D. Cal.), ECF 122 at 2 & ECF 145-2 at ¶ 12 | 6,400,000 | 47,336 | ~0.7% |
| *In re Banner Health Data Breach Litigation*, No. 2:16-cv-2696 (D. Ariz.), ECF 170 at 1, and ECF 195-3 at ¶ 12 | 2,900,000 | 39,091 | ~1.3% |
| *In re Anthem, Inc. Data Breach Litig.*, No. 5:15-md-02617-LHK (N.D. Cal.), ECF 1007 at 4 & ECF 1007-6 at ¶ 2 | 79,200,000 | 1,380,000 | ~1.7% |
| *Adlouni v. UCLA Health Systems Auxiliary, et al.*, BC589243 (Cal. Super. Ct.) | 4,500,000 | 108,736 | ~2.4% |
| *In re Experian Data Breach Litigation*, No. 8:15-cv-01592-JLS-DFM (C.D. Cal.), ECF 286-1 at 20 & ECF 309-3 at ¶ 8 | 14,931,074 | 436,006 | ~2.9% |
| *Sheth v. Washington State University*, No. 3:17-cv-05511 (W.D. Wash.) | 992,327 | 37,712 | ~3.8% |
| *Winstead v. ComplyRight, Inc.*, No. 1:18-cv-4990 (N.D. Ill.) | 665,680 | 28,073 | ~4.2% |
| *In re Premera Blue Cross Customer Data Security Breach Litigation*, No. 3:15-md-2633 (D. Or.), ECF 273 at 12-13 & ECF 301 at ¶ 13 | 8,855,764 | 803,710 | ~9.1% |
| *In re Equifax Inc. Data Security Breach Litigation*, No. 1:17-md-2800 (N.D. Ga.), ECF 739-1 at 20 & ECF 900-4 at ¶ 5 | 147,000,000 | 15,000,000 | ~10.2% |