Adam E. Polk (State Bar No. 273000)
Jordan Elias (State Bar No. 228731)
Simon S. Grille (State Bar No. 294914)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
apolk@girardsharp.com
jelias@girardsharp.com
sgrille@girardsharp.com

Krysta Kauble Pachman (280951)
Michael Gervais (330731)
Steven G. Sklaver (237612)
Kevin R. Downs (331993)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
Tel: (310) 789-3100
kpachman@susmangodfrey.com
mgervais@susmangodfrey.com
ssklaver@susmangodfrey.com
kdowns@susmangodfrey.com

*Interim Co-Lead Class Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

IN RE ACCELLION, INC. DATA BREACH
LITIGATION

Case No. 21-cv-01155-EJD

Hon. Edward J. Davila

**CONSOLIDATED CLASS ACTION
COMPLAINT**

10477382v1/017147

Plaintiffs Amber Chavez, Derek Dawes, Amiresse Desjardins, Randy Moniz, Robert Olson, Jr., Holly Ringling, Heather Rodriguez, Sherie Taylor, Tito Torres, Valerie Whittaker, and Kimberly Worrick ("Plaintiffs"), individually and on behalf of the Class defined below, bring this action against Defendants Accellion, Inc. ("Accellion"), Flagstar Bancorp, Inc., and Flagstar Bank, FSB ("Flagstar") (collectively, "Defendants"), and allege as follows:

## I.  SUMMARY OF THE ACTION

1.      This action arises out of Defendants' failure to secure sensitive personal information stored on Accellion's File Transfer Appliance ("FTA") product. Plaintiffs seek relief for individuals whose private details—including names, dates of birth, Social Security numbers, driver's license numbers and/or state identification numbers, bank account information, employment information, and personal health information ("Personal Health Information" or "PHI") (collectively "Personally Identifiable Information" or "PII")—were exposed to unauthorized actors from December 2020 to January 2021 (the "Data Breach").

2.      Defendants' failure to safeguard and protect their systems resulted in Plaintiffs' and other Class members' information being hacked and taken. Entities such as government agencies, private businesses, and universities hired Accellion—a cloud solutions company—to collect and securely transfer sensitive Personally Identifiable Information. Accellion stated on its website that it "enables millions . . . from every walk of life to do their jobs without putting their organization at risk. When they click the Accellion button, they know it's the safe and secure way to share information . . . ."[1] Accellion knew, or should have known, that its customers would use its FTA service to store and transfer large quantities of highly sensitive PII. Although such information has consistently been a target of theft, Accellion neglected to secure it.

3.      Exacerbating the risk to Class members, Flagstar, an Accellion client affected by the breach, knew of the security shortcomings in Accellion's FTA product and had been advised to upgrade to a more secure product prior to the breach. Flagstar nevertheless continued to use the

---

[1] https://web.archive.org/web/20210303105519/www.accellion.com/platform/simple/secure-third-party-communication/ (last visited June 23, 2023).

FTA. On March 5, 2021, Flagstar announced that its customers' PII had been compromised in the Data Breach.

4.      Plaintiffs and Class members now must contend with the fallout from their PII being in the hands of unauthorized actors. Some Plaintiffs have already experienced instances of identity theft, including fraudulent charges in their names, and have incurred out-of-pocket loss in addition to understandable distress. Plaintiffs hereby seek appropriate damages or restitution together with injunctive relief to remediate Accellion's and Flagstar's deficient cyber security, to provide credit monitoring, and to provide identity theft insurance and credit repair services that will protect Class members against identity theft and fraud.

## II.     PARTIES

### Plaintiffs

5.      Plaintiff Amber Chavez is a citizen of the state of California and resides in Barstow, California. Plaintiff Chavez, as well as her minor daughter, had savings accounts with Flagstar, and she provided her and her minor daughter's PII to receive those services. Plaintiff Chavez received a letter from Flagstar informing her of the Data Breach and advising her to take protective measures. Her Social Security number, birthdate, and other sensitive facts, as well as those of her minor daughter, were taken by unauthorized actors in the Data Breach. Plaintiff Chavez has experienced fraudulent charges and purchases, and incurred overdraft fees from the fraudulent charges for which she was not reimbursed. Plaintiff Chavez expended time and money in response to the Data Breach, including by purchasing credit monitoring after the Data Breach, replacing credit or debit cards, and making trips to her bank multiple times per week. Since the Data Breach, Plaintiff Chavez also has experienced an increase in scam and phishing telephone calls. Her sensitive information has been found on the dark web. The exposure of her and her daughter's private and confidential information in the Data Breach has caused Plaintiff Chavez to suffer anxiety related to her personal information being compromised and to devote significantly more time to checking her credit reports and financial accounts for fraudulent activity.

6.      Plaintiff Derek Dawes is a citizen of the state of Oklahoma and resides in Bixby, Oklahoma. Plaintiff Dawes was employed by Kroger and provided his PII to Kroger as a condition

of his employment. Plaintiff Dawes received a letter from Kroger informing him of the Data Breach and advising him to take protective measures. His Social Security number, birthdate, and other sensitive facts were taken by unauthorized actors in the Data Breach. Plaintiff Dawes experienced unauthorized charges on his bank account after the Data Breach, and as a result, his account was temporarily frozen. Plaintiff Dawes expended time and money in response to the Data Breach, including by making trips to his bank, having his cards reissued, and researching his exposure in the Data Breach. He spent, and still spends, numerous hours auditing his financial accounts. Since the Data Breach, Plaintiff Dawes has experienced an increase in scam and phishing telephone calls. The exposure of his private and confidential information in the Data Breach has caused Plaintiff Dawes to suffer anxiety related to his personal information being compromised and to devote significantly more time to checking his credit reports and financial accounts for fraudulent activity.

7.      Plaintiff Amiresse Desjardins is a citizen of the state of Tennessee and resides in Madison, Tennessee. Plaintiff Desjardins was employed by Kroger and provided her PII to Kroger as a condition of her employment. Plaintiff Desjardins received a letter from Kroger informing her of the Data Breach and advising her to take protective measures. Her Social Security number, birthdate, and other sensitive facts were taken by unauthorized actors in the Data Breach. Plaintiff Desjardins experienced unauthorized charges on her account after the Data Breach, and she expended time and energy in response to the Data Breach, including by spending numerous hours searching for, reviewing, and responding to fraudulent charges. Since the Data Breach, Plaintiff Desjardins also has experienced an increase in scam and phishing telephone calls. The exposure of her private and confidential information in the Data Breach has caused Plaintiff Desjardins to suffer anxiety related to her personal information being compromised and to devote significantly more time to checking her credit reports and financial accounts for fraudulent activity.

8.      Plaintiff Randy Moniz is a citizen of the state of California and resides in Livermore, California. Plaintiff Moniz was employed at Flagstar and provided his PII as a condition of his employment. Plaintiff Moniz received a letter from Flagstar informing him of the Data Breach and advising him to take protective measures. His Social Security number, birthdate, and other sensitive facts were taken by unauthorized actors in the Data Breach. Plaintiff Moniz's Walmart and PayPal

1    accounts were accessed by unauthorized actors. Additionally, Plaintiff Moniz experienced a

2    fraudulent charge from AT&T on his account after the Data Breach. Plaintiff Moniz expended time

3    and money in response to the Data Breach, including by continuing to pay for his LegalShield

4    Credit Monitoring account, which he otherwise would have cancelled. Since the Data Breach,

5    Plaintiff Moniz also has experienced an increase in spam and phishing telephone calls. Plaintiff

6    Moniz received notice from LegalShield Credit Monitoring that it had discovered his information

7    on the dark web. The exposure of his private and confidential information in the Data Breach has

8    caused Plaintiff Moniz to suffer anxiety related to his personal information being compromised and

9    to devote significantly more time to checking his credit reports and financial accounts for fraudulent

10   activity.

11          9.      Plaintiff Robert Olson, Jr. is a citizen of the state of California and resides in

12   Forestville, California. Plaintiff Olson received health care services from Health Net of California

13   and provided his PII to receive those services. Plaintiff Olson received a letter from Health Net

14   informing him of the Data Breach and advising him to take protective measures. His Social Security

15   number, birthdate, medical information, and other sensitive facts were taken by unauthorized actors

16   in the Data Breach. Plaintiff Olson discovered fraudulent charges on his credit card after the Data

17   Breach, and as a result, his card was cancelled and he lost access to the card while it was being

18   replaced. Plaintiff Olson expended time and money in response to the Data Breach, including by

19   replacing his compromised card, resetting automatic billing information, researching credit

20   protection, resetting passwords, and regularly monitoring his statements for fraudulent charges.

21   Since the Data Breach, Plaintiff Olson also has experienced an increase in scam and phishing

22   telephone calls. He received notice from Experian that it had discovered his information on the dark

23   web. The exposure of his private and confidential information in the Data Breach has caused

24   Plaintiff Olson to suffer anxiety related to his personal information being compromised and to

25   devote significantly more time to checking his credit reports and financial accounts for fraudulent

26   activity.

27          10.     Plaintiff Holly Ringling is a citizen of the state of Texas and resides in San Antonio,

28   Texas. Plaintiff Ringling received banking services from Flagstar and provided her PII to receive

those services. Plaintiff Ringling received a letter from Flagstar informing her of the Data Breach and advising her to take protective measures. Her Social Security number, birthdate, and other sensitive facts were taken by unauthorized actors in the Data Breach. After the Data Breach, Plaintiff Ringling experienced multiple fraudulent charges, including airline purchases, charges from China, and appliance purchases. As a result, she has been forced to routinely change credit and/or debit cards. Additionally, someone tried to create a false TurboTax account in her name. Plaintiff Ringling expended time and money in response to the Data Breach, including by purchasing credit monitoring services and applying a credit freeze, replacing her credit and/or debit cards, and responding to unauthorized charges. Plaintiff Ringling spends hours every day monitoring her accounts for unauthorized activity. Since the Data Breach, Plaintiff Ringling also has experienced an increase in scam and phishing telephone calls. She received notice that her personal information had been discovered on approximately 47-60 sites on the dark web. The exposure of her private, confidential information in the Data Breach has caused Plaintiff Ringling to suffer anxiety related to her personal information being compromised and to devote significantly more time to checking her credit reports and financial accounts for fraudulent activity.

11. Plaintiff Heather Rodriguez is a citizen of the state of Washington and resides in Bellingham, Washington. Plaintiff Rodriguez received unemployment benefits from the state of Washington and provided her PII to receive those benefits. Plaintiff Rodriguez received an online notification from the state of Washington informing her of the Data Breach and advising her to take protective measures. Her Social Security number, birthdate, and other sensitive facts were taken by unauthorized actors in the Data Breach. Plaintiff Rodriguez experienced fraudulent charges on her accounts, as well as months-long delays in receiving unemployment benefits. Plaintiff Rodriguez expended significant time in response to the Data Breach, including by responding to the fraudulent charges, responding to the delayed unemployment benefits, reviewing her accounts and statements and disputing charges, resetting automatic billing information after cancelling her cards, and removing herself from call lists. Since the Data Breach, Plaintiff Rodriguez also has experienced an increase in scam and phishing telephone calls. The exposure of her private and confidential information in the Data Breach has caused Plaintiff Rodriguez to suffer anxiety related to her

- 5 -

1   personal information being compromised and to devote significantly more time to checking her
2   credit reports and financial accounts for fraudulent activity.

3       12.     Plaintiff Sherie Taylor is a citizen of the state of California and resides in Fresno,
4   California. Plaintiff Taylor received healthcare services from CalViva and provided her PII to
5   receive those services. Plaintiff Taylor received a letter from CalViva informing her of the Data
6   Breach and advising her to take protective measures. Her Social Security number, birthdate,
7   medical information, and other sensitive facts were taken by unauthorized actors in the Data
8   Breach. Since the Data Breach, Plaintiff Taylor also has experienced an increase in scam and
9   phishing telephone calls. The exposure of her private and confidential information in the Data
10  Breach has caused Plaintiff Taylor to suffer anxiety related to her personal information being
11  compromised and to devote significantly more time to checking her credit reports and financial
12  accounts for fraudulent activity.

13      13.     Plaintiff Tito Torres is a citizen of the state of Georgia and resides in Stone
14  Mountain, Georgia. Plaintiff Torres was employed by Kroger and provided his PII to Kroger as a
15  condition of his employment. Plaintiff Torres received a letter from Kroger informing him of the
16  Data Breach and advising him to take protective measures. His Social Security number, birthdate,
17  and other sensitive facts were taken by unauthorized actors in the Data Breach. Plaintiff Torres
18  experienced a fraudulent charge after the Data Breach. He expended time in response to the Data
19  Breach, including by monitoring his accounts and reviewing his statements for fraudulent activity.
20  The exposure of his private and confidential information in the Data Breach has caused Plaintiff
21  Torres to suffer anxiety related to his personal information being compromised and to devote
22  significantly more time to checking his credit reports and financial accounts for fraudulent activity.

23      14.     Plaintiff Valerie Whittaker is a citizen of the state of Michigan and resides in Ecorse,
24  Michigan. Plaintiff Whittaker received pharmacy services from Kroger and provided her PII to
25  receive those services. She received a letter from Accellion informing her of the Data Breach and
26  advising her to take protective measures. Her Social Security number, birthdate, and other sensitive
27  facts were taken by unauthorized actors in the Data Breach. Immediately after the Data Breach, an
28  unauthorized person tried to take out a bank loan in Plaintiff Whittaker's name. She has also

- 6 -

experienced fraudulent ID applications and home purchase attempts as a result of the Data Breach. Plaintiff Whittaker expended time and money in response to the Data Breach, including by responding to the fraudulent loan application and by regularly monitoring her accounts. Since the Data Breach, Plaintiff Whittaker also has experienced an increase in scam and phishing telephone calls. The exposure of her private and confidential information in the Data Breach has caused Plaintiff Whittaker to suffer anxiety related to her personal information being compromised and to devote significantly more time to checking her credit reports and financial accounts for fraudulent activity.

15.     Plaintiff Kimberly Worrick is a citizen of the state of Washington and resides in Renton, Washington. Plaintiff Worrick applied for unemployment benefits from the state of Washington and provided her PII to receive those services. Plaintiff Worrick received a letter from the Washington State Auditor's Office informing her of the Data Breach and advising her to take protective measures. Her Social Security number, birthdate, and other sensitive facts were taken by unauthorized actors in the Data Breach. Plaintiff Worrick was the victim of identity theft after the Data Breach. Fraudulent accounts, including credit cards, bank accounts, and utilities, were repeatedly opened in her name on an ongoing basis after the Data Breach. At least one fraudulent tax return was filed in her name, and she incurred a significant drop in her credit score. Plaintiff Worrick expended time and money in response to the Data Breach, including by purchasing fraud-protection services, resetting her passwords and automatic billing instructions, and spending months responding to the fraudulent activity. Since the Data Breach, Plaintiff Worrick also has experienced an increase in scam and phishing telephone calls. Her name, email address, birthdate, Social Security number, and previous address have appeared on the dark web. The exposure of her private and confidential information in the Data Breach has caused Plaintiff Worrick to suffer anxiety related to her personal information being compromised and to devote significantly more time to checking her credit reports and financial accounts for fraudulent activity.

**Defendants**

16.     Accellion, Inc. is a Delaware corporation with its principal place of business in Palo Alto, California.

17.     Defendant Flagstar Bancorp, Inc. (NYSE: FBC) is a Michigan corporation with its corporate headquarters located at 5151 Corporate Drive, Troy, Michigan 48098.

18.     Defendant Flagstar Bank, FSB is a Michigan-based federally chartered stock savings bank with its corporate headquarters located at 5151 Corporate Drive, Troy, Michigan 48098.

## III.     JURISDICTION AND VENUE

19.     This Court has jurisdiction over the lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332, because this is a proposed class action in which: (1) there are at least 100 class members; (2) the combined claims of class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and (3) Defendants and one or more class members are citizens of different states.

20.     The Court has personal jurisdiction over Accellion because its principal place of business is within this District, and it has sufficient minimum contacts in California to render the exercise of jurisdiction by this Court proper and necessary.

21.     The Court has personal jurisdiction over Flagstar because it operates bank branches in California, and it has sufficient minimum contacts in California to render the exercise of jurisdiction by this Court proper and necessary.

22.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and under 28 U.S.C. 1391(a)(1) because Defendants conduct substantial business in this District and California is the principal place of business for Accellion.

23.     Pursuant to Civil Local Rule 3-2(c), a substantial part of the events giving rise to the claims brought herein occurred in Santa Clara County, California. Consequently, assignment of this action to the San Jose Division is appropriate.

1

## IV.      FACTUAL ALLEGATIONS

2

**Accellion Knew of the Risk of a Data Breach But Provided and Permitted an Outdated System**

3      24.     Accellion is a cloud solutions company that provides an enterprise content firewall

4  that it represents "prevents data breaches and compliance violations from third party cyber risk."[2]

5      25.     In the early 2000s, Accellion developed, marketed, and sold a file sharing transfer

6  software product called File Transfer Appliance. The purpose of FTA was to facilitate secure,

7  encrypted file sharing that exceeded limits imposed on the size of email attachments. Instead of

8  transferring documents by email, the intended recipient would receive a link to files, hosted on

9  Accellion's FTA, which could then be viewed or downloaded.

10     26.     Accellion's business is built on the premise that it provides a platform for securely

11  transferring sensitive information, and Accellion's clients and customers rely on its provision of a

12  secure file transfer system. It holds itself out as providing a platform that ensures that PII can be

13  securely transmitted between and among individuals and entities.

14     27.     Accellion has represented that its content firewall:

15
16
17
18
19

> provides the security and governance [information security officers] need to
> protect their organizations, mitigate risk, and adhere to rigorous compliance
> regulations . . . . Accellion solutions have protected more than 25 million
> end users at more than 3,000 global corporations and government agencies,
> including NYC Health + Hospitals; KPMG; Kaiser Permanente; National
> Park Service; Tyler Technologies; and the National Institute for Standards
> and Technology (NIST).[3]

20     28.     Accellion stated on its website that it "enables millions of executives, employees,

21  customers, vendors, partners, investors, attorneys, doctors, patients, and professionals from every

22  walk of life to do their jobs without putting their organization at risk. When they click the Accellion

23  button, they know it's the safe and secure way to share information with the outside world."[4]

24  Accellion's privacy policy further states that it "control[s] information that is provided directly to

25  _____

[2]  https://www.kiteworks.com/company/ (previously https://www.accellion.com/company/) (last accessed June 23, 2023).

26  [3] *Id.*

27  [4]  https://www.kiteworks.com/platform/simple/secure-third-party-communication/ (previously https://www.accellion.com/platform/simple/secure-third-party-communication/) (last accessed

28  June 23, 2023).

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 21-cv-01155-EJD

[it]," and "takes appropriate steps to ensure data privacy and security including through various hardware and software methodologies."[5]

29.      This business model proved successful for Accellion for many years. Accellion's services were used by hundreds of companies and government and private organizations across the United States and abroad, which relied on Accellion to securely transfer sensitive data.

30.      In the ordinary course of doing business with entities that use Accellion's FTA, individuals are typically required to provide PII that is then transferred by Accellion. That PII can include one or several of the following categories of data: names, addresses, phone numbers, email addresses, birthdates, demographic information, Social Security numbers, credit card account numbers, bank account numbers, educational history, healthcare records or other data protected under HIPAA, insurance information, photo identification, employer information, income information, and other Personally Identifiable Information.

31.      This information is valuable and confidential; when electronic files containing such information are transferred, the transfer must be secure. Accellion provides a service to securely transfer files containing PII, for which Accellion is paid.

32.      By December 2020, however, Accellion's FTA product was almost 20 years old. For three years leading up to the Data Breach, Accellion had recognized that the product was nearing the end of its life—yet Accellion did not retire the product during that time. Instead, aware of the risks from using an outdated product to transfer files containing PII, Accellion encouraged customers to switch to its new product, called Kiteworks. Still, Accellion continued to tout its systems and products as secure.

33.      The risk of hacking was well known. As recently before the Data Breach as November 2019, the FBI and the U.S. Secret Service issued warnings to potential targets like Accellion so they would be aware of and prepared for a potential cyberattack.[6] The increase in such

---

[5]   https://www.kiteworks.com/privacy-policy/ (previously https://www.accellion.com/privacy-policy/) (last accessed June 23, 2023).

[6] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-oftargeted-ransomware (last visited June 22, 2023).

attacks, and attendant risk of future attacks, was widely known among the public and known to anyone in the secure file sharing service industry.

**Flagstar Continued to Use FTA After It Was Warned to Switch**

34.    Flagstar, one of Accellion's FTA clients, is one of the largest mortgage originators and savings banks in the country. According to its website, and after a recent merger, it has "assets of $123.8 billion," "operates 435 branches, including strong footholds in the Northeast and Midwest and exposure to high growth markets in the Southeast and West Coast," and "operates nationally through a wholesale network of approximately 3,000 third-party mortgage originators."[7]

35.    As part of Flagstar's banking relationship with its customers, Flagstar collects, stores, and maintains customers' PII, including names, addresses, Social Security numbers, and financial information such as bank account numbers and credit or debit card numbers. Flagstar's Privacy Notice recognizes the necessity of collecting this information, stating that "[a]ll financial companies need to share customers' personal information to run their everyday business" and that "[w]hen you are no longer our customer, we continue to share your information as described in this notice."[8]

36.    Flagstar's customers rely on it to safeguard their PII. Flagstar knows that its customers entrust it with this responsibility, and in Flagstar's privacy notice, it recognizes its duty to safeguard PII. Flagstar's Privacy Policy states that "[f]inancial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do." It further assures customers that to "protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings."[9]

---

[7] https://www.flagstar.com/about-flagstar.html (last visited June 23, 2023).
[8] *Id.*
[9]    https://www.flagstar.com/content/dam/flagstar/pdfs/about-flagstar/PrivacyPolicy.pdf    (last accessed June 23, 2023).

37.     As a large financial institution, Flagstar is subject to federal requirements as to data security and privacy. Flagstar's conduct is governed by the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), which includes privacy regulations that require financial institutions to provide customers with an initial and annual privacy notice. The notice must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6.

38.     The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 & 314.4.

39.     Instead of "adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances," *id.*, Flagstar knowingly used an outdated, near end-of-life file transfer product. At the time of the Data Breach, Flagstar was a customer of Accellion and used the FTA product for large file transfers, which included Flagstar's customers' PII.

40.     Before the Data Breach, Accellion had asked its customers—including Flagstar—to switch to a newer product called Kiteworks. Despite the fact that Flagstar knew of the risk

- 12 -

associated with continued use of the FTA product, Flagstar continued to use Accellion's FTA in relation to its customers' PII.

41.    Flagstar's lax data security protocols also resulted in a second data breach unrelated to Accellion less than 12 months after the Data Breach at issue in this litigation.[10]

**Hackers Exploited the Accellion FTA's Multiple Vulnerabilities**

42.    On December 16, 2020, an Accellion customer received an alert from the FTA product's built-in anomaly detector, signaling that unauthorized third parties had exploited the FTA. The customer notified Accellion, and over the next three days, Accellion verified that its FTA software did, in fact, contain two security vulnerabilities. In technical terms, the vulnerabilities were described as SQL Injection (CVE-2021-27101) and OS Command Execution (CVE-2021-27104).[11]

43.    Four days after the attack had already begun, Accellion released a patch for the two vulnerabilities. After another three days, on December 23, 2020, Accellion released a second patch. During this crucial time, Accellion could have promptly notified its clients of the security threats. But many of Accellion's clients did not receive any notifications from Accellion until January 2021.

44.    The Reserve Bank of New Zealand announced that it was a victim of the attack on January 10, 2021. Accellion had notified the bank of the product's vulnerabilities four days earlier. An assessment by KPMG later confirmed that the "email tool used by [Accellion], however, failed to send the email notifications and consequently the Bank was not notified until 6 January 2021."[12]

---

[10]    https://www.cpomagazine.com/cyber-security/flagstar-bank-data-breach-leaked-sensitive-information-of-1-5-million-customers/ (last accessed June 23, 2023).

[11]   https://www.kiteworks.com/sites/default/files/trust-center/accellion-fta-attack-mandiant-report-full.pdf (last accessed June 22, 2023).

[12]            https://techcrunch.com/2021/07/08/the-accellion-data-breach-continues-to-get-messier/?guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS88&guce_referrer_sig=AQAAA GHO4TSZiDOAY1Gw4LYc4Ka31Juj5IHaTImp7j7QAy8H8ecgjRn3ovVe8ztT_HhxQtp9Nfizyo XekGhbMPhvsyap9s77TK5GnqzDYrx2dO-1EOkAmI_jBDtZ8C6U6gTE7uzFuMYrspXnc2avYtF3XSwxUnX2Y40JEkVV5euY7ljP&gucco unter=2 (last accessed June 22, 2023).

45.     Accellion struggled to notify clients of the ongoing threat. When Accellion tried to notify the Washington State Auditor's Office by email, Accellion received automatic undeliverable notifications. Yet Accellion delayed for days before attempting the notice again.

46.     The two patches released in December 2020 proved insufficient, moreover, to secure the 20-year-old FTA product. Shortly after the first attack, a second attack took place starting on January 20, 2021. Hence the Data Breach, as defined herein, is actually two separate breaches, with the second occurring several weeks after Accellion knew of the first.

47.     Two days after the second attack began, Accellion learned of the new exploit. There were two additional security vulnerabilities in its FTA software, described as Server-Side Request Forgery (CVE-2021-27103) and OS Command Execution (CVE-2021-27102). Only at this point did Accellion advise clients to shut down their FTA systems.

48.     The cybersecurity firm Mandiant later described these Accellion vulnerabilities as being "of critical severity because they were subject to exploitation via unauthenticated remote code execution."[13] Even after Accellion released new patches three and six days later, Mandiant later found two additional vulnerabilities in the FTA software that it described as being of "medium" to "high severity."[14]

49.     Starting in mid-December 2020, unauthorized third parties, including the ransomware group CLOP, gained access to large amounts of PII, PHI, and other data stored on, or being transferred through, the Accellion FTA. The fact that hackers were able to locate sensitive PII was no accident. Because the purpose of the FTA was to securely transfer files that contained sensitive content, a breach of the system foreseeably resulted in the exposure and theft of highly sensitive data. The resulting Data Breach was the largest data breach in the United States in 2021 and one of the largest data breaches during the last five years, affecting hundreds of companies and millions of individuals.

---

[13] https://www.kiteworks.com/sites/default/files/trust-center/accellion-fta-attack-mandiant-report-full.pdf (previously https://www.accellion.com/sites/default/files/trust-center/accellion-fta-attack-mandiant-report-full.pdf) (last accessed June 21, 2023).

[14] *Id.*

- 14 -

50.     Accellion re-branded after the incident, changing its name to "Kiteworks."[15]

**Initial Reports of the Data Breach's Impact**

51.     The Reserve Bank of New Zealand was the first to publicly announce that its data was compromised in the Data Breach and to raise concerns about the timeliness of Accellion's notification. In a statement, the bank said: "In this instance, their notifications to us did not leave their system and hence did not reach the Reserve Bank in advance of the breach. We received no advance warning."[16]

52.     On January 15, 2021, the Australian Securities and Investments Commission (ASIC) also learned that its data had been compromised as a result of the Data Breach. An unidentified actor had accessed an ASIC server containing sensitive credit license applications. The next week, the Australian law firm Allens confirmed that it "was the victim of a high-profile cyber attack that compromised the service provider it trusted with sensitive information, including commercial-in-confidence documents related to Westpac's anti-money laundering compliance."[17]

53.     During the week of February 1, 2021, the Washington State Auditor's Office announced that it had discovered unauthorized access to a variety of files held in Accellion's systems:

> The Office of the Washington State Auditor ("SAO") was recently made aware of a security breach involving Accellion, a third party provider of hosted file transfer services. During the week of January 25, 2021, Accellion confirmed that an unauthorized person gained access to SAO files by exploiting a vulnerability in Accellion's file transfer service.[18]

54.     Information exfiltrated from the SAO's files included name, Social Security number and/or driver's license or state identification number, bank information, and place of employment, among other items.

---

[15] *See* https://www.kiteworks.com/kiteworks-news/accellions-brand-name-is-now-kiteworks/ (last accessed June 28, 2023).

[16]     https://www.rbnz.govt.nz/hub/news/2021/05/reserve-bank-taking-action-to-respond-to-data-breach-reports (last accessed June 30, 2023).

[17]     https://www.afr.com/companies/financial-services/allens-victim-of-high-profile-cyber-attack-20210122-p56w8g (last accessed June 22, 2023).

[18]     https://www.intelligentcio.com/north-america/2021/02/02/washington-state-auditor-suffers-breach-compromising-data-of-benefit-claimants/ (last visited June 21, 2023).

55.     On March 5, 2021, Flagstar announced that the PII of certain customers was compromised as part of the Data Breach. Flagstar's public statement read:

> Accellion, a vendor that Flagstar uses for its file sharing platform, informed Flagstar on January 22, 2021, that the platform had a vulnerability that was exploited by an unauthorized party. After Accellion informed us of the incident, Flagstar permanently discontinued use of this file sharing platform. Unfortunately, we have learned that the unauthorized party was able to access some of Flagstar's information on the Accellion platform and that we are one of numerous Accellion clients who were impacted.

56.     Information exfiltrated from Flagstar's files included Social Security number, first name, last name, phone number, address, and tax information, among other items.

57.     Flagstar had been made aware of the breach several weeks earlier but delayed until March 5, 2021 before informing customers. Accellion informed Flagstar of the breach on January 22, 2021. Flagstar was aware of the harm that the breach was causing its customers. It acknowledged in its public release that "those responsible for this incident are in some cases contacting Flagstar customers by email and by telephone."

**The Effects of the Data Breach Continued to Spread as PII Leaked to the Dark Web**

58.     Accellion's failure to ensure that the FTA product provided adequate security protocols, and Flagstar's failure to employ reasonable security measures, exposed the PII of millions of individuals. As a result of Defendants' conduct, the PII of Plaintiffs and the other Class members was compromised, and disclosed to unknown and unauthorized third parties without their consent.

59.     Entities that used Accellion's FTA product and were affected by the Data Breach include, among others:

- Allens
- American Bureau of Shipping
- Arizona Complete Health
- Arkansas Health and Wellness
- Aspect Software
- The Australia Securities and Investments Commission

- 16 -

1      •   Australia Transport for New South Wales

2      •   Beaumont Health

3      •   Bombardier

4      •   Brown Rudnick LLP

5      •   Cal Viva

6      •   California Health and Wellness

7      •   Cargill

8      •   Cayuga Medical Center

9      •   Centene Corporation

10      •   Community Memorial Health System

11      •   Congressional Federal Credit Union

12      •   Cook Group, Inc.

13      •   CSX

14      •   Danaher

15      •   Department of Transportation, Office of the Secretary

16      •   Eastern Suffolk BOCES

17      •   El Paso Electric Company

18      •   Faegre Drinker Biddle & Reath LLP

19      •   Finnegan, Henderson, Farablow, Garrett

20      •   Flagstar Bank

21      •   Foley & Lardner, LLP

22      •   Fortior Solutions, LLC

23      •   Fugro

24      •   Goodwin Proctor

25      •   Guidehouse

26      •   Harvard Business School

27      •   Health Net (and other related entities)

28      •   Jones Day

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 21-cv-01155-EJD

1       • Kinzie Manufacturing

2       • The Kroger Co.

3       • Lehigh Valley Health Network

4       • Memorial Sloan Kettering Cancer Center

5       • Millennium Challenge Corporation

6       • Morgan Stanley

7       • National Gallery of Art

8       • National Science Foundation

9       • Office Support Services, LLC

10      • Pentair Management

11      • Postlehwaite & Netterville

12      • The Office of the Washington State Auditor

13      • QIMR Berghofer Medical Research Institute

14      • Qualys

15      • Racetrac Corporation

16      • Racetrac Petroleum

17      • The Reserve Bank of New Zealand

18      • Shell

19      • Singtel

20      • Southern Illinois University School of Medicine

21      • The Small Business Administration

22      • Stanford University

23      • Steris

24      • Transport for New South Wales

25      • Trillium Community Health Plan

26      • University of California system

27      • University of Colorado

28      • University of Maryland, Baltimore

- 18 -

1          • University of Miami (Florida)

2          • Wright Medical Technology

3          • Yeshiva University

4          60.     Months after attackers first breached Accellion's 20-year-old FTA platform, new

5   victims continued to emerge. As late as July 2021, Morgan Stanley confirmed that attackers had

6   stolen PII, including Social Security numbers and addresses, of its customers. Morgan Stanley

7   highlighted yet another flaw in Accellion's platform that reflects its failure to have adopted standard

8   information security protocols: even though the documents were encrypted, the hackers also

9   obtained the decryption key to the files through the FTA exploit.[19]

10          **Accellion and Flagstar Owed Duties to Safeguard Individuals' PII**

11          61.     Beyond the obligations arising from Accellion's own representations about creating

12   a secure file transfer system trusted around the globe, and Flagstar's representations about keeping

13   its customers' data secure, Defendants owed Plaintiffs and Class members a duty to safeguard their

14   PII.

15          62.     As described further below, Defendants owed a duty to safeguard PII under several

16   statutes, including the Federal Trade Commission Act ("FTC Act"), the GLBA, and the Children's

17   Online Privacy Protection Act ("COPPA"), to ensure that all information they transferred and

18   maintained was secure. These statutes were enacted to protect Plaintiffs and the Class members

19   from the type of conduct in which Defendants engaged.

20          63.     Defendants owed a duty to safeguard PII because they were on notice that they were

21   handling highly valuable data and knew there was a risk it would be targeted by cybercriminals.

22   Moreover, Defendants knew of the extensive, foreseeable harm that would ensue for the victims of

23   a data breach, and therefore owed a duty to safeguard that information.

24   ────────────

25   [19]          https://techcrunch.com/2021/07/08/the-accellion-data-breach-continues-to-get-
26   messier/?guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAA
     GHO4TSZiDOAY1Gw4LYc4Ka31Juj5IHaTImp7j7QAy8H8ecgjRn3ovVe8ztT_HhxQtp9Nfizyo
27   XekGhbMPhvsyap9s77TK5GnqzDYrx2dO-
     1EOkAmI_jBDtZ8C6U6gTE7uzFuMYrspXnc2avYtF3XSwxUnX2Y40JEkVV5euY7ljP&gucco
28   unter=2 (last accessed June 22, 2023).

64.     Given the sensitive nature of the PII routinely contained in files transferred over FTA, Defendants knew that hackers and cybercriminals would be able to commit identity theft, financial fraud, phishing, socially-engineered attacks, healthcare fraud, and other identity-related fraud upon exfiltrating that data from Accellion's FTA. Defendants also knew that individuals whose PII was transferred over FTA would reasonably spend time and effort to mitigate their damages and prevent identity theft and fraud, if that PII were taken.

65.     Defendants also owed a duty to safeguard Plaintiffs' and class members' data based upon the promises that they made to their clients and customers to securely transfer and store data. Defendants voluntarily undertook efforts to keep that data secure in their business operations and thus owe a continuing obligation to Plaintiffs and Class members to keep their PII secure.

66.     The duty to protect Plaintiffs' PII is non-delegable. Accellion's business model is premised upon voluntarily assuming this duty, by soliciting customers to rely on its professed ability to transfer sensitive data securely. Accellion's duty is for the benefit of the individuals whose PII its products store, transfer, or otherwise manage.

67.     Defendants also owed a duty to comply with industry standards in safeguarding PII, which they did not do.

68.     Because of the value of PII to hackers and identity thieves, companies in the business of storing, maintaining, securing, or transferring PII, such as Accellion and Flagstar, have been identified as being particularly vulnerable to cyberattacks. Cybersecurity firms have promulgated a series of best practices that at minimum should be implemented by sector participants including, but not limited to: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

69.     Federal and state government bodies have likewise established security standards and issued recommendations to reduce the risk of data breaches and the resulting harm to consumers and financial institutions. The FTC has issued numerous guides for business highlighting the

1   importance of robust and effective data and cyber security practices. According to the FTC, the

2   imperative of data and cyber security should be factored into all business decision-making.

3       70.   In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide*

4   *for Business*, which established guidelines for fundamental data and cyber security principles and

5   practices for business. The guidelines note businesses should protect the personal customer and

6   consumer information that they keep; properly dispose of personal information that is no longer

7   needed; encrypt information stored on networks; understand their network's vulnerabilities; and

8   implement policies to correct security problems. The guidelines further recommend that businesses

9   use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming

10  traffic for activity indicating someone is attempting to hack the system; watch for large amounts of

11  data being transmitted from the system; and have a response plan ready in the event of a breach.

12      71.   The FTC also recommends that companies not maintain cardholder information

13  longer than is needed for authorization of a transaction; limit access to sensitive data; require

14  complex passwords to be used on networks; use industry-tested methods for security; monitor for

15  suspicious activity on the network; and verify that third-party service providers have implemented

16  reasonable security measures.

17      72.   The FTC has brought enforcement actions against businesses for failing to

18  adequately and reasonably protect consumer data, treating the failure to employ appropriate

19  measures to protect against unauthorized access to confidential consumer data as an unfair practice

20  that violates Section 5 of the FTC Act, 15 U.S.C. § 45. Orders in these actions further clarify the

21  measures businesses must take to meet their data and cyber security obligations.

22      73.   Defendants also had obligations created by other federal and state law regulations,

23  contracts, industry standards, and common law to maintain reasonable and appropriate physical,

24  administrative, and technical measures to keep Plaintiffs' and Class members' PII confidential and

25  to protect it from unauthorized access and disclosure.

26      74.   Accellion had a duty to safeguard Plaintiffs' and class members' PHI under HIPAA

27  and its implementing regulations, 45 C.F.R. § 160 *et seq.*, which establish privacy and security

28  standards for certain health organizations and their "business associates." *See id.* § 164.302.

- 21 -

Accellion is a "business associate" subject to HIPAA because it receives, maintains, or transmits customers' PHI. *Id.* § 160.103. "PHI" includes, in relevant part, individually identifiable health data relating to the provision of health care, such as Plaintiff Sherie Taylor's compromised medical information. *Id.*

75. HIPAA required Accellion to ensure the confidentiality of the electronic PHI it received and maintained by protecting against reasonably anticipated threats to the integrity of that PHI. *Id.* § 160.306(a). To do so, Accellion was required to implement reasonable and appropriate security measures to mitigate the risk of unauthorized access to the health information on its systems. *See id.* §§ 164.308 (administrative safeguards), 164.312 (technical safeguards).

76. Accellion recognized its duty to safeguard PHI in its Business Associate Agreement. In that agreement, Accellion promised that it "encrypts all data in transit, at rest, and at the individual file level," and that "[e]ven when Accellion hosts the Accellion Solution, only its customers have access to the unencrypted information and the encryption keys."[20] Accellion further promised in that agreement to "use appropriate safeguards and comply with Subpart C of 45 CFR Part 164 with respect to electronic PHI, to prevent use or disclosure of PHI other than as provided for by the Agreement."[21]

77. Nevertheless, as public reports confirmed, hackers were able to access Accellion decryption keys along with encrypted files. Accellion failed to abide by its own promise to prevent disclosure of PHI. Instead, Accellion marketed and sold an outdated system. Flagstar continued to use that system even when made aware of the substantial risk.

**The Data Breach's Impact on and Risk of Future Harm to Individuals**

78. The Data Breach occurred amidst the COVID-19 pandemic, adding to the challenges that citizens already were facing. Individuals who had applied for unemployment benefits with the Washington State Auditor's Office confronted delays in their applications. Washington State Auditor Pat McCarthy stated that "I know this is one more worry for

---

[20] https://www.kiteworks.com/sites/default/files/resources/accellion-business-associate-agreement.pdf (last accessed June 23, 2023).

[21] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 21-cv-01155-EJD

Washingtonians who have already faced unemployment in a year scarred by both job loss and a pandemic. . . . This is completely unacceptable. We are frustrated and committed to doing everything we can to mitigate the harm . . . ."[22]

79.     Armed with the PII acquired in this type of cyberattack, threat actors can commit a variety of crimes including, for example, opening new financial accounts in Class members' names, taking out loans in Class members' names, using Class members' information to obtain government benefits, filing fraudulent tax returns using Class members' information, and obtaining driver's licenses in Class members' names but with another person's photograph.

80.     This risk is not theoretical. On February 13, 2021, reports emerged that the law firm Jones Day's data was being dumped on the dark web by the ransomware group CLOP (a perpetrator of the Data Breach), which claimed that the law firm had not responded to ransom demands. The threat actors posted the following statement: "Hi, they ignore us so they will be published."[23] They added that they had exfiltrated 100 gigabytes of files, including confidential client documents.

81.     By the end of March 2021, sensitive data had appeared on the dark web for multiple Accellion clients. Private information of minors was also accessed. SingTel confirmed that at least 129,000 of its customers' personal information had been stolen. Bombardier reported that personal and other confidential information relating to employees, customers, and suppliers for approximately 130 employees in Costa Rica was impacted after the CLOP threat group added Bombardier to its leak site on the dark web. Qualys verified that "the threat actor continue[d] to post data taken from the Accellion FTA server" and "there are reports from other attack victims that the threat actor has been emailing those victims' customers directly to further the threat actor's agenda."[24] CSX confirmed that a ransomware gang had "posted screenshots of internal company files to a leak site" and that the files "appear[ed] to contain personal information about employees

---

[22] https://sao.wa.gov/third-party-service-providers-security-incident-compromised-washingtonians-personal-information/ (last visited June 21, 2023).

[23]     https://www.databreaches.net/threat-actors-claim-to-have-stolen-jones-day-files-law-firm-remains-quiet/ (last accessed June 22, 2023).

[24]  https://blog.qualys.com/vulnerabilities-threat-research/2021/04/02/qualys-update-on-accellion-fta-security-incident (last accessed June 22, 2023).

and retirees."[25] The University of Colorado issued a statement that it had discovered "additional data when CLOP, the criminal organization tied to the cyberattack on Accellion, posted CU files on the dark web after not receiving a ransom payment."[26] In March 2021, CLOP added the University of Miami to its dark web leak site and posted screen shots of files from the University's health system.[27] Shortly thereafter, the University of Maryland at Baltimore, Yeshiva University, and the University of California ("UC") system were added to the dark web leak site.[28]

82.    Flagstar, Stanford Medical School, Shell, Danaher, and the American Bureau of Shipping also confirmed that confidential data in their control had appeared on the dark web.

83.    On March 29, 2021, hackers began publishing screenshots of personal data they obtained from the University of California system. The screenshots showed PII like home addresses, Social Security numbers, immigration status, dates of birth, and passport numbers. Some of the screenshots displayed lists of individuals along with their Social Security numbers, retirement documentation, and benefit adjustment requests. Hackers also posted UC employee benefit application forms and UCPath[29] Blue Shield health savings plan enrollment requests.

84.    Also beginning on March 29, 2021, holders of UC email accounts began receiving emails that threatened to publish the recipient's personal information. The emails linked to a website that contained a sample of UC employees' personal information. The subject of the emails states: "Your personal data has been stolen and will be published." Email accounts at multiple campuses throughout the UC system received similar messages. The emails threaten to publish the stolen information on the dark web and appear to seek a ransom.

---

[25]    https://www.freightwaves.com/news/csx-probes-security-incident-as-hackers-leak-data    (last accessed June 22, 2023).

[26] https://www.cu.edu/accellion-cyberattack (last accessed June 22, 2023).

[27]    https://www.databreaches.net/threat-actors-leak-files-with-protected-health-information-from-u-miami/ (last accessed June 22, 2023).

[28]        https://www.databreaches.net/accellions-data-breach-left-clients-in-tough-position-pay-extortion-to-criminals-or-have-their-data-dumped/ (last accessed June 22, 2023).

[29] UCPath is the University of California's payroll, benefits, human resources and academic personnel system for all UC employees. The UCPath system is used at every UC location, including campuses, medical centers, research centers, and the UC Office of the President. *See* https://ucpath.berkeley.edu/about-ucpath (last accessed March 20, 2023).

From: [redacted]
Date: Tue, Mar 30, 2021 at 8:55 AM
Subject: Your personal data has been stolen and will be published
To: [redacted]

Good day!
If you received this letter, you are a customer, student, partner or employee of **University of California**.
The company has been hacked, data has been stolen and will soon be released as the company refuses to protect its peoples' data.

We inform you that information about you will be published on the darknet ( [redacted] dog/universityofcalifornia-edu ) if the university does not contact us.
Call or write to this store and ask to protect your privacy!!!!

85.     Private information is valuable property. Its value is axiomatic, considering the market value and profitability of "Big Data" corporations in America. Illustratively, Alphabet Inc., the parent company of Google, reported in its 2020 Annual Report a total annual revenue of $182.5 billion and net income of $40.2 billion. $160.7 billion of this revenue derived from Alphabet's Google business, which is driven almost exclusively by leveraging the private information it collects about the users of its various free products and services.

86.     Criminal law also recognizes the value of PII and the serious nature of its theft by imposing prison sentences on cyber thieves, who can earn significant revenue through stealing PII. Once a cybercriminal has unlawfully acquired personal data, the criminal can demand a ransom or blackmail payment for its destruction, use the information to commit fraud or identity theft, or sell the PII to another cybercriminal on a thriving black market. Cybercriminals use "ransomware" to make money and harm victims. Ransomware is a widely known and foreseeable malware threat in which a cybercriminal encrypts a victim's computer such that the computer's owner can no longer access any files or use the computer in any way. The cybercriminal then demands a payment for the decryption key. Ransomware is typically propagated through phishing, spear phishing, or visiting a malicious or compromised website that contains a virus or other malware.

87.     Once stolen, PII can be used in a number of different ways. One of the most common is to offer it for sale on the "dark web," a heavily encrypted part of the Internet that makes it difficult for authorities to detect the location or owners of a website. The dark web is not indexed by normal search engines such as Google and is only accessible using a Tor browser (or similar tool), which

- 25 -

aims to conceal users' identities and online activity. The dark web is notorious for hosting marketplaces selling illegal items such as weapons, drugs, and PII. Websites appear and disappear quickly on the dark web, making it a dynamic environment.

88.     The U.S. Government Accountability Office ("GAO") released a report in 2007 regarding data breaches finding that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record." Another older study valued users' web-browsing histories at $52 per year.

89.     More recently, the Organization for Economic Cooperation and Development estimated the prices for various elements of personal data: $0.50 for an address, $2 for birthdate, $8 for a Social Security number, $3 for a driver's license number, and $35 for a military record.[30] The value of personal data continues to be high: a personal email can be worth $89, a complete health care record $250, and a hacked Facebook account can sell for $65 on the dark web.[31] Similarly, a 2019 report found that data generated from an adult is worth roughly $35 per month.[32]

90.     The FTC recommends that identity theft victims take several steps to protect their personal health and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and to consider an extended fraud alert that lasts for seven years if identity theft occurs), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

91.     Cybercriminals use stolen PII such as Social Security numbers ("SSNs") for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. Identity thieves can also use SSNs to obtain a driver's license or other official identification card in the victim's name, but with the thief's picture; use the victim's name and SSN to obtain

---

[30] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD DIGITAL ECONOMY PAPERS, No. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

[31] https://www.invisibly.com/learn-blog/how-much-is-data-worth/ (last accessed January 30, 2023).

[32] https://www.vox.com/recode/2019/6/24/18715421/internet-free-data-ads-cost (last accessed January 30, 2023).

government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house or receive medical services in the victim's name, seek unemployment or other benefits, and may even give the victim's PII to police during an arrest resulting in an arrest warrant being issued in the victim's name.

92.    Obtaining a new SSN is difficult and rarely occurs.

93.    Furthermore, data breaches that expose any personal data, and in particular nonpublic data of any kind (e.g., donation history or hospital records), directly and materially increase the chance that a potential victim is targeted by a spear phishing attack in the future. Spear phishing results in a high rate of identity theft, fraud, and extortion.

94.    For those individuals whose PII was exposed, the effects were real and immediate. Several Plaintiffs experienced fraudulent charges and purchases on their accounts. Plaintiff Chavez incurred overdraft fees from fraudulent charges for which she was not reimbursed. Plaintiff Olson's card was cancelled and he lost access to the card while it was replaced. Fraudulent accounts, including credit cards, bank accounts, and utilities, were repeatedly opened in Plaintiff Worrick's name after the Data Breach; at least one fraudulent tax return was filed in her name, and she incurred a significant drop in her credit score. An unauthorized individual attempted to take out a loan in Plaintiff Whittaker's name, after her PII was exposed in the Data Breach.

95.    Even for those individuals who did not experience unreimbursed charges, the exposure of their PII has caused real, lasting harm. Because her PII was stolen in the Data Breach, Plaintiff Ringling is now forced to routinely change credit and/or debit cards, and at one point, someone tried to create a false TurboTax account in her name. Plaintiff Dawes' PII was exposed in the Data Breach, and as a result, his bank account was temporarily frozen and he had to spend time investigating unauthorized charges on his account. Plaintiff Chavez purchased credit monitoring after the Data Breach, replaced credit or debit cards, and had to make trips to her bank multiple times per week. Plaintiff Olson had to replace his compromised card, reset automatic billing information, research credit protection, and reset passwords. Plaintiff Ringling purchased credit monitoring services and applied a credit freeze, replaced her credit and/or debit cards, and now spends hours every day monitoring her accounts for unauthorized activity. Many Plaintiffs also

- 27 -

have experienced an increase in scam and phishing telephone calls and emails since the Data Breach. All must now spend more time monitoring their accounts, and all have suffered understandable fear and anxiety due to their personal information being compromised.

96.     For Plaintiffs and Class members whose PHI—including unique medical records and other sensitive health and prescription information—was exposed, additional risks exist. Patients must be able to trust that their medical information is secure. Numerous state and federal laws require such security. These laws are especially important for individuals with particular medical conditions such as HIV or AIDS, which can subject patients to discrimination.

97.     There is a strong probability that entire batches of stolen information from the Data Breach have yet to be made available on the black market, meaning Plaintiffs and the Class members are at an increased risk of fraud and identity theft for many years into the future. Some of the Plaintiffs and many of the Class members remain in their early middle age, exposing them to decades of future risk. Regardless of their age, Plaintiffs must vigilantly monitor their financial accounts for many years to come.

98.     Additionally, there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. PII is such an inherently valuable commodity to identity thieves that, once it is compromised, criminals often trade the information on the cyber black market for years.

99.     As a result of the Data Breach, Plaintiffs and Class members have and will continue to incur out-of-pocket costs and expenses for, among other things, purchasing credit monitoring services, credit freezes, credit reports, and/or other protective measures to deter and detect identity theft. Plaintiffs and Class members have and will continue to spend time, resources, and money in order to mitigate their damages from the Data Breach, and they remain at a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class members must now and in the future closely monitor their bank accounts and credit card accounts to guard against the risk of identity theft.

100.    Plaintiffs and Class members' PII and PHI is private and sensitive in nature and was left inadequately protected by Defendants. Defendants did not obtain consent from Plaintiffs or

- 28 -

Class members to disclose their PII to any other person or entity, as required by applicable law and industry standards.

101.    The Data Breach was a direct and proximate result of Defendants' failure to properly safeguard and protect Plaintiffs' and Class members' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law, including Defendants' failure to establish and implement appropriate technical safeguards to ensure the security and confidentiality of Plaintiffs' and the Class members' PII to protect against reasonably foreseeable threats to its security or integrity.

102.    As a direct and proximate result of Defendants' wrongful actions and inaction and the resulting Data Breach, Plaintiffs and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to work, family, and leisure to mitigate the actual and potential impact of the Data Breach on their lives, including by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, changing the information used to verify their identity to information not subject to this Data Breach, and filing police reports. This time has been lost forever and cannot be recaptured.

103.    Defendants' wrongful actions and inaction directly and proximately caused the theft and dissemination to an unknown third party of Plaintiffs' PII, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including: (a) theft of their PII; (b) costs for credit monitoring services; (c) unauthorized charges on their debit and credit card accounts; (d) the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their credit/debit card and PII being placed in the hands of criminals and already misused via the sale of Plaintiffs' and Class members' PII on the internet black market; (e) the improper disclosure of their data; (f) loss of privacy; (g) ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach; (h) ascertainable losses in the form of deprivation

of the value of their PII, for which there is a well-established national and international market; (i)

ascertainable losses in the form of the loss of cash back or other benefits as a result of their inability

to use certain accounts and cards affected by the Data Breach; (j) loss of use of, and access to, their

account funds and costs associated with the inability to obtain money from their accounts or being

limited in the amount of money they were permitted to obtain from their accounts, including missed

payments on bills and loans, late charges and fees, and adverse effects on their credit including

adverse credit notations and decreased credit scores or ratings; and (k) the loss of productivity and

value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and

future consequences of the Data Breach, including finding fraudulent charges, cancelling and

reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of

withdrawal and purchase limits on compromised accounts, changing the information used to verify

their identity to information not subject to this Data Breach, and the stress, nuisance and annoyance

of contending with all such issues resulting from the Data Breach.

## V.    **CLASS ACTION ALLEGATIONS**

104.    Plaintiffs bring this action, on behalf of themselves and all others similarly situated,

as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1), 23(b)(2), 23(b)(3), and where

applicable, 23(c)(4), on behalf of the following Class and Subclasses:

> **Class:** All natural persons in the United States whose PII and/or PHI was compromised as a result of the Data Breach.

> **Flagstar Subclass:** All natural persons in the United States who were notified by Flagstar that their PII was compromised as a result of the Data Breach.

> **California Subclass:** All natural persons whose PII and/or PHI was compromised as a result of, and who resided in California at the time of, the Data Breach.

> **Georgia Subclass:** All natural persons whose PII and/or PHI was compromised as a result of, and who resided in Georgia at the time of, the Data Breach.

> **Michigan Subclass:** All natural persons whose PII and/or PHI was compromised as a result of, and who resided in Michigan at the time of, the Data Breach.

**Oklahoma Subclass:** All natural persons whose PII and/or PHI was compromised as a result of, and who resided in Oklahoma at the time of, the Data Breach.

**Tennessee Subclass:** All natural persons whose PII and/or PHI was compromised as a result of, and who resided in Tennessee at the time of, the Data Breach.

**Texas Subclass:** All natural persons whose PII and/or PHI was compromised as a result of, and who resided in Texas at the time of, the Data Breach.

**Washington Subclass:** All natural persons whose PII and/or PHI was compromised as a result of, and who resided in Washington at the time of, the Data Breach.

105.    The Class and its constituent Subclasses, including the State Subclasses, are collectively referred to herein as the "Class." Excluded from the Class are Defendants' officers, directors, and employees; any entity in which a Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Also excluded from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

106.    Plaintiffs reserve the right to modify the Class and Subclass definitions, including based on discovery and further investigation.

107.    The Class is so large as to make joinder impracticable. The number of Class members exceeds 9 million, and disposition of their claims in a single action will provide substantial benefits to all parties and to the Court. Class members are readily ascertainable from information and records in the possession, custody, or control of Defendants or their customers.

108.    Plaintiffs' claims are typical of the claims of the Class in that the sensitive personal information of the representative Plaintiffs, like that of all Class members, was compromised and stolen in the Data Breach.

109.    Plaintiffs are members of the Class and will fairly and adequately represent and protect its interests. Plaintiffs' counsel are competent and experienced in prosecuting class actions, including relating to data breaches. Plaintiffs have no interest contrary to or in conflict with the interests of Class members.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 21-cv-01155-EJD

110.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

- Whether Defendants engaged in the conduct alleged;

- Whether Defendants had a duty to implement reasonable cyber security measures to protect Plaintiffs' and Class members' sensitive, personal information and to promptly alert them if such information was compromised;

- Whether Defendants breached their duties by failing to take reasonable precautions to protect Plaintiffs' and Class members' sensitive, personal information;

- Whether Defendants acted unfairly or deceptively in violation of state statutory laws;

- Whether Plaintiffs and Class Members are entitled to recover actual damages and/or statutory damages; and

- Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, and/or disgorgement.

111.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would have no effective remedy. Given the relatively small size of the individual Class members' claims, few, if any, Class members would seek redress for Defendants' violations individually. Class treatment will conserve the resources of the courts and promote consistency and efficiency of adjudication.

112.    Class certification is also appropriate under Rules 23(b)(1), (b)(2), and/or (c)(4) because:

- The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 21-cv-01155-EJD

- The prosecution of separate actions by individual Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests.

- Defendants have acted or refused to act on grounds generally applicable to the Class, making injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole; and

- The claims of Class members are comprised of common issues whose resolution in a class trial would materially advance this litigation.

## FIRST CAUSE OF ACTION
**Negligence**
**(Against All Defendants)**
**On Behalf of the Class, or, in the Alternative, the State Subclasses**

113.    Plaintiffs incorporate and reallege the foregoing allegations of fact.

114.    Defendants collected and stored Plaintiffs' and Class members' personal information, including their names, addresses, telephone numbers, birthdates, Social Security numbers, bank account information, and personal health information.

115.    In providing their PII, Plaintiffs, Class and Subclass members had a reasonable expectation that this information would be securely maintained and not easily accessible to, or exfiltrated by cybercriminals.

116.    Defendants owed Plaintiffs and Class members a duty of reasonable care to preserve and protect the confidentiality of their PII that they collected. This duty included, among other obligations, maintaining and testing their security systems and computer networks, and taking other reasonable security measures to safeguard and adequately secure the PII of Plaintiffs and the Class from unauthorized access and use. Defendants, as the purported expert guardians and gatekeepers of data, had a duty to Plaintiffs and Class members to securely maintain and/or securely transfer the PII as promised in a reasonable manner that would prevent cybercriminals from accessing and exfiltrating this information. Defendants' duty arose independently from any contract.

117.    By undertaking the duty to maintain and secure this data, Defendants had a duty of care to use reasonable means to secure and safeguard its systems and networks—and Plaintiffs and Class members' PII held or transferred within it—to prevent disclosure of the information, and to safeguard the information from cyber theft.

118.    Defendants' duty included a responsibility to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and outside vendors used, adequately protected and safeguarded the PII of the Plaintiffs, Class and Subclasses.

119.    Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and Plaintiffs and Class members, the end users of the services Accellion and Flagstar provided to their clients.

120.    While this special relationship exists independent from any contract, it is recognized by Flagstar's Privacy Policy, as well as by applicable laws and regulations. Specifically, Flagstar actively solicited PII as part of its business. Likewise, Accellion's entire business model was built on promising its clients that it provided a platform to securely transfer files that contained sensitive data. Accellion's promises of data security were for the benefit of those to whom the data belonged. Defendants were solely responsible for and in the position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class members from a resulting data breach.

121.    Defendants also had a common law duty to prevent foreseeable harm to others. Plaintiffs and Class members were the foreseeable and probable victims of any inadequate security practices. It was foreseeable that Plaintiffs and Class members would be harmed by the failure to protect their personal information because hackers are known to routinely attempt to steal such information and use it for nefarious purposes.

122.    Defendants' duties also arise by operation of statute.

- The California Customer Records Act, Cal. Civ. Code § 1798.80 *et seq.*, imposes a mandatory duty on Accellion to implement and maintain reasonable security

procedures and practices to safeguard and protect against the unauthorized disclosure of personal information.

- Pursuant to the FTC Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class members' Private Information.

- Pursuant to HIPAA, 42 U.S.C. § 1320d, Accellion had a duty to securely store and maintain the Plaintiffs, Class and Subclass Members' Private Information collected in conjunction with receiving medical services.

- Pursuant to the Children's Online Privacy Protection Act, 15 U.S.C. §§ 6501-6505, Defendants had a "mandate[d]" duty "get parental consent up front before collecting personal information from children under 13" and to "provide parents with the right to review and delete their children's information." Furthermore, under Section 312.10 of COPPA, Defendants could only "retain children's personal information 'for only as long as is reasonably necessary to fulfill the purpose for which the information was collected[,]'" and thereafter had a duty to "delete [children's personal information] using reasonable measures to ensure it's been securely destroyed" even absent a parent's request for the deletion of a child's personal information.[33]

123.    Flagstar's duties also arose under the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A).

124.    Flagstar is a financial institution, as that term is defined by Section 509(3)(A) of the GLBA, and thus is subject to the GLBA. The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

---

[33] See FTC, *Under COPPA, data deletion isn't just a good idea. It's the law.* (May 31, 2018), https://www.ftc.gov/news-events/blogs/business-blog/2018/05/under-coppa-data-deletion-isntjust-good-idea-its-law (last visited June 23, 2023).

125.   Flagstar collects nonpublic personal information, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period Flagstar was subject to the requirements of the GLBA, 15 U.S.C. § 6801.1 *et seq.*, and is subject to numerous rules and regulations promulgated on the GLBA statutes.

126.   The GLBA Privacy Rule became effective on July 1, 2001. *See* 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the CFPB became responsible for implementing the Privacy Rule. In December 2011, the CFPB restated the implementing regulations in an interim final rule that established the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. § 1016 ("Regulation P"), with the final version becoming effective on October 28, 2014.

127.   Accordingly, Flagstar's conduct is governed by the Privacy Rule prior to December 30, 2011 and by Regulation P after that date.

128.   Both the Privacy Rule and Regulation P require financial institutions to provide customers with an initial and annual privacy notice. These privacy notices must be "clear and conspicuous." 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. "Clear and conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. § 1016.3(b)(1). These privacy notices must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. They must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. As alleged herein, Flagstar violated the Privacy Rule and Regulation P.

129.   The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of

customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4. As alleged herein, Flagstar violated the Safeguard Rule.

130.    Defendants also owed a duty to timely disclose to Plaintiffs and Class members that their personal information had been or was reasonably believed to have been compromised. Timely disclosure was necessary so that Plaintiffs and Class members could, among other things: (1) purchase identity protection, monitoring, and recovery services; (2) flag asset, credit, and tax accounts for fraud, including by reporting the theft of their Social Security numbers to financial institutions, credit agencies, and the IRS; (3) purchase or otherwise obtain credit reports; (4) place or renew fraud alerts on a quarterly basis; (5) intensively monitor loan data and public records; and (6) take other steps to protect themselves and attempt to avoid or recover from identity theft.

131.    In addition to arising by reason of the statutes and regulations described above, Defendants' duty to use reasonable care in protecting confidential data also arose because industry standards require Defendants to adequately protect confidential PII.

132.    Defendants had the ability to sufficiently guard against data breaches by implementing adequate measures to protect their systems, such as by removing the legacy Accellion FTA software and updating to a state of the art and current file transfer software.

133.    Defendants breached their duty to exercise reasonable care in protecting Plaintiffs' and Class members' PII by failing to implement and maintain adequate security measures to

safeguard Plaintiffs' and Class members' personal information, failing to monitor their systems to identify suspicious activity, and allowing unauthorized access to, and exfiltration of, Plaintiffs' and Class members' confidential PII. Accellion knew that its FTA system was outdated but took insufficient action to ensure that its customers stopped using it to transfer highly sensitive personal information. Flagstar was aware of the need to update to a newer file transfer platform, but failed to do so.

134.     The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

- Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs and Class members' PII;

- Failing to adequately monitor the security of its networks and systems;

- Allowing unauthorized access to and exfiltration of Plaintiffs and Class members' PII;

- Failing to provide timely notice that Plaintiffs and Class members' PII had been compromised so those at risk could take timely and appropriate steps to mitigate the potential for identity theft and other damages; and

- Failing to ensure that clients were timely notified about the FTA security vulnerabilities.

135.     Plaintiffs and Class members were the foreseeable victims of Defendants' inadequate and ineffectual cybersecurity. The natural and probable consequence of Defendants' failing to adequately secure their information networks was Plaintiffs' and Class members' personal information being hacked.

136.     Defendants knew or should have known that Plaintiffs' and Class members' personal information was an attractive target for cyber thieves, particularly in light of data breaches experienced by other entities around the United States. Moreover, the harm to Plaintiffs and Class members from exposure of their highly confidential personal facts was reasonably foreseeable to Defendants.

- 38 -

137.    It was foreseeable to Defendants that their failure to use reasonable measures to protect Plaintiffs and Class members' PII, including when it warned its systems and networks were vulnerable to cyberattack, would result in injury to Plaintiffs and Class members. Further, the breach of security was reasonably foreseeable given the known high frequency of ransomware attacks and data breaches.

138.    It was also foreseeable to Accellion that its failure to timely notify its clients of the vulnerabilities would result in the disclosure of individual's PII. Likewise, it was foreseeable to Flagstar that its failure to timely and adequately provide notice of the Data Breach would result in Plaintiffs and Class members not being afforded the ability to timely safeguard their identities.

139.    There is a close connection between Defendants' failure to employ reasonable security protections for the PII and the injuries suffered by Plaintiffs and Class members. When individuals' sensitive personal information is stolen, they face a heightened risk of identity theft and may need to: (1) purchase identity protection, monitoring, and recovery services; (2) flag asset, credit, and tax accounts for fraud, including by reporting the theft of their Social Security numbers to financial institutions, credit agencies, and the IRS; (3) purchase or otherwise obtain credit reports; (4) monitor credit, financial, utility, explanation of benefits, and other account statements on a monthly basis for unrecognized credit inquiries and charges; (5) place and renew credit fraud alerts on a quarterly basis; (6) contest fraudulent charges and other forms of identity theft; (7) repair damage to credit and financial accounts; and (8) take other steps to protect themselves and attempt to avoid or recover from identity theft and fraud.

140.    Defendants were in a special relationship with Plaintiffs and Class members with respect to the hacked information because the end and aim of Defendants' data security measures was to benefit Plaintiffs and Class members by ensuring that their personal information would remain protected and secure. Only Defendants were in a position to ensure that their systems were sufficiently secure to protect Plaintiffs' and Class members' personal and medical information. The harm to Plaintiffs and Class members from its exposure was highly foreseeable to Defendants.

141.    The policy of preventing future harm disfavors application of the economic loss rule, particularly given the sensitivity of the private information entrusted to Defendants. A high degree

of opprobrium attaches to Defendants' failure to secure Plaintiffs' and class members' personal and extremely confidential facts. Defendants had an independent duty in tort to protect this information and thereby avoid reasonably foreseeable harm to Plaintiffs and class members.

142.   Defendants' negligence was gross, willful, wanton, and reprehensible and warrants the imposition of punitive damages given the clear foreseeability of a hacking incident, the extreme sensitivity of the private information under Defendants' care, and their failure to take adequate remedial steps, including prompt notification of the victims, following the Data Breach.

143.   As a result of Defendants' negligence, Plaintiffs and Class members have suffered damages that have included or may, in the future, include, without limitation: (1) loss of the opportunity to control how their personal information is used; (2) diminution in the value and use of their personal information entrusted to Defendants with the understanding that Defendants would safeguard it against theft and not allow it to be accessed and misused by third parties; (3) the compromise and theft of their personal information; (4) out-of-pocket costs associated with the prevention, detection, and recovery from identity theft and unauthorized use of financial accounts; (5) costs associated with the ability to use credit and assets frozen or flagged due to credit misuse, including increased costs to use credit, credit scores, credit reports, and assets; (6) unauthorized use of compromised personal information to open new financial and other accounts; (7) continued risk to their personal information, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect the personal information in its possession; and (8) future costs in the form of time, effort, and money they will expend to prevent, detect, contest, and repair the adverse effects of their personal information being stolen in the Data Breach.

**SECOND CAUSE OF ACTION**
**Negligence Per Se**
**(Against All Defendants)**
**On Behalf of the Class, or, in the Alternative, the State Subclasses**

144.   Plaintiffs incorporate and reallege the foregoing allegations of fact.

145.   Defendants owed a duty to Plaintiffs and Class members to provide adequate data-security practices and to safeguard their PII, under the Federal Trade Commission Act (15 U.S.C.

- 40 -

§ 45) (all Defendants) and under HIPAA (42 U.S.C. § 1302d *et seq.*) (Accellion), the California Customer Records Act, Cal. Civ. Code § 1798.80 *et seq.* (all Defendants), the Children's Online Privacy Protection Act, 15 U.S.C. § 6501-6505 (all Defendants), and the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A) (Flagstar), as described above. Defendants' action and inaction breached those duties by failing to provide adequate data security to safeguard the PII under their possession, custody or control.

146.    Defendants' failure to comply with applicable laws and regulations constitutes negligence per se.

147.    Plaintiffs and Class members are members of the classes of persons the foregoing statutes are intended to protect.

148.    The essential purposes of these statutes are to protect citizens from the same or similar kind of harm that Defendants' breach of those statutory and regulatory duties caused to Plaintiffs and Class members.

149.    Defendants breached their duties to Plaintiffs and Class members under the above-references statutes by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs and Class members' PII.

150.    But for Defendants' breach of their duties owed to Plaintiffs and Class members, they would not have been harmed.

151.    Plaintiffs' and Class members' harm was reasonably foreseeable. Defendants knew or should have known of the FTA platform's vulnerabilities and that a data breach would cause Plaintiffs and other Class members to experience the foreseeable harms associated with the exposure of their PII.

152.    As a direct and proximate result of Defendants' negligence per se, Plaintiffs and Class members have suffered injury in the form of, among other things, out-of-pocket losses, lost time, loss of value of their PII, and loss of privacy relating to their PII, and now face a heightened risk of future harm such as identity theft and fraud. Plaintiffs and Class members are therefore entitled to damages in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**Violation of California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.140 *et seq.***
**(Against All Defendants)**
**On Behalf of the California Subclass**

153.    Plaintiffs Chavez, Moniz, Olson, and Taylor ("Plaintiffs," for purposes of this Count), individually and on behalf of the California Subclass, repeat and allege the foregoing allegations of fact.

154.    For purposes of this claim, statutory subdivisions invoked are to the CCPA as it existed at the time of the Data Breach, subject to subsequent clarifications.

155.    Section 1798.150(a)(1) of the CCPA provides, "[a]ny consumer whose nonencrypted or nonredacted personal information, as defined [by California Civil Code section 1798.81.5(d)(1)(A)] is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

156.    Plaintiffs and California Subclass members are consumers and California residents as defined by California Civil Code section 1798.140(g).

157.    Each Defendant is a "business" as defined by California Civil Code section 1798.140(c) because each is a "sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners that collects consumers' personal information, or on the behalf of which that information is collected and that alone, or jointly with others, determines the purposes and means of the processing of consumers' personal information, that does business in the State of California." In addition, each Defendant has annual gross revenues in excess of $25 million, receives the personal information of 50,000 or more consumers or households, and/or derives 50 percent of their annual revenue from selling or sharing consumers' personal information. Each Defendant is therefore subject to the CCPA.

- 42 -

158.     Defendants collect personal information from, among other sources, consumers who request information from them, consumers who use their services, including users of their mobile applications, and consumers who submit customer support requests. This PII includes information defined as "sensitive" under the CCPA. Mandiant found that the hackers who perpetrated the Data Breach used "tooling designed to facilitate exfiltration of data from the FTA system."

159.     Plaintiffs' and California Subclass members' personal information, as defined by California Civil Code section 1798.81.5(d)(1)(A), was subject to unauthorized access and exfiltration, theft, or disclosure. The Data Breach described herein exposed, without limitation, full names, addresses, telephone numbers, birthdates, Social Security numbers, driver's license information, passport information, financial information including bank routing and account numbers, health and related benefit information, and disability information, as well as other personal information provided to Defendants and their clients.

160.     Defendants maintained Plaintiffs' and California Subclass members' PII and PHI in a form that allowed criminals to access it.

161.     Plaintiff and California Subclass members' PII accessed by the cybercriminals in the Data Breach includes nonencrypted and unredacted personal information as set forth in California Civil Code section 1798.81.5(d)(1)(A).

162.     The Data Breach occurred as a result of Defendants' failure to implement and maintain reasonable security procedures and practices for protecting the exposed information given its nature. Accellion failed to monitor its systems to identify suspicious activity and allowed unauthorized access to Plaintiffs' and Class members' PII. Flagstar failed to implement a secure system for transferring files.

163.     Consistent with California Civil Code section 1798.150(b), on May 14, 2021, Plaintiff Chavez provided written notice to Flagstar identifying the CCPA provisions that Flagstar violated. Similarly, on August 24, 2021, Plaintiff Olson provided written notice to Accellion identifying the CCPA provisions Accellion violated. Defendants failed to cure their violations within 30 days of Plaintiffs' notifications. Nor is any cure reasonably possible, for Plaintiffs can never regain control of their confidential personal information taken in the Data Breach.

- 43 -

Subsequently, on June 29, 2023, Plaintiffs' Chavez, Moniz, and Taylor provided written notice to Accellion, and Plaintiff Moniz also provided written notice to Flagstar identifying the CCPA provisions Accellion violated.

164.    CCPA actions for statutory damages "may be brought by a consumer if, prior to initiating any action against a business for statutory damages on an individual or class-wide basis, a consumer provides a business 30 days' written notice identifying the specific provisions of this title the consumer alleges have been or are being violated." Cal. Civ. Code § 1798.150(b). In response to Plaintiffs Chavez and Olson's notifications,[34] Defendants did not provide an "express written statement that the violations have been cured and that no further violations shall occur[.]"

165.    Accordingly, on behalf of the California Subclass, Plaintiffs seek actual and statutory damages under California Civil Code section 1798.150(a)(1)(A), injunctive and declaratory relief, and any other relief deemed appropriate by the Court, for Defendants' CCPA violations.

**FOURTH CAUSE OF ACTION**
**Violation of Confidentiality of Medical Information Act ("CMIA"), Cal. Civ. Code § 56 *et seq*.**
**(Against Accellion)**
**On Behalf of the California Subclass**

166.    Plaintiffs Olson and Taylor ("Plaintiffs," for purposes of this Count), individually and on behalf of the California Subclass, repeat and allege the foregoing allegations of fact.

167.    Accellion is a "provider of health care" as defined in California Civil Code sections 56.05 and 56.06. Accellion is organized in part for the purpose of maintaining medical information to make it available to an individual or provider of health care for purposes of information management, diagnosis, or treatment. Under subdivision (b) of section 56.06, Accellion provides

---

[34] Plaintiffs Chavez, Moniz, and Taylor presently seek injunctive relief and any other relief the Court may deem proper pursuant to the CCPA as against Accellion. Plaintiff Moniz similarly seeks injunctive relief at this time as against Flagstar under the CCPA. If, within thirty days, Defendants have failed to cure, Plaintiffs will amend the complaint to seek statutory damages pursuant to Civil Code section 1798.150(a)(1)(A). Nor is any cure for Defendants' invasion of Plaintiffs' statutory rights realistically possible, two and a half years after the breach exposed some of their most sensitive data, which cannot ever be returned to their control.

software that is designed to maintain medical information in order to make such information available to individuals or a provider of health care at the request of the individual or a provider of health care, for the purpose of diagnosis, treatment, or management of a medical condition of the individual. Accellion specifically notes on its website that it provides secure file-sharing services for hospitals and other medical professionals to facilitate "patient care" through the sharing of patient's medical records such as EKG results, x-rays, ultrasounds, MRIs and other "protected health information."[35]

168.  Plaintiffs and California Subclass members are "patients" within the meaning of California Civil Code section 56.05(l).

169.  Plaintiffs and California Subclass members, as patients, had their individually identifiable "medical information," within the meaning of California Civil Code section 56.05(i), created, maintained, preserved, stored, abandoned, destroyed, or disposed of on or through Accellion's computer networks at the time of the Data Breach.

170.  Accellion violated California Civil Code section 56.101 by failing to maintain and preserve the confidentiality of Plaintiffs' and California Subclass members' medical information.

171.  In violation of California Civil Code section 56.101(a), Accellion negligently created, maintained, preserved, stored, abandoned, destroyed, or disposed of Plaintiffs' and California Subclass members' medical information in a manner that failed to preserve the security of that information and breached its confidentiality. As a result, Plaintiffs' and California Subclass members' confidential information and records were negligently released to hackers in the Data Breach.

172.  Medical information that was the subject of the Data Breach included "electronic medical records" or "electronic health records" as defined by California Civil Code section 56.101(c).

---

[35] https://www.kiteworks.com/hipaa-compliance/secure-medical-records-access-how-secure-file sharing-helps-hospitals-adopting-emrs/ (previously https://www.accellion.com/hipaa compliance/secure-medical-records-access-how-secure-file-sharing-helps-hospitals-adopting emrs/) (last accessed March 20, 2023).

173.    That the information taken in the Data Breach was viewed by unauthorized individuals is evidenced by the fact that the personal information was posted on the dark web, the subject of ransom emails, and was used for identity theft and financial account misconduct. The information was necessarily viewed to have been used in this manner.

174.    In violation of California Civil Code section 56.101(b)(1)(A), Accellion's electronic health record system or electronic medical record system failed to protect and preserve the integrity of electronic medical information.

175.    Accellion also violated California Civil Code section 56.36(b) by negligently releasing Plaintiffs' and California Subclass members' confidential PHI in the Data Breach.

176.    Accellion's wrongful conduct, actions, inaction, omissions, and want of ordinary care violate the CMIA and directly and proximately caused the Data Breach. Plaintiffs and California Subclass members consequently have suffered (and will continue to suffer) economic damages and other injuries and actual harm including, without limitation: (1) the compromise and theft of their medical information; (2) loss of the opportunity to control how their medical information is used; (3) diminution in the value and use of their medical information entrusted to Accellion with the understanding that Accellion would safeguard it against theft and not allow it to be accessed and misused by third parties; (4) out-of-pocket costs associated with the prevention and detection of, and recovery from, identity theft and misuse of their medical information; (5) continued undue risk to their medical information; and (6) future costs in the form of time, effort, and money they will expend to prevent, detect, contest, and repair the adverse effects of their medical information being stolen in the Data Breach.

177.    Plaintiffs and California Subclass members were injured and have suffered damages, as described above, from Accellion's negligent release of their medical information in violation of California Civil Code sections 56.36, and 56.101, and accordingly are entitled to relief under section 56.36, including actual damages, as well as nominal statutory damages of $1,000 for each victim, injunctive relief, and attorney fees, expenses, and costs.

## FIFTH CAUSE OF ACTION
### Violation of California Customer Records Act ("CCRA"), Cal. Civ. Code § 1798.80 *et seq.*

- 46 -

**(Against All Defendants)**
**On Behalf of the California Subclass**

178.    Plaintiffs Chavez, Moniz, Olson, and Taylor ("Plaintiffs," for purposes of this Count), individually and on behalf of the California Subclass, repeat and allege the foregoing allegations of fact.

179.    Plaintiffs and California Subclass members are "customers" within the meaning of California Civil Code section 1798.80(c), as they provided personal information to Defendants for the purpose of obtaining services from Defendants.

180.    Each Defendant is a "business" within the meaning of California Civil Code section 1798.80(a).

181.    The CCRA provides that "[a] person or business that conducts business in California, and that owns or licenses computerized data that includes personal information, shall disclose a breach of the security of the system following discovery or notification of the breach in the security of the data to a resident of California . . . whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person . . . in the most expedient time possible and without unreasonable delay[.]" Cal. Civ. Code § 1798.82.

182.    The Data Breach constitutes a breach of security within the meaning of section 1798.82. PII stolen in the Data Breach, such as full names, addresses, telephone numbers, birthdates, Social Security numbers, driver's license information, financial information, and medical information, as well as other information, constitutes "personal information" within the meaning of section 1798.80(e).

183.    In violation of the CCRA, Defendants failed to promptly notify Plaintiffs and California Subclass members of the Data Breach. Timely disclosure was necessary so that Plaintiffs and Class members could, among other things: (1) purchase identity protection, monitoring, and recovery services; (2) flag asset, credit, and tax accounts for fraud, including by reporting the theft of their Social Security numbers to financial institutions, credit agencies, and the IRS; (3) purchase or otherwise obtain credit reports; (4) place or renew fraud alerts on a quarterly basis; (5) intensively

- 47 -

monitor loan data and public records; and (6) take other steps to protect themselves and attempt to avoid or recover from identity theft.

184.    As a result of Defendant's unreasonable delay in notifying its customers, Plaintiffs, and California Subclass members of the Data Breach, they were deprived of an opportunity to take timely and appropriate self-protective measures, such as requesting a credit freeze. In addition, as a result of the delay, Plaintiffs and California Subclass members have suffered (and will continue to suffer) economic damages and other injuries and actual harm including, without limitation: (1) the compromise and theft of their personal information; (2) loss of the opportunity to control how their personal information is used; (3) diminution in the value and use of their personal information entrusted to Defendants with the understanding that Defendants would safeguard it against theft and not allow it to be accessed and misused by third parties; (4) out-of-pocket costs associated with the prevention and detection of, and recovery from, identity theft and misuse of their personal information; (5) continued undue risk to their personal information; and (6) future costs in the form of time, effort, and money they will expend to prevent, detect, contest, and repair the adverse effects of their personal information being stolen in the Data Breach.

185.    Therefore, on behalf of the California Subclass, Plaintiffs seek actual damages under California Civil Code section 1798.84(b), injunctive and declaratory relief, and any other relief deemed appropriate by the Court.

**SIXTH CAUSE OF ACTION**
**Invasion of Privacy (Intrusion Upon Seclusion)**
**(Against All Defendants)**
**On Behalf of the Class, or, in the Alternative, the State Subclasses**

186.    Plaintiffs incorporate and reallege the foregoing allegations of fact.

187.    Defendants wrongfully intruded upon Plaintiffs' and Class members' seclusion in violation of common law. Plaintiffs and Class members reasonably expected that the personal information they entrusted to Defendants, such as their names, addresses, telephone numbers, birthdates, health information, Social Security numbers, and bank account information would be kept private and secure, and would not be disclosed to any unauthorized third party or for any improper purpose.

- 48 -

188.   Defendants unlawfully invaded Plaintiffs' and Class members' privacy rights by: (a) failing to adequately secure their personal information from disclosure to unauthorized third parties or for improper purposes; (b) enabling the disclosure of personal and sensitive facts about them in a manner highly offensive to a reasonable person; and (c) enabling the disclosure of personal and sensitive facts about them without their informed, voluntary, affirmative, and clear consent.

189.   A reasonable person would find it highly offensive that Defendants, having received, collected, and stored Plaintiffs' and Class members' birthdates, Social Security numbers, and other personal details, failed to protect that information from unauthorized disclosure to third parties.

190.   In failing to adequately protect Plaintiffs' and Class members' personal information, Defendants acted knowingly and in reckless disregard of their privacy rights. Accellion was aware of the security vulnerabilities from its legacy system but failed to ensure that its clients patched them. Flagstar knew of the need to upgrade to a more secure platform but failed to do so. Defendants also knew or should have known that their ineffective security measures, and their foreseeable consequences, are highly offensive to a reasonable person in Plaintiffs' position.

191.   Defendants' unlawful invasions of privacy damaged Plaintiffs and Class members. As a direct and proximate result of Defendants' unlawful invasions of privacy, Plaintiffs and Class members suffered mental distress, and their reasonable expectations of privacy were frustrated and defeated.

**SEVENTH CAUSE OF ACTION**
**Breach of Contract (Third-Party Beneficiary)**
**(Against Accellion)**
**On Behalf of the Class**

192.   Plaintiffs incorporate and reallege the foregoing allegations of fact.

193.   This cause of action is brought under California law.

194.   Plaintiffs assert this cause of action in the alternative to their tort claims.

195.   Accellion and its FTA customers entered into contracts related to the FTA platform.

- 49 -

196. These contracts required Accellion to keep PII and PHI stored on and/or shared through FTA secure. Accellion agreed to "maintain in confidence and not disclose any Confidential Information acquired directly or indirectly from the other party."[36]

197. Accellion's contracts with its FTA customers also include a provision selecting the laws of the State of California as the governing law.

198. Plaintiffs and Class members were not parties to these contracts, but Accellion and its FTA customers intended that Plaintiffs and Class members would be the primary beneficiaries of these confidentiality and choice of law provisions. The information subject to the confidentiality provisions belonged to Plaintiffs and Class members.

199. Accellion knew or should have known that its FTA customers included law firms, government agencies, and universities, and that these customers could and would use FTA "to transfer large and sensitive files," including PII, and that it was important to these customers that sensitive files be transferred "securely," as advertised.

200. Accellion breached the contracts with its FTA customers by failing to keep the PII and PHI of Plaintiffs and Class members secure and confidential.

201. As a direct and proximate result of Accellion's breach of contract, Plaintiffs and Class members, as intended third-party beneficiaries, have suffered (and will continue to suffer) economic and other damage, in an amount to be determined at trial, that includes, without limitation: (1) the compromise and theft of their personal information; (2) loss of the opportunity to control how their personal information is used; (3) diminution in the value and use of their personal information entrusted to Defendants with the understanding that Defendants would safeguard it against theft and not allow it to be accessed and misused by third parties; (4) out-of-pocket costs associated with the prevention and detection of, and recovery from, identity theft and misuse of their personal information; (5) continued undue risk to their personal information; and (6) future costs in the form of time, effort, and money they will expend to prevent, detect, contest, and repair the adverse effects of their personal information being stolen in the Data Breach.

---

[36] https://www.kiteworks.com/legal/asla/ (last accessed June 23, 2023).

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 21-cv-01155-EJD

202.    Plaintiffs consequently seek damages, injunctive and declaratory relief, and any other relief deemed appropriate by the Court.

**EIGHTH CAUSE OF ACTION**
**Breach of Implied Contract**
**(Against Flagstar)**
**On Behalf of the Flagstar Subclass, or, in the Alternative, Flagstar Members of the State Subclasses**

203.    Plaintiffs Chavez, Moniz, and Ringling ("Plaintiffs," for purposes of this Count) incorporate and reallege the foregoing allegations of fact.

204.    Plaintiffs assert this cause of action in the alternative to their tort claims.

205.    Flagstar provides banking services to Plaintiffs and Flagstar Subclass members.

206.    Plaintiffs and Flagstar Subclass members entered into implied contracts with Flagstar related to banking services. Plaintiffs and Flagstar Subclass members provided Flagstar with their PII, and Flagstar agreed in exchange to take reasonable measures to protect the security and confidentiality of Plaintiffs' and Flagstar Subclass members' PII, in compliance with federal and state laws and regulations and industry standards.

207.    Protection of the PII was material to the implied contracts at issue. Plaintiffs and Flagstar Subclass members would not have entered into the implied contracts by doing business with Flagstar had they known that Flagstar would not adequately protect its customers' PII.

208.    By providing Flagstar with their PII and using Flagstar's banking services, Plaintiffs and Flagstar Subclass members fully performed their obligations. Flagstar, however, breached its obligations under its implied contracts by failing to implement and maintain adequate security measures to protect the PII under its care.

209.    Flagstar's breach of its obligations of its implied contracts with Plaintiffs and Flagstar Subclass members directly resulted in the Data Breach.

210.    The damages sustained by Plaintiffs and Flagstar Subclass members as described above were the direct and proximate result of Flagstar's breaches of implied contract.

211.    Plaintiffs and Flagstar Subclass members were damaged by the foregoing breach of implied contract by, among other damage, (1) the compromise and theft of their personal

- 51 -

information; (2) loss of the opportunity to control how their personal information is used; (3) diminution in the value and use of their personal information entrusted to Defendants with the understanding that Defendants would safeguard it against theft and not allow it to be accessed and misused by third parties; (4) out-of-pocket costs associated with the prevention and detection of, and recovery from, identity theft and misuse of their personal information; (5) continued undue risk to their personal information; and (6) future costs in the form of time, effort, and money they will expend to prevent, detect, contest, and repair the adverse effects of their personal information being stolen in the Data Breach.

212.    Plaintiffs consequently seek damages, injunctive and declaratory relief, and any other relief deemed appropriate by the Court.

<u>**NINTH CAUSE OF ACTION**</u>
**Unjust Enrichment**
**(Against All Defendants)**
**On Behalf of the Class, or, in the Alternative, the State Subclasses**

213.    Plaintiffs incorporate and reallege the foregoing allegations of fact.

214.    Plaintiffs assert this cause of action in the alternative to their claims at law.

215.    Plaintiffs and the Class members have an interest, both equitable and legal, in the PII about them that was collected, secured, and maintained by Defendants and that was ultimately compromised in the Data Breach.

216.    A financial benefit was conferred upon Defendants when Plaintiffs and the Class members provided their PII to Defendants in connection with file transfer activity.

217.    Defendants' business models would not exist save for the need to ensure the security of Plaintiffs' and Class members' PII. Plaintiffs would not have provided their PII to Flagstar or other Accellion clients, had they known that Defendants had not taken adequate steps to safeguard that data.

218.    Plaintiffs and the Class members had a reasonable expectation that the security of their information would be maintained when they provided their information to Defendants. Plaintiffs and Class members paid fees directly to Flagstar or other Accellion clients in

consideration for their services, which included the promise that they would provide adequate security for PII.

219.    Plaintiffs and Class members conferred a financial benefit on Defendants when portions of their fees were paid in exchange for Defendants' services.

220.    As a result of Defendants' wrongful conduct as alleged in this Complaint, including their failure to employ adequate data security measures, continued maintenance and use of the PII without having adequate data security measures, and other conduct facilitating the theft of that PII, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and the Class members.

221.    Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the collection, maintenance, and inadequate security of Plaintiffs' and Class members' sensitive PII, while at the same time failing to maintain that information secure from unauthorized access and exfiltration by cyber criminals.

222.    It would be unjust, inequitable, and unconscionable for Defendants to be permitted to retain the benefits they received, and are still receiving, from Plaintiffs and Class members, including in connection with the collection or maintenance of their PII. Defendants' retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

223.    Defendants appreciated the benefit conferred upon, received, and enjoyed by them. That benefit was not conferred officiously or gratuitously, and would be inequitable for Defendants to retain.

224.    Defendants are therefore liable to Plaintiffs and Class members for restitution in the amount of the benefit conferred on Defendants as a result of their wrongful conduct, including specifically the value to Defendants of the PII that was stolen in the Data Breach and the profits Defendants have received and continue to receive from the use and sale of that information.

**TENTH CAUSE OF ACTION**
**Violation of Right to Privacy, Cal. Const., Art. 1, §§ 1, 12**
**(Against Accellion)**
**On Behalf of the California Subclass**

- 53 -

225.    Plaintiffs Chavez, Moniz, Olson, and Taylor ("Plaintiffs," for purposes of this Count), individually and on behalf of the California Subclass, repeat and allege the foregoing allegations of fact.

226.    Plaintiffs and California Subclass members have a constitutionally protected privacy interest, and a reasonable expectation of privacy, in their PII.

227.    Accellion violated that right by disclosing Plaintiffs' and California Subclass members' PII to unauthorized third parties. Accellion's violation is extremely offensive to a reasonable person, particularly given the sensitive nature of the information compromised.

228.    Plaintiffs and California Subclass members have been harmed as a result of Accellion's violation of their privacy rights and are entitled to appropriate relief.

229.    Plaintiffs seek damages, injunctive and declaratory relief, and any other relief deemed appropriate by the Court.

**ELEVENTH CAUSE OF ACTION**
**Violation of Washington Consumer Protection Act, RW 19.86.010 *et seq.***
**(Against Accellion)**
**On Behalf of the Washington Subclass**

230.    Plaintiffs Rodriguez and Worrick ("Plaintiffs," for purposes of this Count), individually and on behalf of the Washington Subclass, repeat and allege the foregoing allegations of fact.

231.    The Washington State Consumer Protection Act, RCW 19.86.020 (the "WCPA") prohibits any "unfair or deceptive acts or practices" in the conduct of any trade or commerce as those terms are described by the WCPA and relevant case law.

232.    Accellion is a "person" as described in RCW 19.86.010(1).

233.    Accellion engages in "trade" and "commerce" as described in RCW 19.86.010(2) in that it engages in the sale of services and commerce directly and indirectly affecting the people of the State of Washington.

234.    By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Accellion engaged in unlawful, unfair and fraudulent practices within the meaning, and in violation of, the WCPA, in that

Accellion's practices were injurious to the public interest because they injured other persons, had

the capacity to injure other persons, and have the capacity to injure other persons.

235.    In the course of conducting its business, Accellion committed "unfair or deceptive

acts or practices" by, *inter alia*, knowingly failing to design, adopt, implement, control, direct,

oversee, manage, monitor, and audit appropriate data security processes, controls, policies,

procedures, protocols, and software and hardware systems to safeguard and protect Plaintiffs' and

Washington Subclass members' PII, and violating the common law alleged herein in the process.

Plaintiffs and Washington Subclass members reserve the right to allege other violations of law by

Accellion constituting other unlawful business acts or practices. Accellion's above-described

wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this

date.

236.    Accellion's above-described wrongful actions, inaction, omissions, want of ordinary

care, misrepresentations, practices, and non-disclosures also constitute "unfair or deceptive acts or

practices" in violation of the WCPA in that Accellion's wrongful conduct is substantially injurious

to other persons, had the capacity to injure other persons, and has the capacity to injure other

persons. Such conduct is particularly unscrupulous in view of the highly sensitive information

entrusted to Accellion, the loss of which creates an indefinite threat to the victims, among other

serious harm.

237.    The gravity of Accellion's wrongful conduct outweighs any alleged benefits

attributable to such conduct. There were reasonably available alternatives to further Accellion's

legitimate business interests other than engaging in the above-described wrongful conduct.

238.    As a direct and proximate result of Accellion's above-described wrongful actions,

inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach

and its violations of the WCPA, Plaintiffs and Washington Subclass members have suffered, and

will continue to suffer, economic damages and other injury and actual harm in the form of, *inter*

*alia*, (1) the compromise and theft of their personal information; (2) loss of the opportunity to

control how their personal information is used; (3) diminution in the value and use of their personal

information entrusted to Defendants with the understanding that Defendants would safeguard it

against theft and not allow it to be accessed and misused by third parties; (4) out-of-pocket costs associated with the prevention and detection of, and recovery from, identity theft and misuse of their personal information; (5) continued undue risk to their personal information; and (6) future costs in the form of time, effort, and money they will expend to prevent, detect, contest, and repair the adverse effects of their personal information being stolen in the Data Breach.

239.    Unless restrained and enjoined, Accellion will continue to engage in the above-described wrongful conduct and more data breaches will occur. Plaintiffs and Washington Subclass members also seek restitution and an injunction prohibiting Accellion from continuing such wrongful conduct, and requiring Accellion to modify its corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect the Private Information entrusted to it.

240.    Plaintiffs, on behalf of themselves and the Washington Subclass members, also seeks to recover actual damages sustained by each Washington Subclass member together with the costs of the suit, including reasonable attorney fees. In addition, Plaintiffs Rodriguez and Worrick, on behalf of themselves and the Washington Subclass members, requests that this Court use its discretion, pursuant to RCW 19.86.090, to increase the damages award for each class member by three times the actual damages sustained not to exceed $25,000.00 per Washington Subclass Member.

**TWELFTH CAUSE OF ACTION**
**Violation of Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901 *et seq.*
(Against All Defendants)
On Behalf of the Michigan Subclass**

241.    Plaintiff Whittaker, individually and on behalf of the Michigan Subclass, repeats and alleges the foregoing allegations of fact.

242.    Plaintiff Whittaker, Michigan Subclass members, and Defendants are "persons" as defined by MCPA § 445.903(d).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

243.    Defendants advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, under Mich. Comp. Laws Ann. § 445.903(g).

244.    Defendants engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of Mich. Comp. Laws Ann. § 445.903(1), including: (a) representing that their services have characteristics, uses, and benefits that they do not have; (b) representing that their services are of a particular standard or quality if they are of another; (c) making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and (d) failing to reveal facts that are material to the transaction in light of representations of fact made in a positive matter. MCPA § 445.903(1)(c), (e), (b)(b), (c)(c).

245.    Defendants committed these violations of the MCPA by: (a) Failing to implement and maintain reasonable security and privacy measures to protect the PII of Plaintiff Whittaker and Michigan Subclass members, which failure was a direct and proximate cause of the Data Breach; (b) Failing to vet, test, properly evaluate and replace the vulnerable file transfer application; (c) Failing to identify foreseeable privacy risks and remediate identified security and privacy risks, which failure was a direct and proximate cause of the Data Breach; (d) Failing to comply with, and omitting, concealing, and suppressing noncompliance with, common law and statutory duties pertaining to the security and privacy of Plaintiff Whittaker and Michigan Subclass members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and, as to Flagstar, the GLBA, 15 U.S.C. § 6801 *et seq.*, which failure was a direct and proximate cause of the Data Breach; and (e) Omitting, suppressing, and concealing the material fact that Defendants did not reasonably or adequately secure Plaintiff Whittaker and Michigan Subclass members' PII.

246.    Defendants' unfair and unconscionable acts and practices were oppressive and unjustly imposed hardship on Plaintiff Whittaker and the Michigan Subclass, including by imposing on them, through no fault of their own, an increased and imminent risk of fraud and identity theft; substantial cost in time and expenses related to monitoring their financial accounts for fraudulent activity; and lost value of their PII. The deficiencies in Defendants' data security,

- 57 -

and the material omissions concerning those deficiencies, caused unfair surprise and damage to Plaintiff Whittaker and the Michigan Subclass after the Data Breach occurred. Such conduct is particularly unscrupulous in view of the highly sensitive information entrusted to Defendants, the loss of which creates an indefinite threat to the victims, among other serious harm.

247.   As to deceit, Defendants' omissions were material because they were likely to deceive reasonable consumers about the adequacy of their data security and ability to protect the confidentiality of PII.

248.   Defendants intended to mislead Plaintiff Whittaker and Michigan Subclass members and induce them to rely on Defendants' omissions.

249.   Had Defendants disclosed to Plaintiff Whittaker and Subclass members that the PII was vulnerable to attack, Defendants would have been unable to continue in business and would have been forced to adopt reasonable data security measures and comply with the law.

250.   As a direct and proximate result of Defendants' unfair, deceptive, and unconscionable acts or practices, Plaintiff Whittaker and Michigan Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII.

251.   Plaintiff Whittaker and Michigan Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $250, restitution, injunctive and equitable relief, and any other relief this Court deems proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully seek an order:

A.   Certifying this case as a class action, appointing Plaintiffs as Class representatives, and appointing interim co-lead class counsel to represent the Class;

B.   Entering judgment for Plaintiffs and the Class;

1             C.      Awarding Plaintiffs and Class members actual damages, compensatory

2     damages, punitive damages, statutory damages, and statutory penalties, in an amount to be

3     determined, as allowable by law;

4             D.      Ordering appropriate injunctive relief;

5             E.      Awarding pre- and post-judgment interest according to law;

6             F.      Awarding reasonable attorneys' fees and costs as permitted by law;

7             G.      Granting such further and other relief as may be just and proper.

8                                **JURY TRIAL DEMANDED**

9             Plaintiffs hereby demand a trial by jury on all issues so triable.

10

11    Dated: June 30, 2023

12

13    By: /s/ *Adam E. Polk*               /s/ *Krysta Kauble Pachman*

        Adam E. Polk (State Bar No. 273000)      Krysta Kauble Pachman (280951)

14            Jordan Elias (State Bar No. 228731)        Michael Gervais (330731)

        Simon S. Grille (State Bar No. 294914)     Steven G. Sklaver (237612)

15            **GIRARD SHARP LLP**                   Kevin R. Downs (331993)

        601 California Street, Suite 1400        **SUSMAN GODFREY L.L.P.**

16            San Francisco, CA 94108              1900 Avenue of the Stars, Suite 1400

        Tel: (415) 981-4800                  Los Angeles, California 90067-6029

17            apolk@girardsharp.com             Tel: (310) 789-3100

        jelias@girardsharp.com            kpachman@susmangodfrey.com

18            sgrille@girardsharp.com           mgervais@susmangodfrey.com

                                       ssklaver@susmangodfrey.com

19                                           kdowns@susmangodfrey.com

20

                            *Interim Co-Lead Class Counsel*

21

22

23                                     **ATTESTATION**

24            I, Krysta Kauble Pachman, am the ECF user whose ID and password are being used to file

25    this document. In compliance with Civil Local Rule 5-1(h)(3), I hereby attest that the other

26    signatory has concurred in this filing.

27                                /s/ *Krysta Kauble Pachman*

28

                             - 59 -