Fred Norton (SBN 224725)
fnorton@nortonlaw.com
Bree Hann (SBN 215695)
bhann@nortonlaw.com
Janelle Sampana (SBN 336398)
jsampana@nortonlaw.com
Emily Kirk (SBN 348547)
ekirk@nortonlaw.com
THE NORTON LAW FIRM PC
299 Third Street, Suite 200
Oakland, CA 94607
Phone: (510) 906-4900
Fax: (510) 906-4910

Camilo Artiga-Purcell (SBN 273229)
camilo.apurcell@kiteworks.com
ACCELLION, INC.
1510 Fashion Island Blvd, Suite 100
San Mateo, CA 94404
Tel: (415) 515-4724

Attorneys for Defendant
Accellion, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE ACCELLION, INC. DATA BREACH LITIGATION | Case No. 21-CV-01155-EJD<br><br>**DEFENDANT ACCELLION, INC.'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Date:     July 18, 2024<br>Time:    9:00 a.m.<br>Judge:   Hon. Edward J. Davila<br>Courtroom:  4 – 5th Floor |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION TO DISMISS

**TO THE COURT, CLERK, PLAINTIFFS AND ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on July 18, 2024 at 9:00 a.m. in Courtroom 4 of the United States District Court for the Northern District of California, located at 280 South 1st Street, San Jose, California 95113, Defendant Accellion, Inc. will and hereby does move to dismiss the Amended Consolidated Complaint (Dkt. 230) with prejudice.

The negligence claim in the Amended Consolidated Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6), as it fails to state a claim as a matter of law.  The motion will be based on this Notice of Motion and Motion, the accompanying memorandum of points and authorities, the pleadings and papers on file in this matter, arguments of counsel, and any other matter the Court may properly consider.

## STATEMENT OF RELIEF SOUGHT

Accellion seeks an order pursuant to Federal Rule of Civil Procedure 12(b)(6) dismissing the negligence claim in the Amended Consolidated Complaint for failure to state a claim upon which relief may be granted.

Dated:  April 29, 2024

Respectfully submitted,

THE NORTON LAW FIRM PC

*/s/ Fred Norton*

Fred Norton

Attorneys for Defendant
ACCELLION, INC.

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................ 1

II. STATEMENT OF FACTS ......................................................................................... 2

    A. Background ...................................................................................................... 2

    B. Accellion Was A Stranger To Plaintiffs ......................................................... 2

    C. The Prior Complaint's Allegations That Accellion Possessed Plaintiffs' Data................. 3

    D. The Amended Complaint Abandons The Central Premise Of The Court's Prior Order, Conceding That Accellion Did Not Possess, Transfer, Or Handle Plaintiffs' Data ........................ 4

    E. Plaintiffs' Other Allegations And Facts Subject To Judicial Notice Corroborate That Accellion Did Not Have Access To Or Control Over Plaintiffs' PII Or Accellion's Customers Use Of The FTA ..................... 5

III. LEGAL STANDARD ................................................................................................ 7

IV. ARGUMENT ............................................................................................................. 7

    A. Plaintiffs Have Failed To Plead Facts That Establish A Claim For Negligence Under California Law ................................................................................................. 7

        1. Plaintiffs' Negligence Theory Depends Entirely on Establishing that Accellion Had a "Special Relationship" with Plaintiffs That Imposed a Duty to Protect Against Criminal Conduct of Third Parties ........................ 7

        2. The Special Relationship Exception ..................................................... 8

        3. The Amended Complaint Fails To Plead Facts That Establish A Special Relationship Between Accellion And Plaintiffs Under California Law ............... 12

    B. Non-California Plaintiffs Have Failed To Allege Facts That Would Support A Negligence Claim Under the Laws of Their Home States ................ 17

        1. Non-California Plaintiffs Have Made No Showing That California Law Should Apply to Their Claims of Negligence ................ 17

        2. Plaintiff Torres Has No Claim for Negligence Under Georgia Law .............. 18

        3. Plaintiff Whittaker Has No Claim for Negligence Under Michigan Law .......... 19

        4. Plaintiffs Worrick and Rodriguez Have No Claim for Negligence Under Washington Law ........................ 20

        5. Plaintiff Dawes Has No Claim for Negligence Under Oklahoma Law ............... 22

i

6.     Plaintiff Desjardins Has No Claim for Negligence Under Tennessee Law.......... 23

7.     Plaintiff Ringling Has No Claim for Negligence Under Texas Law .................... 24

V.     CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allstate Prop. & Cas. v. Sevier Cty. Elec. Sys.*,
    666 S.W.3d 429 (2022) ........................................................................... 23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................. 7

*Azadpour v. Sun Microsys., Inc.*,
    2007 WL 2141079 (N.D. Cal. July 23, 2007) ........................................ 6

*Barenborg v. Sigma Alpha Epsilon Fraternity*,
    33 Cal. App. 5th 70 (2019) ............................................................. 11, 14

*Bass v. Facebook, Inc.*,
    394 F. Supp. 3d 1024 (N.D. Cal. 2019) ................................................ 16

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................. 7

*Biscan v. Brown*,
    160 S.W.3d 462 (Tenn. 2005) ............................................................... 23

*Blotner v. Doreika*,
    678 S.E.2d 80 (Ga. 2009) ..................................................................... 18

*Bradley Center, Inc. v. Wessner*,
    296 S.E.2d 693 (Ga. 1982) ................................................................... 18

*Brown v. USA Taekwondo*,
    11 Cal. 5th 204 (2021) ................................................................... passim

*Buckley v. Santander Consumer USA, Inc.*,
    2018 WL 1532671 (W.D. Wash. Mar. 29, 2018) .................................. 20

*Carr v. Okla. Student Loan Auth.*,
    2023 WL 6929850 (W.D. Okla. Oct. 19, 2023) .................................... 22

*Castillo v. Seagate Tech., LLC*,
    2016 WL 9280242 (N.D. Cal. Sept. 14, 2016) ................................. 3, 16

*City of Santa Barbara v. Super. Ct.*,
    41 Cal. 4th 747 (2007) ............................................................................ 4

*Clark Fire Equip., Inc. v. Arkema, Inc.*,
    176 F. Supp. 3d 646 (S.D. Tex. 2015) .................................................. 24

*CSX Transp., Inc. v. Williams*,
    608 S.E.2d 208 (Ga. 2005) ................................................................... 19

*Davidson v. City of Westminster*,
    32 Cal. 3d 197 (1982) ........................................................................... 12

*Dep't. of Labor v. McConnell*,
    828 S.E.2d 352 (Ga. 2019) ............................................................. 18, 19

iii

*Doe 12 v. Baylor Univ.*,
   336 F. Supp. 3d 763 (W.D. Tex. 2018) ............................................................... 24

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
   751 F.3d 990 (9th Cir. 2014) ............................................................................. 7

*Ethridge v. Samsung SDI Co.*,
   604 F. Supp. 3d 556 (S.D. Tex. 2022) ............................................................. 24

*Giraldo v. Dep't. of Corr. & Rehab.*,
   168 Cal. App. 4th 231 (2008) ........................................................................... 11

*Greyhound Lines, Inc. v. Dep't of Cal. Highway Patrol*,
   213 Cal. App. 4th 1129 (2013) ........................................................................... 8

*Grifo & Co., PLLC v. Cloud X Partners Holdings, LLC.*,
   485 F. Supp. 3d 885 (E.D. Mich. 2020) .................................................... 19, 20

*Hutchins v. 1001 Fourth Ave. Assocs.*,
   802 P.2d 1360 (Wash. 1991) ...................................................................... 20, 21

*In re Arby's Rest. Grp. Inc. Litig.*,
   2018 WL 2128441 (N.D. Ga. Mar. 5, 2018) ................................................... 18

*In re Equifax Fair Credit Reporting Act*,
   2023 WL 6192732 (N.D. Ga. 2023 Sept. 11, 2023) ................................... 18, 19

*In re Equifax, Inc., Customer Sata Sec. Breach Litig.*,
   362 F. Supp. 3d 1295 (N.D. Ga. 2019) ........................................................... 18

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ........................................................................... 7

*In re: The Home Depot, Inc. Customer Data Sec. Litig.*,
   2016 WL 2897520 (N.D. Ga. May 18, 2016) ................................................. 18

*Jones v. Bayer Healthcare LLC*,
   2009 WL 1186891 (N.D. Cal. May 4, 2009) ..................................................... 6

*Kim v. Budget Rent A Car Sys., Inc.*,
   15 P.3d 1283 (Wash. 2001) .............................................................................. 21

*Koczera v. Steele*,
   570 S.W.3d 242 (Tenn. Ct. App. 2018) ........................................................... 23

*Lett v. Collis Foods, Inc.*,
   60 S.W.3d 95 (2001) ......................................................................................... 23

*Mann v. State of Cal.*,
   70 Cal. App. 3d 773 (1977) ....................................................................... 10, 13

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ........................................................................... 17

*McConnell v. Dep't of Lab.*,
   787 S.E.2d 794 (Ga. Ct. App. 2016) ............................................................... 18

*Melton v. Boustred*,
   183 Cal. App. 4th 521 (2010) ..................................................................... 8, 10

*Minch v. Dep't of Cal. Highway Patrol*,
   140 Cal. App. 4th 895 (2006) ................................................................................ 8

*Moriarty v. Bayside Ins. Assocs., Inc.*,
   2021 WL 4061105 (9th Cir. Sept. 7, 2021) ...................................................... 14

*Nivens v. 7-11 Hoagy's Corner*,
   943 P.2d 286 (Wash. 1997)................................................................................ 21

*Papadimas v. Mykonos Lounge*,
   176 Mich. App. 40 (1989)................................................................................. 20

*Perdue v. Baker*,
   586 S.E.2d 606 (Ga. 2003)................................................................................ 18

*Purvis v. Aveanna Healthcare*,
   563 F. Supp. 3d 1360 (N.D. Ga. 2021) ........................................................... 19

*Regents of Univ. of Cal. v. Super. Ct.*,
   4 Cal. 5th 607 (2018) ................................................................................. passim

*Satterfield v. Breeding Insulation Co.*,
   266 S.W.3d 347 (2008) ..................................................................................... 23

*Snow v. Travel Centers of Am. LLC*,
   527 P.3d 741 (Okla. Ct. Civ. App. 2022) ....................................................... 22

*Staples v. CBL & Assocs., Inc.*,
   15 S.W.3d 83 (2000)......................................................................................... 23

*Stasi v. Inmediata Health Grp. Corp.*,
   501 F. Supp. 3d 898 (S.D. Cal. 2020)........................................................ 3, 16

*Stromberg v. Qualcomm Inc.*,
   14 F.4th 1059 (9th Cir. 2021) .......................................................................... 17

*Tristan v. Bank of America*,
   2023 WL 4417271 (C.D. Cal. June 28, 2023) ........................................... 13, 14

*User Profile Litig.*,
   402 F. Supp. 3d 767 (N.D. Cal. 2019) ............................................................ 16

*Van Horn v. Chambers*,
   970 S.W.2d 542 (Tex. 1998).............................................................................. 24

*Washington Mut. Bank, FA v. Super. Ct.*,
   24 Cal. 4th 906 (2001) ..................................................................................... 17

*Webstad v. Stortini*,
   924 P.2d 940 (Wash. Ct. App. 1996)............................................................... 21

*Wells Fargo Bank, N.A. v. Jenkins*,
   744 S.E.2d 686 (Ga. 2013)................................................................................ 18

*Williams v. Abilene Christian Univ.*,
   2020 WL 10458627 (N.D. Tex. Dec. 14, 2020) ............................................. 24

*Williams v. Cunningham Drug Stores, Inc.*,
   429 Mich. 495 (1988) ....................................................................................... 20

v

*Williams v. State of Cal.*,
   34 Cal. 3d 18 (1983) ............................................................................................ 10, 11, 13

*Zelig v. Cnty. of L.A.*,
   27 Cal. 4th 1112 (2002) .................................................................................................. 12

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ..................................................................... 1, 7

## I.     INTRODUCTION

Defendant Accellion, Inc. (Accellion) moves to dismiss Plaintiffs' claims for negligence.

Accellion is a small, privately owned company that licensed a software product (known as the File Transfer Appliance, or FTA) to corporate and government customers such as retailers, banks, and hospitals.  The FTA software allowed those customers to store and transfer data as the customers chose, on their own systems.  In December 2020 and January 2021, third-party criminal hackers breached the FTA systems of some Accellion corporate and government customers and allegedly obtained personal data concerning the individual Plaintiffs here.  Plaintiffs sued Accellion, alleging negligence and other claims.

In its January 29, 2024, Order (Dkt. 217), the Court held that Plaintiffs' prior complaint pled a claim for negligence under California law.  In particular, the Court held that Plaintiffs had adequately alleged facts establishing a "special relationship" between themselves and Accellion, such that California law would impose on Accellion an affirmative duty to protect Plaintiffs from malicious, criminal acts by third parties.  In so holding, the Court relied on Plaintiffs' repeated factual assertions that Accellion itself "obtained" and "transferred" Plaintiffs' sensitive data.  *See* Dkt. 217 at 2, 7-11.

That allegation was untrue, and Plaintiffs have now abandoned it in their Amended Consolidated Complaint (ACC), Dkt. 230.  In their prior complaint, Dkt. 170, Plaintiffs lumped together Accellion with Flagstar Bank, an Accellion corporate customer that ***did*** possess and transfer end-user consumer data.  But Flagstar is now gone from this case, and the flimsy façade of Plaintiffs' negligence theory has disappeared with it.  Under the authority of *Brown v. USA Taekwondo* ("*USAT*"), 11 Cal. 5th 204, 214 (2021), *Regents of Univ. of Cal. v. Super. Ct.*, 4 Cal. 5th 607 (2018), and this Court's Order interpreting those decisions, there is no basis to find a "special relationship" between Accellion and third parties whose data Accellion never obtained, stored, or transferred.  As there is no other basis to impose upon Accellion a duty to protect Plaintiffs from third parties, the negligence claims must be dismissed.

The negligence claims fail for an additional, related reason as well.  Seven of the Plaintiffs reside in states other than California – Georgia, Michigan, Oklahoma, Tennessee, Texas, and Washington – and the allegations of the ACC provide no basis to apply California law to their claims of negligence.  To the extent the laws of those states differ from the law of California, the requirements to establish a

"special relationship" that would impose a duty to protect are still greater, and the bar to the non-California Plaintiffs' negligence claims is even higher.  The non-California Plaintiffs have not alleged facts that, under the laws of their home states, would impose upon Accellion a duty to protect them from the actions of third-party criminal hackers.  For this reason as well, these negligence claims fail as a matter of law.

## II.    STATEMENT OF FACTS

For purposes of this targeted motion to dismiss, Accellion focuses on the specific allegations of fact that bear on the existence or absence of a "special relationship" between Accellion and Plaintiffs.  As explained below, there was no special relationship; there was ***no relationship at all***.  Accellion did not contract with Plaintiffs; did not contract on behalf of Plaintiffs; did not communicate with Plaintiffs; did not provide services to Plaintiffs; and did not have access to, transfer, store, collect, or handle Plaintiffs' sensitive data.

### A.    Background

The FTA was a software product developed by Accellion that facilitated "secure, encrypted sharing of files" that were too large to send as email attachments.  ACC ¶ 26.  In doing business with their own, distinct customers like Plaintiffs, Accellion's corporate and government customers used the FTA software on their own systems to transfer large files that included personally identifiable information (PII).  *Id.* ¶¶ 26, 32.

In December 2020 and January 2021, criminals exploited previously unknown vulnerabilities in FTA to mount cyberattacks against some of the companies using the software (the "Attacks").  *Id.* ¶¶ 39, 52.  Plaintiffs allege that the criminal hackers obtained their PII from the Accellion corporate and government customers with which Plaintiffs did business.  *Id.* ¶¶ 5-19.

### B.    Accellion Was A Stranger To Plaintiffs

The complaint contains no allegation of any kind that, prior to the Attacks, any Plaintiff (a) was aware that Accellion existed, (b) had heard of any Accellion product, (c) had any idea that the companies and government agencies with which they did business used the FTA or any other Accellion product, (d) had read or seen any statement by Accellion about the applications or security advantages of the FTA, or (e) relied in any way on any statement that Accellion had ever made about its products.

Unsurprisingly, while Plaintiffs are unable to allege they actually relied on any words or conduct by Accellion, they **have alleged in their prior complaint that they relied on Accellion's customers** – the parties with whom Plaintiffs did do business – to secure Plaintiffs' data.  *See* Dkt. 170 ¶ 36 ("Flagstar's customers rely on it to safeguard their PII. Flagstar knows that its customers entrust it with this responsibility ….").

## C.  The Prior Complaint's Allegations That Accellion Possessed Plaintiffs' Data

In their prior complaint, Plaintiffs generally alleged that "Defendants" (defined to refer collectively to both Accellion and its customer Flagstar Bank) "transferred" (Dkt. 170 ¶¶ 29-31), "collected" (*id.* ¶¶ 114, 116, 122, 158, 189), "stored" (*id.* ¶¶ 65, 114, 122, 169, 171, 189, 196), "received" (*id.* ¶¶ 75, 157, 189) and "maintained" (*id.* ¶¶ 75, 160, 167, 215) Plaintiffs' PII.

Although Accellion objected to the confusion and conflation created by this group pleading strategy, Dkt. 174 at 15, in its January 29 Order the Court expressly relied on these allegations as to Accellion in deciding whether Plaintiffs had adequately pled the existence of a "special relationship." For example, the Court understood Plaintiffs to plead that "they relied on Accellion to safeguard the PII that it [i.e., Accellion] transferred," Dkt. 217 at 7, and observed that the prior complaint "alleges that '[i]n the ordinary course of doing business with entities that use Accellion's FTA, individuals are typically *required to provide PII that is then transferred by Accellion*.'"  *Id.* (quoting complaint ¶ 30, emphasis supplied by the Court) (emphasis in original).  The Court plainly relied on Plaintiffs' allegations that Accellion itself actually collected, transferred, stored, received, and maintained their data in its discussion of the legal standards as well.  Thus, the Court's opinion includes the following (emphases added):

- The Court reasoned that California law imposes a duty on a company "to take reasonable steps to protect all sensitive information **it obtains** from individuals." *Id.* at 8.

- The Court twice cited *Stasi v. Inmediata Health Grp. Corp.*, 501 F. Supp. 3d 898, 915 (S.D. Cal. 2020), as supporting the notion that there can be a special relationship between "a company **that possesses** peoples' personal and medical information and those people."  Dkt. 217 at 8 and again at 9.

- The Court three times cited *Castillo v. Seagate Tech., LLC*, 2016 WL 9280242, at *3 (N.D. Cal. Sept. 14, 2016), as supporting the notion that a company had a duty to take steps to protect "personal identifying information **it obtained** from its employees." Dkt. 217 at 8 and again at 9

3

and again at 11.

- The Court characterized "the type of special relationship in this case" as a relationship "between a file transfer company and the owners of the information *it shared* [i.e., Accellion shared]." *Id.* at 10.

- The Court observed that California courts had held that "data companies owed duties of care in handling the personal information *they received*." *Id.* at 11.

- The Court summarized its holding: "the Court finds that Plaintiffs have alleged that there exists a 'special relationship' between Accellion and the Plaintiffs who own *the PII that Accellion handled* …." *Id.* at 12.

### D.  The Amended Complaint Abandons The Central Premise Of The Court's Prior Order, Conceding That Accellion Did Not Possess, Transfer, Or Handle Plaintiffs' Data

Plaintiffs filed an Amended Consolidated Complaint on March 14, 2024.  Dkt. 230.  The ACC alleges claims solely for negligence and for violations of the Washington Consumer Protection Act, and no longer includes Flagstar as a defendant.[1]

Most importantly, the ACC abandons the false assertions that Accellion itself "transferred," "collected," "stored," "received," "maintained," and "handled" Plaintiffs' PII.

Thus, whereas the prior complaint alleged that Accellion's direct customers "relied *on Accellion* to securely transfer sensitive data," Dkt. 170 ¶ 29, the ACC now alleges that those customers "relied on *Accellion's FTA* to securely transfer sensitive data," Dkt. 230 ¶ 31.

Likewise, whereas the prior complaint alleged that, "[i]n the ordinary course of doing business with entities that use Accellion's FTA, individuals are typically required to provide PII that is then *transferred by Accellion*," Dkt. 170 ¶ 30, the ACC now alleges that "[i]n the ordinary course of doing business with entities that use Accellion's FTA, individuals are typically required to provide PII that is then *transferred by Accellion's product*," Dk. 230 ¶ 32.

Whereas the prior complaint alleged that "Defendants owed a duty to safeguard PII … to ensure that all *information they transferred and maintained* was secure," Dkt. 170 ¶ 62, the ACC now alleges

---

[1] Plaintiffs also amended the *name* of their first cause of action, revising it from "Negligence" to "Negligence and/or Gross Negligence."  *See* Dkt. 230 Count 1.  This revision is inconsequential, as there is no such thing as a standalone claim for "gross negligence."  *See City of Santa Barbara v. Super.* Ct., 41 Cal. 4th 747, 779-80 (2007).

that "Accellion owed a duty to safeguard PII … to ensure that all information ***being transferred and maintained*** on FTA was secure," Dkt. 230 ¶ 72.

Whereas the prior complaint alleged that "Defendants owed a duty to safeguard PII because they were on notice that ***they were handling highly valuable data* …**," Dkt. 170 ¶ 63, the ACC now alleges that "Accellion owed a duty to safeguard PII because it knew that ***its product was being used to transfer and store highly valuable data***," Dkt. 230 ¶ 73.

Whereas the prior complaint alleged that "***Defendants voluntarily undertook efforts to keep that data secure*** in their business operations and thus owe a continuing obligation to Plaintiffs and Class members to keep their PII secure," Dkt. 170 ¶ 65, that allegation has been deleted entirely from the ACC.

Whereas the prior complaint alleged that "***Defendants collected and stored*** Plaintiffs' and Class members' personal information …," Dkt. 170 ¶ 114, the ACC now alleges that "[t]he ***FTA stored and/or transferred*** Plaintiffs' and Class members' PII," Dkt. 230 ¶ 123.

Whereas the prior complaint alleged that "***Defendants*** owed Plaintiffs and Class members a duty of reasonable care to preserve and protect the confidentiality of their ***PII that they collected***," Dkt. 170 ¶ 116, the ACC now alleges that "Accellion owed Plaintiffs and Class members a duty of reasonable care to preserve and protect the confidentiality of their ***PII being stored, transferred, and secured by Accellion's FTA***," Dkt. 230 ¶ 125.

In sum, Plaintiffs no longer allege that Accellion collected, handled, stored, transferred, or possessed Plaintiff data.  Rather, they allege only that Accellion's ***customers*** used Accellion's FTA to store Plaintiffs' PII the ***customers*** selected.  Dkt. 230 ¶¶ 3, 34.

### E.   Plaintiffs' Other Allegations And Facts Subject To Judicial Notice Corroborate That Accellion Did Not Have Access To Or Control Over Plaintiffs' PII Or Accellion's Customers Use Of The FTA

In addition to the revised allegations above, the allegations in Plaintiffs' current and prior pleadings and facts subject to judicial notice corroborate that Accellion did not have access to or control over its PII that its customers chose to store or transfer on the FTA, or the FTA itself that its customers had installed on their own systems.

***First***, the ACC concedes that Accellion repeatedly advised its corporate and government

5

customers "for years" to upgrade from the FTA, a twenty-year-old legacy product, to Kiteworks,

Accellion's newer, "more secure product." Dkt. 230 ¶¶ 3, 34. But the customers that possessed

Plaintiffs' data, like Flagstar, disregarded that advice and made their own independent choice to

"knowingly use[] an outdated, near end-of-life file transfer product." Dkt. 170 ¶ 39; *see also id.* ¶¶ 34-

41 (section titled "**Flagstar Continued to Use FTA After It Was Warned to Switch**"). Those

customers made that choice, Plaintiffs concede, even though Accellion had made them aware "of the

risk associated with continued use of the FTA product." *Id.* ¶ 40. Thus, Plaintiffs expressly alleged that

"Flagstar, an Accellion client affected by the breach, knew of the security shortcomings in Accellion's

FTA product and had been advised to upgrade to a more secure product prior to the breach. Flagstar

nevertheless continued to use the FTA." *Id.* ¶ 3. *See also id.* ¶ 77 ("Flagstar continued to use that

system [FTA] even when made aware of the substantial risk."); ¶ 133 ("Flagstar was aware of the need

to update to a newer file transfer platform, but failed to do so."); ¶ 190 ("Flagstar knew of the need to

upgrade to a more secure platform but failed to do so.").[2] Accellion did not possess or control Plaintiffs'

data and did not control its customers' decision to ignore its advice to upgrade from the FTA to the more

secure Kiteworks.

     ***Second,*** in their prior pleading, Plaintiffs also incorporated by reference Accellion's end-user

license agreement ("EULA"), of which the Court took judicial notice. Dkt. 217 at 28 n.6 (granting

Request for Judicial Notice); Dkt. 175, 174-2 (Request for Judicial Notice, copy of EULA). The EULA

---

[2] Although Plaintiffs have amended their complaint, they cannot avoid the effect of admissions in the prior pleading that they do not contend were made in error. *See Azadpour v. Sun Microsys., Inc.*, 2007 WL 2141079, at *2 (N.D. Cal. July 23, 2007); *Jones v. Bayer Healthcare LLC*, 2009 WL 1186891, at *3 (N.D. Cal. May 4, 2009). In addition, three Plaintiffs here – Chavez, Moniz, and Ringling – now are pursuing their claims against Flagstar related to the Attacks in a separate lawsuit in the Eastern District of Michigan. In that case, those plaintiffs have filed pleadings further emphasizing the responsibility that ***Flagstar***, as opposed to Accellion, had for protecting their PII. *See Angus, et al. v. Flagstar Bank, N.A., et al.*, No. 2:21-cv-10657-MFL-DRG, Dkt. No. 69 (E.D. Mich. Sept. 12, 2023) at ¶ 36 ("Plaintiffs and Class Members relied on [Flagstar], a sophisticated financial institution, to keep their PII confidential and securely maintained"); ¶ 45 (alleging that Flagstar "knew of the risk associated with continued use of the FTA product" but used it anyway); ¶ 48 (alleging that "[g]iven the 'legacy' status of Accellion FTA and the superiority of Kiteworks in protecting third-party communications, Defendant should have migrated to Kiteworks or another superior solution before the Data Breach occurred."); ¶ 49 (alleging that "Defendant continued to use Accellion FTA to share and/or store the PII of Class Members, notwithstanding its 'legacy' status and the availability of a 'superior' alternative that would have better protected Plaintiffs' and Class Members' PII.").

made clear that the "Customer is solely responsible and liable for the use of and access to" the Accellion software they obtain "and for all files and data transmitted, shared, or stored using the [software]." *See* Dkt. 174-2 § 4.3. The EULA likewise made clear that "Accellion does not need or require access to any files or attachments stored or transmitted with the Accellion [software] or any personally identifiable information about any Customer." Dkt. 174-2 § 7.2. To that end, the EULA affirmatively ***prohibited*** Accellion's customers from giving Accellion access to protected data without Accellion's prior written approval, which Accellion could deny in its sole discretion. *See id.* Again, Accellion did not possess, store, or transfer Plaintiffs' data or even have a means to identify Plaintiffs, let alone know what Plaintiff data its customers chose to possess, store, or transfer using the FTA.

*Third*, just as Accellion could not compel its customers to follow its advice and upgrade to the more secure Kiteworks product, there is no allegation that Accellion could compel its customers to install patches or fixes on the FTA software on customer systems.

## III.   LEGAL STANDARD

Under Rule 12(b)(6), a claim must be dismissed unless it pleads "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted); *see* Fed. R. Civ. P. 12(b)(6). At a minimum, a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and "include sufficient factual enhancement to cross the line between possibility and plausibility," *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 995 (9th Cir. 2014). The Court need not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## IV.   ARGUMENT

### A.   Plaintiffs Have Failed To Plead Facts That Establish A Claim For Negligence Under California Law

#### 1.   Plaintiffs' Negligence Theory Depends Entirely on Establishing that Accellion Had a "Special Relationship" with Plaintiffs That Imposed a Duty to Protect Against Criminal Conduct of Third Parties

The premise of Plaintiffs' negligence claim against Accellion is one of non-feasance – that Accellion supposedly failed to take action to protect Plaintiffs from third-party criminal hackers who

7

stole Plaintiffs' data. *See, e.g.*, Dkt. 230 ¶ 125 (alleging Accellion had a duty to "prevent cybercriminals from accessing and exfiltrating" Plaintiffs' PII); ¶ 126 (alleging Accellion had a duty "to prevent disclosure of the information, and to safeguard the information from cyber theft").  As Accellion previously argued, and the Court held, allegations of non-feasance typically do not state a claim for negligence, as "one owes no duty to control the conduct of another, nor to warn those endangered by such conduct."  *Regents*, 4 Cal. 5th at 619; *see also Melton v. Boustred*, 183 Cal. App. 4th 521, 536 (2010); Dkt. 217 at 6.

There is a limited exception to this general rule.  "In a case involving harm caused by a third party, a person may have an affirmative duty to protect the victim of another's harm if that person is in what the law calls a 'special relationship' with either the victim or the person who created the harm." *USAT*, 11 Cal. 5th at 215.  Like any exception to a general rule, the duty to protect another from potential harm is narrow, otherwise the exception would swallow the rule.  Thus, "California courts have made it plain that the special relationship rule is not expansive but, rather, is narrow and is reserved for a very limited class of unusual cases."  *Greyhound Lines, Inc. v. Dep't of Cal. Highway Patrol*, 213 Cal. App. 4th 1129, 1137 (2013) (citing *Minch v. Dep't of Cal. Highway Patrol*, 140 Cal. App. 4th 895, 905 (2006)).

In its January 29 Order, the Court held that the allegations of the prior complaint sufficiently alleged facts that would give rise to a duty on Accellion's part to exercise care to protect Plaintiffs from the actions of third-party criminal hackers.  Dkt. 217 at 6-10.  As explained above, however, Plaintiffs have now abandoned the central premise of that analysis, that Accellion itself transferred and possessed Plaintiffs' data.  Accordingly, Accellion applies the analysis that the Court used in its January 29 Order, but with the more anemic allegations of the amended complaint.

## 2. The Special Relationship Exception

As the Court observed in its January 29 Order, in recent years the California Supreme Court has twice addressed in detail the circumstances in which a "special relationship" may be found and a resulting duty to protect against the acts of third parties.  *See USAT*, 11 Cal. 5th at 215; *Regents*, 4 Cal. 5th at 620-21.

The circumstances of *USAT* and *Regents* are instructive and highlight the limited nature of the

8

special relationship exception.  In *USAT*, the plaintiffs were minor, teenage girls who had been sexually abused by their taekwondo coach (Gitelman) when traveling with him to competitions organized by one of the defendants, USA Taekwondo.  *USAT*, 11 Cal. 5th at 210.  The plaintiffs sued both USAT and the United States Olympic Committee (USOC), alleging that each of those organizations had a special relationship with the coach through which they could control him and discipline him and that the vulnerable plaintiffs had relied on defendant organizations to protect them from his criminal behavior. *Id.* at 211.  On appeal from a demurrer, the Court of Appeal found that there was a special relationship between USAT and Gitelman, as USAT could "control Gitelman's actions, as demonstrated by the fact that USAT had registered him as a coach, took disciplinary action against him, and ultimately barred him from coaching." *Id.*  In contrast, there was no special relationship between USOC and the plaintiffs or Gitelman.  With respect to USOC, plaintiffs had alleged that USOC had control of USAT through its oversight and certification of national governing bodies for sports; sexual abuse of young athletes was a known problem; Gitelman's abuse came on the heels of a series of similar instances of abuse of minors by their coaches; USOC had responded to those incidents by requiring national governing bodies to adopt a safe sport program to protect athletes from abuse; and USOC was aware that USAT had failed to implement such a program and placed USAT on probation as a result.  *Id.* at 210.  The Court of Appeal held, and the Supreme Court affirmed the holding, that these facts did ***not*** establish a special relationship.  The notion that USOC could protect plaintiffs through its control of USAT, which did control Gitelman, was too attenuated, and plaintiffs had no "reason to look to the USOC for protection." *Id.* at 212.

In *Regents*, a student at UCLA was attacked in a school chemistry lab, during class, by a fellow student who suffered from paranoid schizophrenia and had a history of hallucinations and disturbing and threatening behavior, known to the university.  *Regents*, 4 Cal. 5th at 613-16.  The student sued the university for negligence, alleging a special relationship.  In deciding whether a special relationship existed, the California Supreme Court discussed at length "the unique features of the college environment," *id.* at 624, which it described as "unlike any other," *id.* at 625.  The Court observed that colleges "provide students social, athletic, and cultural opportunities" and a "discrete community" in an environment over which the college has pervasive control, through "rules and restrictions, both in the

classroom and across campus," as well as "resident advisers, mental health counselors, and campus police." *Id.* at 625-26.  As a result, "college administrators and educators have the power to influence [students'] values, their consciousness, their relationships, and their behaviors." *Id.* (citation omitted). At the same time, college students are particularly vulnerable: "Although college students may no longer be minors under the law, they may still be learning how to navigate the world as adults." *Id.*  Under these particular circumstances, the Supreme Court found that there was a "limited" special relationship that extended "to activities that are tied to the school's curriculum but not to student behavior over which the university has no significant degree of control." *Id.* at 627.

In *Regents*, the Supreme Court identified four attributes of special relationships; this Court cited and relied on those four attributes in its January 29 Order.  Dkt. 217 at 6.

(1)     "Generally, the relationship has an aspect of dependency in which one party relies to some degree on the other for protection." *Regents*, 4 Cal. 5th at 620.  Mere reliance by one party on another is not dependence, however, as every relationship, commercial and personal, has some degree of reliance.  Rather, the existence of a special relationship "puts the defendant in a ***unique*** position to protect the plaintiff from injury," *USAT*, 11 Cal. 5th at 216 (emphasis added), because the "plaintiff is ***particularly vulnerable*** and dependent upon the defendant," *Regents*, 4 Cal. 5th at 621 (emphasis added).  Notably, in illustrating this element, the Court in *Regents* cited *Mann v. State of Cal.*, 70 Cal. App. 3d 773 (1977).  In *Mann*, a police officer created a situation in which stranded motorists were dependent upon him when he stopped at the scene of a nighttime highway accident, affirmatively asserted his authority as an officer to redirect traffic, and used his patrol vehicle and flashing lights to block traffic and shield the motorists.  *Id.* at 776-77, 780.  (The officer breached the duty of care he had assumed when he drove off without warning, leaving the motorists exposed to oncoming highway traffic.  *Id.* at 780.)  *See also Williams v. State of Cal.*, 34 Cal. 3d 18, 28 (1983) (holding that plaintiff did not allege "the requisite factors to a finding of special relationship, namely detrimental reliance by the plaintiff on the officers' conduct, statements made by them which induced a false sense of security and thereby worsened her position"); *Melton*, 183 Cal. App. 4th at 527, 535-36 (no dependency that would establish special relationship between host of party and guests who were assaulted and seriously injured by other party attendees).

(2)     Directly related to the notion of dependency is control.  "The corollary of dependence in a special relationship is control. Whereas one party is dependent, the other has superior control over the means of protection." *Regents*, 4 Cal. 5th at 621.  Once again, the cases that the *Regents* court used to illustrate "control" demonstrate the degree of control and the unusual nature of the circumstances where it exists.  As the Court stated in *Regents*, "'the epitome' of such a special relationship exists between a jailer and prisoner." *Id.* (quoting *Giraldo v. Dep't. of Corr. & Rehab.*, 168 Cal. App. 4th 231, 250-51 (2008)).  Similarly, common carriers and their passengers are a "quintessential example" because "passengers are sealed together in a moving vehicle, with the means of entry and exit under the exclusive control of the driver," leaving them "wholly dependent upon the bus driver to summon help or provide a means of escape." *Id.*  In contrast, in *Barenborg v. Sigma Alpha Epsilon Fraternity*, 33 Cal. App. 5th 70 (2019), the Court of Appeal rejected a claim of a special relationship because of the absence of sufficient control.  There the plaintiff was a guest injured at a party hosted by a local fraternity chapter and sued the national fraternity.  The Court of Appeal held that even though the national fraternity had the power to discipline the local chapter, absent an "ability to monitor the day-to-day operations of local chapters," the national chapter was not in a "unique position to protect against the risk of harm" and no special relationship existed.  33 Cal. App. 5th at 79-80.  *See also USAT*, 11 Cal. 5th at 211 (USOC's control over co-defendant that did in fact have control over the third party who created the harm was insufficient to establish a special relationship and duty to protect).

(3)     "Special relationships also have defined boundaries.  They create a duty of care owed to a limited community, not the public at large." *Regents*, 4 Cal. 5th at 621.  In explaining this attribute, the Supreme Court emphasized that "a special relationship is *limited to specific individuals*," such that "the defendant's duty is less burdensome and more justifiable than a broad-ranging duty would be." *Id.* (citing Restatement (Third) of Torts Section 40, com. h) (emphasis added).  The Restatement comment the Court cited with approval states, "A relationship identifies a specific person to be protected and thus provides a more limited and justified incursion on autonomy."  The Court cited with approval prior decisions that held defendants did not have a special relationship even with plaintiffs who were part of a defined community with which the defendant had direct interactions. *Regents*, 4 Cal. 5th at 621. (*citing Williams*, 34 Cal. 3d at 27-28 (no special relationship between police officers and citizen in their

11

jurisdiction); *Davidson v. City of Westminster*, 32 Cal. 3d 197, 208 (1982) (no special relationship between police officers and an individual citizen whom police know to be at risk of being a victim); *Zelig v. Cnty. of L.A.*, 27 Cal. 4th 1112, 1130 (2002) (no special relationship between county and visitors to county courthouse, and hence no duty to protect courthouse visitors from fatal shooting in courthouse).

(4)   "[M]any special relationships especially benefit the party charged with a duty of care." *Regents*, 4 Cal. 5th at 621.  The fact that a party may benefit is true of every commercial relationship, of course, but does not make every commercial relationship "special" and is not in and of itself a reason to impose a duty of care that otherwise would not apply.  Rather, the existence of a benefit helps distinguish cases that involve mere bystanders, on whom the law has long been reluctant to impose any duty to protect against harm, particularly harm caused by third parties.

### 3.   The Amended Complaint Fails To Plead Facts That Establish A Special Relationship Between Accellion And Plaintiffs Under California Law

Applying the same analysis that the Court previously employed, Plaintiffs' amendments to the complaint tip the balance and confirm they have no claim for negligence.[3]

In its January 29 Order, the Court began by applying each the four enumerated factors from *Regents* described above.  We do the same.

***First,*** the Court found that the attribute of dependency was present here because "Plaintiffs have demonstrated that they relied on Accellion to safeguard the PII that it transferred." Dkt. 217 at 7.  In support, the Court quoted the now-retracted allegation that in "the ordinary course of doing business with entities that use Accellion's FTA, individuals are typically *required to provide PII* that is then *transferred by Accellion.*"  *Id.* (quoting Dkt. 170 ¶ 31 (emphasis supplied by the Court)).  The ACC now makes plain, however, that Accellion did ***not*** "transfer" any Plaintiff data.  And as a result, it is now clear that Plaintiffs, who were apparently completely unaware that Accellion even existed, did not "rely" on Accellion when the companies Plaintiffs did business with stored or transferred Plaintiff data without

---

[3] Accellion continues to assert that the allegations of the prior complaint were insufficient to establish a special relationship, but the Court need not revisit that issue to rule in Accellion's favor now, on this new pleading.

Accellion's involvement.  To the contrary and as one would expect, Plaintiffs relied on the companies to whom they supplied their data to protect it, *see* Dkt. 170 ¶ 36, and seek to hold those third parties liable for the same criminal attacks they blame Accellion for.

Further, the allegations of the ACC clearly fail to demonstrate the kind of "dependency" that the Supreme Court discussed in *USAT* and in *Regents*.  Plaintiffs were not "particularly vulnerable and dependent," *Regents*, 4 Cal. 5th at 621, but rather were vulnerable to the risk of criminal hackers in the same way that everyone with a social security number, an email address, and a bank account is today.  The commercial activity between Accellion and its customers is nothing like the conduct of a national sports body that certifies coaches of minor children, supervises, disciplines, and bans those coaches, and sponsors events to which the coaches travel with children unattended by their parents, as in *USAT*.  It is also nothing like the "unique" college environment that the Court carefully considered in *Regents*, where the university assumed control over and responsibility for nearly every aspect of the lives of young adults first learning to navigate the world.  4 Cal. 5th at 625-26.  There is no allegation of "detrimental reliance" by Plaintiffs on Accellion's conduct, or statements by Accellion that "induced a false sense of security" in Plaintiffs, *see Williams*, 34 Cal. 3d at 28.  There is no allegation that Accellion affirmatively created a situation in which it caused Plaintiffs to become particularly vulnerable to heightened risks that didn't otherwise exist, as in *Mann, see* 70 Cal. App. 3d at 776-77, 780.  And as Plaintiffs' own allegations make clear, Accellion was never in a "***unique* position**" to protect vulnerable Plaintiffs, *USAT*, 11 Cal. 5th at 216 (emphasis added), because Plaintiffs allege that ***Accellion's customers*** were actually responsible for protecting their PII and were at fault for, among other things, not following Accellion's advice to upgrade from FTA to the more secure Kiteworks product.  Dkt. 170 ¶¶ 34-41.

Rather, this case is more like *Tristan v. Bank of America*, 2023 WL 4417271 (C.D. Cal. June 28, 2023).  There, plaintiffs were Bank of America customers who had been duped by third-party scammers into transferring money using Zelle, a payment platform operated by defendant Early Warning Services (EWS) that was marketed as "safe and secure."  *Id.*  at *1-2.  Plaintiffs sued EWS for negligence, along with other theories, claiming that a special relationship required EWS to protect them from third-party criminals.  *Id.* at *15.  Applying *USAT*, the court rejected the argument that "an online payment platform is in a unique position with its users that would justify a finding of a special relationship here," and

13

dismissed the negligence claim with prejudice.  *Id.  See also Moriarty v. Bayside Ins. Assocs., Inc.*, 2021 WL 4061105, at *2 (9th Cir. Sept. 7, 2021) (rejecting supposed "special relationship" where plaintiff had not shown that defendant insurance agent "was in a more 'unique position' than the typical insurance agent to protect her or her husband from injury").

**Second**, this Court's prior Order found that Accellion had "superior control over the means of protection" because Plaintiffs alleged Accellion could release patches to its own customers so **they** could fix the vulnerabilities after they were detected.  Dkt. 217 at 7.  But this holding is also undermined by the amended complaint's concessions.  As Accellion did not possess, transfer, obtain, or handle data of Plaintiffs or any other putative class member, Accellion could have no way to know which of its customers stored PII of consumers using the FTA, what kind of PII they stored, or who among Plaintiffs might be affected.[4]

This is, once again, nothing like the "control" the California Supreme Court described in *USAT* or *Regents*, where defendants had direct and substantial control over the entire environment in which plaintiffs and the criminal third parties acted, as well as control over the criminals themselves.  If anything, this case looks more like the unsuccessful claim by the *USAT* plaintiffs against the United States Olympic Committee.  There the USOC was alleged to have "control" of the risk indirectly, through its substantial control of USAT, which controlled the abusive coach.  That was not enough to create a special relationship, and did not give the plaintiffs a basis to "look to the USOC for protection." 11 Cal. 5th at 212.  The alleged facts here are even more attenuated.  Accellion is not alleged to have had control over its corporate and government customers to dictate whether they implemented patches on their own systems or when, whether they used the FTA to store consumers' PII, or even whether they stopped using the FTA as Accellion advised and used its more secure offering.  Yet again, there is no similarity to the examples of jailer and prisoner, or passengers sealed in a moving vehicle without means of escape.  *Regents*, 4 Cal. 5th at 621.  *See also Barenborg*, 33 Cal. App. 5th at 79-80; *Tristan*, 2023 WL

---

[4] This point was underscored in the context of Accellion's now-defunct settlement in this case, where Accellion was unable to identify potential class members because only its FTA customers had that information. *See* Dkt. 158, 9:22-10:13.  Accellion never knew Plaintiffs or the existence or content of Plaintiffs' data, could not identify Plaintiffs or Plaintiffs' data, and did not have a means of exerting control over Plaintiffs or their data; in the ACC, Plaintiffs now tacitly admit the same.

4417271 at *15; Restatement (Third) of Torts, § 40 (listing the kinds of dealings that may give rise to a special relationship).

*Third*, this Court previously held that the alleged relationship between Accellion and Plaintiffs is limited to specific individuals, as required by *Regents*, such that the special relationship "extends to 'the end users of the services Accellion and Flagstar provided to their clients,' *i.e.*, 'those to whom the data belonged.'"  Dkt. 217 at 7 (citing Dkt. 170 ¶¶ 119-20).  Again, the concessions of the ACC negate this rationale.  Plaintiffs no longer allege that they were "users of the services Accellion … provided to them," but rather that they provided data to Accellion's customers, who independently used Accellion's product to store or transfer that data.

The concessions of the amended complaint defeat the "special relationship" argument for another reason as well.  In every other case in which a special relationship has been found, the community not only is limited in number and in category, ***the defendant readily knows who is in a special relationship with it.***  Accordingly, the defendant can impose and enforce rules and restrictions on that community both to prevent harm and to manage its own liability.  *See e.g.*, *Regents*, 4 Cal. 5th at 625-26 (special relationship limited to students while on campus, noting that colleges impose "rules and restrictions, both in the classroom and across campus," have "resident advisers, mental health counselors, and campus police" to enforce those rules and "have the power to influence [students'] values, their consciousness, their relationships, and their behaviors") (internal citation omitted); *USAT*, 11 Cal. 5th at 211 (special relationship limited to coaches that sports body had power to register, discipline, and ban).  Even common carriers, which of course hold themselves out to the public at large, have special relationships with and assume duties to only a defined number of known, specific individuals who board their transport and agree to the terms of carriage.  Here, in contrast, Plaintiffs concede that Accellion does not have access to, store, or transfer Plaintiff PII.  Plaintiffs thus allege an anomalous and unprecedented "special relationship" between Accellion and an unidentified number of strangers to protect data that Accellion does not have and cannot see.

*Fourth*, it is certainly the case that Accellion has benefitted from its commercial activity of providing the FTA to customers.  But that should merit little weight, as every commercial actor in every segment of the economy benefits from its interactions with its own direct customers as well as the

1   activity of upstream suppliers and downstream users.  This of course does not put every end-user in the

2   stream of commerce in a "special relationship" with every element of the supply chain. Where, as here,

3   the allegation is that Accellion benefits from its relationship with its direct customers, and they in turn

4   benefit from using Accellion's products in their own dealings with Plaintiffs without Accellion's direct

5   involvement, that daisy-chain relationship is not the type of benefit contemplated by the Court in

6   *Regents.*

7        To be sure, Accellion attacked even the prior complaint on the grounds that there was no privity

8   of contract between itself and Plaintiffs and indeed "no relationship at all." Dkt. 217 at 9.  In its prior

9   Order, relying on the now-abandoned allegations of the prior complaint, the Court reasoned that "federal

10  courts applying California law have not hesitated to extend a data company's duty of care beyond those

11  with whom it shares privity or exceeds some threshold level of interactions." *Id.* (citing cases).

12  Consistent with that reasoning and the allegations of the prior complaint, the Court cited and quoted four

13  cases that found a "a duty on companies to take reasonable steps to protect all sensitive information ***it***

14  ***obtains*** from individuals." Dkt. 217 at 8-9 (emphasis added).  Thus, the Court quoted *Stasi*, 501 F. Supp.

15  3d at 914, for the proposition that a defendant had a special relationship with people for whom it

16  "possesses peoples' personal and medical information"; quoted *Castillo*, 2016 WL 9280242, at *3, as

17  holding that a defendant company had a duty to protect "all personal identifying information it obtained

18  from its employees"; cited *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d

19  767, 799 (N.D. Cal. 2019), which held that Facebook had an affirmative duty – not a special relationship

20  – to protect sensitive information it obtained from its own users; and cited *Bass v. Facebook, Inc.*, 394 F.

21  Supp. 3d 1024, 1039 (N.D. Cal. 2019), which held the same.

22       While Accellion respectfully contends that this Court's reasoning went too far in imposing a duty

23  under the prior pleading, it does not matter, because the amended complaint now does not alleges some

24  "threshold level of interactions," it concedes that there were ***no*** "interactions" at all between Accellion

25  and Plaintiffs.  Accellion is aware of no California case that has ever found a special relationship giving

26  rise to a duty of care where there was no direct relationship or interaction between the defendant and the

27  victim or the person who created the harm.  This case should not be the first to cross that line; the

28  negligence claims should be dismissed.

### B.   Non-California Plaintiffs Have Failed To Allege Facts That Would Support A Negligence Claim Under the Laws of Their Home States

None of the Plaintiffs have a claim under California law.  But not all Plaintiffs are from California, and the law of their homes states leans even more favorably in Accellion's favor.  To the extent that their home states would not recognize a special relationship and claim for negligence, the seven non-California plaintiffs are subject to their home states' laws, and their negligence claims must be dismissed for this independent reason.

Seven Plaintiffs are residents of states other than California.  Plaintiff Torres is a resident of **Georgia**, where he was employed by Accellion customer Kroger.  Dkt. 230 ¶ 17.  Plaintiff Whittaker is a resident of **Michigan**, where she received pharmacy services from Kroger.  *Id.* ¶ 18.  Plaintiffs Worrick and Rodriguez are residents of **Washington**, where they received benefits from the state, an Accellion customer.  *Id.* ¶¶ 15, 19.  Plaintiff Dawes is a resident of **Oklahoma**, employed by Kroger.  *Id.* ¶ 8.  Plaintiff Desjardins is a resident of **Tennessee**, employed by Kroger.  *Id.* ¶ 9.  Plaintiff Ringling is a resident of **Texas**, where she banked with Accellion customer Flagstar.  *Id.* ¶ 14.

### 1.   Non-California Plaintiffs Have Made No Showing That California Law Should Apply to Their Claims of Negligence

"When state claims are brought, federal courts apply the choice of law rules of the forum state – here, California."  *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1067 (9th Cir. 2021).  Under California's choice of law rules, the court (1) determines whether there is material conflict between the law of California and the foreign state; (2) if so, determines whether each state has an interest in having its own law apply, and (3) if both states have such an interest, decides whether one state's interest would be more impaired by failing to apply its law.  *See Washington Mut. Bank, FA v. Super. Ct.*, 24 Cal. 4th 906, 920 (2001).

A difference is material when it "will spell the difference between the success and failure of a claim."  *Stromberg*, 14 F.4th at 1068.  As shown below, the non-California Plaintiffs' negligence claims would fail under the laws of their home states.  As for interest, "every state has an interest in having its law applied to its resident claimants."  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 591-92 (9th Cir. 2012) (overruled in part on other grounds).  As for impairment, there is no impairment of California's interest applying the special relationship test of the Plaintiffs' home states, as California has no interest

in applying its tort principles to offer protection to residents of foreign states who allege they were

harmed by criminal conduct in those states.

### 2.   Plaintiff Torres Has No Claim for Negligence Under Georgia Law

Under Georgia law, Accellion had no duty to protect Mr. Torres from third-party criminal

hackers, and no special relationship with him.

In Georgia, "there is no common-law duty to all the world not to subject others to an

unreasonable risk of harm." *In re Equifax Fair Credit Reporting Act*, 2023 WL 6192732, at *7 (N.D.

Ga. 2023 Sept. 11, 2023).  In *Dep't. of Labor v. McConnell*, 828 S.E.2d 352 (Ga. 2019), a Department of

Labor employee inadvertently sent, to approximately 1,000 people, a spreadsheet containing the PII of

other individuals who had previously applied for benefits or services.  The Georgia Supreme Court

rejected a negligence claim in a data breach case, finding no duty of care and hence no negligence claim.

The court expressly disapproved its prior holding in *Bradley Center, Inc. v. Wessner*, 296 S.E.2d 693

(Ga. 1982), "to the extent that it created a general legal duty to all the world not to subject [others] to an

unreasonable risk of harm." *McConnell*, 828 S.E.2d at 358.[5]  The Georgia Court of Appeals' opinion in

that case, adopted by the Georgia Supreme Court, reasoned that the Department of Labor owed no duty

to the plaintiff-applicants because the Georgia legislature had declined to establish a duty of care to

protect the security of personal information.  *McConnell v. Dep't of Lab.*, 787 S.E.2d 794, 800 (Ga. Ct.

App. 2016), *vacated on other grounds*, 805 S.E.2d 79 (Ga. 2017).  According to the Court of Appeals,

"[i]t is beyond the scope of judicial authority … to move from aspirational statements of legislative

policy to an affirmative legislative enactment sufficient to create a legal duty." *Id.*[6]

---

[5] In light of the Georgia Supreme Court's disapproval of *Bradley Center*, Georgia federal district court decisions that relied on *Bradley Center* to find defendants had a duty to safeguard customers' personal data are no longer good law.  *See, e.g.*, *In re Equifax, Inc., Customer Sata Sec. Breach Litig.*, 362 F. Supp. 3d 1295, 1324–27 (N.D. Ga. 2019); *In re Arby's Rest. Grp. Inc. Litig.*, 2018 WL 2128441 (N.D. Ga. Mar. 5, 2018); *In re: The Home Depot, Inc. Customer Data Sec. Litig.*, 2016 WL 2897520 (N.D. Ga. May 18, 2016).

[6] Georgia courts hesitate to expand the reach of the common law duty of care where the legislature has not done so.  *See Wells Fargo Bank, N.A. v. Jenkins*, 744 S.E.2d 686, 688 (Ga. 2013) ("[T]his Court will not usurp legislative authority by inferring or supplying [a duty of care]."); *Blotner v. Doreika*, 678 S.E.2d 80, 80-81 (Ga. 2009) (where a particular common law duty was not recognized in Georgia, the common law rule could be changed only by legislative act); *Perdue v. Baker*, 586 S.E.2d 606, 615 (Ga.

18

Under *McConnell*, Mr. Torres cannot establish Accellion had a duty to protect him from the criminal acts of third parties.  No common law duty to protect individuals' personal information exists in Georgia, *see McConnell*, 828 S.E.2d 352, and Georgia courts are loathe to recognize new common law duties where the Georgia legislature has declined to do so.  Mr. Torres' negligence claim fails.

Federal courts have recognized a duty owed in data breach cases under Georgia law after *McConnell* only where there was both foreseeable harm *and* a "direct relationship" between defendants and plaintiffs.  *See In re Equifax*, 2023 WL 6192732, at *7; *CSX Transp., Inc. v. Williams*, 608 S.E.2d 208, 210 (Ga. 2005) (foreseeability alone cannot establish a duty of care).  In *Purvis v. Aveanna Healthcare*, 563 F. Supp. 3d 1360, 1368-71 (N.D. Ga. 2021), a district court held that Aveanna Healthcare owed its patients and employees a duty to safeguard personal information from a foreseeable data breach, because the plaintiffs had directly entrusted the defendant with personal information that the defendant subsequently allowed to be breached.  Here, no direct relationship exists between Accellion and Torres, contractual or otherwise, that can be likened to the relationship between the defendant and its patients and employees in *Purvis*.  Thus, even if a common law duty to protect Mr. Torres from the criminal acts of third parties *can* be conceived of under Georgia law, despite the Georgia Supreme Court's pronouncement in *McConnell*, no such duty can be established here, and Mr. Torres's negligence claim must fail.

### 3.    Plaintiff Whittaker Has No Claim for Negligence Under Michigan Law

Under Michigan law, Accellion had no duty to protect Ms. Whittaker from third-party criminal hackers, and had no special relationship with her.

Courts applying Michigan law have already held that data transfer companies, like Accellion, do not owe a duty to protect individuals' personal information.  *See Grifo & Co., PLLC v. Cloud X Partners Holdings, LLC.*, 485 F. Supp. 3d 885, 896-97 (E.D. Mich. 2020) (rejecting claim of special relationship arising from "data-hosting relationship" and finding "no general duty to act, install safeguards, and protect Plaintiff and its data from a third-party ransomware attack"). This rule derives in part from the fact that "Michigan courts have been exceptionally hesitant to extend liability to cases of third-party

---

2003) ("The core legislative function is the establishment of public policy through the enactment of laws.").

criminal behavior." *Id.* at 897; *see also id.* at 896 ("Because extending liability to parties who fail to protect and secure others violates a basic norm of negligence law, Michigan courts have been hesitant to create 'special relationships' beyond a few narrow and historical categories."); *Williams v. Cunningham Drug Stores, Inc.*, 429 Mich. 495, 498 (1988) (recognizing that Michigan law "has been slow in recognizing liability for nonfeasance because the courts are reluctant to force persons to help one another and because such conduct does not create a new risk of harm to a potential plaintiff").

Michigan's conservative approach to the special relationship doctrine policy has significantly curbed expansion of Michigan's negligence laws. *See Williams*, 429 Mich. at 503 ("[W]e note that imposing the duty advanced by plaintiffs is against the public interest. The inability of government and law enforcement officials to prevent criminal attacks does not justify transferring the responsibility to a business owner such as defendant.").  Michigan's policy has also led to its firm rejection of the argument that knowledge of potential crimes establishes a duty to protect. *See Papadimas v. Mykonos Lounge*, 176 Mich. App. 40, 47 (1989) ("Although such things [criminal acts] do occur, as must be known to anyone who reads the daily papers, they are still so unlikely in any particular instance …. Requiring business establishments in high crime areas to be turned into fortresses and to be held strictly liable for third-party criminal conduct is undesirable public policy.").

Ms. Whittaker has no claim for negligence under Michigan law.

### 4. Plaintiffs Worrick and Rodriguez Have No Claim for Negligence Under Washington Law

Washington courts would not find a special relationship in this case.  Indeed, "Washington courts have not recognized a 'special relationship' between consumers and data custodians," even where there *is* a direct relationship between them. *Buckley v. Santander Consumer USA, Inc.*, 2018 WL 1532671, at *5 (W.D. Wash. Mar. 29, 2018).

Like California, Washington law provides that that ordinarily, "a private person does not have a duty to protect others from the criminal acts of third parties," *Hutchins v. 1001 Fourth Ave. Assocs.*, 802 P.2d 1360, 1364 (Wash. 1991).  Yet "a duty may arise to protect others from third party criminal conduct if a special relationship exists between the defendant, the third party, or the third party's victim." *Nivens v. 7-11 Hoagy's Corner*, 943 P.2d 286, 290 (Wash. 1997) (finding a special relationship

20

between a business and its invitee).  Washington courts have found a special relationship giving rise to a defendant's legal duty to protect a foreseeable victim of third-party criminal conduct where the relationship is "protective in nature, historically involving an affirmative duty to render aid."  *Webstad v. Stortini*, 924 P.2d 940, 947 (Wash. Ct. App. 1996).  But foreseeability alone is not enough: "in all cases imposing a duty based on a 'special relationship,' the courts have found that the relationship involved an element of 'entrustment'; *i.e.*, one party was, in some way, entrusted with the well-being of the other party."  *Id.*

Accellion was never "entrusted" with Ms. Worrick's and Ms. Rodriguez's well-being.  They were not customers of Accellion, but customers of Accellion's ***customer***; they have no direct relationship with Accellion at all.  Rather, the Washington State Auditor's Office – not Accellion – acquired, stored, and transferred Plaintiffs' data using the FTA.  Accellion is so far removed from Worrick and Rodriguez that any relationship between them cannot be said to be one of "entrustment" akin to that of a carrier and its passenger, an employer and an employee, a hospital and a patient, or a business and a business invitee.  *See Hutchins*, 802 P.2d at 1366; *Nivens*, 943 P.2d 286.

Further, under Washington law, allegations that criminal hackers will attempt to exploit a software's vulnerability counsels ***against*** finding a special relationship here.  Washington courts hold that when crime is particularly foreseeable, such as in an urban area with a high crime rate, it cuts *against* the imposition of a duty to protect the victims of a third party's crime.  *Kim v. Budget Rent A Car Sys., Inc.*, 15 P.3d 1283, 1287 (Wash. 2001).  This is because imposing such a duty would cause businesses to leave urban centers "– an undesirable result."  *Hutchins*, 802 P.2d at 1370.  And "[a]s a policy matter, this premise has legitimacy even in an area of urban crime because the alternative is to presume the need for extraordinary care by all to avoid the responsibility for the lawlessness of others."  *Id.*  Imposing a duty on providers like Accellion to protect downstream users from third-party attackers would require them to take extreme measures to avoid liability or leave the industry altogether.  And as in *Hutchins*, finding a special relationship burdens all software providers that ***could*** experience a data breach with a duty to exercise "extraordinary care … to avoid responsibility for the lawlessness" of cybercriminals from around the world.  *Id.*

This concern is particularly apt here, where Accellion offered a more secure product – Kiteworks

21

1  – to each of the implicated FTA customers. Under Washington law, Accellion was not forced to retire

2  the FTA ("an undesirable result") but instead could continue to offer the legacy product while allowing

3  customers the choice to upgrade. Any other rule of law would force software vendors like Accellion to

4  discontinue a legacy product as soon as they offered a more secure one, or risk being held liable for any

5  harm that resulted from the customer's informed and voluntary decision.

6  Under Washington law, there was no special relationship between Accellion and Ms. Worrick

7  and Ms. Rodriguez, and Accellion had no duty to protect them from the criminal acts of a third party.

8  **5.   Plaintiff Dawes Has No Claim for Negligence Under Oklahoma Law**

9  There is no special relationship between Accellion and Ms. Dawes under Oklahoma law and no

10  duty to protect. Notably, whereas California has adopted the Restatement (Third) of Torts and the

11  California Supreme Court cited it multiple times in *Regents*, *see* 4 Cal. 5th at 621, Oklahoma has not.

12  *See Snow v. Travel Centers of Am. LLC*, 527 P.3d 741, 750 (Okla. Ct. Civ. App. 2022). For this reason

13  and others, Oklahoma is considerably less likely to find a special relationship than California, as

14  illustrated in *Snow*. There, plaintiffs alleged that the defendant gas station sold fuel to an obviously

15  intoxicated person, who drove off and later sped through a stop sign, killing two people. *Id.* at 745. The

16  Oklahoma court noted first that under Oklahoma law, "one does not generally have a duty to protect the

17  public from harm caused by the criminal conduct of a third party." *Id.* at 754. The court then rejected

18  plaintiffs' special relationship theory, reasoning that under the Restatement (Second), the enumerated

19  list of relationships that can be "special" is exclusive. Because the motorist/gas station relationship was

20  not parent/child, master/servant, owners or occupiers of land, or those in charge of prisoners or

21  dangerous individuals, there could be no special relationship. *See id.* The same result is inevitable here.

22  Unsurprisingly, no Oklahoma case has found a duty to protect against third-party hackers based

23  on a special relationship. Rather, the one district court case that considered Oklahoma's negligence laws

24  in the context of a data breach, *Carr v. Okla. Student Loan Auth.*, found that OSLA had a duty to

25  safeguard the plaintiffs' information because OSLA "requested and collected the Plaintiffs' sensitive

26  information," thereby "plac[ing] upon itself a duty to safeguard that information." *Carr v. Okla. Student*

27  *Loan Auth.*, 2023 WL 6929850, at *2 (W.D. Okla. Oct. 19, 2023). As the ACC now makes clear,

28  Accellion did not "collect" any of Ms. Dawes's data, so Accellion cannot be found to have a special

relationship with her under the reasoning of *Carr*.  *See Carr*, 2023 WL 6929850 at *3 ("If Nelnet had access to Plaintiffs' PII such that vulnerabilities in its online portal placed Plaintiffs at risk of foreseeable harm, Nelnet held a duty to Plaintiffs.").  Therefore, Oklahoma would not impose a duty on Accellion to safeguard Plaintiffs' personal information.

### 6.  Plaintiff Desjardins Has No Claim for Negligence Under Tennessee Law

Tennessee, like California, would not impose a general duty upon Accellion to safeguard Plaintiffs' personal information against the criminal acts of third parties.  The Tennessee Court of Appeal recently held, "As for nonfeasance, Tennessee's courts generally have declined to impose a duty to act or to rescue. [citing cases]  Simply stated, persons do not ordinarily have a duty to act to protect others from dangers or risks except for those that they themselves have created."  *Koczera v. Steele*, 570 S.W.3d 242, 247 (Tenn. Ct. App. 2018).  *See also Satterfield v. Breeding Insulation Co*., 266 S.W.3d 347, 355 (2008) (holding Tennessee does not "require that persons always act reasonably to secure the safety of others"); *Allstate Prop. & Cas. v. Sevier Cty. Elec. Sys.*, 666 S.W.3d 429, 452 (2022) ("We emphasize, however, that in instances where the defendant has made the plaintiff's situation no worse (nonfeasance), there is generally no duty to act.").  Indeed, Tennessee recognizes that "[t]he business is not to be regarded as the insurer of the safety of its customers, and it has no absolute duty to implement security measures for the protection of its customers."  *Staples v. CBL & Assocs., Inc*., 15 S.W.3d 83, 90 (2000).

Further, Tennessee, like Oklahoma, has declined to adopt the Restatement (Third) of Torts with respect to special relationships and has generally limited the doctrine to the specific traditional categories identified in the Restatement (Second):  parent and child, employer and employee, and innkeeper and guest.  *See Biscan v. Brown*, 160 S.W.3d 462, 479 n.4 (Tenn. 2005) (noting that exception is generally limited to "socially recognized relations" identified in the Restatement: "parent and child, employer and employee, and innkeeper and guest").  Moreover, in applying Restatement (Second) Section 315, Tennessee courts have further imposed an additional requirement that the defendant be able to directly "control" the conduct that allegedly resulted in the harm.  *See Lett v. Collis Foods, Inc*., 60 S.W.3d 95, 100 (2001).  Given that the supposed relationship between Accellion and Ms. Desjardins is not one of the specific special relationships recognized by Tennessee, and there are no factual

1    allegations that Accellion could control the actual conduct that caused the data breaches, Ms. Desjardins

2    has no negligence claim under Tennessee law.

3                 **7.    Plaintiff Ringling Has No Claim for Negligence Under Texas Law**

4            There is no special relationship between Accellion and Ms. Ringling under Texas law and no

5    duty to protect against third-party criminal hackers.

6            "[T]here is no legal duty in Texas to control the actions of third persons absent a special

7    relationship," nor is there any "duty to protect someone from the negligence of a third person," nor is

8    there "a general 'duty to warn of dangers' from third parties." *See Ethridge v. Samsung SDI Co.*, 604 F.

9    Supp. 3d 556, 560 (S.D. Tex. 2022) (citing cases).  In *Ethridge*, the plaintiff sought to hold Amazon

10   responsible for unreasonably dangerous products it sold on its website (a battery-powered e-cigarette

11   that exploded in plaintiff's pocket).  The court rejected his claim that Amazon had a duty to protect him,

12   as he had not alleged a special relationship and "[t]he only such special relationships Texas law

13   recognizes are those 'between a parent and child, master and servant, or independent contractor and

14   contractee under special circumstances.'" *Id.* (*quoting Van Horn v. Chambers*, 970 S.W.2d 542, 546

15   (Tex. 1998)).  In addition, "Texas courts have declined to create a wholesale duty to warn about the

16   criminal acts of third parties, outside of premises liability cases or situations in which the defendant had

17   the ability to control the criminal actor." *Clark Fire Equip., Inc. v. Arkema, Inc.*, 176 F. Supp. 3d 646,

18   649 (S.D. Tex. 2015).  Consistent with these rules, no court applying Texas law has said that a company

19   assumes a special relationship with owners of sensitive data by selling data transfer software or even by

20   collecting the owners' data directly.

21           The fact that Texas law would not provide for a special relationship when California would is

22   readily apparent.  In *Regents*, as discussed above, the California Supreme Court held that a university

23   has a special relationship with its adult students.  4 Cal. 5th at 625-26.  Texas's rule is the opposite.

24   "[E]xisting Texas law regarding the duties of a university to its students … does not indicate that the

25   Texas Supreme Court would recognize a special relationship between a university and its adult

26   students." *Williams v. Abilene Christian Univ.*, 2020 WL 10458627, at *5 (N.D. Tex. Dec. 14, 2020)*;

27   see also Doe 12 v. Baylor Univ.*, 336 F. Supp. 3d 763, 787 (W.D. Tex. 2018).

28           Ms. Ringling has not and cannot plead a negligence claim under Texas law.  Accellion had no

                                                        24

duty to act to protect her from third-party criminal hackers, and Ms. Ringling alleges no facts that would establish a special relationship under the stricter application of Texas law.  Her claim must be dismissed.

## V.   CONCLUSION

For the reasons stated above, the Court should dismiss the negligence claims of each Plaintiff, with prejudice.

Dated:  April 29, 2024

Respectfully submitted,

THE NORTON LAW FIRM PC

*/s/ Fred Norton*

Fred Norton

Attorneys for Defendant
ACCELLION, INC.

25