1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Adam E. Polk (State Bar No. 273000)
Jordan Elias (State Bar No. 228731)
Simon S. Grille (State Bar No. 294914)
Kyle P. Quackenbush (State Bar No. 322401)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
apolk@girardsharp.com
jelias@girardsharp.com
sgrille@girardsharp.com
kquackenbush@girardsharp.com

Krysta Kauble Pachman (280951)
Michael Gervais (330731)
Steven G. Sklaver (237612)
Kevin R. Downs (331993)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
Tel: (310) 789-3100
kpachman@susmangodfrey.com
mgervais@susmangodfrey.com
ssklaver@susmangodfrey.com
kdowns@susmangodfrey.com

*Interim Co-Lead Class Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

IN RE ACCELLION, INC. DATA BREACH
LITIGATION

Case No. 21-cv-01155-EJD

Hon. Edward J. Davila

**AMENDED CONSOLIDATED CLASS
ACTION COMPLAINT**

Plaintiffs Rose Becker, Amber Chavez, Karlina Chavez, Derek Dawes, Amiresse Desjardins, Alvaro Galvis, Jamie McDole, Randy Moniz, Robert Olson, Jr., Holly Ringling, Heather Rodriguez, Sherie Taylor, Tito Torres, Valerie Whittaker, and Kimberly Worrick ("Plaintiffs"), individually and on behalf of the Class defined below, bring this action against Defendant Accellion, Inc., and allege as follows:

## I.    SUMMARY OF THE ACTION

1.    This action arises out of Accellion's failure to secure sensitive personal information being stored and transferred on Accellion's File Transfer Appliance ("FTA")—file sharing software that purportedly enabled end-users to securely transfer or store files. Plaintiffs seek relief for individuals whose private details—including names, dates of birth, Social Security numbers, driver's license numbers and/or state identification numbers, bank account information, employment information, and personal health information ("Personal Health Information" or "PHI") (collectively "Personally Identifiable Information" or "PII")—were exposed to unauthorized actors from December 2020 to January 2021 (the "Data Breach").

2.    Accellion's failure to safeguard and protect its FTA product resulted in the PII of Plaintiffs and Class members being hacked and taken. Entities such as government agencies, private businesses, and universities hired Accellion—a cloud solutions company—to securely transfer PII. Accellion stated on its website that it "enables millions . . . from every walk of life to do their jobs without putting their organization at risk. When they click the Accellion button, they know it's the safe and secure way to share information . . . ."[1] Accellion knew that its customers would use its FTA product to store and transfer large quantities of highly sensitive PII. Although such information has consistently been a target of theft, Accellion neglected to secure it.

3.    Discovery has confirmed that Accellion knew of the security shortcomings in its FTA product before the Data Breach occurred. For years leading up to the Data Breach, Accellion advised its clients to upgrade to a more secure product, the Kiteworks product, but failed to require that change or to remove FTA from the market. Instead, Accellion used its less secure,

---

[1] https://web.archive.org/web/20210303105519/www.accellion.com/platform/simple/secure-third-party-communication/ (last visited June 23, 2023).

AMENDED CONSOLIDATED COMPLAINT
Case No. 21-cv-01155-EJD

1    older FTA product to market its more secure, and more expensive, Kiteworks product. Many of

2    Accellion's customers continued to use FTA, despite Accellion knowing it was vulnerable to a

3    Data Breach.

4           4.      Plaintiffs and Class members must contend with the fallout from their PII being in

5    the hands of unauthorized actors. Some Plaintiffs have already experienced instances of identity

6    theft, including fraudulent charges in their names, and have incurred out-of-pocket loss. Plaintiffs

7    seek appropriate damages, including punitive and nominal damages, as well as injunctive relief to

8    remediate Accellion's deficient cyber security, provide credit monitoring, and provide identity

9    theft insurance and credit repair services that will protect the Class against identity theft and

10   fraud.

11   **II.    PARTIES**

12          **A.    Plaintiffs**

13          5.      Plaintiff Rose Becker is a citizen of the state of California and resides in Los

14   Angeles County. Plaintiff Becker was a student at the University of California, Los Angeles

15   ("UCLA") at the time of the Data Breach. During her time as a student at UCLA, Plaintiff Becker

16   received health care services from UCLA's student health facilities. To receive treatment and

17   other health care services at UCLA, Plaintiff Becker provided PII, including her name, address, e-

18   mail address, and telephone number. She also provided UCLA PHI concerning her medical

19   history, mental or physical condition, and treatment history. Plaintiff Becker received a letter and

20   emails from representatives of UCLA informing her of the Data Breach and advising her to take

21   protective measures. On April 13, 2021, Plaintiff Becker received an alert from her credit

22   monitoring service that her Social Security number was taken by unauthorized actors in the Data

23   Breach and has been found on the dark web. UCLA informed her in a letter dated June 30, 2021,

24   that her Social Security number was taken in the Data Breach. In 2023, an unknown individual

25   attempted to open an unauthorized bank account in Plaintiff Becker's name. She spent time

26   dealing with the consequences of the Data Breach, including time spent on the telephone,

27   reviewing her unsolicited emails, investigating credit monitoring and identity theft insurance

28

- 2 -

options, and filing a police report regarding the unauthorized account opened in her name. The exposure of her private and confidential information in the Data Breach has caused Plaintiff Becker to suffer anxiety related to her personal information being compromised and to devote significantly more time to checking her credit reports and financial accounts for fraudulent activity.

6.      Plaintiff Amber Chavez is a citizen of the state of California and resides in Barstow, California. Plaintiff Amber Chavez, as well as her minor daughter, had savings accounts with Flagstar, and she provided her and her minor daughter's PII to receive those services. Plaintiff Amber Chavez received a letter from Flagstar informing her of the Data Breach and advising her to take protective measures. Her Social Security number, birthdate, and other sensitive facts, as well as those of her minor daughter, were taken by unauthorized actors in the Data Breach. Plaintiff Amber Chavez has experienced fraudulent charges and purchases, and incurred overdraft fees from the fraudulent charges for which she was not reimbursed. Plaintiff Amber Chavez expended time and money in response to the Data Breach, including by purchasing credit monitoring after the Data Breach, replacing credit or debit cards, and making trips to her bank multiple times per week. Since the Data Breach, Plaintiff Amber Chavez also has experienced an increase in scam and phishing telephone calls. Her sensitive information has been found on the dark web. The exposure of her and her daughter's private and confidential information in the Data Breach has caused Plaintiff Amber Chavez to suffer anxiety related to her personal information being compromised and to devote significantly more time to checking her credit reports and financial accounts for fraudulent activity.

7.      Plaintiff Karlina Chavez is a citizen of the state of California and resides in Los Angeles County. Plaintiff Karlina Chavez was employed by University of California, Irvine ("UCI") as an administrative assistant and provided her PII to UCI as a condition of her employment. Plaintiff Karlina Chavez received a letter from the Regents of the University of California ("UC Regents") on behalf of UCI informing her of the Data Breach and advising her to take protective measures. Her email was taken by unauthorized actors in the Data Breach and has

been found on the dark web. Plaintiff Karlina Chavez also was the victim of identity theft after the Data Breach—she had money fraudulently taken from her bank account. The exposure of her private and confidential information in the Data Breach has caused Plaintiff Karlina Chavez to suffer anxiety related to her personal information being compromised and to devote significant time to dealing with the consequences of the Data Breach, for example in contacting UCI, banks and other companies, investigating credit monitoring options, closing her accounts that experienced fraudulent activity, remediating the consequences of identity theft, and monitoring her accounts with greater frequency. The exposure of her private and confidential information in the Data Breach has caused Plaintiff Karlina Chavez to suffer anxiety related to her personal information being compromised and to devote significantly more time to checking her credit reports and financial accounts for fraudulent activity.

8.     Plaintiff Derek Dawes is a citizen of the state of Oklahoma and resides in Bixby, Oklahoma. Plaintiff Dawes was employed by Kroger and provided his PII to Kroger as a condition of his employment. Plaintiff Dawes received a letter from Kroger informing him of the Data Breach and advising him to take protective measures. His Social Security number, birthdate, and other sensitive facts were taken by unauthorized actors in the Data Breach. Plaintiff Dawes experienced unauthorized charges on his bank account after the Data Breach, and as a result, his account was temporarily frozen. Plaintiff Dawes expended time and money in response to the Data Breach, including by making trips to his bank, having his cards reissued, and researching his exposure in the Data Breach. He spent, and still spends, numerous hours auditing his financial accounts. Since the Data Breach, Plaintiff Dawes has experienced an increase in scam and phishing telephone calls. The exposure of his private and confidential information in the Data Breach has caused Plaintiff Dawes to suffer anxiety related to his personal information being compromised and to devote significantly more time to checking his credit reports and financial accounts for fraudulent activity.

9.     Plaintiff Amiresse Desjardins is a citizen of the state of Tennessee and resides in Madison, Tennessee. Plaintiff Desjardins was employed by Kroger and provided her PII to Kroger

as a condition of her employment. Plaintiff Desjardins received a letter from Kroger informing her of the Data Breach and advising her to take protective measures. Her Social Security number, birthdate, and other sensitive facts were taken by unauthorized actors in the Data Breach. Plaintiff Desjardins experienced unauthorized charges on her account after the Data Breach, and she expended time and energy in response to the Data Breach, including by spending numerous hours searching for, reviewing, and responding to fraudulent charges. Since the Data Breach, Plaintiff Desjardins also has experienced an increase in scam and phishing telephone calls. The exposure of her private and confidential information in the Data Breach has caused Plaintiff Desjardins to suffer anxiety related to her personal information being compromised and to devote significantly more time to checking her credit reports and financial accounts for fraudulent activity.

10.     Plaintiff Alvaro Galvis is a citizen of the state of California and resides in Orange County. Plaintiff Galvis was employed by the UCI Medical Center. During his time as a UCI employee, Plaintiff Galvis received health care services from the UCI Medical Center. To receive treatment and other health care services, Plaintiff Galvis provided PII and PHI to UCI, including his name, address, e-mail address, telephone number, and information concerning his medical history, mental or physical condition, and treatment history. Plaintiff Galvis received a letter from UCI on behalf of UC Regents informing him of the Data Breach and that "the impacted files" contain his birthdate and Social Security number. After the Data Breach, someone attempted to place fraudulent charges on his bank account using his debit card account number. Plaintiff Galvis' PII was found on the dark web. Since the Data Breach, Plaintiff Galvis has experienced an increase in scam and phishing telephone calls. As a result of the Data Breach, he has spent time and money to protect against identity and to stop the spam calls to his cell phone, including by purchasing subscriptions to identity theft protection services. Plaintiff Galvis also placed a fraud alert on his credit report, and paid for services to remove his PII from the dark web. The exposure of his private and confidential information in the Data Breach has caused Plaintiff Galvis to suffer anxiety related to his personal information being compromised and to devote

significantly more time to checking his credit reports and financial accounts for fraudulent activity.

11.     Plaintiff Jamie McDole is a citizen of the state of California and resides in Sacramento County. Plaintiff McDole is employed by University of California, Davis ("UC Davis") as a nurse Case Manager and was previously a student at UC Davis. Plaintiff McDole has received health care from, and is enrolled in health insurance through, UC Davis. As a condition of her employment, she provided UC Davis with her PHI, including her medical history. She also provided UC Davis with PII, including her name, address, e-mail address, and telephone number. After learning of the Data Breach, Plaintiff McDole placed a credit alert for activity associated with her identity and signed up for Experian credit monitoring services for one year. She received a letter from UC Davis informing her that her birthdate, Social Security number, and health insurance information were exposed in the Data Breach. Plaintiff McDole was notified that her Social Security number had been found on the dark web. She discovered fraudulent charges on her credit card and had to spend time closing the account. She has also experienced an increase in scam and phishing telephone calls since the Data Breach. The exposure of her private and confidential information, including health information, in the Data Breach has caused Plaintiff McDole to suffer stress related to her personal information being compromised and to devote significantly more time to checking her credit reports and financial accounts for fraudulent activity. Plaintiff McDole has anxiety and increased concerns over the loss of her privacy.

12.     Plaintiff Randy Moniz is a citizen of the state of California and resides in Livermore, California. Plaintiff Moniz was employed at Flagstar and provided his PII as a condition of his employment. Plaintiff Moniz received a letter from Flagstar informing him of the Data Breach and advising him to take protective measures. His Social Security number, birthdate, and other sensitive facts were taken by unauthorized actors in the Data Breach. Plaintiff Moniz's Walmart and PayPal accounts were accessed by unauthorized actors. Additionally, Plaintiff Moniz experienced a fraudulent charge from AT&T on his account after the Data Breach. Plaintiff Moniz expended time and money in response to the Data Breach, including by

continuing to pay for credit monitoring services, which he otherwise would have cancelled. Since the Data Breach, Plaintiff Moniz also has experienced an increase in spam and phishing telephone calls. Plaintiff Moniz received notice from LegalShield Credit Monitoring that it had discovered his information on the dark web. The exposure of his private and confidential information in the Data Breach has caused Plaintiff Moniz to suffer anxiety related to his personal information being compromised and to devote significantly more time to checking his credit reports and financial accounts for fraudulent activity.

13.     Plaintiff Robert Olson, Jr. is a citizen of the state of California and resides in Forestville, California. Plaintiff Olson received health care services from Health Net of California and provided his PII and PHI to receive those services. Plaintiff Olson received a letter from Health Net informing him of the Data Breach and advising him to take protective measures. His Social Security number, birthdate, medical information, and other sensitive facts were taken by unauthorized actors in the Data Breach. Plaintiff Olson discovered fraudulent charges on his credit card after the Data Breach, and as a result, his card was cancelled and he lost access to the card while it was being replaced. Plaintiff Olson expended time and money in response to the Data Breach, including by replacing his compromised card, resetting automatic billing information, researching credit protection, resetting passwords, and regularly monitoring his statements for fraudulent charges. Since the Data Breach, Plaintiff Olson also has experienced an increase in scam and phishing telephone calls. He received notice from Experian that it had discovered his information on the dark web. The exposure of his private and confidential information in the Data Breach has caused Plaintiff Olson to suffer anxiety related to his personal information being compromised and to devote significantly more time to checking his credit reports and financial accounts for fraudulent activity.

14.     Plaintiff Holly Ringling is a citizen of the state of Texas and resides in San Antonio, Texas. Plaintiff Ringling received banking services from Flagstar and provided her PII to receive those services. Plaintiff Ringling received a letter from Flagstar informing her of the Data Breach and advising her to take protective measures. Her Social Security number, birthdate,

and other sensitive facts were taken by unauthorized actors in the Data Breach. After the Data Breach, Plaintiff Ringling experienced multiple fraudulent charges, including airline purchases, charges from China, and appliance purchases. As a result, she has been forced to routinely change credit and/or debit cards. Additionally, someone tried to create a false TurboTax account in her name. Plaintiff Ringling expended time and money in response to the Data Breach, including by purchasing credit monitoring services and applying a credit freeze, replacing her credit and/or debit cards, and responding to unauthorized charges. Plaintiff Ringling spends substantial time monitoring her accounts for unauthorized activity. Since the Data Breach, Plaintiff Ringling also has experienced an increase in scam and phishing telephone calls. She received notice that her personal information had been discovered on approximately 47-60 sites on the dark web. The exposure of her private, confidential information in the Data Breach has caused Plaintiff Ringling to suffer anxiety related to her personal information being compromised and to devote significantly more time to checking her credit reports and financial accounts for fraudulent activity.

15. Plaintiff Heather Rodriguez is a citizen of the state of Washington and resides in Bellingham, Washington. Plaintiff Rodriguez received unemployment benefits from the state of Washington and provided her PII to receive those benefits. Plaintiff Rodriguez received an online notification from the state of Washington informing her of the Data Breach and advising her to take protective measures. Her Social Security number, birthdate, and other sensitive facts were taken by unauthorized actors in the Data Breach. Plaintiff Rodriguez experienced fraudulent charges on her accounts, as well as months-long delays in receiving unemployment benefits. Plaintiff Rodriguez expended significant time in response to the Data Breach, including by responding to the fraudulent charges, responding to the delayed unemployment benefits, reviewing her accounts and statements and disputing charges, resetting automatic billing information after cancelling her cards, and removing herself from call lists. Since the Data Breach, Plaintiff Rodriguez also has experienced an increase in scam and phishing telephone calls. The exposure of her private and confidential information in the Data Breach has caused

AMENDED CONSOLIDATED COMPLAINT
Case No. 21-cv-01155-EJD

Plaintiff Rodriguez to suffer anxiety related to her personal information being compromised and to devote significantly more time to checking her credit reports and financial accounts for fraudulent activity.

16.     Plaintiff Sherie Taylor is a citizen of the state of California and resides in Fresno, California. Plaintiff Taylor received healthcare services from CalViva and provided her PII and PHI to receive those services. Plaintiff Taylor received a letter from CalViva informing her of the Data Breach and advising her to take protective measures. Her Social Security number, birthdate, medical information, and other sensitive facts were taken by unauthorized actors in the Data Breach. Since the Data Breach, Plaintiff Taylor also has experienced an increase in scam and phishing telephone calls. The exposure of her private and confidential information in the Data Breach has caused Plaintiff Taylor to suffer anxiety related to her personal information being compromised and to devote significantly more time to checking her credit reports and financial accounts for fraudulent activity.

17.     Plaintiff Tito Torres is a citizen of the state of Georgia and resides in Stone Mountain, Georgia. Plaintiff Torres was employed by Kroger and provided his PII to Kroger as a condition of his employment. Plaintiff Torres received a letter from Kroger informing him of the Data Breach and advising him to take protective measures. His Social Security number, birthdate, and other sensitive facts were taken by unauthorized actors in the Data Breach. Plaintiff Torres experienced a fraudulent charge after the Data Breach. He expended time in response to the Data Breach, including by monitoring his accounts and reviewing his statements for fraudulent activity. The exposure of his private and confidential information in the Data Breach has caused Plaintiff Torres to suffer anxiety related to his personal information being compromised and to devote significantly more time to checking his credit reports and financial accounts for fraudulent activity.

18.     Plaintiff Valerie Whittaker is a citizen of the state of Michigan and resides in Ecorse, Michigan. Plaintiff Whittaker received pharmacy services from Kroger and provided her PII to receive those services. She received a letter from Accellion informing her of the Data

Breach and advising her to take protective measures. Her Social Security number, birthdate, and other sensitive facts were taken by unauthorized actors in the Data Breach. Immediately after the Data Breach, an unauthorized person tried to take out a bank loan in Plaintiff Whittaker's name. She has also experienced fraudulent ID applications and home purchase attempts as a result of the Data Breach. Plaintiff Whittaker expended time and money in response to the Data Breach, including by responding to the fraudulent loan application and by regularly monitoring her accounts. Since the Data Breach, Plaintiff Whittaker also has experienced an increase in scam and phishing telephone calls. The exposure of her private and confidential information in the Data Breach has caused Plaintiff Whittaker to suffer anxiety related to her personal information being compromised and to devote significantly more time to checking her credit reports and financial accounts for fraudulent activity.

19.    Plaintiff Kimberly Worrick is a citizen of the state of Washington and resides in Sultan, Washington. Plaintiff Worrick applied for unemployment benefits from the state of Washington and provided her PII to receive those services. Plaintiff Worrick received a letter from the Washington State Auditor's Office informing her of the Data Breach and advising her to take protective measures. Her Social Security number, birthdate, and other sensitive facts were taken by unauthorized actors in the Data Breach. Plaintiff Worrick was the victim of identity theft after the Data Breach. Fraudulent accounts, including credit cards, bank accounts, and utilities, were repeatedly opened in her name on an ongoing basis after the Data Breach. At least one fraudulent tax return was filed in her name, and she incurred a significant drop in her credit score. Plaintiff Worrick expended time and money in response to the Data Breach, including by purchasing fraud-protection services, resetting her passwords and automatic billing instructions, and spending months responding to the fraudulent activity. Since the Data Breach, Plaintiff Worrick also has experienced an increase in scam and phishing telephone calls. Her name, email address, birthdate, Social Security number, and previous address have appeared on the dark web. The exposure of her private and confidential information in the Data Breach has caused Plaintiff Worrick to suffer anxiety related to her personal information being compromised and to devote

- 10 -

significantly more time to checking her credit reports and financial accounts for fraudulent activity.

**B.     Defendant**

20.     Accellion, Inc. is a Delaware corporation with its principal place of business in Palo Alto, California.

**III.    JURISDICTION AND VENUE**

21.     This Court has jurisdiction over the lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332, because this is a proposed class action in which: (1) there are at least 100 class members; (2) the combined claims of class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and (3) Defendant and one or more class members are citizens of different states.

22.     The Court has personal jurisdiction over Accellion because its principal place of business is within this District, and it has sufficient minimum contacts in California to render the exercise of jurisdiction by this Court proper and necessary.

23.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and under 28 U.S.C. 1391(a)(1) because Accellion conducts substantial business in this District and California is the principal place of business for Accellion.

24.     Pursuant to Civil Local Rule 3-2(c), a substantial part of the events giving rise to the claims brought herein occurred in Santa Clara County, California. Consequently, assignment of this action to the San Jose Division is appropriate.

**IV.    FACTUAL ALLEGATIONS**

**A.     Accellion's File Transfer Application**

25.     Accellion is a cloud solutions company that provides an enterprise content firewall that it represents "prevents data breaches and compliance violations from third party cyber risk."[2]

---

[2] https://www.kiteworks.com/company/ (previously https://www.accellion.com/company/) (last accessed June 23, 2023).

AMENDED CONSOLIDATED COMPLAINT
Case No. 21-cv-01155-EJD

26.     In the early 2000s, Accellion began marketing and selling a file sharing transfer software product called File Transfer Appliance ("FTA"). The purpose of FTA was to facilitate secure, encrypted sharing of files, including where files exceeded limits on the size of email attachments. Instead of transferring documents by email, the intended recipient would receive a link to files, hosted on Accellion's FTA, which could then be viewed or downloaded.

27.     Accellion's business is built on the premise that its products securely transfer confidential information. Accellion holds itself out as providing a platform that ensures that PII can be securely transmitted between and among individuals and entities. Accellion's clients and customers accordingly rely on (and pay for) its provision of a secure file transfer system.

28.     Accellion has represented that its content firewall:

> provides the security and governance [information security officers] need to protect their organizations, mitigate risk, and adhere to rigorous compliance regulations . . . . Accellion solutions have protected more than 25 million end users at more than 3,000 global corporations and government agencies, including NYC Health + Hospitals; KPMG; Kaiser Permanente; National Park Service; Tyler Technologies; and the National Institute for Standards and Technology (NIST).[3]

29.     Accellion stated on its website that it "enables millions of executives, employees, customers, vendors, partners, investors, attorneys, doctors, patients, and professionals from every walk of life to do their jobs without putting their organization at risk. When they click the Accellion button, they know it's the safe and secure way to share information with the outside world."[4] Accellion's Privacy Policy further states that it "takes appropriate steps to ensure data privacy and security including through various hardware and software methodologies."[5]

30.     Accellion controlled the FTA, as licensed to its clients, in regard to the software itself, updates to the software, security patches for the software, and encryption of files on FTA.

---

[3] *Id.*

[4] https://www.kiteworks.com/platform/simple/secure-third-party-communication/ (previously https://www.accellion.com/platform/simple/secure-third-party-communication/) (last accessed June 23, 2023).

[5] https://www.kiteworks.com/privacy-policy/ (previously https://www.accellion.com/privacy-policy/) (last accessed June 23, 2023).

AMENDED CONSOLIDATED COMPLAINT
Case No. 21-cv-01155-EJD

31.     Accellion's business model proved successful for many years. Accellion's services were used by hundreds of companies and government and private organizations across the United States and abroad. These entities relied on Accellion's FTA to securely transfer sensitive data.

32.     In the ordinary course of doing business with entities that use Accellion's FTA, individuals are typically required to provide PII that is then transferred by Accellion's product. That PII can include one or several of the following categories of data: names, addresses, phone numbers, email addresses, birthdates, demographic information, Social Security numbers, credit card account numbers, bank account numbers, educational history, healthcare records, insurance information, photo identification, employer information, income information, and other PII.

33.     This personal information is valuable and confidential. Thus, when electronic files containing such information are transferred, the transfer must be secure. Accellion provides a service to securely transfer files containing PII, and is paid for this service.

**B.     Accellion Knew of the Risk of a Data Breach But Maintained and Provided Its Customers With an Outdated and Insecure System**

34.     By December 2020, Accellion's FTA product was almost 20 years old. For three years leading up to the Data Breach, Accellion had recognized that the FTA product was nearing the end of its life—yet Accellion did not retire the FTA product during that time. Instead, despite being aware of the risks from using an outdated product to transfer files containing PII, Accellion encouraged customers to purchase its new product, called Kiteworks. In the meantime, Accellion continued to tout its systems and products as secure.

35.     Moreover, Accellion did not support the aging FTA product with adequate resources to ensure its security. One Accellion engineer observed that "[t]here is no plan to fix any more FTA medium severity issues and only selected High issues might be fixed." (ACCELLION0001290-91.) Another engineer acknowledged that implementing a "fix" for FTA was "not possible with the current manpower that we have." (*Id*.)

36.     On February 12, 2019, Accellion opened a support ticket that recognized attackers could exploit the FTA via an OS Command, *i.e.*, an operating system command, because there was "no proper validation of user input" for logged-in administrators. (ACCELLION0001298.)

Accellion engineers marked the severity of the vulnerability as "high." (*Id.*) The ticket was resolved on May 5, 2019, but updated on December 19, 2020, around the time Accellion was discovering the initial Data Breach on the FTA. (*Id.*)

37.    On May 10, 2019, Accellion created another support ticket that identified another significant vulnerability, stating that "[a]n admin user having Administration privileges . . . is able to execute arbitrary SQL queries . . . [and] there is no proper filtering implemented to pass only white-listed SQL queries . . . ***Blind SQL Injection vulnerability***." (ACCELLION0001300 (emphasis added).) The vulnerability was reported to Accellion by Bugcrowd, an external crowdsourced security platform. (*Id.*) After supposedly being resolved on October 15, 2019, that support ticket was updated again on December 20, 2020, around the time Accellion was discovering the initial Data Breach on the FTA. (*Id.*)

38.    The risk of hacking was well known to Accellion. In November 2019, the FBI and the U.S. Secret Service issued warnings to potential targets like Accellion so they would be aware of and prepared for a potential cyberattack.[6] The recent increase in such attacks, and attendant risk of future attacks, was widely known among the public and known to anyone in the secure file sharing service industry.

**C.    Hackers Exploited the Accellion FTA's Multiple Vulnerabilities**

39.    On December 16, 2020, an Accellion customer received an alert from the FTA product's built-in anomaly detector, signaling that unauthorized third parties had exploited the FTA. The customer notified Accellion, and over the next three days, Accellion verified that its FTA software contained two security vulnerabilities. In technical terms, the vulnerabilities were described as SQL Injection (CVE-2021-27101) and OS Command Execution (CVE-2021-27104).[7] The documents cited above evidence Accellion's knowledge of related vulnerabilities at

---

[6] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-oftargeted-ransomware (last visited June 22, 2023).

[7] https://www.kiteworks.com/sites/default/files/trust-center/accellion-fta-attack-mandiant-report-full.pdf (last accessed June 22, 2023).

least months before the breach. In simple terms, each of these vulnerabilities stems from the FTA having trusted user inputs when it should not have.

40.      Four days after the attack began, on December 20, 2020, Accellion released a patch for the two vulnerabilities. After another three days, on December 23, 2020, Accellion released a second patch. During this critical time, Accellion could have promptly notified its clients of the FTA security threats. Many of Accellion's clients did not receive any such notification from Accellion until January 2021.

41.      The Reserve Bank of New Zealand announced that it was a victim of the attack on January 10, 2021. Accellion had notified the bank of the FTA's vulnerabilities four days earlier. An assessment by KPMG later confirmed that the "email tool used by [Accellion], however, failed to send the email notifications and consequently the Bank was not notified until 6 January 2021."[8]

42.      When Accellion tried to notify the Washington State Auditor's Office by email, Accellion received automatic undeliverable notifications. Accellion delayed for days before attempting the notice again.

43.      The two patches released in December 2020 proved insufficient to secure the 20-year-old FTA product. Shortly after the first attack, a second attack took place starting on January 20, 2021. Hence the Data Breach, as defined herein, is actually two separate breaches, with the second occurring several weeks after Accellion knew of the first.

44.      Two days after the second attack began, on January 22, 2021, Accellion learned of the new exploit. There were two additional security vulnerabilities in its FTA software, described as OS Command Execution (CVE-2021-27102) and Server-Side Request Forgery (CVE-2021-

---

[8] https://techcrunch.com/2021/07/08/the-accellion-data-breach-continues-to-get-messier/?guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbvbS8&guce_referrer_sig=AQAAA GHO4TSZiDOAY1Gw4LYc4Ka31Juj5IHaTImp7j7QAy8H8ecgjRn3ovVe8ztT_HhxQtp9Nfizyo XekGhbMPhvsyap9s77TK5GnqzDYrx2dO-1EOkAmI_jBDtZ8C6U6gTE7uzFuMYrspXnc2avYtF3XSwxUnX2Y40JEkVV5euY7ljP&gucco unter=2 (last accessed June 22, 2023).

1   27103). An attacker engaged in Server-Side Request Forgery typically uses malicious code

2   disguised as a URL.

3         45.      Accellion still had not advised its clients to shut down their FTA systems.

4         46.      The cybersecurity firm Mandiant later described these Accellion vulnerabilities as

5   being "of critical severity because they were subject to exploitation via unauthenticated remote

6   code execution."[9] Even after Accellion's release of new patches three and six days later,

7   Mandiant found two additional vulnerabilities in the FTA that it described as being of "medium"

8   to "high severity."[10]

9         47.      Even though Accellion had represented that the FTA contained advanced security

10   features because of its "anomaly detector," the FTA's anomaly detector was not programmed to

11   scan the files that the attackers accessed. In a post-Data Breach memo with talking points for

12   affected customers, Accellion admitted that this vulnerability was critical because "currently our

13   built in file integrity monitoring *system does not detect when the exploit is being used* because it

14   does not monitor the area of the file system where it is creating a new file," and the vulnerability

15   "*allows the attacker a high level of access* to the server including the ability to download any

16   files from the system." (ACCELLION0001235 (emphasis added).)

17         48.      After the second attack, Accellion engineers created a support ticket on January

18   22, 2021 that stated: "verify_server.p| doesn't seem to check the /home/httpd/html folder."

19   (ACCELLION0001321.) That folder was one of the problematic folders from the SQL Injection.

20   (*See, e.g.*, ACCELLION0001235.)

21         49.      A similar Accellion support ticket created on January 25, 2021, noted that even on

22   testing the alert monitoring system by adding the malicious script to it, an alert "does not

23   generate" and "currently it is not sending any anomaly email." (ACCELLION0001347.)

24   Accellion's ineffective alert system contributed to the second round of FTA attacks in January

25

26   [9] https://www.kiteworks.com/sites/default/files/trust-center/accellion-fta-attack-mandiant-report-full.pdf (previously https://www.accellion.com/sites/default/files/trust-center/accellion-fta-attack-mandiant-report-full.pdf) (last accessed June 21, 2023).

28   [10] *Id.*

AMENDED CONSOLIDATED COMPLAINT
Case No. 21-cv-01155-EJD

1 2021. As late as October 25, 2022, Accellion still had not resolved the January 25, 2021 ticket.

2 (*Id.*)

3     50.     As of January 25, 2021, the "parameter on wmProgressstat.html [was] not

4 sufficiently sanitized," allowing for "injecting multiple URL besides the actual FTA domain

5 resulting in internal SSRF [server-side request forgery] . . . Many things can be done with internal

6 SSRF, like reading files . . . and accessing internal services." (ACCELLION0001338.) Similarly,

7 on January 29, 2021, Accellion engineers acknowledged in an internal email that "multiple issues

8 found in wmProgressstat.html and it still had this gaping hole[.]" (ACCELLION0001442.)

9     51.     Weeks after the Data Breach, Accellion still was not properly blocking suspicious

10 Internet Protocol addresses. A ticket created on February 23, 2021 stated that "[t]he blocking of

11 suspicious ip are not working properly. We need to fix it." (ACCELLION0001342.)

12     **D.     The Data Breach Exposed Millions of Individuals' PII**

13     52.     Starting in mid-December 2020, unauthorized third parties, including the

14 ransomware group CLOP, gained access to large amounts of PII, PHI, and other data stored on, or

15 being transferred through, the FTA. The fact that hackers were able to locate sensitive PII was no

16 accident. Because the purpose of the FTA was to securely transfer files, including those with

17 sensitive content, a breach of the system foreseeably resulted in the exposure and theft of highly

18 confidential data. The Data Breach was the largest data breach in the United States in 2021 and

19 one of the largest data breaches during the last five years, affecting hundreds of companies and

20 millions of individuals.

21     53.     The Reserve Bank of New Zealand was the first to publicly announce that its data

22 was compromised in the Data Breach and to raise concerns about the timeliness of Accellion's

23 notification. In a statement, the bank said: "In this instance, their notifications to us did not leave

24 their system and hence did not reach the Reserve Bank in advance of the breach. We received no

25 advance warning."[11]

26

27 ───────────
[11] https://www.rbnz.govt.nz/hub/news/2021/05/reserve-bank-taking-action-to-respond-to-data-
28 breach-reports (last accessed June 30, 2023).

- 17 -

54.     On January 15, 2021, the Australian Securities and Investments Commission ("ASIC") also learned that its data had been compromised as a result of the Data Breach. An unidentified actor had accessed an ASIC server containing sensitive credit license applications. The next week, the Australian law firm Allens confirmed that it "was the victim of a high-profile cyber attack that compromised the service provider it trusted with sensitive information, including commercial-in-confidence documents related to Westpac's anti-money laundering compliance."[12]

55.     During the week of February 1, 2021, the Washington State Auditor's Office announced that it had discovered unauthorized access to a variety of files as a result of the breach involving Accellion's FTA:

> The Office of the Washington State Auditor ("SAO") was recently made aware of a security breach involving Accellion, a third party provider of hosted file transfer services. During the week of January 25, 2021, Accellion confirmed that an unauthorized person gained access to SAO files by exploiting a vulnerability in Accellion's file transfer service.[13]

56.     Information exfiltrated from the files of the Washington State Auditor's Office included name, Social Security number and/or driver's license or state identification number, bank information, and place of employment, among other items.

57.     On February 19, 2021, Kroger similarly announced that the PII of certain customers was compromised as part of the Data Breach. Kroger's press release read:

> The Kroger Co. (NYSE: KR) Family of Companies today confirmed that it was impacted by the data security incident affecting Accellion, Inc. Accellion's services were used by Kroger, as well as many other companies, for third-party secure file transfers. Accellion notified Kroger that an unauthorized person gained access to certain Kroger files by exploiting a vulnerability in Accellion's file transfer service. The incident was isolated to Accellion's services and did not affect the Kroger Family of Companies' IT systems or any grocery store systems or data. No credit or debit card information or customer account passwords were affected by this incident. After being informed of the incident's effect on January 23, 2021, Kroger discontinued the use of Accellion's services, reported the incident to federal

---

[12] https://www.afr.com/companies/financial-services/allens-victim-of-high-profile-cyber-attack-20210122-p56w8g (last accessed June 22, 2023).

[13] https://www.intelligentcio.com/north-america/2021/02/02/washington-state-auditor-suffers-breach-compromising-data-of-benefit-claimants/ (last visited June 21, 2023).

law enforcement, and initiated its own forensic investigation to review the potential scope and impact of the incident.

58.    Information exfiltrated from Kroger's files included names, email addresses, birthdates, phone numbers, home addresses, Social Security numbers, salary information, and health information, including pharmacy records, among other items. Kroger's customers were not made aware of the Data Breach until February 19, 2021, after Accellion informed Kroger of the breach on January 23, 2021.

59.    On March 5, 2021, Flagstar announced that the PII of certain customers was compromised as part of the Data Breach. Flagstar's public statement read:

> Accellion, a vendor that Flagstar uses for its file sharing platform, informed Flagstar on January 22, 2021, that the platform had a vulnerability that was exploited by an unauthorized party. After Accellion informed us of the incident, Flagstar permanently discontinued use of this file sharing platform. Unfortunately, we have learned that the unauthorized party was able to access some of Flagstar's information on the Accellion platform and that we are one of numerous Accellion clients who were impacted.

60.    Information exfiltrated from Flagstar's files included Social Security number, first name, last name, phone number, address, and tax information, among other items.

61.    On March 24, 2021, Health Net announced that the PII of certain customers was compromised as part of the Data Breach. Health Net's public statement read:

> On January 25, 2021, Health Net, LLC (Health Net) received information that one of our business partners was a victim of a cyber-attack. A cyber-attack means a hacker was able to steal data. Health Net works with Accellion. Health Net uses Accellion's system to exchange files with your health providers and others who help support our operations . . . . The hacker was able to get access to Accellion's system. The hacker was able to view or save Health Net's files stored by Accellion. Your personal information was included in the files that were on Accellion's system. This happened between January 7 and January 25, 2021.

62.    Information exfiltrated from Health Net's files included addresses, birthdates, and insurance information, and health information, including medical condition and treatment information.

- 19 -

63.     On March 31, 2021, UC Regents announced that it was subject to the Data Breach and that UC employees, students, and other individuals associated with the UC were affected. The UC Regents' public statement read:

> UC has learned that it, along with other universities, government agencies, and private companies throughout the country, was recently subject to a cybersecurity attack. The attack involves the use of Accellion, a vendor used by many organizations for secure file transfer, in which an unauthorized individual appears to have copied and transferred UC files by exploiting a vulnerability in Accellion's file transfer service. Upon learning of the attack, UC immediately reported the incident to federal law enforcement, took measures to contain it, and began an investigation.

64.     In addition, UC Regents directly notified victims of the Data Breach via email on April 2, 2021, noting that "[t]he attackers are threatening to publish, or have published, stolen information on the dark web in an attempt to extort organizations and individuals." Additional notifications were sent to those affected in June and July 2021.

65.     Information exfiltrated from UC Regents' files included names, addresses, telephone numbers, Social Security numbers, driver's license information, passport information, financial information including bank routing and account numbers, health and related benefit information, disability information, and birthdates, among other items.

66.     Accellion's failure to ensure that the FTA was adequately secured exposed the PII of millions of individuals. As a result of Accellion's inaction, the PII of Plaintiffs and the other Class members was compromised, and disclosed to unknown and unauthorized third parties without their consent.

67.     Entities that used Accellion's FTA product and were affected by the Data Breach include, among others:

- Allens
- Arizona Complete Health
- Arkansas Health and Wellness
- Aspect Software
- The Australia Securities and Investments Commission

- 20 -

1    • Australia Transport for New South Wales

2    • Beaumont Health

3    • Bombardier

4    • Brown Rudnick LLP

5    • Cal Viva

6    • California Health and Wellness

7    • Cayuga Medical Center

8    • Centene Corporation

9    • Community Memorial Health System

10   • Congressional Federal Credit Union

11   • Cook Group, Inc.

12   • CSX

13   • Danaher

14   • Department of Transportation, Office of the Secretary

15   • El Paso Electric Company

16   • Faegre Drinker Biddle & Reath LLP

17   • Finnegan, Henderson, Farablow, Garrett

18   • Flagstar Bank

19   • Foley & Lardner, LLP

20   • Fortior Solutions, LLC

21   • Fugro

22   • Goodwin Proctor

23   • Guidehouse

24   • Harvard Business School

25   • Health Net (and other related entities)

26   • Jones Day

27   • Kinzie Manufacturing

28

AMENDED CONSOLIDATED COMPLAINT
Case No. 21-cv-01155-EJD

1      •   The Kroger Co.

2      •   Lehigh Valley Health Network

3      •   Memorial Sloan Kettering Cancer Center

4      •   Millennium Challenge Corporation

5      •   Morgan Stanley

6      •   National Gallery of Art

7      •   National Science Foundation

8      •   Office Support Services, LLC

9      •   Pentair Management

10     •   Postlehwaite & Netterville (now known as EisnerAmper)

11     •   The Office of the Washington State Auditor

12     •   QIMR Berghofer Medical Research Institute

13     •   Racetrac Corporation

14     •   Racetrac Petroleum

15     •   The Reserve Bank of New Zealand

16     •   Shell

17     •   Singtel

18     •   Southern Illinois University School of Medicine

19     •   The Small Business Administration

20     •   Stanford University

21     •   Steris

22     •   Transport for New South Wales

23     •   Trillium Community Health Plan

24     •   University of California system

25     •   University of Colorado

26     •   University of Maryland, Baltimore

27     •   University of Miami (Florida)

28

- Wright Medical Technology

- Yeshiva University

68.     Months after attackers first breached Accellion's 20-year-old FTA platform, new victims continued to emerge. As late as July 2021, Morgan Stanley confirmed that attackers had stolen PII, including Social Security numbers and addresses, of its customers. Morgan Stanley highlighted yet another flaw in Accellion's platform that reflects its failure to have adopted standard information security protocols: even though the files were encrypted, the hackers were able to obtain the decryption key to the files through the FTA exploit.[14]

69.     After the Data Breach, Accellion rebranded, changing its name to "Kiteworks."[15]

**D.      Accellion Owed a Duty to Safeguard Individuals' PII**

70.     Accellion was aware that sensitive data was transferred through its FTA because that is what the FTA was designed for and how Accellion marketed the FTA, as set forth above.

71.     Beyond the obligations arising from Accellion's own representations about creating a secure file transfer system trusted around the globe, Accellion owed Plaintiffs and Class members a duty to safeguard their PII.

72.     As described further below, Accellion owed a duty to safeguard PII under statutory law, including the Federal Trade Commission Act ("FTC Act"), to ensure that all information being transferred and maintained on FTA was secure. These statutes were enacted to protect Plaintiffs and the Class members from the type of conduct in which Accellion engaged.

73.     Accellion owed a duty to safeguard PII because it knew that its product was being used to transfer and store highly valuable data and that there was a risk of cybercriminals

---

[14] https://techcrunch.com/2021/07/08/the-accellion-data-breach-continues-to-get-messier/?guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAA GHO4TSZiDOAY1Gw4LYc4Ka31Juj5IHaTImp7j7QAy8H8ecgjRn3ovVe8ztT_HhxQtp9Nfizyo XekGhbMPhvsyap9s77TK5GnqzDYrx2dO-1EOkAmI_jBDtZ8C6U6gTE7uzFuMYrspXnc2avYtF3XSwxUnX2Y40JEkVV5euY7ljP&gucco unter=2 (last accessed June 22, 2023).

[15] *See* https://www.kiteworks.com/kiteworks-news/accellions-brand-name-is-now-kiteworks/ (last accessed June 28, 2023).

AMENDED CONSOLIDATED COMPLAINT
Case No. 21-cv-01155-EJD

targeting that data. Moreover, Accellion knew of the extensive, foreseeable harm that would ensue for the victims of a data breach, and therefore owed a duty to safeguard that data.

74.     Given the sensitive nature of the PII routinely contained in files transferred over FTA, Accellion knew that hackers and cybercriminals would be able to commit identity theft, financial fraud, phishing, socially engineered attacks, healthcare fraud, and other identity-related fraud upon exfiltrating that data from Accellion's FTA. Accellion also knew that individuals whose PII (including PHI) was transferred over FTA would reasonably spend time and effort to mitigate their damages and prevent identity theft and fraud, if that PII were taken.

75.     Accellion also owed a duty to safeguard Plaintiffs' and Class members' data based on the representations that it made to its clients and customers that FTA would securely transfer and store data.

76.     The duty to protect Plaintiffs' PII and PHI is non-delegable. Accellion's business model is premised upon voluntarily assuming this duty, by soliciting customers to rely on its professed ability to transfer and store sensitive data securely.

77.     Accellion owed a duty to protect PII and PHI for the benefit of the individuals whose PII and PHI its products store, transfer, or otherwise manage.

78.     Accellion also owed a duty to comply with industry standards in safeguarding PII and PHI, which it did not do.

79.     Because of the value of PII and PHI to hackers and identity thieves, companies that sell products responsible for storing, securing, or transferring PII and PHI, such as Accellion, have been identified as being particularly vulnerable to cyberattacks. Cybersecurity firms have promulgated a series of best practices that at minimum should be implemented by sector participants including, but not limited to: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

80.     Federal and state government bodies have likewise established security standards and issued recommendations to reduce the risk of data breaches and the resulting harm to consumers and financial institutions. The FTC has issued numerous guidelines for businesses highlighting the importance of robust and effective data and cyber security practices. According to the FTC, the imperative of data and cyber security should be factored into all business decision-making.

81.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data and cyber security principles and practices for business. The guidelines note businesses should protect the personal customer and consumer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines further recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

82.     The FTC also recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

83.     The FTC has brought enforcement actions against businesses for failing to adequately protect consumer data, treating the failure to employ appropriate measures to protect against unauthorized access to confidential consumer data as an unfair practice that violates Section 5 of the FTC Act, 15 U.S.C. § 45. Orders in these actions further clarify the measures businesses must take to meet their data and cyber security obligations.

84.     Accellion also had obligations created by other federal and state law regulations, contracts, industry standards, and common law to maintain reasonable and appropriate physical,

administrative, and technical measures to keep Plaintiffs' and Class members' PII and PHI confidential and to protect it from unauthorized access and disclosure.

85.     Accellion itself recognized its duty to safeguard PHI in its Business Associate Agreement. In that agreement, Accellion promised that it "encrypts all data in transit, at rest, and at the individual file level," and that "[e]ven when Accellion hosts the Accellion Solution, only its customers have access to the unencrypted information and the encryption keys."[16] Accellion further promised in that agreement to "use appropriate safeguards and comply with Subpart C of 45 CFR Part 164 [Security Standards for the Protection of Electronic Protected Health Information] with respect to electronic PHI, to prevent use or disclosure of PHI other than as provided for by the Agreement."[17]

86.     Nevertheless, as public reports confirmed, hackers were able to access Accellion decryption keys along with encrypted files. Accellion failed to abide by its own promise to prevent disclosure of PHI. Instead, Accellion marketed and sold an outdated and insecure system.

**E.     The Data Breach's Impact on and Risk of Future Harm to Individuals**

87.     The Data Breach occurred amidst the COVID-19 pandemic, adding to the challenges that citizens already were facing. Individuals who had applied for unemployment benefits with the Washington State Auditor's Office confronted delays in their applications. Washington State Auditor Pat McCarthy stated that "I know this is one more worry for Washingtonians who have already faced unemployment in a year scarred by both job loss and a pandemic. . . . This is completely unacceptable. We are frustrated and committed to doing everything we can to mitigate the harm . . . ."[18]

88.     Armed with the PII and PHI acquired in this type of cyberattack, threat actors can commit a variety of crimes including, for example, opening new financial accounts in Class members' names, taking out loans in Class members' names, using Class members' information

---

[16] https://www.kiteworks.com/sites/default/files/resources/accellion-business-associate-agreement.pdf (last accessed June 23, 2023).
[17] *Id.*
[18] https://sao.wa.gov/third-party-service-providers-security-incident-compromised-washingtonians-personal-information/ (last visited June 21, 2023).

- 26 -

to obtain government benefits, filing fraudulent tax returns using Class members' information, and obtaining driver's licenses in Class members' names but with another person's photograph.

89.     This risk is not theoretical. On February 13, 2021, reports emerged that the law firm Jones Day's data was being dumped on the dark web by the ransomware group CLOP (a perpetrator of the Data Breach), which claimed that the law firm had not responded to ransom demands. The threat actors posted the following statement: "Hi, they ignore us so they will be published."[19] They added that they had exfiltrated 100 gigabytes of files, including confidential client documents.

90.     By the end of March 2021, sensitive data had appeared on the dark web for multiple Accellion clients. Private information of minors was also accessed. SingTel confirmed that at least 129,000 of its customers' personal information had been stolen. Bombardier reported that personal and other confidential information relating to employees, customers, and suppliers for approximately 130 employees in Costa Rica was impacted after the CLOP threat group added Bombardier to its leak site on the dark web. Qualys verified that "the threat actor continue[d] to post data taken from the Accellion FTA server" and "there are reports from other attack victims that the threat actor has been emailing those victims' customers directly to further the threat actor's agenda."[20] CSX confirmed that a ransomware gang had "posted screenshots of internal company files to a leak site" and that the files "appear[ed] to contain personal information about employees and retirees."[21] The University of Colorado issued a statement that it had discovered "additional data when CLOP, the criminal organization tied to the cyberattack on Accellion, posted CU files on the dark web after not receiving a ransom payment."[22] In March 2021, CLOP added the University of Miami to its dark web leak site and posted screen shots of files from the

---

[19] https://www.databreaches.net/threat-actors-claim-to-have-stolen-jones-day-files-law-firm-remains-quiet/ (last accessed June 22, 2023).

[20] https://blog.qualys.com/vulnerabilities-threat-research/2021/04/02/qualys-update-on-accellion-fta-security-incident (last accessed June 22, 2023).

[21] https://www.freightwaves.com/news/csx-probes-security-incident-as-hackers-leak-data (last accessed June 22, 2023).

[22] https://www.cu.edu/accellion-cyberattack (last accessed June 22, 2023).

- 27 -

1   University's health system.[23] Shortly thereafter, the University of Maryland at Baltimore, Yeshiva

2   University, and the University of California ("UC") system were added to the dark web leak

3   site.[24]

4          91.     Flagstar, Stanford Medical School, Shell, Danaher, and the American Bureau of

5   Shipping also confirmed that confidential data in their control had appeared on the dark web.

6          92.     On March 29, 2021, hackers began publishing screenshots of personal data they

7   obtained from the UC system. The screenshots showed PII like home addresses, Social Security

8   numbers, immigration status, dates of birth, and passport numbers. Some of the screenshots

9   displayed lists of individuals along with their Social Security numbers, retirement documentation,

10  and benefit adjustment requests. Hackers also posted UC employee benefit application forms and

11  UCPath[25] Blue Shield health savings plan enrollment requests.

12         93.     Also beginning on March 29, 2021, holders of UC email accounts began receiving

13  emails that threatened to publish the recipient's personal information. The emails linked to a

14  website that contained a sample of UC employees' personal information. The subject of the

15  emails states: "Your personal data has been stolen and will be published." Email accounts at

16  multiple campuses throughout the UC system received similar messages. The emails threaten to

17  publish the stolen information on the dark web and appear to seek a ransom:

18  From:
    Date: Tue, Mar 30, 2021 at 8:55 AM
    Subject: Your personal data has been stolen and will be published
19  To:

20

21  Good day!
    If you received this letter, you are a customer, student, partner or employee of **University of California.**
    The company has been hacked, data has been stolen and will soon be released as the company refuses to protect its peoples' data.

22  We inform you that information about you will be published on the darknet (
    dog/universityofcalifornia-edu ) if the university does not contact us.
    Call or write to this store and ask to protect your privacy!!!!

23  _____

24  [23] https://www.databreaches.net/threat-actors-leak-files-with-protected-health-information-from-u-miami/ (last accessed June 22, 2023).

25  [24] https://www.databreaches.net/accellions-data-breach-left-clients-in-tough-position-pay-extortion-to-criminals-or-have-their-data-dumped/ (last accessed June 22, 2023).

26  [25] UCPath is the University of California's payroll, benefits, human resources and academic
27  personnel system for all UC employees. The UCPath system is used at every UC location,
    including campuses, medical centers, research centers, and the UC Office of the President. *See*
28  https://ucpath.berkeley.edu/about-ucpath (last accessed March 20, 2023).

                                    - 28 -

94.     Private information is valuable property. Its value is beyond reasonable dispute considering the market value and profitability of "Big Data" corporations in America. Illustratively, Alphabet Inc. reported in its 2020 Annual Report a total annual revenue of $182.5 billion, $160.7 billion of which derived from Alphabet's Google business, which is driven almost exclusively by leveraging the private information it collects about the users of its various free products and services.

95.     Criminal law also recognizes the value of PII and PHI and the serious nature of its theft by imposing prison sentences on cyber thieves, who can earn significant revenue through stealing PII and PHI. Once a cybercriminal has unlawfully acquired personal data, the criminal can demand a ransom or blackmail payment for its destruction, use the information to commit fraud or identity theft, or sell the PII and/or PHI to another cybercriminal on a thriving black market.

96.     Once stolen, PII and PHI can be used in a number of different ways. One of the most common is to offer it for sale on the "dark web," a heavily encrypted part of the Internet that makes it difficult for authorities to detect the location or owners of a website. The dark web is not indexed by normal search engines such as Google and is only accessible using a Tor browser (or similar tool), which aims to conceal users' identities and online activity. The dark web is notorious for hosting marketplaces selling illegal items such as weapons, drugs, PII and PHI. Websites appear and disappear quickly on the dark web, making it a dynamic environment.

97.     In 2013, the Organization for Economic Cooperation and Development estimated the prices for various elements of personal data: $0.50 for an address, $2 for birthdate, $8 for a Social Security number, $3 for a driver's license number, and $35 for a military record.[26] The value of personal data continues to be high: a personal email can be worth $89, a complete health

---

[26] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD DIGITAL ECONOMY PAPERS, No. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

- 29 -

care record $250, and a hacked Facebook account can sell for $65 on the dark web.[27] Similarly, a 2019 report found that data generated from an adult is worth roughly $35 per month.[28]

98.     The FTC recommends that identity theft victims take several steps to protect their personal health and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and to consider an extended fraud alert that lasts for seven years if identity theft occurs), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

99.     Cybercriminals use stolen PII such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. Identity thieves can also use Social Security numbers to obtain a driver's license or other official identification card in the victim's name, but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, seek unemployment or other benefits, and may even give the victim's PII to police during an arrest resulting in an arrest warrant being issued in the victim's name.

100.    Obtaining a new Social Security number is difficult and rarely occurs.

101.    Furthermore, data breaches that expose any personal data, and in particular nonpublic data of any kind (e.g., donation history or hospital records), directly and materially increase the chance that a potential victim is targeted by a spear phishing attack in the future. Spear phishing, in which hackers typically seek to acquire access to a computer system by sending counterfeit emails, results in a high rate of identity theft, fraud, and extortion.

---

[27] https://www.invisibly.com/learn-blog/how-much-is-data-worth/ (last accessed January 30, 2023).

[28] https://www.vox.com/recode/2019/6/24/18715421/internet-free-data-ads-cost (last accessed January 30, 2023).

102.     For those individuals whose PII was exposed, the effects were real and immediate. Several Plaintiffs experienced fraudulent charges and purchases on their accounts. Plaintiff Amber Chavez incurred overdraft fees from fraudulent charges for which she was not reimbursed. Plaintiff Olson's credit card was cancelled and he lost access to the card while it was replaced. Fraudulent accounts, including credit cards, bank accounts, and utilities, were repeatedly opened in Plaintiff Worrick's name after the Data Breach; at least one fraudulent tax return was filed in her name; and she incurred a significant drop in her credit score. An unauthorized individual attempted to take out a loan in Plaintiff Whittaker's name, after her PII was exposed in the Data Breach.

103.     Even for individuals who did not experience unreimbursed charges, the exposure of their PII has caused real, lasting harm. Because her PII was stolen in the Data Breach, Plaintiff Ringling is now forced to routinely change credit and/or debit cards, and at one point, someone tried to create a false TurboTax account in her name. She purchased credit monitoring services and applied a credit freeze, replaced her credit and/or debit cards, and now spends considerable time daily monitoring her accounts for unauthorized activity. Plaintiff Dawes's bank account was temporarily frozen and he had to spend time investigating unauthorized charges on his account. Plaintiff Amber Chavez purchased credit monitoring after the Data Breach, replaced credit or debit cards, and had to make trips to her bank multiple times per week. Plaintiff Olson had to replace his compromised card, reset automatic billing information, research credit protection, and reset passwords.

104.     Many Plaintiffs also have experienced an increase in scam and phishing telephone calls and emails since the Data Breach. All must now spend more time monitoring their accounts, and all have suffered understandable fear and anxiety due to their personal information being compromised.

105.     For Plaintiffs and Class members whose PHI—including unique medical records and other sensitive health and prescription information—was exposed, additional risks exist.

Patients must be able to trust that their medical information is secure. Numerous state and federal laws require such security.

106.    There is a strong probability that entire batches of stolen information from the Data Breach have yet to be made available on the black market, meaning Plaintiffs and Class members are at an increased risk of fraud and identity theft for many years into the future. Some of the Plaintiffs and many of the Class members remain in their early middle age, exposing them to decades of future risk. Regardless of their age, Plaintiffs must vigilantly monitor their financial accounts for many years to come.

107.    Additionally, there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. PII is such an inherently valuable commodity to identity thieves that, once it is compromised, criminals often trade the information on the cyber black market for years.

108.    As a result of the Data Breach, Plaintiffs and Class members have and will continue to incur out-of-pocket costs and expenses for, among other things, purchasing credit monitoring services, credit freezes, credit reports, and/or other protective measures to deter and detect identity theft. Plaintiffs and Class members have and will continue to spend time, resources, and money in order to mitigate their damages from the Data Breach, and they remain at a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class members must now and in the future closely monitor their bank accounts and credit card accounts to guard against the risk of identity theft.

109.    Plaintiffs and Class members' PII and PHI is private and sensitive in nature and was left inadequately protected by Accellion.

110.    The Data Breach was a direct and proximate result of Accellion's failure to properly safeguard and protect Plaintiffs' and Class members' PII and PHI from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law, including Accellion's failure to establish and implement appropriate technical safeguards to ensure the security and confidentiality of Plaintiffs' and the

Class members' PII and PHI to protect against reasonably foreseeable threats to its security or integrity.

111. As a direct and proximate result of Accellion's wrongful actions and inaction and the resulting Data Breach, Plaintiffs and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to work, family, and leisure to mitigate the actual and potential impact of the Data Breach on their lives, including by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, changing the information used to verify their identity to information not subject to this Data Breach, and filing police reports. This time has been lost forever and cannot be recaptured.

112. Accellion's wrongful actions and inaction directly and proximately caused the theft and dissemination to an unknown third party of Plaintiffs' PII and PHI, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including: (a) theft of their PII and/or PHI; (b) costs for credit monitoring services; (c) unauthorized charges on their debit and credit card accounts; (d) the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals and already misused via the sale of Plaintiffs' and Class members' PII and/or PHI on the dark web; (e) the improper disclosure of their data; (f) loss of privacy; (g) ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach; (h) ascertainable losses in the form of loss of the value of their PII and/or PHI, for which there is a well-established national and international market; (i) ascertainable losses in the form of the loss of cash back or other benefits as a result of their inability to use certain accounts and cards affected by the Data Breach; (j) loss of use of, and access to, their account funds and costs associated with the inability to obtain money from their accounts or being limited in the amount

- 33 -

of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit including adverse credit notations and decreased credit scores or ratings; and (k) the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, changing the information used to verify their identity to information not subject to this Data Breach, and the stress, nuisance and annoyance of contending with all such issues resulting from the Data Breach.

## V.    CLASS ACTION ALLEGATIONS

113.    Plaintiffs bring this class action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and where applicable, 23(c)(4), on behalf of the following Class and Subclasses:

> **Class:** All natural persons in the United States whose PII and/or PHI was compromised as a result of the Data Breach.
>
> **California Subclass:** All natural persons whose PII and/or PHI was compromised as a result of, and who resided in California at the time of, the Data Breach.
>
> **Georgia Subclass:** All natural persons whose PII and/or PHI was compromised as a result of, and who resided in Georgia at the time of, the Data Breach.
>
> **Michigan Subclass:** All natural persons whose PII and/or PHI was compromised as a result of, and who resided in Michigan at the time of, the Data Breach.
>
> **Tennessee Subclass:** All natural persons whose PII and/or PHI was compromised as a result of, and who resided in Tennessee at the time of, the Data Breach.
>
> **Texas Subclass:** All natural persons whose PII and/or PHI was compromised as a result of, and who resided in Texas at the time of, the Data Breach.
>
> **Washington Subclass:** All natural persons whose PII and/or PHI was compromised as a result of, and who resided in Washington at the time of, the Data Breach.

114.     The Class and its constituent Subclasses are collectively referred to herein as the "Class." Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Also excluded from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

115.     Plaintiffs reserve the right to modify the Class and Subclass definitions, including based on discovery and further investigation.

116.     The Class is so large as to make joinder impracticable. There are several million Class members. Disposition of their claims in a single action will provide substantial benefits to all parties and to the Court. Class members are readily ascertainable from information and records in the possession, custody, or control of Defendant or its customers.

117.     Plaintiffs' claims are typical of the claims of the Class in that the sensitive personal information of the representative Plaintiffs, like that of all Class members, was compromised and stolen in the Data Breach.

118.     Plaintiffs are members of the Class and will fairly and adequately represent and protect its interests. Plaintiffs' counsel are competent and experienced in prosecuting class actions, including relating to data breaches. Plaintiffs have no interest contrary to or in conflict with the interests of Class members.

119.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

- Whether Defendant engaged in the conduct alleged;
- Whether Defendant had a duty to implement reasonable cyber security measures to protect Plaintiffs' and Class members' sensitive, personal information;
- Whether Defendant breached its duty by failing to take reasonable precautions to protect Plaintiffs' and Class members' sensitive, personal information;

- Whether Defendant acted unfairly or otherwise wrongfully in violation of state statutory law;

- Whether Plaintiffs and Class members are entitled to recover damages; and

- Whether Plaintiffs and Class members are entitled to equitable relief, including injunctive relief, restitution, and/or disgorgement.

120.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would have no effective remedy. Given the relatively small size of the individual Class members' claims, few, if any, Class members would seek redress for Defendant's violations individually. Class treatment will conserve the resources of the courts and promote consistency and efficiency of adjudication.

121.    Class certification is also appropriate under Rules 23(b)(1), (b)(2), and/or (c)(4) because:

- The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendant.

- The prosecution of separate actions by individual Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests.

- Defendant has acted or refused to act on grounds generally applicable to the Class, making injunctive and corresponding declarative relief appropriate with respect to the Class as a whole; and

- The claims of Class members are comprised of common issues whose resolution in a class trial would materially advance this litigation.

1

2

**FIRST CAUSE OF ACTION**
**Negligence and/or Gross Negligence**
**On Behalf of the Class, or, in the Alternative, the State Subclasses**

3        122.    Plaintiffs incorporate and reallege the foregoing allegations of fact.

4        123.    The FTA product was marketed, controlled in many respects, and licensed by

5    Accellion. The FTA stored and/or transferred Plaintiffs' and Class members' PII, including their

6    names, addresses, telephone numbers, birthdates, Social Security numbers, bank account

7    information, and personal health information.

8        124.    In providing their PII, Plaintiffs and Class members had a reasonable expectation

9    that this information would be securely maintained and not easily accessible to, or exfiltrated by,

10   cybercriminals.

11       125.    Accellion owed Plaintiffs and Class members a duty of reasonable care to preserve

12   and protect the confidentiality of their PII being stored, transferred, and secured by Accellion's

13   FTA. This duty included, among other obligations, maintaining and testing Accellion's security

14   systems and computer networks, and taking other reasonable security measures to safeguard and

15   adequately secure the PII of Plaintiffs and the Class from unauthorized access and use. Accellion,

16   whose FTA product was held out as an expert guardian and gatekeeper of data, had a duty to

17   Plaintiffs and Class members to securely maintain and/or securely transfer the PII in a reasonable

18   manner that would prevent cybercriminals from accessing and exfiltrating this information.

19   Accellion's duty arose independently from any contract.

20       126.    By undertaking the duty to secure this data on FTA, Accellion had a duty of care

21   to use reasonable means to secure and safeguard its systems and networks—and Plaintiffs and

22   Class members' PII being stored or transferred on FTA—to prevent disclosure of the information,

23   and to safeguard the information from cyber theft.

24       127.    Accellion's duty included a responsibility to provide data security consistent with

25   industry standards and other requirements discussed herein, and to ensure that its systems and

26   networks, and the outside vendors it used, adequately protected and safeguarded the PII of

27   Plaintiffs and the Class.

28

- 37 -

128.    Accellion's duty of care to use reasonable security measures arose, in part, as a result of the special relationship that existed between Accellion and Plaintiffs and Class members, the end users of the services Accellion provided to its clients. Accellion was in a special relationship with Plaintiffs and Class members with respect to the hacked personal and medical information because the aim of Accellion's data security measures was to benefit Plaintiffs and Class members by ensuring that their personal information would remain protected and secure. Accellion's entire business model was built on promising its clients that it provided a platform—here, the FTA—for securely storing and transferring files that contained sensitive data. Accellion's promises of data security were for the benefit of those to whom the data belonged—*i.e.*, individual consumers. Only Accellion was in a position to ensure that its systems, including FTA, were sufficiently secure to protect Plaintiffs' and Class members' personal and medical information.

129.    Accellion had a common law duty to prevent foreseeable harm to others. Plaintiffs and Class members were the foreseeable and probable victims of any inadequate security practices on the part of Accellion. It was foreseeable that Plaintiffs and Class members would be harmed by Accellion's failure to protect their personal information because hackers are known to routinely attempt to steal such information and use it for nefarious purposes.

130.    Accellion also owed a duty to Plaintiffs and Class members to provide adequate data security practices and to safeguard their PII, by operation of statute. For instance:

- The California Customer Records Act, Cal. Civ. Code § 1798.80 *et seq.*, imposes a mandatory duty on Accellion to implement and maintain reasonable security procedures and practices to safeguard and protect against the unauthorized disclosure of PII.

- Pursuant to the FTC Act, 15 U.S.C. § 45, Accellion had a duty to provide fair and adequate computer systems and data security practices to safeguard PII.

131.    Plaintiffs and Class members are members of the classes of persons the foregoing statutes are intended to protect. The essential purposes of these statutes are to protect citizens

- 38 -

1   from the same or similar kind of harm that Accellion's violation of those statutory duties caused

2   to Plaintiffs and Class members.

3        132.    Accellion's actions and inaction breached its statutory duties by failing to provide

4   adequate data security to safeguard the PII under its possession, custody or control. Accellion

5   breached its duties to Plaintiffs and Class members under the above-referenced statutes by failing

6   to provide fair, reasonable, or adequate computer systems and data security practices to safeguard

7   Plaintiffs and Class members' PII. Accellion's failure to comply with all applicable laws and

8   regulations constitutes negligence per se.

9        133.    In addition, Accellion owed a duty to timely disclose to Plaintiffs and Class

10  members, by publication or other means, that their personal information had been or was

11  reasonably believed to have been compromised. Timely disclosure was necessary so that

12  Plaintiffs and Class members could, among other things: (1) purchase identity protection,

13  monitoring, and recovery services; (2) flag asset, credit, and tax accounts for fraud, including by

14  reporting the theft of their Social Security numbers to financial institutions, credit agencies, and

15  the IRS; (3) purchase or otherwise obtain credit reports; (4) place or renew fraud alerts on a

16  quarterly basis; (5) intensively monitor loan data and public records; and (6) take other steps to

17  protect themselves and attempt to avoid or recover from identity theft.

18       134.    In addition to arising by reason of the statutes noted above, Accellion's duty to use

19  reasonable care in protecting confidential data also arose because industry standards require

20  Accellion to adequately protect confidential PII, including PHI.

21       135.    Accellion had the ability to sufficiently guard against data breaches by

22  implementing adequate measures to protect its systems, such as by sufficiently funding and

23  implementing necessary, effective fixes for FTA, or by removing the legacy Accellion FTA

24  software and updating to a state of the art and current file transfer software.

25       136.    Accellion breached its duty to exercise reasonable care in protecting Plaintiffs' and

26  Class members' PII and PHI by failing to implement and maintain adequate security measures to

27  safeguard Plaintiffs' and Class members' personal and medical information, failing to monitor its

28

systems to identify suspicious activity, and allowing unauthorized access to, and exfiltration of, Plaintiffs' and Class members' confidential PII and PHI. Accellion knew that its FTA system was outdated but took insufficient action to ensure that its customers stopped using it to transfer and store sensitive personal information.

137.     The specific negligent acts and omissions committed by Accellion include, without limitation:

- Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs and Class members' PII and PHI;

- Failing to adequately monitor the security of its networks and systems;

- Allowing unauthorized access to and exfiltration of Plaintiffs and Class members' PII and PHI;

- Failing to provide timely notice that Plaintiffs and Class members' PII and PHI had been compromised, by publicity or other means,  so those at risk could take timely and appropriate steps to mitigate the potential for identity theft and other damages; and

- Failing to ensure that clients were timely notified about the FTA security vulnerabilities.

138.     Plaintiffs and Class members were the foreseeable victims of Accellion's inadequate and ineffectual cybersecurity. The natural and probable consequence of Accellion's failure to adequately secure its information networks was Plaintiffs' and Class members' personal information being hacked.

139.     Accellion knew that Plaintiffs' and Class members' personal information was an attractive target for cyber thieves, particularly in light of data breaches experienced by other entities around the United States. The breach of security was reasonably foreseeable given the known high frequency of ransomware attacks and data breaches.

140.     Further, the harm to Plaintiffs and Class members from exposure of their highly confidential personal facts was reasonably foreseeable to Accellion. It was foreseeable that

Accellion's failure to use reasonable measures to protect Plaintiffs and Class members' PII and PHI would result in injury to Plaintiffs and Class members.

141.   It was also foreseeable to Accellion that its failure to timely notify its clients of the vulnerabilities would result in the disclosure of individual's PII/PHI and/or exacerbate the harm to Plaintiffs and Class members.

142.   There is a close connection between Accellion's failure to employ reasonable security protections for the PII/PHI and the injuries suffered by Plaintiffs and Class members. When individuals' sensitive personal information is stolen, they face a heightened risk of identity theft and may need to: (1) purchase identity protection, monitoring, and recovery services; (2) flag asset, credit, and tax accounts for fraud, including by reporting the theft of their Social Security numbers to financial institutions, credit agencies, and the IRS; (3) purchase or otherwise obtain credit reports; (4) monitor credit, financial, utility, explanation of benefits, and other account statements on a monthly basis for unrecognized credit inquiries and charges; (5) place and renew credit fraud alerts on a quarterly basis; (6) contest fraudulent charges and other forms of identity theft; (7) repair damage to credit and financial accounts; and (8) take other steps to protect themselves and attempt to avoid or recover from identity theft and fraud.

143.   The policy of preventing future harm disfavors application of the economic loss rule, particularly given the sensitivity of the private information entrusted to Accellion's customers that relied on the security of the FTA. A high degree of opprobrium attaches to Accellion's failure to secure Plaintiffs' and Class members' personal and extremely confidential facts. Accellion had an independent duty in tort to protect this information and thereby avoid reasonably foreseeable harm to Plaintiffs and Class members.

144.   Accellion acted, and failed to act, intentionally and with conscious and reckless disregard for the rights and interests of Plaintiffs. Accellion's negligence was therefore gross, willful, wanton, and reprehensible and warrants the imposition of punitive damages given the clear foreseeability of a hacking incident, the extreme sensitivity of the private information that

- 41 -

1   Accellion held itself out as protecting, and its failure to take adequate remedial steps, including

2   prompt notification of the victims, following the Data Breach.

3       145.    As a result of Accellion's negligence, Plaintiffs and Class members have suffered

4   damages that have included or may, in the future, include, without limitation: (1) loss of the

5   opportunity to control how their personal information is used; (2) diminution in the value and use

6   of their personal information entrusted to Accellion's customers that relied on the security of FTA

7   with the understanding that Accellion would safeguard the information against theft and not allow

8   it to be accessed and misused by third parties; (3) lost market value in their personal information;

9   (4) the compromise and theft of their personal information; (5) out-of-pocket costs associated

10  with the prevention, detection, and recovery from identity theft and unauthorized use of financial

11  accounts; (6) costs associated with the ability to use credit and assets frozen or flagged due to

12  credit misuse, including increased costs to use credit, credit scores, credit reports, and assets; (7)

13  unauthorized use of compromised personal information to open new financial and other accounts;

14  (8) continued risk to their personal information, which is subject to further breaches so long as

15  Accellion fails to undertake appropriate and adequate measures to protect the personal

16  information in its possession; (9) future costs in the form of time, effort, and money they will

17  expend to prevent, detect, contest, and repair the adverse effects of their personal information

18  being stolen in the Data Breach; and (10) nominal damages in the alternative.

19                      **SECOND CAUSE OF ACTION**
        **Violation of Washington Consumer Protection Act, RW 19.86.010 *et seq.***
20               **On Behalf of the Washington Subclass**

21      146.    Plaintiffs Rodriguez and Worrick ("Plaintiffs," for purposes of this Count),

22  individually and on behalf of the Washington Subclass, repeat and allege the foregoing

23  allegations of fact.

24      147.    The Washington State Consumer Protection Act, RCW 19.86.020 (the "WCPA")

25  prohibits any "unfair or deceptive acts or practices" in the conduct of any trade or commerce as

26  those terms are described by the WCPA and relevant case law.

27      148.    Accellion is a "person" as described in RCW 19.86.010(1).

28

- 42 -

149.   Accellion engages in "trade" and "commerce" as described in RCW 19.86.010(2) in that it engages in the sale of services and commerce directly and indirectly affecting the people of the State of Washington.

150.   By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Accellion engaged in unlawful, unfair and fraudulent practices within the meaning, and in violation of, the WCPA, in that Accellion's practices were injurious to the public interest because they injured other persons, had the capacity to injure other persons, and have the capacity to injure other persons.

151.   In the course of conducting its business, Accellion committed "unfair or deceptive acts or practices" by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiffs' and Washington Subclass members' PII, and violating the common law alleged herein in the process. Plaintiffs and Washington Subclass members reserve the right to allege other violations of law by Accellion constituting other unlawful business acts or practices. Accellion's above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

152.   Accellion's above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair or deceptive acts or practices" in violation of the WCPA in that Accellion's wrongful conduct is substantially injurious to other persons, had the capacity to injure other persons, and has the capacity to injure other persons. Such conduct is particularly unscrupulous in view of the highly sensitive information entrusted to Accellion's customers that relied on the security of FTA, the loss of which information creates an indefinite threat to the victims, among other serious harm.

153.   The gravity of Accellion's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Accellion's legitimate business interests other than engaging in the above-described wrongful conduct.

154.    As a direct and proximate result of Accellion's above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach and its violations of the WCPA, Plaintiffs and Washington Subclass members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*, (1) the compromise and theft of their personal information; (2) loss of the opportunity to control how their personal information is used; (3) diminution in the value and use of their personal information entrusted to Accellion's customers that relied on its FTA with the understanding that Accellion would safeguard it against theft and not allow it to be accessed and misused by third parties; (4) out-of-pocket costs associated with the prevention and detection of, and recovery from, identity theft and misuse of their personal information; (5) continued undue risk to their personal information; and (6) future costs in the form of time, effort, and money they will expend to prevent, detect, contest, and repair the adverse effects of their personal information being stolen in the Data Breach.

155.    Unless restrained and enjoined, Accellion will continue to engage in the above-described wrongful conduct and more data breaches will occur. Plaintiffs and Washington Subclass members also seek restitution and an injunction prohibiting Accellion from continuing such wrongful conduct, and requiring Accellion to modify its corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect the Private Information for which it is responsible.

156.    Plaintiffs, on behalf of themselves and the Washington Subclass members, also seeks to recover actual damages sustained by each Washington Subclass member together with the costs of the suit, including reasonable attorney fees. In addition, Plaintiffs Rodriguez and Worrick, on behalf of themselves and the Washington Subclass members, requests that this Court use its discretion, pursuant to RCW 19.86.090, to increase the damages award for each Washington Subclass member by three times the actual damages sustained not to exceed $25,000.00 per Washington Subclass member.

- 44 -

1

**PRAYER FOR RELIEF**

2

WHEREFORE, Plaintiffs respectfully seek an order:

3

      A.     Certifying this case as a class action, appointing Plaintiffs as Class

4

representatives, and appointing interim co-lead class counsel to represent the Class;

5

      B.     Entering judgment for Plaintiffs and the Class;

6

      C.     Awarding Plaintiffs and Class members actual damages, compensatory

7

damages, punitive damages, statutory penalties, and nominal damages in an amount to be

8

determined, as allowable by law;

9

      D.     Ordering appropriate injunctive relief;

10

      E.     Awarding pre- and post-judgment interest according to law;

11

      F.     Awarding reasonable attorneys' fees and costs as permitted by law;

12

      G.     Granting such further and other relief as may be just and proper.

13

**JURY TRIAL DEMANDED**

14

Plaintiffs demand a trial by jury on all issues so triable.

15

16

Dated: March 14, 2024

17

18

By: /s/ *Adam E. Polk*　　　　　　　　　　/s/ *Krysta Kauble Pachman*

    Adam E. Polk (273000)　　　　　　　　　Krysta Kauble Pachman (280951)

19

    Jordan Elias (228731)　　　　　　　　　　Michael Gervais (330731)

    Simon S. Grille (294914)　　　　　　　　Steven G. Sklaver (237612)

20

    Kyle P. Quackenbush (322401)　　　　　Kevin R. Downs (331993)

    **GIRARD SHARP LLP**　　　　　　　　　**SUSMAN GODFREY L.L.P.**

21

    601 California Street, Suite 1400　　　　1900 Avenue of the Stars, Suite 1400

    San Francisco, CA 94108　　　　　　　Los Angeles, California 90067-6029

22

    Tel: (415) 981-4800　　　　　　　　　　Tel: (310) 789-3100

23

    apolk@girardsharp.com　　　　　　　　kpachman@susmangodfrey.com

    jelias@girardsharp.com　　　　　　　　mgervais@susmangodfrey.com

24

    sgrille@girardsharp.com　　　　　　　　ssklaver@susmangodfrey.com

    kquackenbush@girardsharp.com　　　　kdowns@susmangodfrey.com

25

26

*Interim Co-Lead Class Counsel*

27

28

- 45 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>ATTESTATION</u>**

I, Krysta Kauble Pachman, am the ECF user whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(h)(3), I hereby attest that the other signatory has concurred in this filing.

/s/ *Krysta Kauble Pachman*

- 46 -