Adam E. Polk (State Bar No. 273000)
Jordan Elias (State Bar No. 228731)
Kyle P. Quackenbush (State Bar No. 322401)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
apolk@girardsharp.com
jelias@girardsharp.com
kquackenbush@girardsharp.com

Krysta K. Pachman (State Bar No. 280951)
Michael Gervais (State Bar No. 330731)
Steven G. Sklaver (State Bar No. 237612)
Kevin R. Downs (State Bar No. 331993)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
Tel: (310) 789-3100
Fax: (310) 789-3150
kpachman@susmangodfrey.com
mgervais@susmangodfrey.com
ssklaver@susmangodfrey.com
kdowns@susmangodfrey.com

*Interim Co-Lead Class Counsel*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| IN RE ACCELLION, INC. DATA BREACH LITIGATION | Case No. 5:21-cv-01155-EJD<br><br>**PLAINTIFFS' OPPOSITION TO ACCELLION'S MOTION TO DISMISS AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Hon. Edward J. Davila<br>Courtroom: 4 – 5th Floor<br>July 18, 2024<br>9:00 a.m. |

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II.  STATEMENT OF FACTS ................................................................................... 2

III.  PROCEDURAL HISTORY .................................................................................. 4

IV.  LEGAL STANDARD ........................................................................................... 4

V.  ARGUMENT ........................................................................................................ 5

    A.   The Court's Finding That Accellion Owed a Duty to Plaintiffs Remains
       Correct. ........................................................................................................ 5

        1.   A Special Relationship Exists Between a File-Transfer Company and
           the Individuals Whose Information is Transferred. ........................... 7

           i.    Dependency ................................................................................ 7

           ii.   Control ...................................................................................... 10

           iii.  Limited to Specific Individuals ................................................ 12

           iv.  Benefit to Accellion .................................................................. 13

        2.   California Recognizes a Duty on Companies to Take Reasonable Steps
           to Protect Sensitive Information ....................................................... 14

    B.   The Court Should Reject Accellion's Arguments Regarding Other States'
       Laws. ......................................................................................................... 15

        1.   Choice of Law Should Be Deferred to a Later Stage. ....................... 15

        2.   Alternatively, California Law Applies to the Claims of All Plaintiffs. ......... 16

        3.   Even if the Court Were to Apply the Various Laws of Plaintiffs, Their
           Causes of Action for Negligence Should Proceed. ........................... 18

           i.    Plaintiff Torres Properly Pleads a Claim for Negligence Under
               Georgia Law .............................................................................. 18

           ii.   Plaintiff Whittaker Properly Pleads a Claim for Negligence Under
              Michigan Law. .......................................................................... 19

            iii.  Plaintiffs Worrick and Rodriguez Properly Plead Claims for
              Negligence Under Washington Law. ......................................... 20

PLAINTIFFS' OPPOSITION TO ACCELLION'S MOTION TO DISMISS
CASE NO. 5:21-cv-01155-EJD

iv.    Plaintiff Dawes Properly Pleads a Claim for Negligence Under Oklahoma Law.........................................................................................21

v.    Plaintiff Desjardins (Tennessee) and Plaintiff Ringling (Texas) Properly Plead Claims for Negligence........................................................22

VI.    CONCLUSION .............................................................................................. 24

PLAINTIFFS' OPPOSITION TO ACCELLION'S MOTION TO DISMISS
CASE NO. 5:21-cv-01155-EJD

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barenborg v. Sigma Alpha Epsilon Fraternity*,
  33 Cal. App. 5th 70 (2019) ................................................................................................ 12

*Barlow v. State*
  2 Wash. 3d 583 (2024)....................................................................................................... 20

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................................. 5

*Bradley Center v. Wessner*,
  250 Ga. 199, 296 S.E.2d 693 (1982) ................................................................................ 18

*Brown v. USA Taekwondo*,
  11 Cal. 5th 204, 483 P.3d 159 (2021) .................................................................... 6, 11, 13

*Buckley v. Santander Consumer USA, Inc.*
  No. C17-5813 BHS, 2018 WL 1532671 (W.D. Wash. Mar. 29, 2018)............................. 21

*Campidoglio LLC v. Wells Fargo & Co.*,
  870 F.3d 963 (9th Cir. 2017) ............................................................................................... 5

*Carr v. Oklahoma Student Loan Auth.*,
  No. CIV-23-99-R, 2023 WL 6929853 (W.D. Okla. Oct. 19, 2023) ..................... 15, 21, 22

*Castillo v. Seagate Tech., LLC*,
  2016 WL 9280242 (N.D. Cal. Sept. 14, 2016) .................................................................. 14

*Chavez v. Blue Sky Nat. Beverage Co.*,
  268 F.R.D. 365 (N.D. Cal. 2010) ...................................................................................... 17

*Clancy v. The Bromley Tea Co.*,
  308 F.R.D. 564 (N.D. Cal. 2013) ...................................................................................... 15

*Clark Fire Equip., Inc. v. Arkema, Inc.*,
  176 F. Supp. 3d 646 (S.D. Tex. 2015) ............................................................................... 23

*Clay v. CytoSport, Inc.*,
  No. 3:15-CV-00165-L-AGS, 2018 WL 4283032 (S.D. Cal. Sept. 7, 2018)...................... 17

*Clothesrigger, Inc. v. GTE Corp.*,
  191 Cal. App. 3d 605 (1987) ....................................................................................... 16, 18

iv

*Collins v. Athens Orthopedic Clinic, P.A.*,
  307 Ga. 555, 837 S.E.2d 310 (2019).........................................................................19

*CRS Recovery, Inc. v. Laxton*,
  600 F.3d 1138 (9th Cir. 2010) .................................................................................16

*Department of Labor v. McConnell*,
  305 Ga. 812 (2019) ................................................................................18, 19, 20

*Diamond Multimedia Sys., Inc. v. Superior Ct.*,
  19 Cal. 4th 1036 (1999) ..........................................................................................18

*Ehret v. Uber Techs., Inc.*,
  68 F. Supp. 3d 1121 (N.D. Cal. 2014) .....................................................................16

*Erickson v. Pardus*,
  551 U.S. 89 (2007)......................................................................................................5

*Ethridge v. Samsung SDI Co.*
  604 F. Supp. 3d 556 (S.D. Tex. 2022) .....................................................................23

*First Choice Fed. Credit Union v. Wendy's Co.*,
  No. 16-506, 2017 WL 9487086 (W.D. Pa. Feb. 13, 2017)......................................15

*Giraldo v. Department of Corrections & Rehabilitation*,
  168 Cal. App. 4th 231 (2008) ..................................................................................12

*Grifo & Co., PLLC v. Cloud X Partners Holdings, LLC*
  485 F. Supp. 3d 885 (E.D. Mich. 2020) ..................................................................19

*In re Accellion, Inc. Data Breach Litig.*,
  — F. Supp. 3d —, 2024 WL 333893 (N.D. Cal. Jan. 29, 2024)................................4

*In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*,
  No. 19-md-2904, 2021 WL 5937742 (D.N.J. Dec. 16, 2021) ..................................15

*In re Apple Inc. Device Performance Litig.*,
  386 F. Supp. 3d 1155 (N.D. Cal. 2019) ...................................................................15

*In re Blackbaud, Inc., Customer Data Breach Litig.*,
  567 F. Supp. 3d 667 (D.S.C. 2021)....................................................................17, 22

*In re Capital One Consumer Data Security Breach Litigation*
  488 F. Supp. 3d 374 (E.D. Va. 2020) ......................................................................22

*In re Equifax, Inc., Customer Data Sec. Breach Litig.*,
  No. 1:17-MD-2800-TWT, 2022 WL 1122841 (N.D. Ga. Apr. 13, 2022)..............18, 19

v

*In re iPhone 4S Consumer Litig.*,
  No. C 12-1127 CW, 2013 WL 3829653 (N.D. Cal. July 23, 2013) ................................ 16

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
  440 F. Supp. 3d 447 (D. Md. 2020) ................................................................. 18, 19

*In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*,
  603 F. Supp. 3d 1183 (S.D. Fla. 2022) ................................................................. 15

*Junod v. NWP Servs. Corp.*,
  No. SA CV-14-1734-JLS, 2015 WL 12712309 (C.D. Cal. Apr. 2, 2015) ........................ 17

*Koczera v. Steele*,
  570 S.W.3d 242 (Tenn. Ct. App. 2018) ................................................................. 22

*Marble Voip Partners LLC v. Zoom Video Commc'ns, Inc.*,
  No. 23-CV-03619-JSW, 2024 WL 86859 (N.D. Cal. Jan. 8, 2024) ................................ 6

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ............................................................................. 17

*Moriarty v. Bayside Insurance Associates, Inc.*,
  No. 20-56139, 2021 WL 4061105 (9th Cir. Sept. 7, 2021) ........................................ 10

*Papadimas v. Mykonos Lounge*,
  176 Mich. App. 40 (1989) ................................................................................. 20

*Purvis v. Aveanna Healthcare, LLC*,
  563 F. Supp. 3d 1360 (N.D. Ga. 2021) ............................................................. 18, 19

*Regents of University of California v. Superior Court*,
  4 Cal. 5th 607 (2018) ................................................................................ *passim*

*Satterfield v. Breeding Insulation Co.*,
  266 S.W.3d 347 (Tenn. 2008) ...................................................................... 17, 23

*Smith v. Pathway Fin. Mgmt., Inc.*, No. SACV 11-01573  JVS (MLGx)
  2012 WL 12884448 (C.D. Cal. Nov. 26, 2012) ...................................................... 16

*Stasi v. Inmediata Health Grp. Corp.*,
  501 F. Supp. 3d 898 (S.D. Cal. 2020) ................................................................. 14

*Strigliabotti v. Franklin Res., Inc.*,
  398 F. Supp. 2d 1094 (N.D. Cal. 2005) ................................................................. 6

*Torres v. Wendy's Int'l, LLC*,
  No. 6:16-cv-210-Orl-40DCI, 2017 WL 8780453 (M.D. Fla. Mar. 21, 2017) .................. 22

*Traxler v. Entergy Gulf States, Inc.*,
   376 S.W.3d 742 (Tex. 2012) ............................................................................................ 17

*Tristan v. Bank of America*,
   2023 WL 4417271 (C.D. Cal. June 28, 2023) ............................................................ 9, 12

*United States v. Jingles*,
   702 F.3d 494 (9th Cir. 2012) .......................................................................................... 5, 6

*Van Horn v. Chambers*,
   970 S.W.2d 542 (Tex. 1998) ............................................................................................ 23

*Washington Mut. Bank, FA v. Super. Ct.*,
   24 Cal. 4th 906 (2001) ..................................................................................................... 16

*Weirum v. RKO Gen., Inc.*,
   15 Cal. 3d 40, 539 P.2d 36 (1975) ..................................................................................... 6

*Williams v. Abilene Christian University*,
   2020 WL 10458627 (N.D. Tex. Dec. 14, 2020) .............................................................. 23

*Williams v. Cunningham Drug Stores, Inc.*,
   429 Mich. 495 (1988) ................................................................................................ 20, 23

PLAINTIFFS' OPPOSITION TO ACCELLION'S MOTION TO DISMISS
CASE NO. 5:21-cv-01155-EJD

# I.     INTRODUCTION

Accellion's Motion to Dismiss the Amended Complaint focuses on its "special relationship" under Plaintiffs' negligence claim. The Court previously denied Accellion's challenge to Accellion's special relationship with Plaintiffs, dkt. 217, which makes Accellion's challenge a belated motion for reconsideration. In a renewed effort to evade accountability for one of the largest data breaches in recent U.S. history, Accellion boldly claims that this Court's prior decision is incorrect and "went too far." Dkt. 244 at 24. But the Court got it right the first time and the law of the case doctrine precludes Accellion from rehashing the same argument now.

Accellion relies on many of the same legal arguments this Court already rejected in upholding Plaintiffs' negligence claim. Accellion asserts that Accellion's FTA platform—which Accellion itself designed, marketed, licensed, supported, and profited from—transferred Plaintiffs' data, as opposed to Accellion itself. Yet Accellion's FTA cannot be artificially separated from Accellion, and the Court made no such distinction. Accellion also repeats many of the same arguments that this Court previously rejected: Plaintiffs did not interact with Accellion, the duty would extend too broadly, and Accellion lacked privity with Plaintiffs.

The Court recognized Accellion's responsibility for, and control over, the FTA platform that transferred millions of individuals' sensitive information, along with Plaintiffs' dependency on the FTA as a secure method of transferring their information. These factual allegations remain the same in the Amended Complaint. The Court found that Accellion owed a duty because "there exists a special relationship between a file transfer company and the individuals whose information is being transferred." Dkt. 217 at 6. The Court rejected Accellion's privity argument, recognizing that "federal courts applying California law have not hesitated to extend a data company's duty of care beyond those with whom it shares privity or exceeds some threshold level of interactions." *Id.* at 9. And the Court also rejected Accellion's public policy arguments that a software company's customers should not be allowed to sue, agreeing with other courts: "[f]rom a policy standpoint, to hold that [the company] has no duty of care here would create perverse incentives for businesses who profit off the use of consumers' personal data to turn a blind eye and ignore known security risks." *Id.* at 11 (internal quotations removed).

The Amended Complaint rests on the same allegations as Plaintiffs' previous complaint, and

Accellion was in a special relationship with Plaintiffs because Accellion was charged with safeguarding Plaintiffs' confidential information kept on the FTA. Plaintiffs relied on Accellion's FTA software to securely transfer their personal information, and there is still "no reason to believe that Plaintiffs could have secured their PII themselves when it was sent using Accellion's FTA software." *Id.* at 7. Accellion was the party best positioned to identify and remedy security vulnerabilities in the FTA software. Accellion's duty extends only to specific individuals—whose personal information was transferred on Accellion's software—and does not run to the public at large. And, because Accellion's business model is based on its claim that its software securely transfers confidential information, Accellion benefits from its special relationship with Plaintiffs. The Court's ruling therefore was, and is, correct.

The Court also should defer Accellion's new choice of law argument based on an incomplete record at this early stage. As many courts have found, it is premature to conduct a choice of law analysis on the pleadings, particularly in a data breach case where facts relevant to choice of law are not in the record. Moreover, even if the Court conducted the choice of law analysis (which it should not), Accellion makes no effort to carry its burden of showing that California law should not apply to the negligence claims of all Plaintiffs, when Accellion maintained its headquarters in California and no Plaintiff dealt with Accellion in any state. Nor is there any material conflict between the other states' laws and California's strong interest—which without would be substantially impaired—to ensure the protection of consumers' PII by companies controlled within the state. Alternatively, non-California Plaintiffs' negligence claims survive because Accellion owed all Plaintiffs a duty of care under the law of each state.

Plaintiffs' remaining claims accordingly survive. Accellion does not move to dismiss Plaintiff Worrick and Rodriguez's WCPA claims, nor Plaintiffs' negligence claims based on a duty established through affirmative conduct that created a reasonably foreseeable risk of harm, or duty evidenced by statute (*i.e.*, negligence per se).

## II.    STATEMENT OF FACTS

Accellion is a software company that licensed a product called FTA to its customers to securely transfer large files. Dkt. 248, Amended Consolidated Complaint ("ACC") ¶ 26. FTA was nearing the end-of-life stage leading up to late 2020, but Accellion continued to license FTA while using it to market its newer product, Kiteworks, to existing FTA customers. ACC ¶¶ 3, 34. Starting in mid-December 2020,

2

the ransomware group CLOP exploited vulnerabilities in the FTA software and exfiltrated large amounts of sensitive data stored on, or being transferred through, the FTA, including personally identifiable information ("PII") belonging to millions of individuals. ACC ¶¶ 1, 52. The resulting data breach was the largest in the United States in 2021 and one of the largest data breaches during the last five years, affecting hundreds of companies and millions of individuals. ACC ¶ 52.

Leading up to the breach, and after, Accellion controlled the FTA software. It controlled its licenses to clients, and in regard to the software itself, Accellion controlled updates to the software, security patches for the software, and encryption of files on FTA. ACC ¶¶ 30, 123; *see also* Accellion EULA, Dkt. 174-2 at 6–7 ("As part of Maintenance Support Services, Accellion will make available to Customer all Updates to the supported Accellion Solution that Accellion makes generally available to its other customers. Customer **shall provide Accellion access to the Accellion Solution to install such Updates if required by Accellion**") (emphasis added). Accellion was responsible for sufficiently securing the FTA software to protect Plaintiffs' and Class members' personal information. ACC ¶ 128. Accellion demonstrated this ability when, days after the attack began, Accellion released patches to fix the vulnerabilities. ACC ¶ 40.

Accellion was aware that sensitive data was transferred through its FTA because that is what the FTA was designed for and how Accellion marketed the FTA. ACC ¶ 70. And in the ordinary course of doing business with entities that use Accellion's FTA, individuals are typically required to provide PII, which is then transferred by Accellion's FTA platform. ACC ¶ 32. Accellion's clients and customers depended on (and paid for) a secure file transfer system. ACC ¶ 27.  Indeed, Accellion's entire business model was built on its claims that the FTA platform securely stores and transfers files that contain sensitive data. ACC ¶ 128.

Plaintiffs and Class members must now contend with the fallout from their PII being in the hands of criminals. Some Plaintiffs have already experienced instances of identity theft, including fraudulent charges in their names, and have incurred out-of-pocket losses. Many Plaintiffs also have experienced emotional distress, and all Plaintiffs are now at an increased risk of experiencing identity theft in the future and have suffered from diminished value of their PII. ACC ¶¶ 4, 108, 111–12.

III.    **PROCEDURAL HISTORY**

On January 29, 2024, the Court granted in part and denied in part Accellion's motion to dismiss Plaintiffs' consolidated class action complaint, denying the motion as to Plaintiffs' claim for negligence under California law and violations of the WCPA, dismissing without leave to amend Plaintiffs' claims for negligence per se,[1] breach of contract, and violations of the MCPA, and dismissing with leave to amend Plaintiffs' claims for violations of the CMIA, CCRA, intrusion upon seclusion, unjust enrichment, and the California constitution. *In re Accellion, Inc. Data Breach Litig.*, — F. Supp. 3d —, 2024 WL 333893, at *18 (N.D. Cal. Jan. 29, 2024). The Court held that Plaintiffs had sufficiently alleged the existence of a special relationship between Accellion and Plaintiffs to establish a duty under California's negligence law. *Id.* at *6.

On March 14, 2024, Plaintiffs filed the Amended Complaint, dkt. 230 (unredacted version at dkt. 248), alleging Accellion was negligent in the storing or transferring of Plaintiffs' and Class members' PII and that Accellion violated the WCPA. ACC ¶¶ 122–156. Plaintiffs did not attempt to replead any other claim. Regarding negligence, Plaintiffs alleged that Accellion had a duty of reasonable care "to preserve and protect the confidentiality of their PII being stored, transferred, and secured by Accellion's FTA," based on Accellion's common law duty to refrain from acting in an unreasonable manner that causes foreseeable harm to others, from the special relationship between Accellion and Plaintiffs, and by operation of statutes, including Section 5 of the FTC Act. *Id.* ¶¶ 128–131.

On April 29, 2024, Accellion moved to dismiss Plaintiffs' negligence claims solely based on a purported failure to establish a "special relationship," dkt. 244, despite the Court's ruling on that issue. Accellion did not move to dismiss Plaintiffs' WCPA claim.

IV.    **LEGAL STANDARD**

The Court accepts all factual allegations in the complaint as true and construes them together and

---

[1] The Court held that negligence per se was not a standalone claim under California law, but allowed Plaintiffs to rely on the "provisions of the FTC Act, HIPAA, CCRA, or COPPA in support of the elements in their negligence claim, provided they can also meet the other requirements for negligence per se." 2024 WL 333893, at *9–10.

1  in the light most favorable to the nonmoving party. *See Campidoglio LLC v. Wells Fargo & Co.*, 870

2  F.3d 963, 970 (9th Cir. 2017). Plaintiffs need not plead "detailed factual allegations" under Rule 8, but

3  need only set forth enough facts to state a plausible entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550

4  U.S. 544, 555 (2007); *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) ("Specific facts are not necessary; the

5  statement need only give the defendant fair notice of what the claim is and the grounds upon which it

6  rests.") (citations and alteration omitted).

7  **V.    ARGUMENT**

8      **A.    The Court's Finding That Accellion Owed a Duty to Plaintiffs Remains Correct.**

9         The Court's previous finding that Accellion owed a duty based on a special relationship with

10  Plaintiffs and others whose information was transferred by the FTA constitutes the law of the case and

11  should not be disturbed. *See United States v. Jingles,* 702 F.3d 494, 499 (9th Cir. 2012) ("Under the 'law

12  of the case' doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the

13  same court, or a higher court, in the same case."). The Court's ruling remains correct. The Court, applying

14  the factors identified in *Regents of University of California v. Superior Court*, 4 Cal. 5th 607 (2018),

15  found that Plaintiffs depended on the FTA to safeguard their PII, that Accellion had demonstrated

16  superior control over the FTA, that the special relationship was limited to specific individuals, and that

17  Accellion benefited from the special relationship. Dkt. 217 at 7–8.

18         Relitigating this Court's findings, Accellion now focuses on Plaintiffs' additional allegations that

19  Accellion's product—the FTA platform that Accellion designed, marketed as secure, licensed, supported,

20  and profited from—transferred Plaintiffs' data. Accellion's argument lacks merit, and disregards that it

21  is liable for its own product, and Plaintiffs' additional allegations do not change the analysis. Accellion

22  claims that "the Court relied on Plaintiffs' repeated factual assertions that Accellion itself 'obtained' and

23  'transferred' Plaintiffs' sensitive data." Dkt. 244 at 9. But the Court, in finding that "there exists a special

24  relationship between a file transfer company and the individuals whose information is being transferred,"

25  recognized Accellion's duty to protect Plaintiffs' PII, whether through the FTA platform (or any of its

26  other products). The Court focused on Accellion's responsibility for safeguarding the FTA platform,

27  Accellion's control over its product, and Plaintiffs' dependency on Accellion to protect their sensitive

28  information. And the Court already rejected Accellion's argument—repeated here—that the lack of

contractual privity with Plaintiffs precludes a duty of care. *See* Dkt. 217 at 9 ("*Regents*, however, did not identify 'privity of contract' or 'direct correspondence' as common features of special relationships, even though both features were evidently present in the college-student relationship in *Regents*.").

In a strained reading of both this Court's opinion and the Amended Complaint, Accellion claims that Plaintiffs have "now abandoned the central premise of [the Court's] analysis, that Accellion itself transferred and possessed Plaintiffs' data." Dkt. 244 at 16. Not so. The Amended Complaint alleges Accellion was charged with safeguarding Plaintiffs' confidential information kept on Accellion's FTA. *See* ACC ¶ 128. It was Accellion's FTA—the product that Accellion designed, licensed, marketed, and controlled—that transferred Plaintiffs' data. Accellion's entire argument for revisiting the Court's ruling hinges on a meaningless distinction and an impermissible attempt to relitigate issues already decided by this Court. *United States v. Jingles*, 702 F.3d at 499; *Strigliabotti v. Franklin Res., Inc.*, 398 F. Supp. 2d 1094, 1098 (N.D. Cal. 2005) (the law of the case doctrine precluded the defendant's second motion to dismiss when the second motion was "essentially the same, but with a different emphasis" and "both motions rel[ied] on the same case law and advance[d] the same general attack"); *Marble Voip Partners LLC v. Zoom Video Commc'ns, Inc.*, No. 23-CV-03619-JSW, 2024 WL 86859, at *2 (N.D. Cal. Jan. 8, 2024) (denying 12(c) motion raising same issue decided in prior 12(b)(6) motion). The Court's ruling, upholding in full Plaintiffs' negligence claim and finding that "there exists a special relationship between a file transfer company and the individuals whose information is being transferred," remains correct.

Additionally, California law does not *require* a special relationship between the parties for a duty to arise to protect against the acts of third parties. *See Weirum v. RKO Gen., Inc.*, 15 Cal. 3d 40, 49, 539 P.2d 36, 41 (1975) (holding broadcaster liable for the conduct of third parties because his conduct created an undue risk of harm). Accellion focuses on the distinction between misfeasance and nonfeasance, arguing that this is a case of nonfeasance and therefore there cannot be a duty to protect absent a special relationship. Dkt. 244 at 15–16. The California Supreme Court, however, recently clarified that the distinction between nonfeasance and misfeasance is "imprecise and prone to misinterpretation," holding that the "proper question" is "whether the actor's entire conduct created a risk of harm." *Brown v. USA Taekwondo*, 11 Cal. 5th 204, 215, 483 P.3d 159, 165 n.6 (2021).

PLAINTIFFS' OPPOSITION TO ACCELLION'S MOTION TO DISMISS
CASE NO. 5:21-cv-01155-EJD

Here, it was Accellion's entire conduct of marketing the FTA platform as a secure method of transferring sensitive files, knowing that the platform was nearing end of life and choosing not to devote sufficient resources to fix identified security issues—all while using FTA to market its newer platform to customers—that created the risk that Plaintiffs' PII would be stolen through exploited security vulnerabilities in FTA that were reasonably foreseeable. Dkt. 248 ¶¶ 3, 34–38. Thus, in addition to Accellion's special relationship with Plaintiffs, Accellion's entire course of conduct created a risk such that Accellion owed a duty of care to Plaintiffs.

### 1.     A Special Relationship Exists Between a File-Transfer Company and the Individuals Whose Information is Transferred.

The Court previously found that the four factors discussed in *Regents* all supported finding a special relationship between Accellion and Plaintiffs. Dkt. 217 at 6. Nothing in the Amended Complaint changes that analysis.

The California Supreme Court in *Regents* identified four attributes present in many recognized special relationships: (1) the relationship "has an aspect of dependency in which one party relies to some degree on the other for protection"; (2) the party charged with a duty of care has "superior control over the means of protection"; (3) the duty of care is "owed to a limited community, not the public at large"; and (4) "many special relationships especially benefit the party charged with a duty of care." 4 Cal. 5th at 620–21.

### i.     Dependency

The Court first addressed dependency in its prior ruling, explaining that in a special relationship, "[g]enerally, the relationship has an aspect of dependency in which one party relies to some degree on the other for protection." Dkt. 217 at 6 (quoting *Regents*, 4 Cal. 5th at 620). The Court found that "Plaintiffs have demonstrated that they relied on Accellion to safeguard the PII that it transferred." Dkt. 217 at 7. The Court cited Plaintiffs' allegation that "when electronic files containing such information are transferred, the transfer *must be secure*," explaining that "there is no reason to believe that Plaintiffs could have secured their PII themselves when it was sent using Accellion's FTA software." *Id* (emphasis added). The Court noted that this dependency is "heightened by the high value of PII and its frequent targeting by hackers and cybercriminals." *Id.*

Accellion ignores these points and instead latches on to a single allegation cited by the Court—that in "the ordinary course of doing business with entities that use Accellion's FTA, individuals are typically required to provide PII that is then transferred by Accellion." Dkt. 244 at 20. The Amended Complaint makes the same allegation but clarifies that the PII is transferred by "Accellion's product." ACC ¶ 32. Accellion argues that this narrow change somehow alters the Court's entire analysis. Dkt. 244 at 20. It does not. Those individuals whose PII was transferred by Accellion's FTA depended on the medium for the transfer being secure. Plaintiffs have therefore alleged "an aspect of dependency in which one party relies to some degree on the other for protection," just as they did before. *Id.*

Accellion also argues that Plaintiffs could not have relied on Accellion because the Amended Complaint "makes plain" that Accellion itself did not transfer Plaintiffs' data. Dkt. 244 at 20. But Accellion *did* transfer the data because Accellion's FTA—the product that Accellion designed, marketed, licensed, and controlled—transferred the data. Nor are Plaintiffs required to have been aware of Accellion to be dependent on its FTA platform. Plaintiffs depended on having their data securely transferred, and Accellion's FTA was the medium by which it was transferred. It defies logic to think Accellion was not involved in the transfer, as Accellion argues, when it was Accellion's own software that was responsible for the transfer of Plaintiffs' data.

Accellion argues that Plaintiffs were not "particularly vulnerable and dependent" because they shared that risk with any individual who has a social security number or bank account number. Dkt. 244 at 21. But the correct analysis focuses on the context of the relationship: here, between a file transfer company and those whose data is transferred, not simply on the fact that many individuals share the same type of PII. Plaintiffs were not just vulnerable and dependent because they, like many others, had PII; they were *completely* dependent on someone else to securely transfer their data. *See* Dkt. 217 at 7 (finding that "there is no reason to believe that Plaintiffs could have secured their PII themselves when it was sent using Accellion's FTA software"). That other individuals may also be vulnerable to electronic security breaches does not eliminate the acute threat of harm in this context—nor does that somehow make Plaintiffs *less* vulnerable when their data was transferred using Accellion's FTA.

Accellion also points to Plaintiffs' allegations against Flagstar in the prior consolidated complaint, arguing that Accellion was "never in a 'unique position' to protect Plaintiffs" because Plaintiffs alleged

that Flagstar and other customers were also responsible. Dkt. 244 at 21. While Flagstar could have taken steps to improve its data security—such as electing a more secure platform than FTA to transfer PII—that does not excuse Accellion's failures to secure the FTA. After all, Accellion was the only entity that controlled the FTA software's security. *See* EULA, Dkt. 174-2 at 6–7 ("Customer shall not make or permit the making of any modifications, additions or enhancements to the Accellion Solution"; "any and all modifications, enhancements, derivative works, Updates and Releases, are the sole and exclusive property of Accellion"; "Customer shall provide Accellion access to the Accellion Solution to install such Updates if required by Accellion."). Accellion was therefore uniquely positioned to identify and fix FTA vulnerabilities and to issue security patches.

Relying on *Tristan v. Bank of America*, 2023 WL 4417271 (C.D. Cal. June 28, 2023), Accellion argues that the Plaintiffs whose PII was stolen are like bank customers who were tricked into sending money to criminals using a payment application. Dkt. 244 at 21–22. In *Tristan*, the court found no special relationship between the online payment platform Zelle and its users who had been scammed into transferring money to criminals. *Tristan*, 2023 WL 4417271 at *15. The court explained that the plaintiffs had not cited any cases indicating that "a facilitator of payments between individuals and their banks—has any 'special relationship' with its users," and that "there is generally no special relationship between a depositor and their bank." *Id.* The court concluded that an online payment platform is not "in a unique position with its users" that would justify finding a special relationship. *Id.*

Here, Plaintiffs were not simply tricked into sending money using a platform that had no technical flaws that were exploited. Instead, Accellion advertised its platform as secure when it contained serious security vulnerabilities. Accellion was uniquely positioned with those individuals whose data was transferred, because only Accellion could secure the FTA platform. And unlike in *Tristan*¸ where ample case law precluded finding a special relationship between a bank and its customers, here, this Court has already recognized that there is "abundant authority that California law recognizes a duty on companies to take reasonable steps to protect all sensitive information it obtains from individuals" and that "federal courts applying California law have not hesitated to extend a data company's duty of care beyond those with whom it shares privity or exceeds some threshold level of interactions." Dkt. 217 at 8–9 (citing *Stasi*

1  *v. Inmediata Health Grp. Corp.*, 501 F. Supp. 3d 898, 915 (S.D. Cal. 2020) and *Castillo v. Seagate Tech.,*

2  *LLC*, 2016 WL 9280242, at *3 (N.D. Cal. Sept. 14, 2016)).

3      Accellion also cites *Moriarty v. Bayside Insurance Associates, Inc.*, No. 20-56139, 2021 WL

4  4061105, at *2 (9th Cir. Sept. 7, 2021), arguing that Accellion was not uniquely positioned with Plaintiffs

5  to justify a special relationship. Dkt. 244 at 22. In *Moriarty*, the Court held that the defendant insurance

6  agent was not "in a more 'unique position' than the typical insurance agent to protect [the plaintiffs] from

7  injury." 2021 WL 4061105 at *2. Here, on the other hand, Accellion was the party best positioned to

8  secure its FTA platform before the data breach because it was the party that had access to the software's

9  source code and the contractual right to create updates to the platform. Dkt. 174-2 at 6–7.

10      This Court's finding that Plaintiffs were dependent on Accellion, supporting a special

11  relationship, was and still is correct.

12             **ii.**       **Control**

13      The Court found that Accellion had "superior control" over FTA and "demonstrated this control

14  when it released patches for the vulnerabilities within days after they were exploited." Dkt. 217 at 7.

15  Misreading this Court's Order, Accellion argues that because it did not directly obtain Plaintiffs' data

16  and could not control when or if its customers applied patches, it did not have superior control over the

17  means of protection. Dkt. 244 at 22. As explained above, Accellion *did* have the right to apply patches to

18  customers' software under the EULA. *See* EULA, Dkt. 174-2 at 6–7. But whether Accellion directly

19  obtained Plaintiffs' PII and controlled its customers' patching does not diminish Accellion's superior

20  control over FTA.

21      Whether Accellion did or did not "possess, transfer, obtain, or handle" Plaintiffs' data has no

22  impact on its control of the means of protection. Accellion does not and cannot deny that it alone was

23  responsible for designing the FTA software, programming that software, and identifying and remediating

24  vulnerabilities within the software. Even if Accellion purportedly had "no way to know which of its

25  customers stored PII of consumers using FTA" (which would turn Rule 8 on its head by failing to draw

26  inferences in Plaintiffs' favor), dkt. 244 at 22, that does not change the fact that only Accellion could

27  identify vulnerabilities within the software and release patches. This Court recognized that Accellion's

28  ability to release patches within days after the vulnerabilities were exploited demonstrated its superior

control. Dkt. 217 at 7. What is important is not whether FTA customers had the choice to install the patches—only Accellion could identify the vulnerabilities and program the software to fix FTA.

Accellion compares its control over FTA to that of the United States Olympic Committee in *Brown v. USA Taekwondo*, which the court held did not give rise to a special relationship. Dkt. 244 at 22. Accellion argues that the Olympic Committee's "control" over an abusive taekwondo coach through its substantial control over USA Taekwondo—the national body that was responsible for registering and ultimately terminating the coach—is similar to Accellion's control over how its FTA customers used FTA. *Id.* Accellion's comparison misses the point by focusing only on whether its *customers* installed patches and how *they* used the FTA. Accellion is the entity directly responsible for the FTA platform, including making decisions related to security features, what resources to devote to support, and whether to continue licensing an end-of-life product. In that context, Accellion is more like USA Taekwondo with its direct control over the abusive coach. As the California Supreme Court explained in *Brown*, "a typical setting for the recognition of a special relationship is where the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare" and that "the existence of such a special relationship puts the defendant in a unique position to protect the plaintiff from injury." 11 Cal 5th at 216. That succinctly describes the relationship between Plaintiffs and Accellion. *See* Dkt. 248 ¶¶ 27, 30, 32, 40, 70, 123, 128. Yet, Accellion now insists that it should not be held responsible when its software failed, and the sensitive data of millions of people was exposed to criminals.

Accellion also points to the classic examples of control: the jailer and prisoner and the passenger in a vehicle, arguing that it lacked that kind of control. Dkt. 244 at 22–23. To the contrary, Accellion had precisely the same kind of control over the means of protection. As the *Regents* court explained about the passenger-vehicle scenario, "passengers have no control over who is admitted on the bus and, if trouble arises, are wholly dependent upon the bus driver to summon help or provide a means of escape." 4 Cal. 5th at 621. Similarly, those individuals whose PII was transferred by Accellion's FTA were wholly dependent on the software developer—Accellion—to provide a secure platform for file transfer, and they had no control over how the software was designed or what kind of security protocols were followed. The fact that Accellion's customers were not required to install patches (even though Accellion had the

PLAINTIFFS' OPPOSITION TO ACCELLION'S MOTION TO DISMISS
CASE NO. 5:21-cv-01155-EJD

authority to install the patches itself) does not change that Accellion was the only party that could provide needed patches in the first instance. And as the court explained of the jailer-prisoner relationship in *Giraldo v. Department of Corrections & Rehabilitation*, 168 Cal. App. 4th 231, 250 (2008), a "jailer has control over the prisoner, who is deprived of the normal opportunity to protect himself from harm inflicted by others." So too are Plaintiffs deprived of the normal opportunity to protect themselves when the danger is from hackers exploiting security vulnerabilities in software to which Plaintiffs have no access.

The other cases Accellion cites are similarly inapposite because they do not illustrate scenarios where one party, like Accellion, has complete control over its software. *See Barenborg v. Sigma Alpha Epsilon Fraternity*, 33 Cal. App. 5th 70, 80 (2019) (national fraternity did not have sufficient control over local chapter to justify a special relationship because the national fraternity could not monitor the local chapter's day-to-day operations); *Tristan*, 2023 WL 4417271 at *15 (finding no special relationship between online payment app and users without discussing the control factor).

Thus, as the Court properly found, Accellion had superior control over the means of protecting the FTA software.

### iii.       Limited to Specific Individuals

As the Court also held, "consistent with *Regents*, this relationship is limited to specific individuals and does not run to the public at large." Dkt. 217 at 7 (quoting *Regents*, 4 Cal. 5th at 621) (internal quotations removed). The Court recognized that "the special relationship exists only between Accellion and those specific individuals whose information the FTA software ferries," *id.* at 8, and nothing about the allegations in the Amended Complaint changes the Court's analysis.

Relying on a meaningless distinction, Accellion argues that the Amended Complaint "negate[s] this rationale" because Plaintiffs no longer allege that they were "users of the services Accellion . . . provided to them." Dkt. 244 at 23. But Plaintiffs continue to allege they were the "end users of the services Accellion provided to its clients." ACC ¶ 128. Accellion makes no attempt to explain how this language—which this Court cited in support of its prior analysis—somehow changes the Court's finding that Accellion's special relationship "is limited to specific individuals and does not run to the public at

---

12

large," and that the "special relationship exists only between Accellion and those specific individuals whose information the FTA software ferries." Dkt. 217 at 7–8.

Nor does it matter whether Accellion "readily knows who is in a special relationship with it," dkt. 244 at 23, because privity, or any specific ability for Accellion to identify the individuals, was not part of this Court's prior analysis, or that of other California courts. Indeed, this Court cited multiple cases in which the parties lacked privity, and in the cases Accellion cites, the court did not consider the ability to identify individuals. *See Regents*, Cal. 5th at 625–26 (analyzing whether the "relationship is bounded by the student's enrollment status" and not whether the university could readily identify the individuals); *USAT*, 11 Cal. 5th at 211 (not reaching the question of whether the relationship is limited); dkt. 217 at 9 (citing *Stasi* and *Castillo* as examples where the parties lacked privity).

Here, the "relationship is limited to specific individuals" and does not run to "the public at large" because it was limited to only those individuals whose PII was transferred through Accellion's FTA. Dkt. 217 at 7–8. That was true in the first consolidated complaint, and it remains true under the allegations in the Amended Complaint.

### iv.    Benefit to Accellion

The Court found that Accellion was a benefactor of this special relationship, explaining that in "much the same way that '[r]etail stores or hotels could not successfully operate [] without visits from their customers and guests,' *Regents*, 4 Cal. 5th at 621, Accellion could not successfully operate without the need for secure transfers of Plaintiffs' sensitive data." Dkt. 217 at 8. Accellion does not (and cannot) deny that it benefits from the relationship. It instead argues that this factor should merit little weight because every commercial actor benefits from certain downstream users. Dkt. 244 at 23–24. But mere incidental benefit from downstream users is not what this Court contemplated or what Plaintiffs allege. Instead, as the Court recognized, Accellion could not successfully operate without the need for secure transfers of Plaintiffs' sensitive data, just as the court illustrated in *Regents*. 4 Cal. 5th at 621 ("Retail stores or hotels could not successfully operate, for example, without visits from their customers and guests."). Nothing has changed; this factor supports finding a special relationship.

* * *

All four factors continue to support a finding of a special relationship between Accellion and those individuals whose information was transferred through FTA. Merely recognizing the fact that it was Accellion's product—the FTA platform—that transferred Plaintiffs' PII does not change the Court's prior analysis.

### 2. California Recognizes a Duty on Companies to Take Reasonable Steps to Protect Sensitive Information.

This Court previously recognized that there is "abundant authority that California law recognizes a duty on companies to take reasonable steps to protect all sensitive information it obtains from individuals." Dkt. 217 at 8. In addressing Accellion's prior argument that it had "no relationship at all with Plaintiffs," the Court noted that "federal courts applying California law have not hesitated to extend a data company's duty of care beyond those with whom it shares privity or exceeds some threshold level of interactions." Dkt. 217 at 9.

Accellion nonetheless resurrects the same rejected privity argument, asserting that the Court "went too far" and relied on allegations of direct contact between Accellion and Plaintiffs. Dkt. 244 at 24. The Court, however, did not focus its analysis on whether there was direct contact or whether Accellion directly "obtained" Plaintiffs' information. The Court's analysis focused instead on the fact that Accellion's product was used to transfer Plaintiffs' PII, Accellion's responsibility for safeguarding the FTA software, Accellion's control over its product, and Plaintiffs' dependency on Accellion to protect their sensitive information. *See* Dkt. 217 at 7–8. Indeed, the Court cited the *Stasi* and *Castillo* cases <u>because</u> there was no privity in those cases, not because the Court was relying on allegations of direct contact, as Accellion asserts. *See* Dkt. 217 at 9 (citing *Stasi* and *Castillo* and explaining that "*Regents*, however, did not identify "privity of contract" or "direct correspondence" as common features of special relationships, even though both features were evidently present in the college-student relationship in *Regents*").

Plaintiffs' allegations in the Amended Complaint make clear that it was Accellion's software, for which Accellion was responsible, that transferred their PII. The Court's negligence analysis accounted for that in the prior Order. Accellion's renewed Motion should, therefore, be denied.

1

**B.     The Court Should Reject Accellion's Arguments Regarding Other States' Laws.**

2

Accellion raises arguments for the first time, asking the Court to consider which state law applies

3

to the claims of non-California Plaintiffs. These arguments fall short.

4

**1.     Choice of Law Should Be Deferred to a Later Stage.**

5

The Court need not address choice of law but instead may prudently consider these issues on a

6

more complete record. In class actions, courts routinely decline to engage in fact-intensive choice of law

7

inquiries at the motion to dismiss stage. *See In re Apple Inc. Device Performance Litig.*, 386 F. Supp. 3d

8

1155, 1170 (N.D. Cal. 2019) (finding "it is premature to conduct a detailed choice-of-law analysis at [the

9

motion to dismiss] stage of this litigation"); *Clancy v. The Bromley Tea Co.*, 308 F.R.D. 564, 572–73

10

(N.D. Cal. 2013); *Carr v. Oklahoma Student Loan Auth.*, No. CIV-23-99-R, 2023 WL 6929853, at *2

11

(W.D. Okla. Oct. 19, 2023) (declining to conduct choice of law analysis at motion to dismiss stage in a

12

data breach case because the "analysis is a fact intensive process which this Court is ill-equipped to

13

engage in at this early stage of litigation"); *In re Am. Med. Collection Agency, Inc. Customer Data Sec.*

14

*Breach Litig.*, No. 19-md-2904, 2021 WL 5937742 (D.N.J. Dec. 16, 2021) (collecting cases); *First*

15

*Choice Fed. Credit Union v. Wendy's Co.*, No. 16-506, 2017 WL 9487086, at *2 (W.D. Pa. Feb. 13,

16

2017) (similar).

17

Courts have recognized that "[t]he data breach context raises unique problems in choice-of-

18

law analysis" because it may not be clear where, for example, the breach occurred, or the harm derived

19

from the breach arose. *In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*, 603 F. Supp. 3d

20

1183, 1199 (S.D. Fla. 2022) ("Gone are the days when all data was stored on local servers or mainframes,

21

whose physical location readily determined the location of the injury—*i.e.*, the breach. Instead, today's

22

cases often involve data stored on the cloud—an interconnected and redundant storage mechanism

23

distributed across datacenters whose locations may be unknown or even unknowable."). Thus, on the

24

pleadings, facts relevant to the choice of law analysis are not in the record—*e.g.*, where Accellion

25

maintained its servers, exercised administrative oversight of data security issues, provided software

26

updates, and failed to adequately patch its systems. Therefore, the Court should follow the majority of

27

courts in deferring a choice of law determination until the factual record is more developed.

28

2.     **Alternatively, California Law Applies to the Claims of All Plaintiffs.**

Even if the Court were to reach choice of law, California law should apply. Accellion is based in California and admits that no Plaintiff dealt directly with it, let alone purchased any goods or services from Accellion. Under the circumstances presented here, California has a greater interest in resolving this dispute than the law of any other state. *See, e.g.*, *In re iPhone 4S Consumer Litig.*, No. C 12-1127 CW, 2013 WL 3829653, at *7 (N.D. Cal. July 23, 2013) (defendant failed to show "how any such [state-law] differences would also be material to the facts of the instant litigation"); *Smith v. Pathway Fin. Mgmt., Inc.*, No. SACV 11-01573 JVS (MLGx), 2012 WL 12884448, at *6 & n.8 (C.D. Cal. Nov. 26, 2012) (California law would govern even absent an applicable choice of law provision "[g]iven that [the defendant's] headquarters are located in California, its employees conduct operations from within California, and a significant portion of its clients are located in California").

As a federal court sitting in diversity, the Court must apply the conflicts law of California. *CRS Recovery, Inc. v. Laxton*, 600 F.3d 1138, 1141 (9th Cir. 2010). California applies the "governmental interest" analysis in choice of law questions. *Id.* at 1141–42 (citing *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 107 (2006)). Under California's choice of law rules, the Court: (1) determines whether there is a material conflict between the law of California and the foreign state; (2) if so, determines whether each state has an interest in having its own law apply; and (3) if both states have such an interest, decides whether one state's interest would be more impaired by failing to apply its law. *See Washington Mut. Bank, FA v. Super. Ct.*, 24 Cal. 4th 906, 920 (2001). As the proponent of applying a foreign law, Accellion bears the burden of establishing that the government interest test favors applying the foreign rule of decision. *CRS Recovery, Inc.*, 600 F.3d at 1142.

Accellion has not carried its burden with its cursory choice-of-law arguments. Dkt. 244 at 25. Accellion disregards that non-Californians may invoke California law where, as here, the defendant is based in California and its misconduct emanated from California. *See Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605, 616 (1987); *Ehret v. Uber Techs., Inc.*, 68 F. Supp. 3d 1121, 1131–32 (N.D. Cal. 2014) (finding that out-of-state plaintiffs could assert California claims because the defendant was headquartered in California and the actions underlying the plaintiffs' claims "were developed in California, contained on websites and an application that are maintained in California, and . . . billing and

16

payment of services went through servers located in California"); *Clay v. CytoSport, Inc.*, No. 3:15-CV-00165-L-AGS, 2018 WL 4283032, at *17 (S.D. Cal. Sept. 7, 2018); *Chavez v. Blue Sky Nat. Beverage Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010) (certifying a nationwide class under California law and rejecting the defendants' argument "that the law applicable to the proposed nationwide class is not uniform"); *Junod v. NWP Servs. Corp.*, No. SA CV-14-1734-JLS (JCGx), 2015 WL 12712309, at *2 n.1 (C.D. Cal. Apr. 2, 2015) (noting that *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) does not stand for the proposition that out-of-state plaintiffs cannot maintain claims under California law).[2]

Further, no material conflict exists between the negligence law of California and that of non-California Plaintiffs. At all times, Accellion controlled the FTA and made updates to the software, including security patches and encryption of files. Accordingly, under *all* of these laws, Accellion owed a duty of care given its control over the FTA that it allowed to be breached, harming each Plaintiff. *See, e.g.*, *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355–56 (Tenn. 2008) (liability for negligence may arise out of active misconduct that worked a positive injury to others and resulted in unreasonable risk of harm); *Traxler v. Entergy Gulf States, Inc.*, 376 S.W.3d 742, 751 (Tex. 2012) (allegations and evidence of affirmative conduct that encouraged criminal behavior was sufficient to establish a duty of care). Thus, for example, in *In re Blackbaud, Inc., Customer Data Breach Litig.*, the court held that Blackbaud owed all plaintiffs and class members a duty to protect plaintiffs from the ransomware attack based on Blackbaud's own affirmative negligence of failing to use reasonable security measures, creating a foreseeable risk of the data breach. 567 F. Supp. 3d 667, 682 (D.S.C. 2021). Blackbaud's duty arose from its contracts with customers to provide "computing software, services, and cybersecurity" intended to control the security of the stored data. *Id*. at 680. The same is true here.

Even if Accellion could eventually show a material conflict (again, it makes no effort to do so), California's interest would be significantly more impaired by applying the law of the states where non-Californians reside. California's strong interest in protecting sensitive customer information—an interest repeatedly identified and furthered through legislative action—would be substantively more impaired by

---

[2] Once the data was stolen, all Plaintiffs were damaged, and *none* interacted with Accellion in their home state. Cases like *Mazza*, involving products sold in intrastate commerce, therefore do not apply.

failing to apply its own law to a resident company like Accellion. *See Diamond Multimedia Sys., Inc. v. Superior Ct.*, 19 Cal. 4th 1036, 1063 (1999) (stating that "the Legislature may reasonably conclude that California does have a legitimate interest in discouraging unlawful conduct that has a potential to harm California investors as well as persons in other states"); *Clothesrigger, Inc.*, 191 Cal. App. 3d at 616 (holding that "California's more favorable laws may properly apply to benefit nonresident plaintiffs when their home states have no identifiable interest in denying such persons full recovery").

For these reasons, California law properly applies to the negligence claim of each Plaintiff in this case, and Accellion has entirely failed to meet its burden.

### 3. Even if the Court Were to Apply the Various Laws of Plaintiffs, Their Causes of Action for Negligence Should Proceed.

#### i. Plaintiff Torres Properly Pleads a Claim for Negligence Under Georgia Law.

Contending that Plaintiff Torres has no claim for negligence under Georgia law, Accellion primarily relies on the Georgia Supreme Court's decision in *Department of Labor v. McConnell*, 305 Ga. 812 (2019). But since that decision, courts faced with analogous facts to this case have consistently distinguished *McConnell* as a narrow decision based on unique, inapplicable facts. *See, e.g.*, *Purvis v. Aveanna Healthcare, LLC*, 563 F. Supp. 3d 1360, 1366–71 (N.D. Ga. 2021) (distinguishing *McConnell* and holding plaintiffs properly pled negligence under Georgia law based on a foreseeability theory in a data breach involving hackers); *see also In re Equifax, Inc., Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2022 WL 1122841, at *7–8 (N.D. Ga. Apr. 13, 2022) (similar); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 454, 479–82 (D. Md. 2020) (distinguishing *McConnell* and holding plaintiffs properly pled negligence per se under Georgia law based on Section 5 of the FTC Act in data beach case involving hackers).

As the court in *Purvis* recognized, the Georgia Supreme Court "merely rejected that [] a duty arose from the sources the plaintiff had relied upon to support his claim, namely: (1) the purported duty 'to all the world not to subject [others] to an unreasonable risk of harm' that was articulated in *Bradley Center v. Wessner*, 250 Ga. 199, 296 S.E.2d 693 (1982); and (2) O.C.G.A. §§ 10-1-910 and 10-1-393.8." 563 F. Supp. 3d at 1366. The Georgia Supreme Court made clear that its decision was narrowly confined to the arguments advanced by plaintiffs. *McConnell*, 305 Ga. at 816 n.5 ("We also do not consider

18

whether a duty might arise on these or other facts from any other statutory or common law source, as no such argument has been made here."). And subsequently, the Georgia Supreme Court's decision in *Collins v. Athens Orthopedic Clinic, P.A.*, 307 Ga. 555, 837 S.E.2d 310 (2019) affirmed that *McConnell* does not foreclose the existence of a duty under Georgia law to safeguard personal information. *Purvis*, 563 F. Supp. 3d at 1367 ("[I]f *McConnell* had already answered the question as to whether such a duty could arise under Georgia law, this discussion in *Collins* (and indeed the court's holding) would make little sense.").

As in *Purvis*, *Equifax*, and *Marriott*, Plaintiff Torres alleges that Accellion owed him a duty of care, including because the risk of a data breach and resulting harm to Torres was reasonably foreseeable to Accellion. These allegations are sufficient to deny Accellion's motion as to Plaintiff Torres' negligence claim.

### ii.   Plaintiff Whittaker Properly Pleads a Claim for Negligence Under Michigan Law.

Under Michigan law, Accellion had a duty to protect Plaintiff Whittaker's PII from unauthorized access. Accellion's argument to the contrary relies on inapposite case law that is either non-binding or decided well before the development of negligence law related to data breaches. *Grifo & Co., PLLC v. Cloud X Partners Holdings, LLC*—the only recent case Accellion cites—involved an accounting firm that brought claims against a cloud computing business for breach of contract and negligence after a ransomware attack exposed and destroyed the accounting firm's data, causing the accounting firm to experience "significant downtime" and to lose the ability to generate revenue based on the lost files. 485 F. Supp. 3d 885, 889–90 (E.D. Mich. 2020). There, the defendant argued that "the parties' relationship is governed by contract, and therefore Plaintiff is precluded from bringing an independent claim for negligence." *Id.* at 894. Agreeing with the defendant and holding that it did not owe a duty to the business-plaintiff, the court rooted its analysis in contract law and the expectations of sophisticated business entities in arms-length negotiations.[3]

---

[3] *See, e.g.*, *id.* at 895 ("Michigan courts have refused to find a duty of care where the extent of alleged misconduct amounts to a failure to perform promises included in a contract."); *id.* at 896 ("[S]ome of the

Other than this inapposite, non-binding precedent, Accellion cites inapposite cases from the 1980's cited by the court in *Grifo*, which stand for the general proposition that there is no duty to protect against the unforeseeable criminal acts of third parties on premises. *Williams v. Cunningham Drug Stores, Inc.*, 429 Mich. 495, 501 (1988) (holding "a merchant's duty of reasonable care does not include providing armed, visible security guards to deter criminal acts of third parties"); *Papadimas v. Mykonos Lounge*, 176 Mich. App. 40, 41 (1989) (affirming grant of partial summary disposition that a business and its partners did not owe the plaintiff a duty to prevent "sudden and unexpected" assault). There is no reason to think the Michigan Supreme Court would break with the modern trend towards providing a negligence cause of action to unsophisticated individual plaintiffs based on a foreseeable data breach.

### iii.   Plaintiffs Worrick and Rodriguez Properly Plead Claims for Negligence Under Washington Law.

Plaintiffs Worrick and Rodriguez have sufficiently alleged a claim for negligence under Washington law. While there is no case directly on point, recent decisions suggest the Washington Supreme Court would find that Accellion owed Plaintiffs a duty. In *Barlow v. State*, the Washington Supreme Court held that Washington law recognizes a special relationship between a university and its students, giving rise to a duty to use reasonable care to protect students from foreseeable injury at the hands of other students within campus confines or university sponsored and controlled events, and the scope of the duty is based on a student's enrollment and presence on campus. 2 Wash. 3d 583, 586 (2024). The Washington Supreme Court in *Barlow* cites with approval the California Supreme Court decision in *Regents*. *Id.* at 595–96 ("Cases from the California and Massachusetts Supreme Courts are consistent, matching closely to the duty that we recognized in *Restatement (Second)* § 344.") (citing *Regents*, 4 Cal. 5th 607).

---

actions Plaintiff claims Defendant had a duty to perform were explicitly contemplated and provided for in the parties' contract."); *id.* at 899 ("In all, the court does not believe that the parties' arms-length contractual relationship is sufficiently close, or Plaintiff sufficiently vulnerable to abuse in the context of a sophisticated commercial transaction, that the costs that would be imposed on all data-hosts are outweighed by the societal benefit of liability.").

The cases Accellion cites are non-binding or inapposite. For example, in the non-binding opinion, *Buckley v. Santander Consumer USA, Inc.*, the court held that the plaintiff had properly alleged a claim for negligence where the defendant deliberately transmitted her personal information to an unauthorized third party, but declined to find a special relationship extending the duty based on defendant's omissions. No. C17-5813 BHS, 2018 WL 1532671, at *5 (W.D. Wash. Mar. 29, 2018). The court noted that "absent clear Washington authority, the Court declines to extend Washington's 'special relationship' doctrine to include relationships between businesses and consumers when the parties' transaction involves the disclosure of private information," despite recognizing the trend in that direction. *Id.* at *6. That case, however, was decided almost six years *before* the Washington Supreme Court issued its opinion in *Barlow* based on similar reasoning in *Regents*.

### iv.  Plaintiff Dawes Properly Pleads a Claim for Negligence Under Oklahoma Law.

Under Oklahoma negligence law, Accellion had a duty to protect Plaintiff Dawes' personal information from disclosure. Unmoored from an analogous data breach case, Accellion relies on the general proposition that one does not have a duty to protect the public from harm caused by criminal conduct, arguing that Oklahoma would be less likely to find a "special relationship" than California because it has not adopted the Restatement (Third) of Torts. Dkt. 244 at 30. Then Accellion cites to "the one district court case that considered Oklahoma's negligence laws in the context of a data breach"—*Carr v. Oklahoma Student Loan Authority*—arguing that despite the court finding that a duty existed, the court's analysis turned on the fact the defendant "requested and collected Plaintiffs' sensitive information." Dkt. 244 at 30 (citing 2023 WL 6929850, at *2 (W.D. Okla. Oct. 19, 2023)) ("*Carr I*"). Perhaps inadvertently, Accellion fails to cite the other motion to dismiss opinion from that court, which held that the other defendant, Nelnet, *did* have a duty to safeguard Plaintiffs' PII under Oklahoma law despite plaintiffs not having "a relationship with and never [having] provided their PII to Nelnet . . .." *Carr v. Oklahoma Student Loan Auth.*, No. CIV-23-99-R, 2023 WL 6929853, at *2 (W.D. Okla. Oct. 19, 2023) ("*Carr II*") (finding Nelnet's argument "has no basis in the law of negligence). As noted by the court Accellion primarily relies on: "if Nelnet had access to Plaintiffs' PII such that vulnerabilities in its online portal placed Plaintiffs at risk of foreseeable harm, Nelnet held a duty to Plaintiffs," even though

"Nelnet merely provided an online portal through which Plaintiffs' PII passed." *Id.* at *3. The facts in *Carr II* are analogous to those Plaintiff Dawes has pleaded, and Accellion similarly owed Plaintiff a duty of care.

### v. Plaintiff Desjardins (Tennessee) and Plaintiff Ringling (Texas) Properly Plead Claims for Negligence.

There is no decision from a Tennessee or Texas court examining duty in a data breach case, and no sufficiently analogous cases to offer significant guidance. But several courts have held that under state laws that have adopted the Restatement (Second) of Torts—as Texas and Tennessee have—a business can be liable for negligence in a data breach perpetrated by criminal actors. *See e.g.*, *Torres v. Wendy's Int'l, LLC*, No. 6:16-cv-210-Orl-40DCI, 2017 WL 8780453, at *4 (M.D. Fla. Mar. 21, 2017) (holding defendant had a duty to protect its customers' information because the risk of harm created by its actions was foreseeable and citing to Restatement (Second) of Torts § 302A (1965)); *Blackbaud*, 567 F. Supp. 3d 667, 682 (D.S.C. 2021) (holding that under South Carolina law—which adopts the Restatement (Second) of Torts, defendant owed plaintiffs a duty of care in a ransomware attack). Moreover, in *In re Capital One Consumer Data Security Breach Litigation*, the court *upheld* plaintiffs' negligence claims under Texas law, concluding "that if faced with this case, the Texas Supreme Court would recognize a duty separate and apart from the parties' contractual relationship where plaintiffs alleged that by creating a so-called data lake without adequate safeguards to protect against hacking, defendants created a hazardous condition that threatened the plaintiffs with foreseeable injuries." 488 F. Supp. 3d 374, 397 (E.D. Va. 2020).

Accellion relies on inapplicable case law for general propositions that do not fit the circumstances of this case.[4] And Accellion also misleadingly cites cases without appropriate context. For instance,

---

[4] *See Koczera v. Steele*, 570 S.W.3d 242, 248–49 (Tenn. Ct. App. 2018) (holding that in case of nonfeasance, doctor and office manager did not owe plaintiffs a duty of care to correct a sheriff deputy's error in serving process on one not authorized to accept it); *Allstate Prop. & Cas. Ins. Co. v. Sevier Cnty. Elec. Sys.*, 666 S.W.3d 429, 434–37, 443 (Tenn. Ct. App. 2022) (affirming trial court's grant of summary judgment and holding electrical utility's vegetation management contractor did not owe property insurer

1

2

3

4

5

6

7

8

9

10

11

12

Accellion cites *Ethridge v. Samsung SDI Co.*, claiming that "[t]he only such special relationships Texas law recognizes are those 'between a parent and child, master and servant, or independent contractor and contractee under special circumstances.'" 604 F. Supp. 3d 556, 560 (S.D. Tex. 2022) (quoting *Van Horn v. Chambers*, 970 S.W.2d 542, 546 (Tex. 1998)). But the court in *Van Horn* made that comment with regards to section 315 of the Restatement (Second) of Torts, which concerns the duty to "control the conduct of a third party to prevent [the third party] from causing physical harm to another." Similarly off point, Accellion partially quotes from *Williams v. Abilene Christian University*, 2020 WL 10458627, at *5 (N.D. Tex. Dec. 14, 2020) that "existing Texas law regarding the duties of a university to its students . . . does not indicate that the Texas Supreme Court would recognize a special relationship between a university and its adult students" but skips the remainder of the quote: "to prevent student suicide." And the court in *Williams* held that the university owed plaintiff a duty when it negligently undertook providing mental-health services and increased the risk of harm to the plaintiff. *Id.* at *1, *11–13.

13

14

15

16

17

18

19

20

21

22

Accellion also relies on *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355 (2008), but incorrectly contends that the court held that Tennessee does not "require that persons always act reasonably to secure the safety of others." Dkt. 244 at 31. In fact, the court in *Satterfield* held that the defendant "*had a duty* to use reasonable care to prevent exposure to asbestos fibers not only to its employees but also to those who came into close regular contact with its employees' contaminated work clothes over an extended period of timed . . .." *Id.* at 369 (emphasis added). The court further found that "it is not necessary to analyze in detail whether [the defendant] also had duties arising from special relationships with third parties" because the plaintiff sufficiently alleged the defendant's misfeasance. *Id.* at 364. The facts of this case are similar: Accellion—a sophisticated company—knew of the risks of a data breach but acted with disregard to continue promoting its outdated legacy product.

23

24

25

26

27

28

---

a duty of care when it failed to identify and remove a decaying tree outside the area it was obligated to monitor under its contract); *Clark Fire Equip., Inc. v. Arkema, Inc.*, 176 F. Supp. 3d 646, 650 (S.D. Tex. 2015) (holding defendant's longstanding business relationship and course of dealings with plaintiff did not create duty, under Texas law, to timely warn plaintiff of third parties' fraudulent scheme).

1

## VI.    CONCLUSION

2

For the foregoing reasons, Accellion's motion to dismiss should be denied.

3

4

Dated: May 22, 2024                                    Respectfully submitted,

5

By:  ___/s/ *Krysta K. Pachman*_____

6

Krysta K. Pachman (State Bar No. 280951)

Michael Gervais (State Bar No. 330731)

7

Steven G. Sklaver (State Bar No. 237612)

Kevin R. Downs (State Bar No. 331993)

8

**SUSMAN GODFREY L.L.P.**

9

1900 Avenue of the Stars, Suite 1400

Los Angeles, California 90067-6029

10

Tel: (310) 789-3100

kpachman@susmangodfrey.com

11

mgervais@susmangodfrey.com

ssklaver@susmangodfrey.com

12

kdowns@susmangodfrey.com

13

14

Adam E. Polk (State Bar No. 273000)

Jordan Elias (State Bar No. 228731)

15

Kyle P. Quackenbush (State Bar No. 322401)

**GIRARD SHARP LLP**

16

601 California Street, Suite 1400

San Francisco, CA 94108

17

Tel: (415) 981-4800

apolk@girardsharp.com

18

jelias@girardsharp.com

19

kquackenbush@girardsharp.com

20

21

*Interim Co-Lead Class Counsel*

22

23

24

25

26

27

28

24

**ATTESTATION**

I, Krysta K. Pachman, am the ECF User whose ID and password are being used to file this document. In compliance with Civil L.R. 5-1(h)(3), I hereby attest that all counsel have concurred in this filing.

By:   _/s/ Krysta K. Pachman_

PLAINTIFFS' OPPOSITION TO ACCELLION'S MOTION TO DISMISS
CASE NO. 5:21-cv-01155-EJD