Adam E. Polk (SBN 273000)
Kyle P. Quackenbush (SBN 322401)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
apolk@girardsharp.com
kquackenbush@girardsharp.com

Krysta K. Pachman (SBN 280951)
Michael Gervais (SBN 330731)
Steven G. Sklaver (SBN 237612)
Kevin R. Downs (SBN 331993)
Madeline M. Yzurdiaga (SBN 344676)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
Tel: (310) 789-3100
Fax: (310) 789-3150
kpachman@susmangodfrey.com
mgervais@susmangodfrey.com
ssklaver@susmangodfrey.com
kdowns@susmangodfrey.com
myzurdiaga@susmangodfrey.com

*Interim Co-Lead Class Counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE ACCELLION, INC. DATA BREACH LITIGATION | Case No. 5:21-cv-01155-EJD |
| | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | Date: April 17, 2025<br>Time: 9:00 AM<br>Courtroom: 4 – 5th<br>Hon. Edward J. Davila |

**NOTICE OF MOTION AND MOTION**

**PLEASE TAKE NOTICE** that Plaintiffs Rose Becker, Karlina Chavez, Derek Dawes, Alvaro Galvis, Jamie McDole, Randy Moniz, Robert Olson, Jr., Heather Rodriguez, Valerie Whittaker, and Kimberly Worrick (collectively, "Plaintiffs") will and do hereby move the Court, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) or, alternatively (c)(4), to certify the Class and Subclasses specified below.

Plaintiffs also seek appointment of the proposed class representatives and Interim Co-Lead Class Counsel, as described below. A hearing on this motion will be held on April 17, 2025, at 9:00 AM in the Courtroom of the Honorable Edward J. Davila of the United States District Court for the Northern District of California, located at 280 South 1st Street, San Jose, CA 95113.

## I.    NEGLIGENCE CLASS OR NEGLIGENCE SUBCLASSES

Plaintiffs move the Court to certify their negligence claim against Defendant Accellion, Inc. ("Accellion") pursuant to Rule 23(a) and, 23(b)(3) or, alternatively, 23(c)(4) on behalf of the following Class ("Negligence Class"):

> All natural persons whose PII and/or PHI was compromised as a result of the Data Breach of the following Accellion customers (i) The Regents of the University of California, (ii) Centene, (iii) Flagstar, (iv) Washington State Auditor's Office, and (v) Kroger, and who resided in California, Georgia, Illinois, Michigan, Oklahoma, Tennessee, Texas, or Washington at the time of the Data Breach

In the alternative, Plaintiffs Rose Becker, Karlina Chavez, Alvaro Galvis, Jamie McDole, Randy Moniz, and Robert Olson Jr. (California), Valerie Whittaker (Michigan), Derek Dawes (Oklahoma), and Heather Rodriguez and Kimberly Worrick (Washington) move to certify their negligence claim against Accellion pursuant to Rule 23(a) and 23(b)(3) (or 23(c)(4)) on behalf of the following respective Subclasses ("Negligence Subclasses"):

> **California Subclass:** All natural persons whose PII and/or PHI was compromised as a result of the Data Breach of the following Accellion customers (i) The Regents of the University of California, (ii) Centene,[1] and (iii) Flagstar and who resided in California at the time of the Data Breach.

---

[1] Centene includes the following related entities: Health Net, Centene, and CalViva.

**Michigan Subclass:** All natural persons whose PII and/or PHI was compromised as a result of, and who resided in Michigan at the time of, the Data Breach of Kroger's FTA.

**Oklahoma Subclass:** All natural persons whose PII and/or PHI was compromised as a result of, and who resided in Oklahoma at the time of, the Data Breach of Kroger's FTA.

**Washington Subclass:** All natural persons whose PII and/or PHI was compromised as a result of, and who resided in Washington at the time of, the Data Breach of the Washington State Auditor's Office's FTA.

## II.    WASHINGTON CONSUMER PROTECTION ACT SUBCLASS

Plaintiffs Heather Rodriguez and Kimberly Worrick move the Court to certify their claim against Accellion for violating the Washington Consumer Protection Act ("WCPA"), RCW 19.86.010 *et seq.* pursuant to Rule 23(a) and 23(b)(3) (or 23(c)(4)) on behalf of the following Washington Subclass ("WCPA Subclass"):

All natural persons whose PII and/or PHI was compromised as a result of, and who resided in Washington at the time of, the Data Breach of the Washington State Auditor's Office's FTA.

## III.    EXCLUSIONS FROM CLASS AND SUBCLASSES

Excluded from the Class and all Subclasses are Accellion, and Accellion's officers, directors, and employees; any entity in which Accellion has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Accellion. Also excluded from the Class and all Subclasses are members of the judiciary to whom this case is assigned, their families and members of their staff.

## IV.    APPOINTMENT OF CLASS COUNSEL

Plaintiffs also seek the appointment of Girard Sharp LLP and Susman Godfrey L.L.P., current Interim Co-Lead Class Counsel, as Co-Lead Class Counsel.

****

This Motion is based on this Notice of Motion and Motion; the attached Memorandum of Points and Authorities; the Declarations of Interim Co-Lead Class Counsel in support thereof and the exhibits attached thereto; the Declaration of Adam E. Polk in support thereof and the exhibits attached thereto, including the proposed trial plan and survey of state negligence laws; the expert reports of Matthew

ii

Strebe, Mark Lanterman, Dan Korczyk, and Russell Mangum, Ph.D.; Plaintiffs' declarations in support thereof; pleadings, records, and papers on file in this action; and any such other argument and evidence as may be presented to the Court.

Dated: December 16, 2024

Respectfully submitted,

By:   /s/ *Adam E. Polk*

Adam E. Polk (SBN 273000)
Kyle P. Quackenbush (SBN 322401)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
apolk@girardsharp.com
kquackenbush@girardsharp.com

Krysta K. Pachman (SBN 280951)
Michael Gervais (SBN 330731)
Steven G. Sklaver (SBN 237612)
Madeline M. Yzurdiaga (SBN 344676)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
Tel: (310) 789-3100
kpachman@susmangodfrey.com
mgervais@susmangodfrey.com
ssklaver@susmangodfrey.com
myzurdiaga@susmangodfrey.com

Kevin R. Downs (SBN 331993)
**SUSMAN GODFREY L.L.P.**
1000 Louisiana, Suite 5100
Houston, TX 77002
Tel: (713) 651-9366
kdowns@susmangodfrey.com

*Interim Co-Lead Class Counsel*

iii

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ....................................................................................... i

I.      Negligence Class or Negligence Subclasses ................................................................ i

II.     Washington Consumer Protection Act Subclass .......................................................... ii

III.    Exclusions from Class and Subclasses ....................................................................... ii

IV.     Appointment of Class Counsel .................................................................................... ii

TABLE OF AUTHORITIES ................................................................................................... vi

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 1

I.      INTRODUCTION ......................................................................................................... 1

II.     STATEMENT OF THE ISSUE TO BE DECIDED ...................................................... 2

III.    STATEMENT OF FACTS ............................................................................................ 2

        A.      Accellion Knew its FTA Software Was Vulnerable But Failed to Secure It ............. 2

        B.      Hackers Exploited Known Vulnerabilities to Gain Access to the FTA ...................... 5

        C.      Plaintiffs and Class Members were Harmed by the Data Breach ............................... 7

IV.     LEGAL STANDARD ................................................................................................... 8

V.      THE COURT SHOULD CERTIFY THE CLASS AND SUBCLASSES ........................... 8

        A.      Plaintiffs have Article III Standing ......................................................................... 9

        B.      The Class and Subclasses Satisfy Rule 23(a) ........................................................ 10

                i.      Class and Subclass Members are so Numerous that Joinder is Impractical ........ 10

                ii.     Plaintiffs' Claims Present Common Issues of Law and Facts ............................ 10

                iii.    Proposed class representatives' claims are typical of the Class and
                        Subclasses ....................................................................................................... 12

                iv.     Plaintiffs and Interim Co-Lead Class Counsel will adequately represent
                        the Class and Subclasses .................................................................................. 12

        C.      The Negligence Class, State Negligence Subclasses, and WCPA Subclass satisfy
                Rule 23(b)(3) ..................................................................................................... 13

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 5:21-cv-01155-EJD

i.      Common Issues Predominate over Individualized Questions Regarding Accellion's Negligence ..................................................................................14

ii.     Common Issues Predominate over Individualized Issues under the WCPA .......22

D.     Class Treatment is Superior to Adjudicate the Class Claims ................................... 23

E.     In the Alternative, the Court Should Certify Issues Class Under Rule 23(c)(4) ....... 24

VI.     CONCLUSION ............................................................................................................... 25

ATTESTATION ........................................................................................................................ 26

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 5:21-cv-01155-EJD

# TABLE OF AUTHORITIES

**Cases**

*4041–49 W Maple Condo. Ass'n v. Countrywide Home Loans, Inc.*
768 N.W.2d 88 (Mich. App. 2009)...............................................................................................22

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*
568 U.S. 455 (2013).......................................................................................................................8

*Beeman v. Anthem Prescription Mgmt., LLC*
689 F.3d 1002 (9th Cir. 2012) ....................................................................................................19

*Briseno v. ConAgra Foods, Inc.*
844 F.3d 1121 (9th Cir. 2017) ...............................................................................................18, 24

*Brown v. Mortensen*
242 Cal. Rptr. 3d 67 (Cal. App. 2d Dist. 2019)..........................................................................22

*Brush v. Miami Beach Healthcare Grp. Ltd.*
238 F. Supp. 3d 1359 (S.D. Fla. 2017) .......................................................................................14

*Butler v. Sears, Roebuck & Co.*
727 F.3d 796 (7th Cir. 2013) .......................................................................................................25

*Cabrera v. Google LLC*
2023 WL 5279463 (N.D. Cal. Aug. 15, 2023) ............................................................................23

*Cai v. CMB Exp. LLC*
2024 WL 2334509 (C.D. Cal. Apr. 4, 2024) ...............................................................................24

*Calhoun v. Google LLC*
526 F. Supp. 3d 605 (N.D. Cal. 2021).........................................................................................21

*Casola v. Dexcom, Inc.*
98 F.4th 947 (9th Cir. 2024) ........................................................................................................19

*Castro v. ABM Indus., Inc.*
325 F.R.D. 332 (N.D. Cal. 2018).................................................................................................13

*Clemens v. ExecuPharm Inc.*
48 F.4th 146 (3d Cir. 2022) .........................................................................................................20

*Cole v. Town of Los Gatos*
140 Cal. Rptr. 3d 722 (Cal. App. 6th Dist. 2012).......................................................................17

*Collins v. Athens Orthopedic Clinic, P.A.*
837 S.E.2d 310 (Ga. 2019) ..........................................................................................................19

*Cottle v. Plaid Inc.*
340 F.R.D. 356 (N.D. Cal. 2021).................................................................................................24

*Daniel v. Ford Motor Co.*
806 F.3d 1217 (9th Cir. 2015) .....................................................................................................19

*Davidson v. Apple, Inc.*
2018 WL 2325426 (N.D. Cal. May 8, 2018)...............................................................................24

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 5:21-cv-01155-EJD

*Doe v. Sutherland Healthcare Sols., Inc.*
  2021 WL 5765978 (Cal. Ct. App. Dec. 6, 2021).................................................................19

*DZ Rsrv. v. Meta Platforms, Inc.*
  96 F.4th 1223 (9th Cir. 2024) .......................................................................................13, 14

*Ellis v. Costco Wholesale Corp.*
  657 F.3d 970 (9th Cir. 2011) .........................................................................................12, 13

*Emps. Ins. of Wausau v. Granite State Ins. Co.*
  330 F.3d 1214 (9th Cir. 2003) .............................................................................................19

*Farar v. Bayer AG*
  2017 WL 5952876 (N.D. Cal. Nov. 15, 2017) .....................................................................11

*Fitzgerald v. Pollard*
  2022 WL 22442009 (S.D. Cal. Nov. 3, 2022).......................................................................25

*Friddle v. Epstein*
  16 Cal. App. 4th 1649 (1993) ..............................................................................................22

*Green-Cooper v. Brinker Intl., Inc.*
  73 F.4th 883 (11th Cir. 2023) .........................................................................................15, 18

*Griswold v. Connecticut*
  381 U.S. 479 (1965)..............................................................................................................22

*Guy v. Convergent Outsourcing, Inc.*
  2023 WL 4637318 (W.D. Wash. July 20, 2023)..................................................................23

*Hamilton v. Wal-Mart Stores, Inc.*
  39 F.4th 575 (9th Cir. 2022) ................................................................................................23

*Hunt v. Check Recovery Sys., Inc.*
  241 F.R.D. 505, 515 (N.D. Cal. 2007)
  *modified*, 2007 WL 2220972 (N.D. Cal. Aug. 1, 2007) ......................................................24

*In re Accellion, Inc. Data Breach Litig.*
  2024 WL 4592367 (N.D. Cal. 2024) ....................................................................................15

*In re Accellion, Inc. Data Breach Litig.*
  713 F. Supp. 3d 623 (N.D. Cal. 2024)......................................................................... passim

*In re Adobe Sys., Inc. Privacy Litig.*
  66 F. Supp. 3d 1197 (N.D. Cal. 2014)..................................................................................10

*In re Anthem, Inc. Data Breach Litig.*
  2016 WL 3029783 (N.D. Cal. May 27, 2016).......................................................................20

*In re Brinker Data Incident Litig.*
  2021 WL 1405508 (M.D. Fla. Apr. 14, 2021)...........................................................15, 17, 18

*In re Equifax Inc. Customer Data Sec. Breach Litig.*
  999 F.3d 1247 (11th Cir. 2021) ...........................................................................................19

*In re Experian Data Breach Litig.*
  2016 WL 7973595 (C.D. Cal. Dec. 29, 2016).................................................................18, 20

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 5:21-cv-01155-EJD

*In re Facebook, Inc. Internet Tracking Litig.*
956 F.3d 589 (9th Cir. 2020) ........................................................................................20

*In re HIV Antitrust Litig.*
2022 WL 22609107 (N.D. Cal. Sept. 27, 2022) .............................................................12

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*
341 F.R.D. 128 (D. Md. 2022)
*reinstated after appeal*, 345 F.R.D. 137 (D. Md. 2023) ........................................11, 20

*In re Sonic Corp.*
2021 WL 6694843 (6th Cir. Aug. 24, 2021) .............................................11, 14, 15, 16

*In re Sonic Corp. Customer Data Sec. Breach Litig.*
2021 WL 4060369 (N.D. Ohio Sept. 7, 2021)................................................................17

*In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*
928 F.3d 42 (D.C. Cir. 2019).........................................................................................9

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*
2017 WL 3727318 (N.D. Cal. Aug. 30, 2017) ...............................................................21

*In re Zappos.com, Inc.*
888 F.3d 1020 (9th Cir. 2018) ....................................................................................9, 10

*Just Film, Inc. v. Buono*
847 F.3d 1108 (9th Cir. 2017) ......................................................................................12

*Kamakahi v. Am. Soc'y for Reprod. Med.*
305 F.R.D. 164 (N.D. Cal. 2015)...................................................................................24

*Krottner v. Starbucks Corp.*
628 F.3d 1139 (9th Cir. 2010) .........................................................................................9

*Lamartina v. VMware, Inc.*
2024 WL 3286059 (N.D. Cal. July 2, 2024) .................................................................10

*Leyva v. Medline Indus. Inc.*
716 F.3d 510 (9th Cir. 2013) .........................................................................................18

*Lilly v. Jamba Juice Co.*
308 F.R.D. 231 (N.D. Cal. 2014)...................................................................................24

*LSIMC, LLC v. Am. Gen. Life Ins. Co.*
2022 WL 4596597 (C.D. Cal. Aug. 4, 2022) ................................................................25

*Lynch v. Matterport, Inc.*
2023 WL 5310558 (N.D. Cal. Aug. 16, 2023) ..............................................................25

*Nunley v. Chelan-Douglas Health Dist.*
558 P.3d 513 (Wash. Ct. App. Oct. 31, 2024).............................................................20

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*
31 F.4th 651 (9th Cir. 2022) ............................................................................................8

*Opperman v. Path, Inc.*
2016 WL 3844326 (N.D. Cal. July 15, 2016) ................................................................21

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 5:21-cv-01155-EJD

*Panag v. Farmers Ins. Co. of Washington*
    166 Wash. 2d 27 (2009)..................................................................................................23

*Remijas v. Neiman Marcus Grp.*
    794 F.3d 688 (7th Cir. 2015) ...........................................................................................9

*Savidge v. Pharm-Save, Inc.*
    727 F. Supp. 3d 661 (W.D. Ky. 2024)..................................................................... passim

*Savidge, et al. v. Pharm-Save, Inc., d/b/a Neil Medical Group, et al*
    2024 WL 1366832 (W.D. Ky. 2024)...............................................................................18

*Smith v. Triad of Alabama, LLC*
    2017 WL 1044692 (M.D. Ala. Mar. 17, 2017)
    *on reconsideration in part*, 2017 WL 3816722 (M.D. Ala. Aug. 31, 2017) .................12, 14, 15, 17

*Sterling Drug v. Benatar*
    99 Cal. App. 2d 393 (Cal. App. 2d 1950).......................................................................22

*United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Intern.*
    *Union, AFL-CIO, CLC v. ConocoPhillips Co.*
    593 F.3d 802 (9th Cir. 2010) ...........................................................................................8

*Vaquero v. Ashley Furniture Indus., Inc.*
    824 F.3d 1150 (9th Cir. 2016) .......................................................................................18

*Walker v. Life Ins. Co. of the Sw.*
    953 F.3d 624 (9th Cir. 2020) ...........................................................................................8

*Wal-mart Stores E., LP v. Leverette*
    901 S.E.2d 607 (Ga. App. 2024) ...................................................................................22

*Wal-Mart Stores, Inc., v. Dukes*
    564 U.S. 338 (2011)......................................................................................................11

*Walnut Creek Manor v. Fair Emp. & Hous. Com.*
    54 Cal. 3d 245 (1991) ...................................................................................................22

*Zeiger v. WellPet LLC*
    526 F. Supp. 3d 652 (N.D. Cal. 2021)............................................................................24

**Other Authorities**

1 McLaughlin on Class Actions § 5:23 (20th ed.)................................................................17

7 Michigan Civil Jurisprudence, Damages § 9....................................................................22

Internet Privacy Protection Act, Mich. Comp. Laws Ann. § 37.271 ....................................22

Myriam Gilles & Gary Friedman, *The Issue Class Revolution*
    101 B.U. L. Rev. 133 (2021) .........................................................................................24

Washington Consumer Protection Act ("WCPA"), RCW 19.86.010 *et seq.* .......................... ii

**Rules**

Fed. R. Civ. P. 23 ........................................................................................................ passim

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 5:21-cv-01155-EJD

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Plaintiffs are ten individuals who had their personally identifiable information ("PII")[2] exfiltrated between December 16, 2020, and January 20, 2021, when hackers twice infiltrated Accellion's file transfer application ("FTA") and compromised the personal information of millions of consumers ("Data Breach"). Plaintiffs' negligence and Washington Consumer Protection Act claims are well-suited for class treatment under Rule 23 because the central question in this case—whether Accellion adequately maintained the FTA while offering it to the public as a secure way to store and transmit sensitive data—will be answered, up or down, using common evidence.

The requirements of Rule 23(a) are readily met, and a class action is the superior means of resolving this dispute because a class proceeding will be manageable. Predominance under Rule 23(b)(3) is satisfied because the most important issues of duty, breach, and causation will be resolved using class-wide evidence. Despite publicly touting the FTA as a secure method to transfer private information, behind closed doors, Accellion's management and employees knew that the FTA was a vulnerable 20-year-old product with known security vulnerabilities. Its CEO testified that the "FTA was outdated," and that the "FTA was simply not built to withstand the most sophisticated modern cyberattacks."[3] Accellion employees knew about the FTA's many issues, including at least seventeen significant security vulnerabilities before the Data Breach, and repeatedly called for the FTA's retirement or "end of life" prior to the Data Breach.[4] But Accellion management—more preoccupied with the company's bottom line than data security—continued to license the FTA to customers until the Data Breach forced them to discontinue it.[5] After the Data Breach occurred, a senior Accellion employee lamented "we have

---

[2] PII includes names, addresses, phone numbers, Social Security numbers, bank account numbers, credit card information, and other financial information, and personal health information ("PHI"), including medical diagnoses and treatment.

[3] Declaration of Adam E. Polk in Support of Plaintiffs' Motion for Class Certification ("Polk Decl."), Ex. 3 (Yaron 30(b)(6) Tr.) at 52:21-25, 58:6-9. All citations to exhibits are attached to the Polk Declaration, unless otherwise noted.

[4] *See, e.g.*, Exs. 4 (ACCELLION-SUPP-PROD_0000000076) & 5 (ACCELLION-SUPP-PROD_000000 0078).

[5] Ex. 6 (ACCELLION-SUPP-PROD_0000001353).

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 5:21-cv-01155-EJD

to pay for the sins of upper management…."[6] Other employees complained that "no one had time to fix actual security issues on FTA,"[7] "fixing the security holes in FTA was too low of a priority,"[8] and that the Data Breach was "a sign that we didn't [end of life] FTA when we were supposed to."[9]

Accellion's failure to maintain adequate security measures has harmed Plaintiffs and Class members. *First*, Class members have had to spend time to remediate the consequences of the Data Breach. *Second*, Accellion's inadequate data security measures have put—and continue to put—Class members at a substantial risk of fraud, scams, and identity theft. *Third*, Class members' personal data's real and monetizable value was given up without permission or compensation. To remedy these harms, Plaintiffs seek the (1) value of time spent remediating the consequences of the Data Breach; (2) costs of credit and fraud monitoring necessary to protect these individuals against the substantial and imminent risks described above; and (3) lost value of their PII.

The Court should certify the Negligence Class or Negligence Subclasses and the WCPA Subclass pursuant to Rules 23(a) and (b)(3). In the alternative, Plaintiffs ask the Court to certify an issue class under Rule 23(c)(4) on the questions of Accellion's duty, breach, and causation related to the Data Breach. Resolving these central liability issues will materially advance its resolution and streamline any follow-on litigation, significantly conserving party and judicial resources.

## II.    STATEMENT OF THE ISSUE TO BE DECIDED

Should the Court certify (1) the Negligence Class or Negligence Subclasses under Rules 23(a) and (b)(3) or, alternatively, Rule 23(c)(4), and (2) the WCPA Subclass under Rules 23(a) and (b)(3) or, alternatively, Rule 23(c)(4)?

## III.    STATEMENT OF FACTS

### A.    Accellion Knew its FTA Software Was Vulnerable but Failed to Secure It

Accellion[10] is a software company that designed and developed software called the file transfer application and began licensing it to customers in the early 2000s.[11] Accellion marketed the FTA as a

---

[6] Ex. 7 (Balonis Tr., Ex. 15 (ACCELLION-SUPP-PROD_0000000150)).
[7] Ex. 8 (ACCELLION-SUPP-PROD_0000000408).
[8] Ex. 9 (ACCELLION-SUPP-PROD_0000000414).
[9] Ex. 10 (ACCELLION-SUPP-PROD_0000000094).
[10] Accellion changed its name to Kiteworks but will be referred to throughout this brief as Accellion.
[11] *See* Ex. 3 (Yaron 30(b)(6) Tr.) at 21:7-9.

"secure file sharing solution[]" that "ensures protection of sensitive data" to "increase data security" and "reduce[] risk of data breaches."[12] Accellion told customers that the FTA "provides the security and encryption to ensure the secure transfer of sensitive files containing personal health information."[13] Accellion's customers included businesses with highly sensitive PII: banks such as Flagstar Bank ("Flagstar"), healthcare providers such as Health Net, pharmacies and retailers such as Kroger, and major educational systems such as the University of California.[14] Accellion's customers used the FTA as it was intended: to transfer PII.[15]

Accellion knew that the FTA was a security risk but failed to take adequate measures to prevent the Data Breach. Even before the Data Breach, Accellion acknowledged that the FTA was a vulnerable product. In an April 2020 email, Accellion's Chief Revenue Officer stated, "We should go to [the customer's] CISO and gently let them know that they are using code that is [seven] years old and had [sic] vulnerabilities."[16] Accellion's CEO "knew that the FTA security architecture was aging," that "FTA was outdated," and that "FTA was simply not built to withstand the most sophisticated modern cyberattacks."[17] The FTA used antiquated CentOS versions 5 and 6,[18] two versions of a Linux operating system that discontinued active support years before the Data Breach.[19] Despite its known shortcomings, Accellion continued to license the FTA to customers as a "secure" product.[20]

Despite Accellion's written best practices, like penetration testing, managing and tracking vulnerabilities, and implementing new security features that purportedly applied to the FTA, Accellion

---

[12] Exs. 11 (Wayback Machine Screenshot of Accellion's Website on 02/14/2012) & 12 (Wayback Machine Screenshot of Accellion's Website on 05/09/2012).

[13] Ex. 13 (Balonis 30(b)(6) Tr., Ex. 9 (Wayback Machine Screenshot of Accellion's Website dated September 11, 2011)).

[14] Mangum Rpt. ¶ 66, Figure 2.

[15] See id.; Ex. 3 (Yaron 30(b)(6) Tr.) at 183:21-23 (Accellion "understood that some of [its] customers have used to [sic] transmit sensitive data.").

[16] Ex. 14 (ACCELLION-SUPP-PROD_0000001350).

[17] Ex. 3 (Yaron 30(b)(6) Tr.) at 52:21-25, 58:6-9.

[18] Ex. 15 (Balonis 30(b)(6) Tr.) at 98:8-10; Ex. 3 (Yaron 30(b)(6) Tr.) at 49:1-4.

[19] Ex. 16 (Balonis 30(b)(6) Tr., Ex. 13 (showing CentOS 5 lost active support on January 31, 2014, and lost security support on March 31, 2017, and CentOS 6 lost active support on May 10, 2017, and lost security support on November 30, 2020); see also Ex. 15 (Balonis 30(b)(6) Tr.) at 100:19-101:12; Ex. 3 (Yaron 30(b)(6) Tr.) at 49:5-8.

[20] Ex. 3 (Yaron 30(b)(6) Tr.) at 110:2-20.

3

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 5:21-cv-01155-EJD

did not apply any of these best practices to the FTA.[21] After Accellion released Kiteworks, a newer product with a higher price,[22] it began investing heavily in Kiteworks' security to the detriment of the FTA.[23] As a result, the FTA lacked key security features that Accellion developed in Kiteworks.[24] Accellion did "very little" penetration testing in the years before the Data Breach, did "not develop[] a single new feature[] for the FTA since [it] launched Kiteworks," and as of 2017, "performed FTA security updates on an as-needed basis for critical vulnerabilities only."[25] And Accellion removed the option to encrypt files that were saved on the FTA. Strebe Rpt. ¶¶ 154-165.

The FTA also experienced several vulnerabilities similar to those exploited in the Data Breach. *See* Strebe Rpt. ¶¶ 94-95, 141-147. In February 2019 Accellion identified a "high" severity vulnerability that would permit an exploit of the FTA via an OS Command. *Id*. ¶ 143. In March 2019, Accellion identified a "Blind SQL Injection" vulnerability in the FTA. *Id*., ¶ 144. SQL Injection and OS Command are two types of well-known "injection" vulnerabilities. *Id*. ¶¶ 80, 86, 91-93. SQL Injections are the most common web hacking technique, allowing hackers to insert nefarious instructions that a website does not recognize is harmful. *Id*. ¶ 43. OS command injections are also a common hacking technique that allows an attacker to execute operating system ("OS") commands on the server that is running an application, and typically fully compromise the application and its data. *Id*. ¶ 44. These were the types of vulnerabilities exploited in the Data Breach, *id*. ¶ 42, and according to Accellion's investigation of the Data Breach, "whoever [the attacker is] may have studied old exploits as this seems like it could be similar to the past issues with the put.api."[26] Before the Data Breach occurred, there were at least

---

[21] Exs. 15 (Balonis 30(b)(6) Tr.) at 112:17-113:2; Ex. 17 (ACCELLION_NDCA_0014227 at '37); Strebe Rpt. ¶¶ 53, 57, 62, 95.

[22] Ex. 3 (Yaron 30(b)(6) Tr.) at 229:13-230:11.

[23] *See e.g.*, Ex. 3 (Yaron 30(b)(6) Tr.) at 37:15-38:14 (In a January 27, 2021 press release, Accellion acknowledged that Accellion had "not developed a single new feature for FTA since [Accellion] launched Kiteworks."); Ex. 15 (Balonis 30(b)(6) Tr.) at 167:9-20.

[24] Ex. 3 (Yaron 30(b)(6) Tr.) at 49:9-14 (FTA was not FedRAMP authorized), 49:15-20, 51:16-52:4 (FTA had no access control layering), 52:10-20 (FTA had no intrusion prevention firewall and was less hardened at a system level).

[25] Ex. 15 (Balonis 30(b)(6) Tr.) at 102:5-12, 104:25-105:13, 134:22-135:4, 140:2-13; Ex. 18 (Balonis 30(b)(6) Tr., Ex. 14 (ACCELLION_NDCA_0064227)).

[26] Ex. 19 (ACCELLION0001314).

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 5:21-cv-01155-EJD

seventeen unresolved high or medium security vulnerabilities in the FTA.[27]

In the years leading up to the Data Breach, Accellion employees sounded the alarm, and repeatedly sought an "end of life" ("EOL") to the FTA, meaning that the FTA would no longer be sold or licensed. In a February 7, 2019 message, one of two "senior people" on the Data Breach support team[28] wrote, "I do wish we'd EOL fta now 😊."[29] The same employee wrote on March 15, 2019, "I hope we EOL FTA someday"[30] and that he "dream[ed] of the EOL of FTA" on May 20, 2019.[31] The other senior Accellion employee on the Data Breach support team wrote on July 15, 2020, "meanwhile, FTA is not EOL."[32] Another wrote on August 9, 2019, "I cannot wait until FTA goes EOL."[33] At meetings in 2019, Accellion's senior management discussed EOL for the FTA; notes from the meeting include "FTA is going away."[34]

Despite recognizing that it needed to "go away,"[35] Accellion chose not to retire the FTA for one simple reason: Accellion recognized that customers might switch to another, more secure product if Accellion announced that the FTA was end of life.[36] At least one Accellion employee believed the decision to delay EOL was made because Accellion's customers might switch to a competitor: "like, they're looking at other solutions too...i guess that's why we haven't decided to EOL FTA yet."[37] By 2020, Accellion's FTA was a 20-year-old product but no EOL had been announced.

**B.    Hackers Exploited Known Vulnerabilities to Gain Access to the FTA**

Starting in mid-December 2020, the ransomware group CL0P exploited multiple preexisting

---

[27] Ex. 3 (Yaron 30(b)(6) Tr.) at 219:25-220:12.

[28] Ex. 15 (Balonis 30(b)(6) Tr.) at 34:25-35:3 ("There was a number of people working on [the Data Breach]. There was two people on the support – two senior people on the support team: Jeremy Piekarski and Craig Coffee.").

[29] Ex. 4 (ACCELLION-SUPP-PROD_0000000076).

[30] Ex. 5 (ACCELLION-SUPP-PROD_0000000078).

[31] Ex. 20 (ACCELLION-SUPP-PROD_0000000080).

[32] Ex. 21 (ACCELLION-SUPP-PROD_0000000088).

[33] Ex. 22 (ACCELLION-SUPP-PROD_0000001378).

[34] Ex. 23 (Yaron 30(b)(6) Tr., Ex. 29 (ACCELLION_NDCA_0110455)).

[35] *Id.*

[36] Ex. 24 (ACCELLION-SUPP-PROD_0000001376) (August 7, 2019 message from Accellion employee Erik Granger: "'When can you update to Kiteworks? Really? Wow, that's one day before FTA goes EOL!'").

[37] Ex. 25 (ACCELLION-SUPP-PROD_0000001383).

5

vulnerabilities in the FTA software. On December 16, 2020, CL0P exploited two well-known vulnerabilities in the FTA: an SQL injection (CVE- CVE-20221-27101) and an OS command execution (CVE-2021-27104) (the "December Exploit").[38] These types of "injection" vulnerabilities were well-known in the industry before the Data Breach. OWASP—an industry standard setting organization—identified "injections" as the top risk, and methods on how to prevent these vulnerabilities were common knowledge. Strebe Rpt. ¶¶ 74-85, 91.

On January 22, 2021, Accellion identified a second exploit involving an SSRF vulnerability (CVE-2021-27103) and another command execution vulnerability (CVE-2021-272012) (the "January Exploit," and together with the December Exploit, the "Data Breach.").[39] SSRF vulnerabilities allow an attacker to trick a web application into making unauthorized queries to other servers, allowing them to bypass the server's security and gain access. Strebe Rpt. ¶ 46. SSRF vulnerabilities have been well-known since at least 2009. *Id.* The January Exploit was an "extension" of the December Exploit—hackers injected a web shell[40] into Accellion's system that was "very similar" in both exploits, and the attacks "came from similar IP addresses."[41]

The Data Breach was "automated" using a script,[42] meaning attackers wrote software to automatically find FTA devices on the Internet and exploit them without requiring human labor. Strebe Rpt. ¶ 47. During both the December Exploit and the January Exploit, cybercriminals downloaded Accellion's customers' unencrypted files.[43] Accellion kept a log of the customers that it determined had data exfiltrated.[44] And Accellion employees knew that customer data was likely to end up on the dark

---

[38] Ex. 15 (Balonis 30(b)(6) Tr.) at 21:4-8, 24:19-24.
[39] Ex. 15 (Balonis 30(b)(6) Tr.) at 22:10-13, 40:4-6.
[40] Web shells install a website that attackers can connect to with a web-browser that provide them with access to all files stored on the computer as a download link. They can use the web-shell to browse the filesystem of the exploited computer and simply click links to infiltrate any files on the computer. In this way, hackers can target only high-value data and select what they want to extract, making the attack faster, easier, and harder to detect than exfiltrating all the information stored on a computer. Strebe Rpt. ¶ 38.
[41] Ex. 15 (Balonis 30(b)(6) Tr.) 22:17-23:3.
[42] Ex. 26 (Balonis 30(b)(6) Tr., Ex. 7 (ACCELLION-SUPP-PROD_000000060)); Ex. 15 (Balonis 30(b)(6) Tr.) at 36:17-38-23; Ex. 27 (Yaron 30(b)(6) Tr.; Ex. 42 (ACCELLION-SUPP-PROD_000000060)); Ex. 3 (Yaron 30(b)(6) Tr.) at 117:17-22.
[43] Ex. 15 (Balonis 30(b)(6) Tr.) at 43:5-24, 48:1-10.
[44] Ex. 15 (Balonis 30(b)(6) Tr.) at 44:4-6.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 5:21-cv-01155-EJD

web because of the Data Breach.[45]

After the Data Breach, Accellion employees lamented Accellion's many failures regarding the FTA. Both of the "senior people" on the Data Breach support team faulted Accellion for not announcing EOL. On January 8, 2021—in the midst of the December Exploit but before the January Exploit—one wrote, "the FTA EOL issue is easily the biggest example of us not knowing our target audience."[46] On January 23, 2021, the other senior person on the Data Breach support team wrote, "I think this is a sign that we didn't 'EOL' FTA when we were supposed to."[47]

Other employees faulted the decision to not remediate vulnerabilities. On January 12, 2021, an Accellion employee wrote, "No wonder we spend so much time on all this – that no one had time to fix actual security issues on FTA."[48] A senior Accellion employee wrote on February 17, 2021, "I mean the same people who can't fix FTA are the ones designing Kiteworks but hey"[49] and wrote on April 15, 2021, "because fixing the security holes in FTA was too low of a priority."[50] That same senior Accellion employee lamented "we have to pay for the sins of upper management deciding not to patch P0 vulnerabilities in FTA for 1 year+."[51] On February 25, 2021, Accellion announced formal EOL for the FTA, with an effective date of April 30, 2021.[52] Accellion's announcement came only a few months after the Data Breach, around three years after Accellion employees began calling for an end-of-life to the FTA.

### C.   Plaintiffs and Class Members were Harmed by the Data Breach

The ransomware group CL0P published files from the Data Breach on the dark web.[53] CL0P is "one of the most interesting—and fearsome—hacking groups," and the group has been described as a

[45] Ex. 28 (Yaron 30(b)(6) Tr., Ex. 47, ACCELLION-SUPP-PROD_0000001347 (On December 22, 2020, Accellion employee: "if we wait on this, more customer data will end up on the dark web.")); Ex. 49, ACCELLION-SUPP-PROD_0000001349 (On January 8, 2021, Accellion employee: "a lot of these customers probably now have files on the dark web that were sitting on accellion boxes.")).
[46] Ex. 30 (ACCELLION-SUPP-PROD_0000000092).
[47] Ex. 10 (ACCELLION-SUPP-PROD_0000000094).
[48] Ex. 8 (ACCELLION-SUPP-PROD_0000000408).
[49] Ex. 31 (ACCELLION-SUPP-PROD_0000000410).
[50] Ex. 9 (ACCELLION-SUPP-PROD_0000000414).
[51] Ex. 7 (Balonis 30(b)(6) Tr., Ex. 15 (ACCELLION-SUPP-PROD_0000000150) (emphasis added); Ex. 15 (Balonis 30(b)(6) Tr.) at 34:25-35:3.
[52] Ex. 3 (Yaron 30(b)(6) Tr.) at 110:2-20.
[53] Ex. 3 (Yaron 30(b)(6) Tr.) at 141:1-15.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 5:21-cv-01155-EJD

"'criminal enterprise' that is 'ruthless,' 'sophisticated and innovative," "well-organized and well-structured,' and 'very active—almost tireless.'"[54]

As detailed in Plaintiffs' Declarations, each Plaintiff was harmed because of the Data Breach. Each Plaintiff received a Notice of Data Breach informing them that their PII was exfiltrated in the Data Breach. This information included Social Security numbers, dates of birth, full names, mailing addresses, email addresses, financial information, and health information. Each Plaintiff was advised by Accellion's customers to take preventive measures, including signing up for credit monitoring, monitoring financial accounts, freezing credit files, reporting suspicious activity, and reviewing information on how to protect themselves against identity theft. Plaintiffs spent time addressing the harm from the Data Breach. Plaintiffs also experienced an increased risk of future identity theft and the unauthorized use of valuable personal information without compensation.

## IV.    LEGAL STANDARD

"A plaintiff pursuing class certification must satisfy each prerequisite of Rule 23(a) and establish an appropriate ground for maintaining the class action under Rule 23(b)." *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 630 (9th Cir. 2020). At class certification, "the question is not whether the . . . plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met[.]" *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Intern. Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) (citation omitted and cleaned up). "Merits questions may be considered to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,* 568 U.S. 455, 466 (2013). A district court "cannot decline certification merely because it considers plaintiffs' evidence relating to the common question to be unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 667 (9th Cir. 2022) (en banc).

## V.    THE COURT SHOULD CERTIFY THE CLASS AND SUBCLASSES

As shown below, Plaintiffs have standing and meet each of the Rule 23(a) and 23(b)(3)

---

[54] Lorenzo Franceschi-Bicchierai, *Meet the Ransomware Gang Behind One of the Biggest Supply Chain Hacks Ever*, Vice (Apr. 14, 2021), https://www.vice.com/en/article/meet-the-ransomware-gang-behind-one-of-the-biggest-supply-chain-hacks-ever/; *see also* Lanterman Rpt. ¶¶ 25-28.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 5:21-cv-01155-EJD

requirements. Because their claims will be proven through common evidence, certification is appropriate for the Negligence Class or Subclasses and Washington Subclass.

### A.        Plaintiffs have Article III Standing

To have Article III standing for class certification purposes, a plaintiff must show that he or she "(1) suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *In re Zappos.com, Inc.*, 888 F.3d 1020, 1027 (9th Cir. 2018) (citation omitted).

Plaintiffs have shown injury-in-fact. *Id.* A data breach victims' allegations of "a credible threat of real and immediate harm stemming from the theft" of their PII is sufficient for Article III standing purposes. *Id.* (citing *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1143 (9th Cir. 2010)). Plaintiffs' Social Security numbers, addresses, names, dates of birth, and other PII was stolen by a criminal organization and posted on the dark web—a marketplace used by criminal actors to buy PII to use for identity theft. *See, e.g.*, Chavez Decl. ¶¶ 4-5; Lanterman Rpt. ¶¶ 21, 28-36 (discussing CL0P dark web page where Class members' PII was posted). "It hardly takes a criminal mastermind to imagine how such information could be used to commit identity theft." *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 56 (D.C. Cir. 2019). "Why else would hackers break into a . . . database and steal consumers' private information? Presumably, the purpose of the hack is, sooner or later, to make fraudulent charges or assume those consumers' identities." *Remijas v. Neiman Marcus Grp.*, 794 F.3d 688, 693 (7th Cir. 2015). Certain Plaintiffs have already suffered actual misuses of their stolen PII. *See, e.g.*, Chavez Decl. ¶ 6 (spent time remediating fraud and identity theft); Lanterman Rpt. ¶ 36 (showing Plaintiff Chavez's SSN available on dark web).

Plaintiffs have also suffered emotional distress knowing their PII was stolen by a criminal organization and posted to the dark web. *E.g.*, Chavez Decl. ¶ 7 (describing trauma and fear caused by the Data Breach). And Plaintiffs PII, which has market value, was stolen without Plaintiffs' receiving compensation. *E.g.*, Chavez Decl. ¶ 8; Mangum Rpt. ¶ 69. Each of these types of harms are an injury-in-fact that is concrete and particularized and actual or imminent. *See In re Accellion, Inc. Data Breach Litig.*, 713 F. Supp. 3d 623, 637 (N.D. Cal. 2024) (recognizing lost value of PII as a cognizable injury);

*see also In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1214-15 (N.D. Cal. 2014) (holding that actual misuse of PII constitute injury-in-fact).

Second, Plaintiffs' alleged injury—theft of their PII and its associated consequences—is traceable to the challenged conduct herein. *Zappos.com*, 888 F.3d at 1027. As in *Zappos.com*, Plaintiffs here have linked their harm—theft of PII and the resulting consequences—to the conduct challenged—Accellion's inadequate data security. *Id.* at 1029 (finding traceability met); *Adobe*, 66 F. Supp. 3d at 1215-17 (holding that costs of data monitoring services constitute additional injury-in-fact); *see also* Strebe Rpt. ¶ 3 (opining that Accellion failed to meet industry standards and made the FTA more vulnerable to a foreseeable data breach). Finally, "[t]he injury from the risk of identity theft is" readily redressable through "damages," as requested here. *Zappos.com*, 888 F.3d at 1030. Each Plaintiff has Article III standing sufficient for class certification purposes.

**B.      The Class and Subclasses Satisfy Rule 23(a)**

Plaintiffs must establish that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Plaintiffs meet all these requirements.

**i.      Class and Subclass Members are so Numerous that Joinder is Impractical**

Class and Subclass members are sufficiently numerous to meet Rule 23(a)(1). Millions of Class members had their PII exfiltrated during the Data Breach, and the number of individuals in the Class and Subclasses are "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[A]s a general rule, courts within the Ninth Circuit have found that a class comprising at least forty members indicates joinder impracticability and typically satisfies the numerosity requirement." *Lamartina v. VMware, Inc.*, 2024 WL 3286059, at *2 (N.D. Cal. July 2, 2024) (Davila, J.). Here, there are 5,298,884 Class members and the Subclass with the smallest number of members—the Oklahoma Subclass—has 1,524 members. *See* Mangum Rpt. ¶¶ 129, 136, Figures 14, 14.1.

**ii.      Plaintiffs' Claims Present Common Issues of Law and Facts**

Plaintiffs' claims also satisfy Rule 23(a)(2)'s commonality requirement. Under Rule 23(a)(2),

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 5:21-cv-01155-EJD

"[e]ven a single common question will do" when it is "apt to drive the resolution of the litigation." *Farar v. Bayer AG*, 2017 WL 5952876, at \*5 (N.D. Cal. Nov. 15, 2017) (quoting *Wal-Mart Stores, Inc., v. Dukes*, 564 U.S. 338, 350, 359 (2011)). Data breach cases readily satisfy the commonality requirement because the central question of the adequacy of the defendant's security systems is common across the entire class. *See, e.g.*, *In re Sonic Corp.*, 2021 WL 6694843, at \*3 (6th Cir. Aug. 24, 2021) (finding "the alleged elements of a negligence claim—duty, breach, and causation—all arise from common questions"); *Savidge v. Pharm-Save, Inc.*, 727 F. Supp. 3d 661, 698 (W.D. Ky. 2024) (citation omitted) (holding commonality met given common question of whether defendant's negligent breach "caused a data security breach that resulted in theft of [employees'] data"); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 147 (D. Md. 2022), *reinstated after appeal*, 345 F.R.D. 137, 147 (D. Md. 2023) (finding commonality met given common questions of "whether Defendants knew about their data security vulnerabilities, what Defendants did or did not do to address those vulnerabilities, and whether the hacker(s) exploited those vulnerabilities to exfiltrate customers' PII").

This case is no exception. Common question of fact include whether (1) Accellion was aware of the FTA vulnerabilities that led to the Data Breach—including the specific vulnerabilities implicated in the December and January Exploits; (2) Accellion failed to address those known vulnerabilities; (3) hacker(s) exploited those vulnerabilities to exfiltrate Class members' PII; (4) Accellion's failure to exercise reasonable precautions caused the Data Breach; and (5) the Data Breach exposed Class members to severe and ongoing risk and harms. These questions, and their answers, are common because every class member was subject to the same Accellion policies and practices related to data security. Answering these questions will "resolve an issue that is central to the validity of each one of the claims in one stroke"—whether and to what extent Accellion owed a duty to the class members, whether it breached that duty, and whether the breach of that duty caused damage. *Dukes*, 564 U.S. at 350. And "the fact of damages [is] a question common to the class even if the *amount* of damages sustained by each individual class member varie[s]." *Savidge*, 727 F. Supp. 3d at 700 (emphasis in original and citation omitted). "In light of the low bar set by Rule 23(a)(2)," this is enough for Plaintiffs to demonstrate commonality. *Smith v. Triad of Alabama, LLC*, 2017 WL 1044692, at \*8 (M.D. Ala. Mar. 17, 2017), *on reconsideration in part*, 2017 WL 3816722 (M.D. Ala. Aug. 31, 2017).

### iii. Proposed Class Representatives' Claims are Typical of the Class and Subclasses

Typicality tests "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (internal quotations and citations omitted). Typicality only requires that Plaintiffs' claims are "reasonably coextensive with those of the absent class members," not "substantially identical." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (citation omitted). "[T]ypicality is not primarily concerned with whether each person in a proposed class suffers the same type of damages; rather, it is sufficient for typicality if the plaintiff endured a course of conduct directed against the class." *Id.* at 1118. Several "courts have found the typicality requirement satisfied" in data breach cases. *See, e.g.*, *Savidge*, 727 F. Supp. 3d at 700 (collecting cases).

Typicality is satisfied here. Plaintiffs' claims are premised on the same injury, course of conduct, and legal theories as all other Class members. *Ellis*, 657 F.3d at 984. Each Plaintiff and Class members' claims arise out of the same course of conduct—Accellion's breach of duty that caused Plaintiffs' and Class members' PII to be exfiltrated in the Data Breach. All suffered similar harms—time spent remediating the Data Breach, risk of future identity theft, and lost value of PII—as a result. Typicality is also met for the WCPA Subclass because all WCPA Subclass members' claims arise out of the same unfair practice—Accellion's inadequate data security. Because Plaintiffs' claims are "reasonably coextensive with those of the absent class members," typicality is met here. *Buono*, 847 F.3d at 1116.

The named Plaintiffs' (California, Michigan, Oklahoma, and Washington) negligence claims are also typical of all Class members, including those from Illinois, Tennessee, Texas, and Georgia—because, as shown in Plaintiffs' state-law survey and proposed trial plan, the negligence laws in all these states are sufficiently similar. *See In re HIV Antitrust Litig.*, 2022 WL 22609107, at *6 (N.D. Cal. Sept. 27, 2022) (internal citations omitted and cleaned up) ("If the laws are similar enough, or if they can be grouped into a small number of categories with named plaintiffs representing each category, it may be unnecessary to have a named plaintiff from every state."). Typicality is met here.

### iv. Plaintiffs and Interim Co-Lead Class Counsel Will Adequately Represent the Class and Subclasses

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 5:21-cv-01155-EJD

Plaintiffs and Interim Co-Lead Class Counsel further meet the test of adequacy under Rule 23(a)(4). Adequacy is met where: (1) neither plaintiffs nor their counsel have any conflicts of interest with other class members; and (2) plaintiffs and their counsel will prosecute the action vigorously on behalf of the class. *See Ellis*, 657 F.3d at 985.

Plaintiffs have no conflicts of interest with other class members and will vigorously prosecute this action on behalf of the Class. Each Plaintiff shares the same goal as members of the proposed classes of holding Accellion accountable for its role in the Data Breach. Plaintiffs have fulfilled their duties as class representatives, vigorously prosecuted the case to date, and will continue to do so. *See, e.g.*, Chavez Decl. ¶¶ 9-17. For the past three years, Plaintiffs have dedicated substantial time and effort to this litigation by reviewing pleadings; responding to discovery; searching for, collecting, and producing documents; and preparing to sit for depositions, among other things. *Id*; *see also Castro v. ABM Indus., Inc.*, 325 F.R.D. 332, 342 (N.D. Cal. 2018) (plaintiffs were adequate as "active participants in the litigation"). Plaintiffs each stand ready to testify at trial, if necessary. *Id*.

Likewise, Interim Co-Lead Class Counsel are adequate under Rules 23(a)(4) and 23(g)(1)(A). Since their appointment, Interim Co-Lead Class Counsel have worked diligently and collaboratively to advance the interests of the proposed classes. ECF No. 143 at 1. They have prepared detailed complaints, opposed two motions to dismiss, pursued discovery against Accellion and over thirty non-parties, retained leading experts in the relevant fields, and prepared this action for trial. *See* Decl. of Interim Co-Lead Class Counsel ¶ 13. Each firm has a record of success in prosecuting complex class actions—including serving as lead counsel in other data breach class actions—and are particularly well-suited to serve as Co-Lead Class Counsel. *Id.* ¶ 15.

### C.    The Negligence Class, State Negligence Subclasses, and WCPA Subclass Satisfy Rule 23(b)(3)

"The requirement under Rule 23(b)(3) that common questions predominate over individual ones 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1232-33 (9th Cir. 2024) (citation omitted). Though predominance does not require that "all questions be common," the Court must consider: (1) "which questions are central to the plaintiffs' claim"; (2) "which of these questions are common to the class and

which present individualized issues"; and (3) "whether the common questions predominate over the individual questions." *Id.* at 1233, 1238.

### i.    Common Issues Predominate over Individualized Questions Regarding Accellion's Negligence

The predominance analysis "begins, of course, with the elements of the underlying cause of action." *Id.* at 1233 (quotation marks and citation omitted). Plaintiffs seek to certify a negligence class under the laws of eight states, or alternatively four state negligence subclasses. Under each of these states' laws, the elements of negligence are the same: (1) duty, (2) breach, (3) causation, and (4) damages. Ex. 1 (State Law Survey). As discussed below, the questions of duty, breach, and causation are susceptible to common proof and Plaintiffs have presented viable methods of calculating class-wide damages. Any difference in how these eight states treat the negligence elements is minor, and as described below, can be grouped efficiently and resolved through common proof.

### a.    Whether Accellion Owed a Duty of Care to Safeguard Class Members' PII is a Common Issue

Whether Accellion owed the Negligence Class a duty is a common legal issue that predominates over any individualized inquiry. Fed. R. Civ. P. 23(b)(3). "It is well-established that entities that collect sensitive, private data from consumers and store that data on their networks have a duty to protect that information[.]" *Brush v. Miami Beach Healthcare Grp. Ltd.*, 238 F. Supp. 3d 1359, 1365 (S.D. Fla. 2017). Under each relevant state's negligence law, Accellion owed Plaintiffs a legal duty. Accellion had a duty to act reasonably to safeguard Plaintiffs' PII from reasonably foreseeable threat of a data breach. *See* Ex. 1 (State Law Survey). And under the laws of California and Michigan, Accellion also owed Plaintiffs a duty of care through the special relationship it formed with Plaintiffs. *See id.*

The question of duty is further susceptible to proof on a class-wide basis and is a central question that predominates over any individualized question. *See Savidge*, 727 F. Supp. 3d at 705-706 (existence of all elements of negligence claim, including duty, were predominant questions in data breach case); *Smith*, 2017 WL 1044692, at *13 ("The question[] of duty . . . are common issues susceptible to proof on a class-wide basis."); *In re Sonic Corp.*, 2021 WL 6694843, at *3 (predominance met for negligence claim because "duty, breach, and causation" all arose from common questions about defendant's data security measures); *In re Brinker Data Incident Litig.*, 2021 WL 1405508, at *8 (M.D. Fla. Apr. 14,

14

2021) (finding predominance met for class-wide negligence claim), *vacated in part on other grounds by Green-Cooper v. Brinker Intl., Inc.*, 73 F.4th 883 (11th Cir. 2023).

The same is true here. Accellion's customers used the FTA as marketed: as a secure way to transfer sensitive files containing PII that was supposedly protected against data breaches.[55] Accellion also recognized that a data breach of the FTA was a foreseeable risk: it marketed the FTA as secure against data breaches and initially conducted penetration tests and offered bounties to ethical hackers to prevent data breaches before shifting focus to secure its newer product Kiteworks.[56] Plaintiffs depended on Accellion for the security of their PII and Accellion controlled the means of that protection.[57] Accellion was responsible for designing the FTA, identifying and repairing any vulnerabilities, and updating the FTA's security features.[58] And Accellion does not dispute that it "benefitted from its commercial activity of providing the FTA to customers." *In re Accellion, Inc. Data Breach Litig.*, 2024 WL 4592367, at *4 (N.D. Cal. 2024). This common evidence will determine whether Accellion owed Plaintiffs a duty to act reasonably to prevent a foreseeable data breach as well as whether a special relationship existed. *See In re Accellion, Inc. Data Breach Litig.*, 713 F. Supp. 3d at 636.

**b.    Whether Accellion Breached its Duty of Care is a Common Issue**

Whether Accellion breached its duty of care to act reasonably to safeguard Plaintiffs' PII when it designed, marketed as secure, and licensed FTA to businesses to transfer PII will be proven by common proof relating to Accellion's data security practices. *See Savidge*, 727 F. Supp. 3d at 706 (whether the defendant breached its duty was a key question that predominated); *Smith*, 2017 WL 1044692, at *13 (similar); *In re Sonic Corp.*, 2021 WL 6694843, at *3 (similar).

Despite knowing that the FTA had a flawed security architecture and was vulnerable to data breaches, Accellion chose not to remediate those known flaws or stop licensing the product, leading to the Data Breach. *See* Strebe Rpt. ¶¶ 138-168; *see In re Accellion, Inc. Data Breach Litig.*, 713 F. Supp.

---

[55] Exs. 11-13; *see also* Ex. 3 (Yaron 30(b)(6) Tr.) at 183:21-23 (Accellion "understood that some of [it's] customers have used to [sic] transmit sensitive data."); Chavez Decl. ¶ 4.

[56] *See e.g.*, Ex. 32 (ACCELLION-SUPP-PROD_0000001380); Ex. 3 (Yaron 30(b)(6) Tr.) at 52:21-25, 58:6-9.

[57] *See e.g.*, Ex. 15 (Balonis 30(b)(6) Tr.) at 112:17-113:2, 167:9-20; Ex. 17 (ACCELLION_NDCA_0014227 at '37); Ex. 3 (Yaron 30(b)(6) Tr.) at 37:15-38:14; *see* Strebe Rpt. ¶¶ 95-96.

[58] *See e.g.*, Ex. 15 (Balonis 30(b)(6) Tr.) at 102:5-12, 104:25-105:13, 134:22-135:4, 140:2-13; Ex. 18 (Balonis Tr., Ex. 14 (ACCELLION_NDCA_0064227)).

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 5:21-cv-01155-EJD

3d at 636-37 (existence of vulnerabilities in FTA suggested breach of duty). Many of these facts Accellion readily admits: Accellion recognized that the FTA was an aging, vulnerable product that was not built to withstand sophisticated modern cyberattacks.[59] Accellion admits that the FTA product was missing key security features and had no new features implemented since Accellion launched its newer product, Kiteworks.[60] As of 2018, Accellion admits it only performed FTA security updates on an "as-needed basis" for critical vulnerabilities, and as of 2020, there were at least seventeen high or medium security vulnerabilities in the FTA that had not been resolved.[61] While employees repeatedly voiced concern about the FTA, Accellion's executives did nothing, waiting to retire the product until after the Data Breach. At least one Accellion employee believed Accellion's decision was motivated by the financial loss it would suffer if its customers switched to competitor products.[62] And another senior Accellion employee lamented "we have to pay for the sins of upper management…."[63] In sum, common questions predominate with respect to breach.

### c. Whether Accellion's Duty Caused Class Members' Harm is a Common Issue

Plaintiffs will show through common evidence that Accellion's negligence caused Plaintiffs and Class members' injuries. *See In re Sonic Corp.*, 2021 WL 6694843, at *3 (finding "the alleged elements of a negligence claim—duty, breach, and causation—all arise from common questions: whether [defendant's] internal data security measures and its remote access policy caused the data breach, leading to the issuance of the alerts and actions by the plaintiffs to limit or reimburse harms"). Both proximate and but-for cause revolve around the same common questions, establishing predominance. *See* Ex. 1 (State Law Survey).

Proximate cause (or legal cause) requires a directness of injury and largely turns on whether Accellion should have reasonably foreseen the harm to class members at the time of its negligent acts. *See, e.g.*, *Cole v. Town of Los Gatos*, 140 Cal. Rptr. 3d 722, 742 (Cal. App. 6th Dist. 2012)

---

[59] Ex. 32 (ACCELLION-SUPP-PROD_0000001380); Ex. 15 (Balonis 30(b)(6) Tr.) at 98:8-10; Ex. 3 (Yaron 30(b)(6) Tr.) at 52:21-25, 58:6-9.

[60] Ex. 15 (Balonis 30(b)(6) Tr.) at 142:15-22; Ex. 3 (Yaron 30(b)(6) Tr.) at 49:9-14, 49:15-20, 51:16-52:4, 52:10-20.

[61] Ex. 15 (Balonis 30(b)(6) Tr.) at 134:22-135:4; Ex. 3 (Yaron 30(b)(6) Tr.) at 219:25-220:12.

[62] Ex. 25 (ACCELLION-SUPP-PROD_0000001383).

[63] Ex. 7 (Balonis 30(b)(6) Tr., Ex. 15 (ACCELLION-SUPP-PROD_0000000150)).

("foreseeability of harm" is one of the "touchstones of proximate cause analysis"). What Accellion—a company that designed and licensed a "secure" file transfer application to protect sensitive files from data breaches—knew or should have known about the risk of data breach to a legacy product with multiple vulnerabilities will be shown through uniform evidence that does not vary by class member. *See supra* Section V.C.i. (discussing class-wide evidence of Accellion's duty of care); *see also In re Sonic Corp. Customer Data Sec. Breach Litig.*, 2021 WL 4060369, at *6 (N.D. Ohio Sept. 7, 2021) (denying summary judgment on class-wide negligence claims because "[a] reasonabl[e] jury could find that the hack was a foreseeable consequence of creating and maintaining a vulnerable entry point" and that the ensuing theft of class members' information and their "loss" was foreseeable).

Whether Plaintiffs' harm would have occurred but-for Accellion's conduct (*i.e.*, cause-in-fact) will also use class-wide evidence. *See* Ex. 1 (State Law Survey); Ex. 2 (Proposed Trial Plan) at 4; Korczyk Rpt. ¶¶ 42, 49, 64-69; Mangum Rpt. ¶¶ 62-64, 109-110, 113-36; Lanterman Rpt. ¶¶ 29-38. Courts have repeatedly held that individualized issues of but-for causation in data breach cases *do not* predominate because causation and damages "orbit around" the "two central questions" of duty and breach. *Smith*, 2017 WL 1044692, at *15. Whether Accellion breached its duty, causing Plaintiffs' and Class members' PII to be exposed, is a common question, "even if there also exists other individualized questions about causation (e.g., whether a class member was a victim of another unrelated data breach that might increase the risk of future harm)." *Savidge*, 727 F. Supp. 3d at 706. To the extent these other causation-related issues exist, they "do not require a 'causation-related determination of whether class members were injured *at all* by the defendants.'" *Id.* (emphasis in original) (citing 1 McLaughlin on Class Actions § 5:23 (20th ed.)). Instead, these issues relate to the amount of damage individual Class members suffered. *Id.*; *In re Brinker Data Incident Litig.*, 2021 WL 1405508, at *12 (M.D. Fla. Apr. 14, 2021) (finding "the multiple breach issue [was] not a disqualifying causation issue, but rather [was] to be determined at the damages phase"). As discussed below, common issues predominate as to Plaintiffs' damages theories, and thus causation.

### d.    Plaintiffs Will Calculate Damages on a Class-wide Basis

Plaintiffs seek three types of damages: (1) the value of reasonable time spent mitigating the harm from the breach; (2) credit and identify theft monitoring; and (3) the lost value of their PII. Plaintiffs'

damages models rely on common evidence and are calculable using common methods.

**1.      The Value of Time Spent Remediating the Consequences of the Data Breach can be Calculated on a Class-wide Basis**

This Court and others have recognized time spent responding to a data breach as a valid form of damages. *See In re Accellion, Inc. Data Breach Litig.*, 713 F. Supp. 3d at 637; *see also In re Experian Data Breach Litig.*, 2016 WL 7973595, at *5 (C.D. Cal. Dec. 29, 2016) (citation omitted); *In re Brinker Data Incident Litigation*, 2021 WL 1405508, at *3, 12 (finding Plaintiffs' expert Daniel Korczyk's methodology for calculating time spent remediating the data breach to be reliable, and certifying plaintiffs' damages class); *Brinker Intl., Inc.*, 73 F.4th at 893-94 (upholding time-spent damages methodology, noting that "any individual inquiry into particularized damages resulting from the data breach . . . does not predominate over the three categories of common damages inquiries [including time spent] analyzed by the plaintiffs' expert").

Here, Plaintiffs provide a methodology to calculate the value of time spent remediating the consequences of the Data Breach on a class-wide basis. *See* Dan Korczyk Rpt. ¶¶ 64-69 (calculating the market rate to pay a specialist to perform the workload of mitigating the effects of the breach). This is a reliable damages methodology based on common proof. And at least one court has granted class certification in a data breach case involving Mr. Korcyzk's same methodology for calculating the market rate of lost time. *See Savidge, et al. v. Pharm-Save, Inc., d/b/a Neil Medical Group, et al*, 2024 WL 1366832, at *31 (W.D. Ky. 2024); *see also Savidge*, No. 3:17-cv-00186, ECF No. 109-5 at 23-25 (W.D. Ky. Aug. 23, 2021).

This Court should come to the same conclusion. Even if Accellion argues that time spent varies by Class member, this is not a reason to deny class certification because "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013); *see also Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016). Rather, such differences can be remedied by a claims administrator who can determine the actual time spent by each class member. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1131 (9th Cir. 2017) ("Rule 23 specifically contemplates the need for such individualized claim determinations after a finding of liability.").

### 2. Credit and Identity Theft Monitoring Can be Calculated on a Class-wide Basis

Plaintiffs face actual risk of harm because the PII exposed in the Data Breach is long-lasting and can be used by criminals to perpetrate fraud and identity theft. *See* Korczyk Rpt. ¶¶ 53-54, 59-61; Lanterman Rpt. ¶¶ 19-24, 26-38. There is a robust market for illegally stolen data. *See* Mangum Rpt. ¶¶ 91-96. While information does not need to immediately appear on the dark web to demonstrate injury to class members, *see In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1262 (11th Cir. 2021), Mr. Lanterman has identified datasets from the University of California and Flagstar Bank on the dark web page of CL0P, years after the Data Breach, Lanterman Rpt. ¶¶ 32-36. This "ruthless" and "sophisticated" "criminal enterprise"[64] will take any opportunity to monetize Class members' data—either through a sale to other criminals or by weaponizing the data. *See* Lanterman Rpt. ¶ 38.

The risk of fraud and identity theft is an actual, present injury, and class members are entitled to damages for the costs of prospective insurance and credit monitoring. *See Doe v. Sutherland Healthcare Sols., Inc.*, 2021 WL 5765978, at *11 (Cal. Ct. App. Dec. 6, 2021) ("It is an entirely appropriate . . . that the cost of prospective medical monitoring is cognizable injury in a negligence action to impose responsibility for the cost of credit monitoring services on defendants found liable for a data breach if plaintiffs prove causation.");[65] *In re Equifax*, 999 F.3d at 1264 (settlement with credit monitoring and restoration services "redresses Plaintiffs' injuries"); *Collins v. Athens Orthopedic Clinic, P.A.*, 837 S.E.2d 310, 314 (Ga. 2019) (allegations of "imminent and substantial" risk of identity theft in data breach was enough to state a cognizable injury and discussing credit monitoring). This is because a plaintiff whose PII was intentionally exfiltrated by criminals "cannot be required to wait until she has experienced actual identity theft or fraud before she can sue," and should be entitled to credit monitoring to decrease the chances of future harm. *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 159 (3d Cir. 2022).

---

[64] Franceschi-Bicchierai, *supra* note 54.

[65] Federal courts frequently consider unpublished California appellate decisions in deciding what "accurately represents California law." *Emps. Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003); *see, e.g.*, *Casola v. Dexcom, Inc.*, 98 F.4th 947, 958 & n. 12 (9th Cir. 2024) (relying on unpublished appellate decision for interpretation of California Rules of Court); *Beeman v. Anthem Prescription Mgmt., LLC*, 689 F.3d 1002, 1008 n.2 (9th Cir. 2012) (en banc) (citing unpublished opinion as "support" for interpretation of California law; *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1222-23 & n.3 (9th Cir. 2015) (similar).

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 5:21-cv-01155-EJD

Here, all Class members have been injured because each faces a present and "increased risk of future injury" from scams and fraud resulting from Accellion's negligence. Mr. Korczyk provides a common methodology for calculating damages for this risk—Class members will be provided with robust credit monitoring and identity theft protection services for either 5, 7, or 10 years depending on the type of data exposed. Korczyk Rpt. ¶¶ 52-58. These three tranches recognize that certain types of PII is more durable, or easy to weaponize, than other types of PII—but *all* PII exposed creates a present increased risk. *Id.*; Lanterman Rpt. ¶¶ 23-24. This risk exists for one common reason—Accellion's failure to properly safeguard Plaintiffs and Class members' data. The risk persists because Class members' data is lucrative for cybercriminals—it can be bought, sold, and weaponized for years.

Determining this cost on a class-wide basis is straight-forward: Dr. Mangum calculates the cost of the recommended products over the recommended durations. Mangum Rpt. ¶¶ 130-35. Because each Class member requires credit monitoring, and the only difference is the length of time depending on which elements of their data were compromised, it is simply a matter of multiplication to determine that Class member's damage (and the damages of the Class as a whole). Mangum Rpt. ¶¶ 130-35; Korczyk Rpt. ¶¶ 52-58. This formula can be applied mechanically for each class member and is thus consistent with class-wide treatment. *See In re Marriott*, 341 F.R.D. at 161-62 (finding plaintiffs' overpayment damages model, although complex, "applie[d] classwide" and "relie[d] upon the same set of variables" for every damages computation and was therefore consistent with class-wide treatment).

**3.    Lost Value of PII can be Calculated on a Class-wide Basis**

This Court has already joined a growing number of courts that "have now recognized Loss of Value of PII as a viable damages theory." *In re Accellion, Inc. Data Breach Litig.*, 713 F. Supp. 3d at 637 (citing *In re Experian Data Breach Litig.*, 2016 WL 7973595, at *5); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 600 (9th Cir. 2020) (noting that cited sources demonstrate that browsing histories "carry financial value"); *see also In re Anthem, Inc. Data Breach Litig.*, 2016 WL 3029783, at *14 (N.D. Cal. May 27, 2016) (noting that "the Ninth Circuit and a number of district courts have approved" loss of value of PII as a damages theory); *Nunley v. Chelan-Douglas Health Dist.*, 558 P.3d 513, 527 (Wash. Ct. App. Oct. 31, 2024) ("The loss in value of [Plaintiffs'] PII and PHI is a current

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 5:21-cv-01155-EJD

harm and a cognizable injury sufficient to support a cause of action for negligence.").[66]

Class members' PII has actual, monetizable value that was lost when the data was disclosed without each class member's consent. The value of this data is not abstract. Markets (both legal and illegal) exist for the licensing, purchase, and exchange of PII. Mangum Rpt. ¶¶ 67-96. For example, DirectMail.com, RocketReach, and Whitepages all sell bulk data, including email addresses, physical addresses, and phone numbers. Mangum Rpt. ¶¶ 72-74. Organizations purchase personal information data directly from individuals themselves, representing individual transactions rather than bulk data purchases. This occurs when, for example, a retailer provides a discount to a consumer for registering through a store or company website. Mangum Rpt. ¶¶ 78-79, Figure 3. Some retailers compute the value of PII based on the expenses related to collecting and retaining it. *Id.* ¶ 89. And there is an active illegal market for PII purchases on the dark web—albeit at a discounted rate—with data reflecting prices of $30 and more per set of credentials. Mangum Rpt. ¶¶ 91-96, Figure 5.

Evidence that Class members' PII had actual value is common across Class members and will not require individualized inquiries. *See* Mangum Rpt. ¶¶ 100 ("[M]arket pricing is consistently on a per-record basis following a uniform pricing structure that applies across individuals and Class Members."). As Dr. Mangum describes in his report, the value of each Class member's personal information is formulaic and based on class-wide proof. Mangum Rpt. ¶¶ 100-01. Plaintiffs need only identify the data relating to the Class member that were exposed in the breach, look up the value of each type of data, and add them together. Mangum Rpt. ¶¶ 114-20.

### 4. Plaintiffs and the Class are Entitled to Nominal Damages

If the Court finds that Plaintiffs have not shown that the foregoing types of damages can be measured on a class-wide basis, the Negligence Class and Subclasses should still be certified with respect to nominal damages. *See Opperman v. Path, Inc.*, 2016 WL 3844326, at *15 (N.D. Cal. July 15, 2016) (noting that "several district courts in the Ninth Circuit have certified classes involving claims for nominal damages," citing cases).

---

[66] *See also, e.g.*, *In re Marriott*, 440 F. Supp. 3d at 460-61 (accepting loss of value of PII as a cognizable damages theory); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2017 WL 3727318, at *14 (N.D. Cal. Aug. 30, 2017) (same); *In re Blackbaud, Inc., Customer Data Breach Litig.*, 567 F. Supp. 3d at 686 (same); *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 635 (N.D. Cal. 2021) (same).

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 5:21-cv-01155-EJD

Under the negligence laws of each state that Plaintiffs seek to certify except Illinois and Tennessee, nominal damages are available. Ex. 1 (State Law Survey). For example, under Georgia law, "nominal damages are awarded: (1) where no actual damage flows from the injury; or (2) where the violation of a right is shown, substantial damages claimed, and some actual loss proved, and yet the damages are not susceptible of reasonable certainty of proof as to their extent." *Wal-mart Stores E., LP v. Leverette*, 901 S.E.2d 607, 613 (Ga. App. 2024) (citation omitted). California law is similar, permitting nominal damages "where actual damages have been sustained, the extent of which cannot be determined." *Sterling Drug v. Benatar*, 99 Cal. App. 2d 393, 400 (Cal. App. 2d 1950) (citation omitted). And under Michigan law, "nominal damages are those damages recoverable where [a] plaintiff's rights have been violated by breach of contract or tortious injury, but no actual damages have been sustained or none can be proved." *4041–49 W Maple Condo. Ass'n v. Countrywide Home Loans, Inc.*, 768 N.W.2d 88, 92 (Mich. App. 2009) (citing 7 Michigan Civil Jurisprudence, Damages § 9, p. 313).

Plaintiffs suffered actual damages that may be difficult to prove, including emotional distress caused by the Data Breach.[67] *See, e.g., Walnut Creek Manor v. Fair Emp. & Hous. Com.*, 54 Cal. 3d 245, 255 (1991) (noting that "actual damages" has long been construed to "include nonquantifiable general damages for emotional distress"). Plaintiffs also suffered an invasion of their right to privacy, a right engrained in the United States Constitution, state constitutions, and various state laws. *See, e.g., Griswold v. Connecticut*, 381 U.S. 479, 483 (1965); *Brown v. Mortensen*, 242 Cal. Rptr. 3d 67, 74 (Cal. App. 2d Dist. 2019) (noting that the California legislature enacted the CMIA's "nominal damages" provision to partly "eliminat[e] the difficult and sometimes expensive task of proving actual damages (such as emotional distress) caused by violation of the act's privacy provisions"); Internet Privacy Protection Act, Mich. Comp. Laws Ann. § 37.271, *et seq.*; *cf. Friddle v. Epstein*, 16 Cal. App. 4th 1649, 1660 (1993) ("Any invasion of privacy involves an affront to human dignity which the Legislature could conclude is worth at least $3,000."). For the States that Plaintiffs seek to certify, nominal damages are permitted within a range of $1-$100. Ex. 1 (State Law Survey).

### ii.    Common Issues Predominate over Individualized Issues under the WCPA

---

[67] *See* Becker Decl. at 7; Chavez Decl. at 7; Dawes Decl. at 7; Galvis Decl. at 7; McDole Decl. at 7; Moniz Decl. at 7; Olson, Jr. Decl. at 7; Rodriguez Decl. at 7; Whittaker Decl. at 7; Worrick Decl. at 7.

Common issues also predominate with respect to the WCPA Subclass's claim, which requires: "(1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation." *Panag v. Farmers Ins. Co. of Washington*, 166 Wash. 2d 27, 37 (2009).

Each of these elements is subject to common proof. As discussed above, Accellion's failure to employ adequate data security practices will be shown through common evidence. *See supra* Section V.C.i. And as this Court has held, this is sufficient to establish an unfair or deceptive act under the WCPA. *In re Accellion, Inc. Data Breach Litig.*, 713 F. Supp. 3d at 649. Whether the FTA's vulnerabilities—which led to the dissemination of over a million individuals' PII in Washington—affects the public interest will be answered the same for each WCPA Subclass member. Whether Accellion's inadequate data security for the FTA occurred "in trade or commerce" also relies on common evidence. Class members were all affected by the Accellion breach through one of the five FTA customers listed in Plaintiffs' class definition, and Accellion's licensing of the FTA software to these five entities is evidence common to the Subclass.

Finally, causation and damages will be shown through common proof as described above, *see supra* Section V.C.i., using damages models that can show injury under the WCPA. *See, e.g.*, *Guy v. Convergent Outsourcing, Inc.*, 2023 WL 4637318, at *8 (W.D. Wash. July 20, 2023) (allegations of the lost value of PII were sufficient to show an injury under the WCPA).

**D.      Class Treatment is Superior to Adjudicate the Class Claims**

Given the many common questions here, proceeding as a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). First, most class members have a minimal interest in individually controlling the prosecution of a separate action because the "low potential damages are far outweighed by the high costs of litigation," making a class action the only realistic way for recovery. *Cabrera v. Google LLC*, 2023 WL 5279463, at *27 (N.D. Cal. Aug. 15, 2023) (citation omitted); *see Hamilton v. Wal-Mart Stores, Inc.*, 39 F.4th 575, 588 n.6 (9th Cir. 2022) (noting that for negative value suits, "a class action is the only realistic possibility for redress").

Second, this Court already consolidated the related cases in this action, therefore "efficiency and

consistency of concerns favor litigating the legality of Defendant's standardized conduct by all class members in one suit, rather than forcing each class member to sue individually." *Hunt v. Check Recovery Sys., Inc.*, 241 F.R.D. 505, 515 (N.D. Cal. 2007), *modified*, 2007 WL 2220972 (N.D. Cal. Aug. 1, 2007).

Finally, because common issues predominate with respect to Plaintiffs' claims, individual manageability issues will not overwhelm a class proceeding. *Id.*; *see also* Ex. 1 (State Law Survey). There is a "well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns." *Briseno*, 844 F.3d at 1128 (citations omitted). Plaintiffs seek to certify *only two* claims under the laws of only a handful of states with similar negligence laws—not a nationwide class under all 50-state laws. There are a variety of "management tools" available to the Court to ensure manageability, like subclassing and the use of a special master or magistrate judge for damages determinations in the claims administration phase. *See Davidson v. Apple, Inc.*, 2018 WL 2325426, at *24 (N.D. Cal. May 8, 2018). Moreover, the difficulties of managing a class action pale in comparison with the alternative of millions of individual lawsuits. *See Cottle v. Plaid Inc.*, 340 F.R.D. 356, 372 (N.D. Cal. 2021). For those reasons, proceeding as a class action is superior to the alternatives and Rule 23(b)(3) has been met.

**E.    In the Alternative, the Court Should Certify an Issues Class Under Rule 23(c)(4)**

If the Court finds that Plaintiffs have not met Rule 23(b)(3)'s requirements, the Court should, in the alternative, certify a Rule 23(c)(4) issues class on the key liability questions of whether Accellion had a duty to safeguard Plaintiffs' personal information, breached that duty, and its inadequate security measures caused the Data Breach. *See, e.g.*, *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 244 (N.D. Cal. 2014) (certifying a Rule 23(c)(4) class "solely for purposes of determining liability"); *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 193 (N.D. Cal. 2015) (certifying issue class where damages and standing could not "be shown by common evidence"); *Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 698 (N.D. Cal. 2021) (indicating willingness to issue Rule 23(c)(4) certification as a "fallback"); *see also* Myriam Gilles & Gary Friedman, *The Issue Class Revolution*, 101 B.U. L. Rev. 133, 139–40 (2021). "[T]here is now widespread consensus in support of the broad view that common questions need not predominate in an entire lawsuit or cause of action in order for certification to be proper." *Cai v. CMB Exp. LLC*, 2024 WL 2334509, at *13 (C.D. Cal. Apr. 4, 2024) (quotation omitted).

These issues focusing on Accellion's conduct are of central importance and resolving them in a single proceeding would invariably benefit the disposition of the litigation as a whole—"[i]f and when liability is established, 'damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses.'" *Id.* (quoting *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013)); *Fitzgerald v. Pollard*, 2022 WL 22442009, at *13 (S.D. Cal. Nov. 3, 2022) (certifying liability issues class regarding issues that were of central importance). Should Plaintiffs prevail at trial, Class and Subclass members would receive a judicial declaration of key liability elements of their negligence and WCPA claims that they can then use in a separate litigation or in a damages phase, conserving resources and avoiding repetitive and wasteful discovery. *See LSIMC, LLC v. Am. Gen. Life Ins. Co.*, 2022 WL 4596597, at *13 (C.D. Cal. Aug. 4, 2022) (certifying a Rule 23(c)(4) class because if the defendant's breach of contract was established, damages could be determined later). The alternative—denying class certification outright—would not end the litigation but instead force individual Class members to waste time and resources that have already been expended prosecuting this litigation. *See Lynch v. Matterport, Inc.*, 2023 WL 5310558, at *7 (N.D. Cal. Aug. 16, 2023) (certifying single issue class because resolution of the issue would materially advance the resolution of the case).

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court: (1) certify the Negligence Class or, in the alternative, the Negligence Subclasses under Rules 23(a) and (b)(3); (2) certify the WCPA Subclass under Rules 23(a) and (b)(3); (3) appoint Plaintiffs as Class representatives; and (4) appoint Susman Godfrey L.L.P. and Girard Sharp LLP as co-lead Class Counsel.

Dated: December 16, 2024

Respectfully submitted,

By: /s/ *Adam E. Polk*

Adam E. Polk (SBN 273000)
Kyle P. Quackenbush (SBN 322401)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
apolk@girardsharp.com

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 5:21-cv-01155-EJD

kquackenbush@girardsharp.com

Krysta K. Pachman (SBN 280951)
Michael Gervais (SBN 330731)
Steven G. Sklaver (SBN 237612)
Madeline M. Yzurdiaga (SBN 344676)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
Tel: (310) 789-3100
kpachman@susmangodfrey.com
mgervais@susmangodfrey.com
ssklaver@susmangodfrey.com
myzurdiaga@susmangodfrey.com

Kevin R. Downs (SBN 331993)
**SUSMAN GODFREY L.L.P.**
1000 Louisiana, Suite 5100
Houston, TX 77002
Tel: (713) 651-9366
kdowns@susmangodfrey.com

*Interim Co-Lead Class Counsel*

## ATTESTATION

I, Adam E. Polk, am the ECF User whose ID and password are being used to file this document. In compliance with Civil L.R. 5-1(i)(3), I hereby attest that all counsel have concurred in this filing.

By:   /s/ *Adam E. Polk*
        Adam E. Polk

26

**CERTIFICATE OF SERVICE**

I hereby certify that on December 16, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record. I also caused a copy of the under-seal documents to be served via electronic mail.

By:   /s/ *Adam E. Polk*
Adam E. Polk

27

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 5:21-cv-01155-EJD