# EXHIBIT 2

*In re Accellion, Inc. Data Breach Litigation*, **No. 5:21-cv-01155-EJD**

## PLAINTIFFS' PROPOSED TRIAL PLAN

## I. INTRODUCTION

Plaintiffs Rose Becker, Karlina Chavez, Derek Dawes, Alvaro Galvis, Jamie McDole, Randy Moniz, Robert Olson, Jr., Heather Rodriguez, Valerie Whittaker, and Kimberly Worrick (collectively, "Plaintiffs") move the Court to certify Plaintiffs' negligence claims and Washington Consumer Protection Act ("WCPA") claims.

First, Plaintiffs move the Court to certify their negligence claim against Accellion pursuant to Rule 23(a) and 23(b)(3) on behalf of the following Class ("Negligence Class"):[1]

> All natural persons whose PII and/or PHI was compromised as a result of the Data Breach of the following Accellion customers (i) The Regents of the University of California, (ii) Centene, (iii) Flagstar, (iv) Washington State Auditor's Office, and (v) Kroger, and who resided in California, Georgia, Illinois, Michigan, Oklahoma, Tennessee, Texas, or Washington at the time of the Data Breach

Second, Plaintiffs move to certify Plaintiffs' claim against Accellion for violating the Washington Consumer Protection Act ("WCPA"), RCW 19.86.010 *et seq.* pursuant to Rule 23(a) and 23(b)(3) on behalf of the following Washington Subclass ("WCPA Subclass"):

> All natural persons whose PII and/or PHI was compromised as a result of, and who resided in Washington at the time of, the Data Breach of the Washington State Auditor's Office's FTA.

Whether Accellion (1) violated various states' negligence laws by breaching its duty of care, causing Plaintiffs' and the Class members' harm, and (2) acted unfairly or deceptively in trade or commerce and against public interest, causing Plaintiffs and Class members' injuries turns on common proof.

Along with their class certification motion, Plaintiffs submit this trial plan to illustrate that a class trial of their negligence and WCPA claims are manageable under Rule 23. The trial plan provides

[1] In the alternative, Plaintiffs move to certify Subclasses under California, Michigan, Oklahoma, and Washington negligence law. The negligence elements for the State Subclasses are the same as the Negligence Class.

a representative summary of the common evidence that will establish the elements of Accellion's negligence and WCPA violations. Plaintiffs reserve the right to suggest changes to this Trial Plan as may become necessary.

## II. DETAILS OF THE TRIAL MANAGEMENT PLAN

### A. Trial: Proof of Liability and Damages with Common Evidence

This Court and the jury will hear evidence on Accellion's negligence and WCPA liability. To prevail on their negligence claim, Plaintiffs must show that "(1) [Accellion] owed the plaintiff[s] a duty of care, (2) [Accellion] breached that duty, and (3) the breach proximately caused the [plaintiffs'] damages or injuries."[2] To prevail on their WCPA claims, Plaintiffs must show that Accellion engaged in "(1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation."[3]

#### 1. Preliminary Instructions to the Jury

At the commencement of the trial, jurors will be provided with a summary of the key factual and legal issues that will be at issue during the trial. Manual for Complex Litigation (Fourth) § 12.432 (2004). Although the final instructions given to the jurors will govern the jurors' deliberations, these preliminary instructions will orient the jurors to the evidence they will see and hear throughout trial.

#### 2. Opening Statements

The parties will present opening statements regarding all issues of liability, causation, and damages concerning the claims.

#### 3. Presentation of Evidence of Negligence Violation

Plaintiff will present class-wide evidence to prove Accellion's liability on the negligence claim by showing that (1) Accellion owed a legal duty of care to safeguard Class members' PII from reasonably foreseeable threats when it designed, marketed as "secure," and licensed the FTA to businesses to transfer private information; (2) Accellion breached its duty when it failed to remediate known cybersecurity vulnerabilities and retire the FTA from the market before the Data Breach; (3) Accellion both directly and indirectly caused Class members' injuries; and (4) Class members have

---

[2] *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1038–39 (N.D. Cal. 2019).
[3] *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash. 2d 778, 780 (1986).

been injured by the Data Breach, including a substantial risk of fraud and identity theft, lost market value of their PII, and lost value of reasonable time spent mitigating the harm.

**<u>Element One: Accellion owes a duty of reasonable care to Class members.</u>**

- **Accellion owed a legal duty of care to protect Class members' PII from reasonably foreseeable threats when it designed, marketed as "secure," and licensed the FTA to businesses to transfer private information.**
  - Accellion designed and developed software called the File Transfer Application ("FTA").
  - Accellion began licensing the FTA to businesses in the early 2000s to transfer their customers' PII. Accellion continued to license the FTA to dozens of customers before the Data Breach.
  - Accellion marketed the FTA as a secure product that would ensure the protection of sensitive data, increase data security, and reduce data breach risk.
  - Accellion was responsible for the security of the FTA, including by implementing new security features, remediating vulnerabilities, and deciding whether to continue to license the product.

**<u>Element Two: Accellion breached its duty of reasonable care to Class members.</u>**

- **Accellion breached its duty when it failed to remediate known cybersecurity vulnerabilities and retire the FTA from the market before the Data Breach.**
  - Despite marketing the FTA as a "secure" product, Accellion failed to follow its own written best security practices and industry standards when it came to the FTA.
  - Accellion utilized fewer resources to ensure the FTA's security for its customers' use. For instance, Accellion staffed engineers with considerably less cybersecurity experience to build FTA. Accellion further chose to discontinue or significantly scale back the use of a bug bounty program related to the FTA and only perform security updates on the FTA on an as-needed basis for critical vulnerabilities only.
  - Accellion admitted that the FTA product was missing key security features, including its lack of multiplier architecture, access control layering, intrusion prevention firewall, and lack of hardening at a system level. Accellion further admitted that the FTA had no new features implemented since Accellion launched its newer product, Kiteworks.

- Accellion acknowledged that the FTA was outdated and not built to withstand sophisticated modern cyberattacks but continued to license the FTA to customers.

**Element Three: Accellion's breach of duty of care was the actual and but-for cause of Class members' injuries.**

- **Accellion both directly and indirectly caused Class members' injuries. The Data Breach was the but-for cause of the various damages that Class members suffered. And Accellion knew or should have known about the risk of a data breach and, therefore, proximately caused Class members' injuries.**
  - As shown in the expert report of Matt Strebe, the Data Breach exposed Class members' PII to third parties, including a criminal hacking organization that exfiltrated Class members' data.
  - As shown in the expert report of Mark Lanterman, certain Plaintiff and Class member data was posted on the dark web as a result of the Data Breach.
  - Based on the FTA's myriad technical issues, Accellion's acknowledgment that the FTA was not built to withstand a modern cyberattack, and its own employees' concerns, Accellion should have remediated the vulnerabilities in the FTA or stopped licensing the product before the Data Breach.
  - As a company that marketed the FTA as a secure product for transferring sensitive files that was protected from Data Breach, Accellion knew or should have known of the risk that a data breach would pose.

**Element Four: Class members were injured as a result of Accellion's breach of its duty of care.**

- **Class members have been injured by the Data Breach, including an extended risk of fraud and identity theft, uncompensated market value of their PII, and lost value of reasonable time spent mitigating the harm.**

- As shown in the expert report of Dan Korczyk, Class members face a heightened risk of fraud and identity theft because their PII exposed in the Data Breach is long-lasting and can be used by criminals to perpetrate these crimes in the future.[4]
- As shown in the expert report of Russell Mangum, Class members' PII has actual, monetizable value. This valuable data was stolen without compensating Class members, and therefore Class members have suffered damages.[5]
- Finally, Class members have been forced to spend time remediating the consequences of the Data Breach. The average time spent responding to the Data Breach represents damages owed to the Class.[6]
- In the alternative, Class members should be awarded nominal damages for the privacy violation they suffered.[7]

**4. <u>Presentation of Evidence of WCPA Violation</u>**

Plaintiff will present class-wide evidence to prove Accellion's liability by showing that (1) Accellion engaged in an unfair or deceptive act or practice when it failed to remediate known cybersecurity issues and retire the FTA from the market before the Data Breach; (2) Accellion engaged in "trade" and "commerce" by licensing the FTA to a Washington entity that directly and indirectly affected the people of the State of Washington; (3) Accellion's aforementioned failures affected the public interest—specifically, Washington residents—because the Data Breach exposed

---

[4] *See Doe v. Sutherland Healthcare Sols., Inc.*, 2021 WL 5765978, at *11 (Cal. Ct. App. Dec. 6, 2021) ("It is an entirely appropriate application of the principles underlying *Potter's* holding that the cost of prospective medical monitoring is cognizable injury in a negligence action to impose responsibility for the cost of credit monitoring services on defendants found liable for a data breach if plaintiffs prove causation.").

[5] *See In re Accellion, Inc. Data Breach Litig.*, 713 F. Supp. 3d 623, 637 (N.D. Cal. 2024) (ECF No. 217 at 14) (citing *In re Experian Data Breach Litig.*, 2016 WL 7973595, at *5 (C.D. Cal. Dec. 29, 2016) (noting that an increasing number of courts have recognized "Loss of Value of PII as a viable damages theory"); *In re Anthem, Inc. Data Breach Litigation*, No. 15-MD-02617-LHK, 2016 WL 3029783, at *14 (N.D. Cal. May 27, 2016) (same).

[6] *See In re Accellion, Inc. Data Breach Litig.*, 713 F. Supp. 3d 623, 637 (N.D. Cal. 2024) (ECF No. 217 at 14) (citing *Stasi v. Inmediata Health Grp. Corp.*, 501 F. Supp. 3d 898, 913 (S.D. Cal. 2020)) (noting that courts recognize time spent responding to a data breach as a form of damages).

[7] *See Opperman v. Path, Inc.*, No. 13-CV-00453-JST, 2016 WL 3844326, at *15 (N.D. Cal. July 15, 2016) (noting that "several district courts in the Ninth Circuit have certified classes involving claims for nominal damages").

thousands of Washington residents' private information to hackers and the dark web; (4) Washington Class members have been injured by the Data Breach, specifically the lost market value of their PII; and (5) Accellion both directly and indirectly caused Class members' injuries.

**Element One: Accellion engaged in an unfair or deceptive act or practice.**

- **Accellion engaged in an unfair or deceptive act or practice when it failed to remediate known cybersecurity issues and retire the FTA from the market before the Data Breach.**
- The same or similar evidence used to prove a breach of duty under Plaintiffs' negligence claim will be used to prove that Accellion engaged in unfair or deceptive acts or practices under the WCPA. This evidence includes:
    - Despite marketing the FTA as a "secure" product, Accellion failed to follow its own written best security practices when it came to the FTA.
    - Accellion utilized fewer resources to ensure the FTA's security for its customers' use. For instance, Accellion staffed engineers with considerably less cybersecurity experience to build the FTA. Accellion further chose to discontinue or significantly scale back the use of a bug bounty program related to the FTA and only perform security updates on the FTA on an as-needed basis for critical vulnerabilities only.
    - Accellion admitted that the FTA product was missing key security features, including its lack of multiplier architecture, access control layering, intrusion prevention firewall, and lack of hardening at a system level. Accellion further admitted that the FTA had no new features implemented since Accellion launched its newer product, Kiteworks.
    - Accellion acknowledged that the FTA was outdated and not built to withstand sophisticated modern cyberattacks but continued to license the FTA to customers.
    - While employees repeatedly voiced concern about the FTA's various security vulnerabilities, Accellion's executives did nothing, waiting to retire the FTA and continuing to license a faulty product to dozens of customers.

**<u>Element Two: Accellion's unfair or deceptive act or practice occurred in trade or commerce.</u>**

- **Accellion engaged in "trade" and "commerce"[8] by licensing the FTA to a Washington entity that directly and indirectly affected the people of the State of Washington.**
  - Accellion licensed the FTA to the Washington State Auditor's Office during the class period.
  - The Washington State Auditor's Office utilized the FTA primarily for Washington state residents to submit unemployment claims.
  - As part of the submission process, Washington state residents had to submit their PII, which was transmitted using the FTA.

**<u>Element Three: Accellion's unfair or deceptive act or practice affects the public interest.</u>**

- **Accellion's aforementioned failures affected the public interest because the Data Breach exposed thousands of Washington residents' private information to hackers and the dark web.**
  - As shown in the expert report of Matt Strebe, the Data Breach exposed Washington Class members' PII to third parties.
  - As explained in the expert report of Mark Lanterman, as a result of the Data Breach, thousands of Washington residents' private information was exfiltrated by hackers and certain information was posted on the dark web or is substantially likely to be posted on the dark web.

[8] Washington Revised Code § 19.86.010(2) defines "trade" and "commerce" as "any commerce directly or indirectly affecting the people of the state of Washington."

**Element Four: Class members were injured.**

- **Class members have been injured by the Data Breach, specifically the lost market value of their PII.**
  - As shown in the expert report of Russell Mangum, Class members' PII has actual, monetizable value. This valuable data was stolen without compensating Class members, and therefore Class members have suffered damages.[9]

**Element Five: Accellion's unfair or deceptive act or practice specifically injured Class members.**

- **Accellion both directly and indirectly caused Class members' injuries. The Data Breach was the but-for cause of the various damages that Class members suffered. And Accellion knew or should have known about the vulnerabilities in the FTA before the Data Breach and therefore, proximately caused Class members' injuries.**
  - As shown in the expert report of Matt Strebe, the Data Breach exposed Class members' PII to third parties.
  - As shown in the expert report of Mark Lanterman, the specific exposure stemming from the Data Breach can be linked to hackers posting of Class members' information on the dark web.
  - Based on the FTA's myriad technical issues, its internal acknowledgment that the FTA was not built to withstand attack, and its own employees' repeated concerns, Accellion knew or should have known about the vulnerabilities in the FTA before the breach would be exploited in an attack like the Data Breach.

**5. Closing Arguments**

The parties will present closing arguments summarizing the evidence presented throughout trial and the main issues that the jury will be asked to decide.

[9] *See In re Accellion, Inc. Data Breach Litig.*, 713 F. Supp. 3d 623, 637 (N.D. Cal. 2024) (ECF No. 217 at 14) (citing *In re Experian Data Breach Litig.*, 2016 WL 7973595, at *5 (C.D. Cal. Dec. 29, 2016) (noting that an increasing number of courts have recognized "Loss of Value of PII as a viable damages theory"); *In re Anthem, Inc. Data Breach Litigation*, No. 15-MD-02617-LHK, 2016 WL 3029783, at *14 (N.D. Cal. May 27, 2016) (same).

6. **Final Instructions and Special Verdict Form**

Jury instructions used for the negligence claim will encompass all the elements of the negligence claim, which are the same across all states in the Class and Subclasses, allowing the jury to answer a single verdict form that will be equally applicable across the Class. *See* Ex. 1 (State Law Survey). Additionally, because the evidence proving the negligence and the WCPA claims significantly overlaps, as seen above, Plaintiffs will present evidence for both claims in their case-in-chief and in a streamlined verdict form.

## III. PROCEDURES IN THE EVENT OF A LIABILITY FINDING

In the event the jury finds for Plaintiff on each of the foregoing elements of the negligence claim and WCPA claim,[10] class-wide damages can be readily determined. As explained in the expert report of Russell Mangum, a jury can use common proof to determine damages under any of the damages models proposed by Plaintiffs.

## IV. CONCLUSION

This proposed Trial Plan demonstrates how trial of this action may be efficiently managed before a jury. Plaintiffs reserve the right to make changes to this trial plan in advance of trial as may be necessary or appropriate.

[10] In the event that the jury finds for the Plaintiffs on their WCPA claim, Plaintiffs will additionally seek treble damages under Washington Revised Code § 19.86.090. *See* RCW § 19.86.090 (stating that injured persons can seek treble damages "to increase the award of damages to an amount not more than three times the actual damages sustained, but such increased damage award shall not exceed twenty-five thousand dollars").