Fred Norton (CA SBN 224725)
fnorton@nortonlaw.com
Bree Hann (CA SBN 215695)
bhann@nortonlaw.com
Emily Kirk (CA SBN 348547)
ekirk@nortonlaw.com
Rebecca Kutlow (CA SBN 333944)
rkutlow@nortonlaw.com
Gil Walton (CA SBN 324133)
gwalton@nortonlaw.com
Heather Bates (CA SBN 337703)
hbates@nortonlaw.com
THE NORTON LAW FIRM PC
300 Frank H. Ogawa Plaza, Suite 450
Oakland, CA 94612
Telephone: (510) 906-4900

Camilo Artiga-Purcell (CA SBN 273229)
camilo.apurcell@kiteworks.com
ACCELLION, INC.
1510 Fashion Island Blvd, Suite 100
San Mateo, CA 94404
Tel: (415) 515-4724

Attorneys for Defendant
*Accellion, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE ACCELLION, INC. DATA BREACH LITIGATION | Case No. 21-CV-01155-EJD |
| | **DEFENDANT ACCELLION, INC.'S REPLY IN SUPPORT OF MOTION TO STRIKE PORTIONS OF THE REPORT OF PLAINTIFFS' EXPERT DANIEL KORCZYK** |
| | Hon. Edward J. Davila |
| | Date: April 17, 2025<br>Time: 9:00 AM<br>Courtroom: 4 – 5th<br>Hon. Edward J. Davila |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ...................................................................................................... 1

    A.    The Court May Strike Korczyk's Report At The Class Certification Stage. ..................... 1

    B.    Korczyk Has No Expertise Or Experience In Credit Monitoring, Identity-Theft
        Monitoring, Or The Sensitivity Of Categories Of Data Exposed In A Breach. ................... 3

        1.    Korczyk's Experience Testifying as a Data Breach Damages Expert Does Not
                Qualify Him to Opine on Credit Monitoring, Identity-Theft Monitoring, or the
                Sensitivity of Categories of Data Exposed in Data Breaches. ................................ 3

        2.    Korczyk's Unfamiliarity with His Own Report and the Facts of this Case
                Underscore His Lack of Expertise. .......................................................... 6

    C.    Korczyk's "Methodologies" Are Unreliable and Do Not Fit The Facts of This Case. ......... 8

        1.    Korczyk's Recommendation Regarding the Need for Paid, Third-Party
                Monitoring Services Is Based on Nothing More Than His Say-So. ...................... 9

        2.    Korczyk's Selection of IdentityGuard's Premium Monitoring Service Relies on
                Fatally Flawed Methodologies. ............................................................. 11

        3.    Korczyk's Monitoring-Duration Recommendation Is Pulled Out of Thin Air. ..... 13

III.  CONCLUSION ................................................................................................. 15

## **TABLE OF AUTHORITIES**

**Cases**                                                                                    Page(s)

*Aldan v. Home Depot USA Inc.*,
   2023 WL 5630076 (W.D. Wash. Aug. 31, 2023) ........................................................ 3

*Chamberlin v. Hartog, Baer & Hand, APC*,
   2022 WL 526157 (N.D. Cal. Feb. 22, 2022) ........................................................... 6

*Cleaver v. Transnation Title & Escrow, Inc.*,
   2024 WL 326848 (D. Idaho Jan. 29, 2024) ........................................................... 6

*Est. of Bruess ex rel. Bruess v. Blount Int'l, Inc.*,
   2011 WL 2680760 (N.D. Iowa July 8, 2011) ........................................................ 5

*Sec. Exch. Comm'n v. Lek Sec. Corp.*,
   2019 WL 2021879 (S.D.N.Y. May 8, 2019) ......................................................... 7

*Flipsi, Ltd. v. Tomy Int'l, Inc.*,
   2025 WL 388957 (N.D. Ill. Feb. 4, 2025) ...................................................... 4, 5, 6

*Gamevice, Inc. v. Nintendo Co.*,
   2020 WL 13739193 (N.D. Cal. June 4, 2020) ................................................ 1, 4, 6, 8

*Grodzitsky v. Am. Honda Motor Co.*,
   957 F.3d 979 (9th Cir. 2020) ...................................................................... 1, 2

*Hatfield v. Wal-Mart Stores, Inc.*,
   335 F. App'x 796 (10th Cir. 2009) ................................................................... 8

*Holley v. Gilead Scis., Inc.*,
   2024 WL 538535 (N.D. Cal. Jan. 29, 2024) ..................................................... 10, 14

*Huynh v. Quora, Inc.*,
   508 F. Supp. 3d 633 (N.D. Cal. 2020) ................................................................ 5

*Hynix Semiconductor Inc. v. Rambus Inc.*,
   2008 WL 73681 (N.D. Cal. Jan. 5, 2008) .................................................... 12, 13, 15

*In re Brinker Data Incident Litig.*,
   2021 WL 1405508 (M.D. Fla. Apr. 14, 2021) ........................................................ 4

*In re Apple iPhone Antitrust Litig.*,
   2022 WL 1284104 (N.D. Cal. Mar. 29, 2022) ........................................................ 2

*Klein v. Meta Platforms, Inc.*,
  2025 WL 489871 (N.D. Cal. Feb. 13, 2025) ...................................................... 2

*Maldonado v. Apple, Inc.*,
  2021 WL 1947512 (N.D. Cal. May 14, 2021) ........................................... 1, 3, 6

*Montera v. Premier Nutrition Corp.*,
  2022 WL 1225031 (N.D. Cal. Apr. 26, 2022) .............................................. 5

*NetFuel, Inc. v. Cisco Sys. Inc.*,
  2020 WL 1274985 (N.D. Cal. Mar. 17, 2020) ............................................ 15

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) ....................................................................... 2

*Pac. Info. Res., Inc. v. Simple Commc'ns*,
  2008 WL 5071110 (N.D. Cal. Nov. 26, 2008) ..................................... 1, 12, 14

*Palantir Techs. Inc. v. Abramowitz*,
  2022 WL 22913842 (N.D. Cal. Nov. 3, 2022) ............................................ 9

*Perry v. Schwarzenegger*,
  704 F. Supp. 2d 921 (N.D. Cal. 2010) ...................................................... 13

*Rambus Inc. v. Hynix Semiconductor Inc.*,
  254 F.R.D. 597 (N.D. Cal. 2008) .............................................................. 6

*RJ v. Cigna Health & Life Ins. Co.*,
  2024 WL 1107826 (N.D. Cal. Feb. 12, 2024) ........................................ 1, 2

*Sali v. Corona Reg'l Med. Ctr.*,
  909 F.3d 996 (9th Cir. 2018) ..................................................................... 2

*Savidge v. Pharm-Save, Inc.*,
  2023 WL 2755305 (W.D. Ky. Mar. 31, 2023) ........................................... 4

*Snyder v. Bank of Am., N.A.*,
  2020 WL 6462400 (N.D. Cal. Nov. 3, 2020) ...................................... 4, 5, 12

*Tyson Foods v. Bouaphakeo*,
  577 U.S. 442 (2016) .................................................................................. 2

*United States v. Chang*,
  207 F.3d 1169 (9th Cir. 2000) ................................................................... 4

*W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*,
  65 F. Supp. 2d 1052 (N.D. Cal. 1998) ...................................................... 8

iii

*Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*,
   254 F.3d 706 (8th Cir. 2001) ............................................................................................. 5

*Wilson v. Woods*,
   163 F.3d 935 (5th Cir. 1999) ............................................................................................. 5

*640 Octavia, LLC v. Pieper*,
   2019 WL 1201581 (N.D. Cal. Mar. 14, 2019) ................................................... 1, 9, 12, 14

**<u>Rules</u>**

Fed. R. Civ. P. 23(b)(3) ............................................................................................................ 5

Fed. R. Civ. P. 26(a)(2)(B) ....................................................................................................... 7

Fed. R. Evid. 702 ..................................................................................................................... 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**I.    INTRODUCTION**

Daniel Korczyk is an accountant with experience testifying as an accounting and damages expert.  But he has no expertise in credit monitoring or identity-theft monitoring, and no expertise analyzing the sensitivity of categories of data exposed in data breaches.  It thus unsurprising that Korczyk's report, written by someone with no experience in the relevant subject matter, is littered with *ipse dixit* and flawed, unsupported methodologies.  Plaintiffs, in opposition to Accellion's motion to strike Korczyk's report, offer a few responses to these deficiencies, but they are each unpersuasive.

Beginning with their threshold argument that this Court may not strike Korczyk's report at the class certification stage, Plaintiffs are incorrect.  Both the Ninth Circuit and courts in this District (including this Court) continue to recognize the propriety of striking expert reports at the class certification stage.  *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 985-86 (9th Cir. 2020); *RJ v. Cigna Health & Life Ins. Co.*, 2024 WL 1107826, at *5-6 (N.D. Cal. Feb. 12, 2024) (Davila, J.).

Next, despite efforts to inflate Korczyk's resume, Plaintiffs have not demonstrated he is qualified to opine on the need for credit and identity-theft monitoring after a data breach, or the sensitivity of categories of exposed data.  The best Plaintiffs can cobble together is Korczyk's experience testifying as a *damages* expert in data breach cases, but that experience does not make him qualified to discuss the distinct subjects of his report.  *Maldonado v. Apple, Inc.*, 2021 WL 1947512, at *17 (N.D. Cal. May 14, 2021); *Gamevice, Inc. v. Nintendo Co.*, 2020 WL 13739193, at *13 (N.D. Cal. June 4, 2020).

Turning last to the reliability of Korczyk's methodologies, the central plank of Plaintiffs' argument is that Korczyk's methodologies are "judgment calls," so their flaws and lack of support go only to weight, not admissibility.  But simply labeling Korczyk's say-so a "judgment call" falls well short, particularly given Korczyk's lack of experience and expertise in the subjects on which he purports to exercise judgment.  *Pac. Info. Res., Inc. v. Simple Commc'ns*, 2008 WL 5071110, at *2 (N.D. Cal. Nov. 26, 2008); *640 Octavia, LLC v. Pieper*, 2019 WL 1201581, at *2 (N.D. Cal. Mar. 14, 2019).

For these reasons, paragraphs 5-8, 13, 15, 17, and 19-63 of Korczyk's report should be stricken.

**II.    ARGUMENT**

   **A.    The Court May Strike Korczyk's Report At The Class Certification Stage.**

At the outset, Plaintiffs erroneously contend this Court cannot strike Korczyk's opinions at the

class certification stage, arguing that "an inquiry into the evidence's ultimate admissibility"—even opinions offered by purported experts—"should go to the weight that evidence is given." Dkt. 337 at 2-3 (citing *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018)). Not so. In *Sali*, on which Plaintiffs heavily rely, the Ninth Circuit expressed concerns with striking a *lay witness's* report at class certification where the plaintiffs may not have had the opportunity to "gather crucial admissible evidence." *Sali*, 909 F.3d at 1004. Korczyk is not offered as a lay witness, and the Ninth Circuit's concern about discovery is not present here: discovery is complete, save some unrelated, limited non-party discovery. Dkt. 336. *Sali* does not bar this Court from striking Korczyk's report.

This conclusion is consistent with the practice of courts in this Circuit following *Sali*. Since that decision, the Ninth Circuit has affirmed exclusion of an expert at the class certification stage, *Grodzitsky*, 957 F.3d at 985-86, and courts in this District—including this Court—regularly strike expert reports offered in support of class certification, *Klein v. Meta Platforms, Inc.*, 2025 WL 489871, at *8 (N.D. Cal. Feb. 13, 2025); *Cigna Health & Life Ins. Co.*, 2024 WL 1107826, at *5-6 (Davila, J.); *In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *2-10 (N.D. Cal. Mar. 29, 2022). The continued viability of *Daubert* motions to strike expert reports offered in support of class certification is also supported by (1) the post-*Sali en banc* Ninth Circuit's statement that "[i]n carrying the burden of proving facts necessary for certifying a class under Rule 23(b)(3), plaintiffs may use any *admissible* evidence," *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (en banc) (emphasis added) (citing *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 454-55 (2016)), and (2) the advisory committee notes to the 2023 amendments to Rule 702, which state: "[M]any courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702, Advisory Committee Notes,2023 Amendment. This Court can, and should, strike paragraphs 5-8, 13, 15, 17, and 19-63 of Korczyk's report.

Regardless, even if Plaintiffs are correct that Korczyk's dearth of qualifications and expertise and the unreliability of his methodologies go only to the weight of his report and not its admissibility, those flaws demonstrate his report should be given no weight at all.

### B. Korczyk Has No Expertise Or Experience In Credit Monitoring, Identity-Theft Monitoring, Or The Sensitivity Of Categories Of Data Exposed In A Breach.

Korczyk, an accountant who has *never before* testified about the need for credit- and identity-theft-monitoring services after a data breach, or about the sensitivity of information disclosed in data breaches, is unqualified to opine on the subjects of his report, and his unfamiliarity with the facts of this case and his report only underscores his lack of expertise.

#### 1. Korczyk's Experience Testifying as a Data Breach Damages Expert Does Not Qualify Him to Opine on Credit Monitoring, Identity-Theft Monitoring, or the Sensitivity of Categories of Data Exposed in Data Breaches.

To salvage Korczyk's deficient report, Plaintiffs first obscure the purpose for which Korczyk's opinions are offered by broadly recharacterizing him as a "data breach expert" who has "served as an expert witness or in support of an expert witness in *eighteen* data breach cases." Dkt. 337 at 3 (emphasis in original). But Korczyk is not offered as a general "data breach expert." Instead, Korczyk here opines specifically on (1) the extent of the need for credit and identity-theft monitoring following a data breach and (2) the sensitivity of categories of data exposed in data breaches. Dkt. 317-39 ¶ 7. Plaintiffs cannot recast the purpose for which Korczyk's opinions are offered at a "more generalized level of abstraction" to shield him from *Daubert* scrutiny. *Aldan v. Home Depot USA Inc.*, 2023 WL 5630076, at *8 (W.D. Wash. Aug. 31, 2023); *Maldonado*, 2021 WL 1947512, at *17 ("slapping the label ['data breach expert'] on an expert or opinion is insufficient to show expertise across that expansive field").

Regardless, and as Accellion explained in its opening brief, Korczyk is not the "data breach expert" Plaintiffs claim he is. In his deposition, Korczyk admitted that he has *never before* opined as to whether consumers need credit or identity-theft monitoring following a data breach, nor has he opined on the sensitivity of categories exposed in data breaches. Dkt. 320-13 ("Kirk Ex."), Kirk Ex. 87 at 40:17-41:3. Among other things, Korczyk further conceded (1) he has never published an article about data breaches; (2) he could not recall a single academic article, journal, or book he had ever read that discusses when professional third-party credit monitoring is appropriate; and (3) he could not identify any training or courses that would qualify him to opine on the subjects of his report. Dkt. 318-3 at 6.

Plaintiffs attempt to paper over these admissions by gesturing to the data breach cases in which Korczyk previously testified. But in each of those cases, Korczyk was testifying on a different subject: *damages* following a data breach *after the need for credit and identity-theft monitoring was assumed.*

Plaintiffs do not contest this point, and their own authorities confirm it.  In *In re Brinker Data Incident Litig.*, for instance, Korczyk was offered "to show that a common method of calculating class members' *damages* exists for purposes of predominance under Federal Rule of Civil Procedure 23(b)(3)."  2021 WL 1405508, at *2 (M.D. Fla. Apr. 14, 2021) (emphasis added).  The court there found Korczyk qualified as a *damages* expert because "Korczyk has almost forty years' experience in public accounting, including serving as a lead case analyst, in other data breach actions *where he was also tasked with finding a common method to calculate damages*."  *Id.* (emphasis added).  And *Savidge v. Pharm-Save, Inc.*, is more of the same, as the district court there found Korczyk qualified "to calculate and testify to the[ Plaintiffs'] alleged *damages*."  2023 WL 2755305, at *18 (W.D. Ky. Mar. 31, 2023) (emphasis added).  But Korczyk is not testifying as a damages expert in *this* case, Kirk Ex. 87 at 73:6-7, and he has *never* been qualified as an expert to opine on the need for credit or identity-theft monitoring following a data breach, or on the sensitivity of categories of data exposed in a data breach.

Courts in this District and throughout the country have cautioned against precisely what Plaintiffs attempt here: blurring the line between specializations to allow an expert in one specific domain to claim similar authority in other fields.  *See Snyder v. Bank of Am., N.A.*, 2020 WL 6462400, at *4 (N.D. Cal. Nov. 3, 2020) ("[E]xpertise in one subject does not necessarily mean the expert will be qualified to testify on all issues that could arise from that subject." (quotation omitted)).  In analogous circumstances, courts have excluded proposed expert testimony regarding the technical aspects of patents where the purported expert's experience was only as a *damages* expert in patent cases:

> Harrington is not qualified to testify regarding the relevant article of manufacture in this particular case.  Although Flipsi cites Harrington's extensive background as a forensic accountant, it does not explain how his background qualifies him to identify an article of manufacture in the present circumstances.  Nor could it, as the factors relate to patent construction and product design, not economics.…  Harrington's economic expertise does not make him an expert in patent construction.

*Flipsi, Ltd. v. Tomy Int'l, Inc.*, 2025 WL 388957, at *9 (N.D. Ill. Feb. 4, 2025); *Gamevice, Inc.,* 2020 WL 13739193, at *13 (patent damages expert's opinions on "technical" aspects of patents were "outside [his] area of expertise: economics").

Other examples abound: a proposed expert's expertise in international finance did not qualify him as an expert in the authenticity of a Japanese security, *United States v. Chang*, 207 F.3d 1169, 1171-

74 (9th Cir. 2000); a proposed expert's specialization in flood management did not render them qualified to provide testimony on safe warehousing practices in a case about flood damage to a warehouse, *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 714-16 (8th Cir. 2001); a proposed expert's specialization in fire damage reconstruction did not qualify them to testify on automobile accident reconstruction, *Wilson v. Woods*, 163 F.3d 935, 937-38 (5th Cir. 1999); a proposed expert's experience in real estate and preparing residential loans did not render them qualified to testify about real estate loan servicing, *Snyder*, 2020 WL 6462400, at *4; a proposed medical expert's experience as a rheumatologist did not qualify them to testify on gut biome and nutrient absorption, *Montera v. Premier Nutrition Corp.*, 2022 WL 1225031, at *9 (N.D. Cal. Apr. 26, 2022), *aff'd in relevant part*, 111 F.4th 1018 (9th Cir. 2024); and a proposed expert's specialization in food product warnings did not qualify them to testify on other types of product warnings, *Est. of Bruess ex rel. Bruess v. Blount Int'l, Inc.*, 2011 WL 2680760, at *25 (N.D. Iowa July 8, 2011).

As in *Flipsi* and *Gamevice*, Korczyk's experience as a damages expert in data breach cases, however extensive, simply does not qualify him to opine on separate, specialized aspects of data breach cases: the extent of the need for credit or identity-theft monitoring following a data breach and the sensitivity of categories of data exposed in a data breach.

The "similar" case Plaintiffs offer in support of Korczyk's qualifications actually cuts the other way. In *Huynh v. Quora, Inc.*, the plaintiffs offered a proposed expert declaration regarding "the nature and scope of the Data Breach and the distinction among the various credit monitoring services at issue." 508 F. Supp. 3d 633, 645 (N.D. Cal. 2020). The expert, David Sun, was qualified to testify on those subjects, the court reasoned, because he was the "partner in charge of the cyber security and forensics practice at his firm and previously owned a consulting firm specializing in these areas," and he was a "Certified Information Systems Security Professional, a Certified Computer Examiner, and an EnCase Certified Examiner with a master's degree in electrical engineering." *Id.* at 645-46. Sun's and Korczyk's qualifications could not be more different. Sun had a technical background in cyber security and computer forensics, in addition to experience running a cyber security consulting firm— qualifications directly relevant to "the nature and scope of the Data Breach and the distinction among the various credit monitoring services at issue." *Id.* at 645. Korczyk, on the other hand, is an accountant

with "more than 40 years of experience in Public and Corporate Accounting" and "Forensic Accounting," qualifications perhaps relevant to opining on data breach *damages*, but not on the subjects of Korczyk's report. *Flipsi, Ltd.*, 2025 WL 388957, at *9; *Gamevice, Inc.*, 2020 WL 13739193, at *13.

Finally, Plaintiffs explain that Korczyk's purported "qualifications" will be "discussed more fully in Korczyk's rebuttal report." Dkt. 337. at 5; *see also id.* at 6 ("Korczyk will explain in greater detail how this experience supplements his data breach experience in his rebuttal report."). But Plaintiffs cannot sandbag to save Korczyk. The basis for Korczyk's opinions, including his qualifications, were required to appear in his opening report, and Plaintiffs cannot use a rebuttal report filed well after Accellion's motion to bolster his deficient credentials. Fed. R. Civ. P. 26(a)(2)(B) (expert's opening report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them"); *Chamberlin v. Hartog, Baer & Hand, APC*, 2022 WL 526157, at *14 (N.D. Cal. Feb. 22, 2022), *aff'd*, 2023 WL 2202230 (9th Cir. Feb. 24, 2023); *Cleaver v. Transnation Title & Escrow, Inc.*, 2024 WL 326848, at *5 (D. Idaho Jan. 29, 2024) ("[A] party cannot use a rebuttal report to correct its initial report's deficiencies."). The Court's analysis for the motion to strike is limited to whether Korczyk's opening report, standing alone, passes muster.[1]

In sum, Korczyk lacks the qualifications and expertise to testify as to the subjects of his report, and simply "slapping the label ['data breach expert'] on an expert or opinion is insufficient to show expertise across that expansive field." *Maldonado*, 2021 WL 1947512, at *17.

### 2.    Korczyk's Unfamiliarity with His Own Report and the Facts of this Case Underscore His Lack of Expertise.

Plaintiffs next object that Korczyk' apparent lack of familiarity with the facts of the case and his report are of no moment because he was (1) subjected to a "memory test" deposition and (2) asked about "disputed" facts outside the scope of his report. Dkt. 337 at 8-10. Plaintiffs are wrong on both accounts.

---

[1]In passing, Plaintiffs confusingly argue that Accellion's damages expert, Elizabeth Dean, lacks the qualifications Accellion demands of Korczyk. But whether Dean is qualified to offer expert opinions on damages (she is) is irrelevant to whether Korczyk is qualified and whether his report should be stricken. *Rambus Inc. v. Hynix Semiconductor Inc.*, 254 F.R.D. 597, 604-605 (N.D. Cal. 2008) (rejecting argument that opposing party's expert's qualifications are relevant to a motion to strike different expert).

To start, Korczyk's deposition was not a "memory test," though his lack of familiarity with his report and the credit- and identity-theft-monitoring industries may have made it feel that way. For instance, Korczyk was asked a simple question about IDX, the "the nation's largest provider of data breach response services," Dkt. 317-39 at n.41: "Q. To make sure my record is clear, as a self-professed expert in this area, do you know whether IDX provides credit monitoring; yes or no please? … A. Not as I sit here." Kirk Ex. 87 at 163:3-9. This was not a "gotcha" question about some obscure portion of Korczyk's report. His report purports to analyze various credit- and identity-theft-monitoring services, and yet Korczyk did not know whether IDX, a company *he discusses in his report*, even offers credit-monitoring services. Dkt. 317-39 at p. 3 (report "addresses recommended credit, identity theft, and other monitoring services following the Data Breach"); *id.* at n.41 (discussing IDX and citing to IDX's website). Korczyk's dearth of knowledge was not limited to IDX, either, as he could only recall four of the six credit- and identity-theft monitoring services his report analyzed. Kirk Ex. 87 at 53:12-19.

Plaintiffs try to brush aside these deficiencies by pointing out that Korczyk knew IDX broadly provides "[d]ata breach response services." Dkt. 337 at 9. But Korczyk's report is not about "data breach response services" generally—he makes specific recommendations about individual credit- and identity-theft-monitoring services. Once again, Plaintiffs cannot simply increase the level of abstraction to lift Korczyk over the *Daubert* hurdle. Without his report as a crutch, Korczyk did not know the answers to basic questions about the industry and products on which he opines. This is not enough to survive scrutiny under *Daubert*. *See, e.g.*, *Sec. & Exch. Comm'n v. Lek Sec. Corp.*, 2019 WL 2021879, at *1 (S.D.N.Y. May 8, 2019) (denying motion to reconsider exclusion of expert who, "sitting here right now," "couldn't even explain some of the passages in his own report" and "was not familiar with documents on which his expert report relied").

Plaintiffs then concede Korczyk was unaware of a litany of facts about this case but argue those facts do not matter for purposes of this motion to strike. They do. By way of example, Korczyk was unaware of the undisputed fact that both Kroger and Centene settled the claims against them relating to their FTA attacks and provided credit- and identity-theft-monitoring services as part of those settlements—including to individuals encompassed by Plaintiffs' putative classes. Kirk Ex. 87 at 71:2-17; *see also* Kirk Exs. 73 at 8, 12-13; 74 at 5; 79 at ¶ 4; 80 at 15-16. This is a fact Korczyk should have

considered, as it directly contradicts his conclusion that all named Plaintiffs and class members "require mitigation services," and should receive a paid monitoring service. Dkt. 317-39 at p. 4 (Summary Conclusion 1); *id.* ¶ 42 & n.4. Tellingly, Plaintiffs' opposition does not address this omission at all.

Similarly, Plaintiffs seek to downplay the fact that Korczyk assumed all the information obtained in the attack on Kroger's FTA instance was disclosed, because he did not know that Kroger paid to recover all the information. Dkt. 337 at 9-10. The Court should ignore this deficiency, Plaintiffs contend, because Kroger has not yet been deposed in this case and because a yet-to-be-filed expert report will salvage Korczyk's report on this point. *Id.* But this Court approved settlement of the FTA-related class action against Kroger in reliance, in part, on the parties' sworn representation that Kroger paid a ransom to recover its data, the data was returned, and the hackers provided a video showing the data was deleted. Kirk Ex. 124 ¶ 37. A deposition of a Kroger witness will not change those facts. And as explained above, whether Korczyk's report passes muster must be considered without regard to a rebuttal report filed by a different expert long after Accellion filed its motion to strike. *Supra* p. 6.

Finally, Plaintiffs do not meaningfully address Korczyk's failure to consider the undisputed fact that hundreds of thousands of applications made to the Washington State Employment Security Department, allegedly disclosed as part of this data breach, were submitted by impostors using information disclosed in prior data breaches. Kirk Ex. 87 at 203:19-204:7. This fact, too, is crucial, as it demonstrates Korczyk blindly assumed all class members require the same mitigation services as a result of this breach, even if an individual's information was previously disclosed in an unrelated breach.

In short, Korczyk's lack of familiarity with his own report and the facts of this case renders him unqualified. Paragraphs 5-8, 13, 15, 17, and 19-63 of his report should be stricken. *Gamevice, Inc.*, 2020 WL 13739193, at *13; *W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1060 (N.D. Cal. 1998), *aff'd*, 190 F.3d 974 (9th Cir. 1999) ("When expert opinions are not supported by sufficient facts, or when the indisputable record contradicts or otherwise renders the opinions unreasonable, they cannot be relied upon."); *Hatfield v. Wal-Mart Stores, Inc.*, 335 F. App'x 796, 801 (10th Cir. 2009) (affirming exclusion of expert who "was not familiar with the facts of the case").

**C.   Korczyk's "Methodologies" Are Unreliable and Do Not Fit The Facts of This Case.**

Alternatively, if the Court determines Korczyk is qualified, it should nevertheless hold that his

three conclusions—(1) consumers whose data was allegedly taken in the FTA data breach need paid monitoring services; (2) consumers should receive the premium, $300-per-year monitoring service offered by IdentityGuard; and (3) depending on the information allegedly stolen, consumers should receive either 5, 7, or 10 years of monitoring services—are unreliable, lack fit, and should be stricken.

### 1. Korczyk's Recommendation Regarding the Need for Paid, Third-Party Monitoring Services Is Based on Nothing More Than His Say-So.

In support of Korczyk's flawed conclusion that all named Plaintiffs and class members require paid monitoring services, Plaintiffs rely solely on Korczyk's supposed "knowledge and experience" and invite the Court to ignore the series of sources Korczyk cites that directly contradict his recommendation. Dkt. 337 at 11. This Court should decline the offer.

Plaintiffs first argue Korczyk's conclusion about the need for paid monitoring is sufficiently reliable and not bare *ipse dixit* because it is "based on his knowledge and experience after reviewing the information produced in this litigation and publicly available sources." *Id.* But courts in this District regularly exclude expert testimony that purports to rely on "experience" where the proposed expert does not actually have experience in the relevant field and does not provide a sufficient rationale for how that experience led to the proposed expert's conclusions. *See 640 Octavia, LLC*, 2019 WL 1201581, at *2 (excluding expert because the expert did not explain "how th[eir] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts"); *Palantir Techs. Inc. v. Abramowitz*, 2022 WL 22913842, at *12 (N.D. Cal. Nov. 3, 2022) (excluding in part expert who, when asked to explain a basis for his opinion, responded that it was "based on [his] experience"). Here, Korczyk leans almost exclusively on his non-existent "experience and training" in the credit- and identity-theft monitoring fields to recommend paid monitoring services to the named Plaintiffs and class members, but he does not explain how his conclusion follows from that "experience." *See* Kirk Ex. 87 at 36:7-19. Such a recommendation is no more than impermissible *ipse dixit*.

This flaw in Korczyk's methodology is further exposed by the litany of sources Accellion identified in its opening brief that contradict Korczyk's recommendation. Dkt. 337 at 12. Under the heading "Post-breach Monitoring is Widely Recommended," Korczyk cites only four sources, three of which Accellion addressed in its opening brief: Norton LifeLock, U.S. News and World Report, and a

9

2014 report by the Ponemon Institute.  Dkt. 317-39 ¶¶ 38-40.  As Accellion explained, none of those sources supports Korczyk's recommendation that class members need paid third-party monitoring services (rather than a free service); in fact, they contradict that conclusion.  Dkt. 318-3 at 8-9; *Holley v. Gilead Scis., Inc.,* 2024 WL 538535, at *2 (N.D. Cal. Jan. 29, 2024) (excluding expert who could not point to any publication or literature supporting conclusion).  Lest there be any doubt, the final source Korczyk cites, a Consumer Reports article, fares no better.  Dkt. 317-39 ¶ 41, n.54.  That article does not recommend paid (or even free) monitoring services, and states only that individuals should "be sure to monitor all [their] active accounts, including those with [their] banks, lenders, and retailers."  *Id.*  These sources thus were not "cherry-pick[ed]," as Plaintiffs argue.  Dkt. 337 at 12.  They are the only sources Korczyk cites in support of his paid-monitoring recommendation, and they offer no support at all.

Plaintiffs respond by attempting to prop up Korczyk's report and arguing that at least *some* other sources scattered throughout Korczyk's report do not contradict his paid-monitoring recommendation. But those sources do not support it, either.  For instance, the Fox Business article Korczyk and Plaintiffs identify says nothing about whether individuals should have monitoring services, much less whether individuals should have *paid*—rather than *free*—monitoring services.  Dkt. 317-39 ¶ 22, n.44; Dkt. 337 at 11.  Plaintiffs argue this source and others are "also consistent with the fact that each of the named Plaintiffs received a Data Breach Notice providing some form of credit monitoring."  Dkt. 337 at 11. But the fact that Plaintiffs and class members were already offered monitoring services by the FTA customers only further undercuts Korczyk's recommendation that they also require paid monitoring services in this case.  Indeed, the FTC source on which Plaintiffs and Korczyk rely underscores this internal contradiction, as it includes a model attachment for businesses who suffered a data breach to provide to affected customers, which states, "If a company responsible for exposing your information offers you free credit monitoring, take advantage of it."  Dkt. 317-39 at ¶ 21, n.23.

In short, even a cursory review of Korczyk's deposition and report reveals that (1) his opinions on the need for credit- and identity-theft monitoring services in this case are supported only by his insufficient "experience," and (2) he relies on sources that contradict (or, at minimum, do not support) his recommendation.  Stripped away of the chaff, the lone basis for Korczyk's recommendation that class members should receive paid third-party monitoring services is his unreliable say-so.  Paragraphs

25-42 of his report should be stricken.

### 2. Korczyk's Selection of IdentityGuard's Premium Monitoring Service Relies on Fatally Flawed Methodologies.

Like his initial, unfounded assumption that all class members require paid monitoring services, Korczyk's methodology for selecting a specific monitoring service is riddled with flaws.

To cover up the holes Accellion identified in the "research" Korczyk conducted to create an initial list of monitoring services, Plaintiffs first contend that "most professionals use online searches to supplement their research." Plaintiffs misunderstand the argument. Dkt. 337 at 13. It is not Accellion's position that experts are barred from using Google or the internet for research. Rather, Accellion's argument is that Korczyk did nothing more than a Google search and, rather than deploying any reliable methodology, blindly relied on reviews and ratings from four websites (consumersadvocate.org, the Better Business Bureau, Top10.com, and Identityprotection-review.com) without considering who conducted the reviews for those sites, whether the reviewers had any expertise in credit and identity-theft monitoring, whether the reviews were influenced by money paid by the monitoring services to the website, or whether the websites were simply advertising sites. Dkt. 318-3 at 9-10.

Plaintiffs' efforts to rehabilitate Korczyk's shoddy research only highlight its shortcomings. Plaintiffs argue that Korczyk did not lie when he purported to identify monitoring services with "consistent year-over-year ratings in the range of A- to A+," yet Plaintiffs concede in the same breath that only one of the sites on which Korczyk relied, the Better Business Bureau, uses that rating system. Dkt. 317-39 ¶ 47; Dkt. 337 at 14. Plaintiffs further admit the Better Business Bureau does not review monitoring *services* at all, but rather monitoring *companies*—an important distinction, since Korczyk purports to make a monitoring *service* recommendation; the ranking of the *companies* is irrelevant. Dkt. 337 at 14. And although Plaintiffs claim the Better Business Bureau "does not accept money to review companies" (Accellion never argued it did), they do not attempt to rebut Accellion's point that the reviews on consumersadvocate.org, Top10.com, and identityprotectionreview.com may have been influenced by money paid to the sites by the monitoring services. *Id.*; Dkt. 318-3 at 10.

Plaintiffs then claim the methodology by which Korczyk selected IdentityGuard's $300-per-year "premium" plan is reliable, but in so doing, ignore Korczyk's report and testimony. Dkt. 337 at 12-13. For example, Korczyk supposedly compared free monitoring services to "compensated" monitoring

services and concluded that Plaintiffs and class members require a "more robust" compensated monitoring service. Dkt. 317-39 ¶ 45, n.57. But in support of his assertion that compensated services are "more robust" and a better fit in this case, Korczyk offers no citations, he does not detail the comparison between the various features offered by free and compensated services, and he offers only his own say-so in support of his conclusion: "It is unwise, in my opinion, as a financial forensic specialist, to mirror the insufficient security that led to the breach with subpar mitigation monitoring." *Id.* His unwillingness to offer a side-by-side comparison of free and compensated monitoring services is telling, as his report concedes that free services may actually offer many of the same services as compensated ones, such as "live assistance from specialists" and "insurance protection." *Id.* ¶ 45 (stating vaguely that "[f]ree services also *tend* to not offer live assistance from specialists or provide insurance protection" and compensated services "*tend* to incorporate unique 'add on' features" but offering no real-world comparisons (emphases added)).

Korczyk's "just-trust-me" reasoning is particularly damning here. Although Korczyk ultimately recommends IdentityGuard's premium monitoring service, at his deposition he could not explain the differences between IdentityGuard's $300-per-year service and its less expensive offering, as he professed those differences were outside the "scope" of his report. Kirk Ex. 87 at 104:24-105:16. All that is left, then, is Korczyk's "professional judgment" in selecting a monitoring service. Dkt. 337 at 14. Given his inexperience in this field, that alone is not enough to satisfy *Daubert*. *See Pac. Info. Res., Inc.*, 2008 WL 5071110, at *2 (a "pure judgment call" does not "suggest" a "reliable methodology"); *640 Octavia, LLC*, 2019 WL 1201581, at *2.

Next, Plaintiffs attempt to clean up Korczyk's admission that he would recommend the same premium IdentityGuard service to all class members regardless of what information was stolen. Plaintiffs argue that although Korczyk failed to account for variation among the types of information stolen from class members, that "is not a basis to strike his opinions." Dkt. 337 at 15. Of course, Plaintiffs offer no legal authority in support of this position, and courts have held that failure to account for the underlying facts of the case renders a methodology unreliable. *Snyder*, 2020 WL 6462400, at *6; *Hynix Semiconductor Inc. v. Rambus Inc.*, 2008 WL 73681, at *5 (N.D. Cal. Jan. 5, 2008) ("A reasonable jury cannot credit testimony that fails to reflect reality."). Nor does Plaintiffs' reliance on the

expert report of Mark Lanterman to argue that criminals can use individual pieces of information to create a "more complete profile" save Korczyk's methodology.  Both Lanterman and Korczyk recognize the risk to the individual increases and decreases depending upon the amount and type of information stolen.  *See* Dkt. 317-38 ¶ 24; Dkt. 317-39 ¶ 55.  Korczyk should have accounted for this before recommending the same service for all class members, but he did not.

Last, Plaintiffs argue the Court should ignore Korczyk's failure to account for the fact that (1) Kroger paid to recover all the information that was allegedly removed from the attack on its FTA, (2) class members were already offered monitoring services by Accellion's customers, and (3) class members may have already monitored their credit personally through free or paid third-party services at the time of the breach.  Dkt. 337 at 15.  Specifically, Plaintiffs claim these are "disputed" facts and that Korczyk was not required to "anticipate offsets" that contradict the opinions in his report.  *Id.*  But these facts are not "disputed": Kroger submitted a sworn statement to this Court that it paid the ransom to recover its data, the data was returned, and the hackers provided a video showing the data was deleted, Kirk Ex. 124 ¶ 37; publicly available documents describe the monitoring services Accellion's customers offered to class members, *see* Kirk Exs. 54, 73, 74 (Kroger); 65 (WASAO); 59 at 219, 68, 75 (UC); 78, 79, 80, 81 (Centene); 71 (Flagstar); and several Plaintiffs themselves testified that they either accepted the services offered by Accellion's customers or used another monitoring service, Dkt. 318-4 at 12 (collecting deposition testimony).  To survive scrutiny under *Daubert*, a proposed expert's methodology must account for the real-world facts, including contrary evidence.  *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 950 (N.D. Cal. 2010) (expert's opinions unreliable where expert "failed to consider evidence contrary to his view").  Because Korczyk's methodology does not consider such evidence and "fails to reflect reality," it is unreliable.  *Hynix Semiconductor Inc.*, 2008 WL 73681, at *5.

For these reasons, paragraphs 43-51 of Korczyk's report should be stricken.

### 3. Korczyk's Monitoring-Duration Recommendation Is Pulled Out of Thin Air.

Finally, Plaintiffs spend over five pages trying to rationalize Korczyk's ten-, seven-, and five-year monitoring duration tiers, but ultimately cannot overcome Korczyk's admission that they were pulled out of thin air.  *See* Kirk Ex. 87 at 169:2-170:13, 180:21-182:11.

Plaintiffs begin by discussing the 2015 Office of Personnel Management Data Breach, in which

OPM ultimately offered ten years of monitoring services.  Plaintiffs and Korczyk characterize the OPM breach as "comparable," and Korczyk uses it as the benchmark for his monitoring tiers.  Dkt. 337 at 16; *see* Dkt. 317-39 ¶ 59.  But as Korczyk conceded in his deposition, the OPM breach involved a litany of stolen information not at issue here: educational history, criminal history, background interviews, fingerprint information, and usernames and passwords. Kirk Ex. 87 at 163:11-169:1.  It is not "comparable" at all.  But even if it were, it still does not support Korczyk's ten-, seven-, and five-year monitoring duration tiers.  While Congress ultimately chose to have OPM provide ten years of monitoring following that breach, there was no tiered monitoring duration like Korczyk proposes here. Korczyk's three tiers and their lengths are entirely arbitrary.  *Id.* at 169:2-170:13, 180:21-182:11.

Plaintiffs then follow up by citing to a series of sources scattered throughout other portions of Korczyk's report which they contend "support[] his credit monitoring duration opinion."  Dkt. 337 at 18. But those sources merely stand for the general proposition that there may be a delay between the time when the data is taken and the time when the data is used by criminals.  *Id.*  They are silent as to how long an individual should have monitoring services, and they certainly do not endorse the ten-, seven-, and five-year monitoring duration tiers Korczyk recommends.  *See id.*

This overwhelming lack of support is consistent with Korczyk's admission that the monitoring tiers were entirely subjective and have never been used by anyone else in the field.  Kirk Ex. 87 at 169:2-170:13, 180:21-182:11.  In fact, when asked why his seven-year monitoring tier was not six or eight years, all Korczyk could manage was "[his] judgment around that." *Id.* at 180:21-24.  But a bare judgment call is not enough to make a methodology reliable, particularly where, as here, the expert is entirely inexperienced in the relevant subject matter.  *Pac. Info. Res., Inc.*, 2008 WL 5071110, at *2 (a "pure judgment call" does not "suggest" a "reliable methodology"); *640 Octavia, LLC*, 2019 WL 1201581, at *2 (expert report excluded as unreliable where it relied "solely on his experience" "without explaining why and how he came to his conclusions"); *Holley*, 2024 WL 538535, at *2 (excluding expert who could not point to any publication or literature supporting conclusion).

Turning to the level of "risk" each category of allegedly stolen information presents, Plaintiffs do not even attempt to offer support for Korczyk's classifications.  Instead, Plaintiffs concede the classifications are arbitrary but argue that "classification level of 'risk' is an appropriate judgment call,

and reasonable minds could disagree." Dkt. 337 at 19 ("[D]isputes over whether date of birth is a high-risk category and Accellion's claim that information that is public does not pose an increased risk when exfiltrated by cybercriminals . . . go to weight"). Korczyk's say-so as to what constitutes high- and low-risk information is not enough. He must offer some explanation as to how he arrived at his risk classification levels: "[A]n expert witness must follow some discernable methodology, and may not be a 'a black box into which data is fed at one end and from which an answer emerges at the other.' In order for this Court to determine whether [the expert's] conclusions are 'reliable' and based on 'sufficient facts or data,' the Court must be able to follow his methodology." *NetFuel, Inc. v. Cisco Sys. Inc.*, 2020 WL 1274985, at *7 (N.D. Cal. Mar. 17, 2020) (Davila, J.) (excluding expert's opinion as unreliable).

Plaintiffs then (again) contend Korczyk did not need to consider "disputed" facts, such as that a significant portion of the data records disclosed through WASAO's FTA were unemployment benefit applications consisting of information submitted by fraudsters with data obtained through previous data breaches. Dkt. 337 at 19-20. But those facts have already been "tested in discovery" and are confirmed by WASAO's own statements. Kirk. Exs. 93, 94, 96. They are not "disputed," and Korczyk may not ignore them. *See Hynix Semiconductor Inc.*, 2008 WL 73681, at *5 (opinion must "reflect reality").

Finally, Plaintiffs argue that because Accellion refers to PHI collectively on its website *for purposes of HIPAA compliance*, Korczyk should be entitled treat all PHI identically for purposes of "risk" following a data breach. Dkt. 337 at 20. This argument is illogical: that a sprained ankle diagnosis and a diagnosis of a sexually transmitted disease are both PHI covered by HIPAA does not mean they carry the same risk to an individual if disclosed. Nor do Plaintiffs explain Korczyk's failure to justify why theft of any PHI, like a flu shot, is equivalent to the theft of three pieces of "high risk" information, such that either theft places an individual in his ten-year monitoring category.

All told, the best Plaintiffs can muster in support of Korczyk's monitoring-duration opinion is his "judgment." That alone is insufficient, and paragraphs 52-63 of Korczyk's report should be stricken.

## III. CONCLUSION

Accellion respectfully requests the Court grant its Motion to Strike paragraphs 5-8, 13, 15, 17, and 19-63 of Korczyk's report.

---

ACCELLION'S REPLY IN SUPPORT OF ITS MOTION TO STRIKE PORTIONS OF THE REPORT OF D. KORCZYK
CASE NO. 21-CV-01155-EJD

1

2    Dated:  March 24, 2025                          Respectfully submitted,

3                                                    THE NORTON LAW FIRM PC

4                                                    */s/ Gil Walton*

5                                                    Gil Walton
                                                     Attorneys for Defendant
6                                                    ACCELLION, INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ACCELLION'S REPLY IN SUPPORT OF ITS MOTION TO STRIKE PORTIONS OF THE REPORT OF D. KORCZYK
CASE NO. 21-CV-01155-EJD