1
2
3
4                   UNITED STATES DISTRICT COURT
5                 NORTHERN DISTRICT OF CALIFORNIA
6                        SAN JOSE DIVISION
7

8    IN RE ACCELLION, INC. DATA          Case No.  5:21-cv-01155-EJD
9    BREACH LITIGATION                   **ORDER GRANTING MOTION TO
                                         STRIKE; GRANTING IN PART AND
10                                       DENYING IN PART MOTION FOR
                                         CLASS CERTIFICATION**
11
                                         Re: ECF Nos. 317, 319
12

13         After hackers breached the secure file transfer application offered by Defendant Accellion,

14   Inc., various individuals sued Accellion for exposing their private data.  The Court consolidated

15   those cases, and Plaintiffs in the consolidated case—Rose Becker, Karlina Chavez, Derek Dawes,

16   Alvaro Galvis, Jamie McDole, Randy Moniz, Robert Olson, Jr., Heather Rodriguez, and Kimberly

17   Worrick—now move for class certification.  Accellion opposes certification and simultaneously

18   moves to strike certain portions in the report submitted by Daniel Korczyk, one of Plaintiffs'

19   experts.  After careful consideration of the parties' papers, arguments at hearing, and supplemental

20   briefs, the Court **GRANTS** Accellion's motion to strike and **GRANTS IN PART** and **DENIES**

21   **IN PART** Plaintiffs' motion for class certification.

22   **I.     BACKGROUND**

23         Accellion is a technology company that, among other things, develops and markets

24   software products for securely transferring sensitive files and data.  Am. Compl. ¶¶ 25–26, ECF

25   No. 248.  At issue in this case is one such product known as the File Transfer Appliance (FTA).

26   *Id.* ¶ 1.

27         Accellion launched the FTA in the early 2000s.  Yaron Dep. at 21:7–9, ECF No. 317-7.

28   By 2020, the FTA was allegedly nearing the end of its life and increasingly vulnerable to hackers.

United States District Court
Northern District of California

1    *See id.* at 52:21–25, 58:6–9.  Rather than immediately discontinue the FTA, though, Accellion

2    continued to offer the product to its customers—large organizations that frequently handled

3    sensitive personal data.  *Id.* at 58:10–16.  According to Plaintiffs, that was a catastrophic decision.

4    Between December 2020 and January 2021, hackers were able to exploit vulnerabilities within the

5    FTA in two major data breaches that affected several of Accellion's customers.  Balonis Dep. at

6    20:21–21:3, ECF No. 317-19.  As a result, millions of individuals had their personal information

7    exposed.  Mangum Rpt., fig.14, ECF No. 317-40.

8         Plaintiffs filed suit.  Following pleading practice, there are two remaining claims for

9    negligence and violation of the Washington Consumer Protection Act.  Am. Compl. ¶¶ 122–56.

10    Plaintiffs now seek to represent classes of individuals who had their data exposed in the breaches

11    of five Accellion customers: the Regents of the University of California (UC Regents); Centene

12    Corporation, including several related entities; Flagstar Bank; the Washington State Auditor's

13    Office (WASAO); and The Kroger Co.

## II.    MOTION TO STRIKE

15         The Court begins with Accellion's motion to strike portions of Mr. Korczyk's report

16    because several class certification issues depend on his report.

### A.    Legal Standard

18         Before admitting expert testimony, courts need to ensure that it "rests on a reliable

19    foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.

20    579, 597 (1993).  At the class certification stage, courts may conduct either a "full" *Daubert*

21    inquiry or one that is "limited" to the specialized issues presented by certification.  *Lytle v.*

22    *Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1030–31 (9th Cir. 2024).  Where an "an expert's analysis

23    is complete and her tests fully executed, there may be no reason for a district court to delay its

24    assessment of ultimate admissibility at trial."  *Id.* at 1031.  That is the case here, where there is no

25    more for Mr. Korczyk to do, so the Court proceeds to conduct a full *Daubert* analysis.

26         Plaintiffs, as the proponent of Mr. Korczyk's report, have the burden of establishing the

27    report's admissibility by a preponderance of the evidence.  *Engilis v. Monsanto Co.*, --- F.4th ----,

28    2025 WL 2315898, at *7 (9th Cir. Aug. 12, 2025).  Namely, Plaintiffs must prove that Mr.

1    Korczyk is "qualified . . . by knowledge, skill, experience, training, or education."  Fed. R. Evid.

2    702.  If Plaintiffs show that Mr. Korczyk is qualified, they must then demonstrate that his

3    testimony is relevant and reliable.  *Daubert*, 509 U.S. at 597.  Testimony is relevant when "the

4    expert's scientific, technical, or other specialized knowledge will help the trier of fact to

5    understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).  Testimony is

6    reliable when it is (1) "based on sufficient facts or data"; (2) "is the product of reliable principles

7    and methods"; and (3) "reflects a reliable application of the principles and methods to the facts of

8    the case."  Fed. R. Evid. 702(b)–(d).

9         The reliability assessment "is flexible and can be molded to fit 'the particular

10   circumstances of the particular case.'"  *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1058

11   (9th Cir. 2024) (quoting *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022)).

12   The focus of that assessment is "the soundness of [an expert's] methodology," "not the correctness

13   of the expert's conclusions.  *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citation

14   omitted).  As such, expert testimony does not fail *Daubert* just because a court thinks it is "shaky."

15   *Engilis*, 2025 WL 2315898, at *6.  At the same time, a court cannot abdicate its gatekeeping role

16   by uncritically sending expert testimony to the factfinder.  A court can admit shaky testimony only

17   if that testimony "meets the thresholds of relevance and reliability."  *Id.*

18        **B.     Analysis**

19        The opinions in Mr. Korczyk's report fall into two general categories.  The first category

20   consists of opinions about the risk of identity theft that arises from disclosure of personal

21   information and the steps that class members should take to mitigate that risk.  The second

22   category consists of estimates for the value of time that a class member might spend on

23   responding to those data breaches.  Accellion claims that all opinions in the first category must be

24   excluded because they are unrelated to Mr. Korczyk's qualifications.

25        Courts take a "broad" view of the qualifications sufficient to support expert testimony.

26   *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (citation omitted).

27   Thus, "an expert need not have the best qualifications in her field to survive a Daubert challenge."

28   *Cabrera v. Google LLC*, No. 5:11-cv-01263, 2023 WL 5279463, at *13 (N.D. Cal. Aug. 15, 2023)

Case No.: 5:21-cv-01155-EJD
ORDER RE *DAUBERT* & CLASS CERT.     3

1    (collecting cases).  But even if an expert does not need ideal qualifications, she must still possess

2    qualifications that are "appropriate to the subject matter of [her] testimony."  *Blockchain*

3    *Innovation, LLC v. Franklin Res., Inc.*, No. 21-cv-08787, 2024 WL 5483606, at *9 (N.D. Cal. Oct.

4    22, 2024) (citing *Primiano*, 598 F.3d at 565).  That is because "an expert witness is [a layman]

5    when testifying outside [her] area of expertise."  *White v. Ford Motor Co.*, 312 F.3d 998, 1008

6    (9th Cir. 2002).  So, for instance, the Ninth Circuit has held that a witness with "expert knowledge

7    regarding the history of, and purpose for, the issuance of obligations" does not have the

8    qualifications to provide expert testimony about "detecting counterfeit securities."  *United States*

9    *v. Chang*, 207 F.3d 1169, 1172–73 (9th Cir. 2000).

10       Here, there is little doubt that Mr. Korczyk has the necessary credentials to qualify as an

11   expert in accounting, valuation, and adjacent fields.  He holds an alphabet's worth of accounting-

12   related certifications, including a CPA (Certified Public Accountant), ASA (Accredited Senior

13   Appraiser), and ABV (Accredited in Business Valuations).  Korczyk Rpt. ¶ 9, ECF No. 317-39.

14   He has business and finance degrees from the University of Notre Dame and DePaul University.

15   *Id.* at p. 40.  And he has over forty years of experience in accounting- and valuation-related roles.

16   *Id.* at pp. 38–40.

17       Accounting and valuation, however, are a far cry from the identity theft issues that

18   Plaintiffs have asked Mr. Korczyk to opine on.  One would not expect an accountant to have any

19   specialized knowledge about how a criminal actor might use personal information to conduct

20   identity theft.  Nor would one expect an accountant to have any particular insight into how best to

21   thwart identity thieves.  The Court therefore concludes that Mr. Korczyk lacks the requisite

22   qualifications to offer opinions on those topics.

23       Resisting this conclusion, Plaintiffs point to other experiences that they believe establish

24   qualifications specifically related to identity theft issues.  For starters, they point to the continuing

25   education classes that Mr. Korczyk was required to take to maintain his certifications.  Korczyk

26   Dep. at 42:16–18, ECF No. 353-22.  The record contains very little detail about what those classes

27   entailed, though.  At deposition, Mr. Korczyk testified that "[o]ver the last 10 years[,] the courses

28   have been more focused on litigation and broadened forensics and data breaches and those sorts of

United States District Court
Northern District of California

Case No.: 5:21-cv-01155-EJD

ORDER RE *DAUBERT* & CLASS CERT.    4

things." *Id.* at 43:7–10. But that vague statement does not allow the Court to understand how much and what training Mr. Korczyk actually received. Mr. Korczyk provides somewhat more detail in his report, where he lists thirty-one courses that he had taken. Korczyk Rpt. ¶ 10. Yet, the report listed only the courses' titles, not their descriptions. And based on title alone, just two courses involved identity theft or data breaches[1]—one class called "Forensic Investigations and Legal Theories Relating to Damages in Data Breach Class Actions," and another called "Identity Theft and Protection." *Id.*

Plaintiffs also point to Mr. Korczyk's participation in eighteen prior data breach cases. *Id.*, tbl.1. That is an impressive number, but it says little about whether Mr. Korczyk has experience regarding the identity-theft risks associated with disclosure of personal data or how to mitigate those risks. After all, data breach cases involve many issues beyond just those two. Perhaps, like Mr. Korczyk opines here without challenge, he testified in those prior cases as to the valuation of class members' time. That kind of opinion clearly falls within Mr. Korczyk's valuation-related expertise. Plaintiffs do not provide any evidence of what Mr. Korczyk was asked to do in those prior data breach cases. The most that Plaintiffs offers are citations to two orders briefly assessing *Daubert* challenges to Mr. Korczyk. *See Savidge v. Pharm-Save, Inc.*, No. 3:17-cv-186, 2023 WL 2755305, at *17–18 (W.D. Ky. Mar. 31, 2023); *In re Brinker Data Incident Litig.*, No. 3:18-cv-686, 2021 WL 1405508, at *3 (M.D. Fla. Apr. 14, 2021). Neither suggests that Mr. Korczyk testified in the manner that Accellion challenges here.

Accordingly, Plaintiffs have failed to establish Mr. Korczyk's qualifications by a preponderance of the evidence, and the Court need not address Accellion's other arguments about the reliability of Mr. Korczyk's methods. The Court GRANTS Accellion's motion and STRIKES paragraphs 5–8, 13, 15, 17, and 19–63 of Mr. Korczyk's report.

---

[1] To the extent that Plaintiffs contend courses about "fraud" qualify Mr. Korczyk to opine on identity theft, they are mistaken. Identity theft is a type of fraud, but there are countless varieties of fraud in addition to identity theft. The mere fact that a course dealt with fraud does not suggest that it included any meaningful discussion of identity theft.

United States District Court
Northern District of California

### III.    MOTION FOR CLASS CERTIFICATION

Having resolved Accellion's motion to strike, the Court now turns to class certification. To certify a class, Plaintiffs must prove by a preponderance of the evidence that they satisfy the requirements of Federal Rule of Civil Procedure 23. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (en banc). There are two steps to certification under Rule 23. First, Plaintiffs must demonstrate that their proposed class meets the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a). Second, Plaintiffs must demonstrate that at least one of three circumstances identified in Rule 23(b) applies. *Olean*, 31 F.4th at 663. Because Plaintiffs invoke Rule 23(b)(3), that means they must show predominance and superiority. Fed. R. Civ. P. 23(b)(3).

When evaluating whether Plaintiffs have met these requirements, courts conduct a "rigorous analysis." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). That analysis may "entail some overlap with the merits of the [] underlying claim[s]." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)). But class certification is not an opportunity for courts "to engage in free-ranging merits inquiries." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Courts may consider the merits "only to the extent[] that they are relevant to" the Rule 23 requirements. *Id.*

#### A.    Negligence Classes

The Court starts with Plaintiffs' request to certify classes on their negligence claim. The primary class that Plaintiffs ask the Court to certify is defined as follows:

> **Negligence Class**: All natural persons whose PII [personally identifiable information] and/or PHI [personal health information] was compromised as a result of the Data Breach of the following Accellion customers (i) The Regents of the University of California, (ii) Centene, (iii) Flagstar, (iv) Washington State Auditor's Office, and (v) Kroger, and who resided in California, Georgia, Illinois, Michigan, Oklahoma, Tennessee, Texas, or Washington at the time of the Data Breach.

Class Cert. Mot. at i, ECF No. 317. In the alternative, Plaintiffs propose two sets of subclasses. The first set of subclasses is divided by Accellion customer:

1
2
3
4
5
6
7
8
9

> **UC Regents Subclass**: All natural persons whose PII and/or PHI was compromised as a result of, and who resided in California at the time of, the Data Breach of The Regents of The University of California's FTA.
>
> **Centene Subclass**: All natural persons whose PII and/or PHI was compromised as a result of, and who resided in California at the time of, the Data Breach of Centene's FTA.
>
> **Flagstar Subclass**: All natural persons whose PII and/or PHI was compromised as a result of, and who resided in California at the time of, the Data Breach of Flagstar's FTA.
>
> **WASAO Subclass**: All natural persons whose PII and/or PHI was compromised as a result of, and who resided in Washington at the time of, the Data Breach of the Washington State Auditor's Office's FTA.

10  Plf. Supp. Br. at 12, ECF No. 372.  These customer-specific subclasses would be narrower than

11  the proposed Negligence Class because they do not include residents of Georgia, Illinois,

12  Tennessee, Texas, Oklahoma, or Michigan.  *Id.* at 12 n.5.  They also exclude individuals whose

13  personal data was exposed by the breach of Kroger.

14      The second set of alternative subclasses is divided by state.  Plaintiffs propose three[2] state-

15  specific subclasses:

16
17
18

> **California Subclass**: All natural persons whose PII and/or PHI was compromised as a result of the Data Breach of the following Accellion customers (i) The Regents of the University of California, (ii) Centene, and (iii) Flagstar and who resided in California at the time of the Data Breach.
>
> **Oklahoma Subclass**: All natural persons whose PII and/or PHI was compromised as a result of, and who resided in Oklahoma at the time of, the Data Breach of Kroger's FTA.
>
> **Washington Subclass**: All natural persons whose PII and/or PHI was compromised as a result of, and who resided in Washington at the time of, the Data Breach of the Washington State Auditor's Office's FTA.

19
20
21
22
23

24  Class Cert. Mot. at i–ii.

25
26

---

27  [2] Plaintiffs originally proposed a Michigan Subclass as well, but the sole Plaintiff who could have represented that class, Valerie Whittaker, dismissed her claims.  ECF No. 308.  Thus, the Court does not consider a possible Michigan Subclass.

28

Case No.: 5:21-cv-01155-EJD
ORDER RE *DAUBERT* & CLASS CERT.        7

United States District Court
Northern District of California

**1.    Rule 23(a)**

**a.    Numerosity**

To satisfy numerosity, Plaintiffs must show that their proposed classes are "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  While courts have never formally fixed an exact minimum threshold, they have frequently held that this requirement is satisfied when a proposed class includes at least forty members.  *Sullivan v. City of Berkeley*, 328 F.R.D. 352, 355 (N.D. Cal. 2018).

Here, there is no dispute that both the Negligence Class and all potential subclasses contain at least that many individuals.  The Negligence Class contains over five million members. Mangum Rpt., fig.14.  The Centene, WASAO, California, and Washington Subclasses each number well over one million members.  *Id.*, fig.14.1.  The UC Regents, Flagstar, and Michigan Subclasses are all over two hundred thousand members.  *Id.*  And even the smallest proposed class—the Oklahoma Subclass—has over one thousand members.  *Id.*  Plaintiffs have demonstrated numerosity.

**b.    Commonality**

For commonality to exist, there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  A question is common if it can be resolved "in one stroke." *Wal-Mart*, 564 U.S. at 350.  Put differently, a common question is one with a "common answer."  *Id.*  Even though Rule 23(a)(2) speaks in the plural, not all questions must be common.  *Stockwell v. City & Cnty. of S.F.*, 749 F.3d 1107, 1111 (9th Cir. 2014).  A "single significant question" will do.

As a general matter, a successful negligence claim requires proof that a defendant failed to act with reasonable care.  *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 777 F. Supp. 3d 1016, 1023 (N.D. Cal. 2025).  Whether Accellion acted reasonably in this case does not vary from class member to class member.  It depends solely on Accellion's knowledge and actions.  For this reason, reasonable care presents a common question with a common answer, and commonality is satisfied.  Accellion's arguments that there are other important, non-common questions are better addressed to the predominance analysis.

### c.    Typicality

Typicality requires a class representative's claims to be "reasonably coextensive with those of absent class members." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (citation omitted).  This is a "permissive" requirement." *Id.*  As long as a representative's injury is "similar" to those of absent class members and stems from the "same course of conduct" injuring absent class members, that representative is typical. *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016) (citation omitted).  What matters is the "nature of the claim or defense of the class representative, and not [] the specific facts from which it arose or the relief sought." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted).

All proposed class representatives for the Negligence Class allege that they were injured by data breaches related to Accellion's FTA because their personal data was disclosed.  Am. Compl. ¶¶ 5 (Becker), 7 (Chavez), 8 (Dawes), 10 (Galvis), 11 (McDole), 12 (Moniz), 13 (Olson), 15 (Rodriguez), 19 (Worrick).  In other words, they allege that they were injured by the same course of conduct—exposure of personal data due to breach of the FTA—as all absent class members.  That suffices for typicality.

The same is true when considering Plaintiffs' alternative subclasses.  Each subclass is still based on injury from breach of the FTA but, compared to the Negligence Class, is limited by residence and Accellion customer.  The proposed representatives for each subclass align with those limitations:

| Subclass | States of Residence | Accellion Customers | Class Representatives |
|---|---|---|---|
| UC Regents | California | UC Regents | Becker, Chavez, Galvis, McDole (Am. Compl. ¶¶ 5, 7, 10–11) |
| Centene | California | Centene | Olson (Am. Compl. ¶ 13) |
| Flagstar | California | Flagstar | Moniz (Am. Compl. ¶ 12) |
| WASAO | Washington | WASAO | Rodriguez, Worrick (Am. Compl. ¶¶ 15, 19) |
| California | California | UC Regents, Centene, Flagstar | Becker, Chavez, Galvis, McDole, Moniz, Olson (Am. Compl. ¶¶ 5, 7, 10–13) |
| Oklahoma | Oklahoma | Kroger | Dawes (Am. Compl. ¶ 8) |
| Washington | Washington | WASAO | Rodriguez, Worrick (Am. Compl. ¶¶ 15, 19) |

United States District Court
Northern District of California

Accellion pushes back that several Plaintiffs are atypical because they are subject to unique defenses related to Article III injury and to their roles in lawsuits filed directly against Accellion customers. But unique defenses do not defeat typicality unless "there is a danger that . . . [a] representative [will be] preoccupied with" those defenses. *Hanon*, 976 F.2d at 508. None of Accellion's identified defenses are "so substantial that they risk becoming the focus of this case." *Orshan v. Apple Inc.*, No. 5:14-cv-05659, 2024 WL 4353034, at *8 (N.D. Cal. Sept. 30, 2024).

### i.    Article III Injury

Article III requires plaintiffs to "have suffered an 'injury in fact,'" meaning an injury that is "concrete and particularized" as well as "actual or imminent." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Two aspects of injury are in dispute here. First, can the risk of future harm due to identity theft serve as an injury supporting Plaintiffs' claims? Second, if the answer to the previous question is "no," have Plaintiffs Dawes, Olson, Rodriguez, and Worrick[3] suffered some other concrete injury that confers standing? The Court takes each in turn.

***Risk of Future Harm.*** Much of Plaintiffs' theory of injury is premised on the idea that data breaches increase the risk of identity theft due to the exposure of personal data. While that theory of injury may work in other contexts, it does not establish standing in this case.

The threat of future harm "may suffice" to establish injury if the harm is "certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation modified); *see also Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002) ("[T]he possibility of future injury may be sufficient to confer standing on plaintiffs; threatened injury constitutes 'injury in fact.'"). More specifically, the substantial threat of future identity theft can be a concrete injury. *In re Zappos.com, Inc.*, 888 F.3d 1020, 1029 (9th Cir. 2018); *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1142 (9th Cir. 2010).

---

[3] Accellion suggests it has doubts about the injuries that Plaintiffs Becker, Chavez, Galvis, McDole, and Moniz allegedly suffered, but it does not press that argument at this stage. Because Accellion concedes that "for present purposes [those Plaintiffs] have standing," injury issues do not defeat those Plaintiffs' typicality. Class Cert. Opp'n at 25, ECF No. 353.

United States District Court
Northern District of California

1    The problem for Plaintiffs is that standing must be demonstrated "separately for each form

2    of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167,

3    185 (2000). So, as the Supreme Court recently explained, risk of future harm establishes standing

4    only to seek *prospective relief*, it does not establish standing to seek *retrospective damages*.

5    *TransUnion LLC v. Ramirez*, 594 U.S. 413, 436–37 (2021); *see also Webb v. Injured Workers*

6    *Pharmacy, LLC*, 72 F.4th 365, 376 (1st Cir. 2023). Standing to seek retrospective damages

7    requires either a materialization of that risk or a separate concrete injury. *Id.* at 436–37. Since

8    Plaintiffs seek retrospective damages—they do not ask the Court to certify an injunctive class

9    under Rule 23(b)(2)—risk of identity theft alone cannot support their standing.

10    ***Other Concrete Injury.*** Although risk is not sufficient, Plaintiffs have nonetheless

11    provided sufficient evidence of other injuries. This is most apparent when it comes to Plaintiffs

12    Olson, Rodriguez, and Worrick because the risk of identity theft materialized for them. Olson

13    reports unauthorized activity and charges on his financial accounts. Olson Decl. ¶ 6, ECF No.

14    317-48. Rodriguez reports facing fraudulent activity. Rodriguez Decl. ¶ 7, ECF No. 317-43. And

15    Worrick reports that a fraudulent tax return was filed in her name following the data breach.

16    Worrick Dep. 185:22–186:7, ECF No. 345-12; Worrick Decl. ¶ 6, ECF No. 317-46. Nothing in

17    the record appears to rebut the suggestion that the risks of identity theft materialized following the

18    data breach. So based on the record available now, it is unlikely Olson, Rodriguez, or Worrick

19    will be preoccupied with standing issues.

20    As for Dawes, even though he has not yet had his identity stolen, he does not have to wait

21    until after that occurs before he can sue. After a data breach, that plaintiff may need to spend time

22    and effort to implement safeguards against identity theft. Even if no identity theft has yet

23    occurred, this time spent on mitigating the risks created by a data can be a concrete injury. *Webb*,

24    72 F.4th at 376–77 (collecting cases); *Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384,

25    388–89 (6th Cir. 2016); *cf. Airline Serv. Providers Ass'n v. L.A. World Airports*, 873 F.3d 1074,

26    1078 (9th Cir. 2017) ("The time spent in those negotiations is itself a concrete injury."). At least,

27    such time is a concrete injury if it is expended on mitigating an imminent harm rather than a

28    speculative or hypothetical one. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013)

United States District Court
Northern District of California

1    ("[R]espondents cannot manufacture standing merely by inflicting harm on themselves based on

2    their fears of hypothetical future harm that is not certainly impending."); *see also Webb*, 72 F.4th

3    at 377; *Galaria*, 663 F. App'x at 389.

4         Dawes expended time responding to the breach of Accellion's FTA.  Dawes Decl. ¶ 6,

5    ECF No. 317-42.  That time was also expended in response to a substantial risk of identity theft in

6    the future.  Dawes' social security number was impacted in the data breach.  Cosset Decl. ¶ 16,

7    ECF No. 364-5.  And social security numbers are plainly sensitive enough that their exposure

8    creates a substantial risk of identity theft.  *Krottner*, 628 F.3d at 1142–43.

9         Accellion counters that Dawes did not suffer any injury because he was impacted by the

10   Kroger data breach, and Kroger paid a ransom to recover all the stolen data.  Class Cert. Opp'n at

11   25.  Assuming that is true, and assuming that it defeats Dawes' standing, that at most renders him

12   atypical with respect to the Negligence Class.  Since there are already many representatives for the

13   Negligence Class who have standing, Dawes' assumed typicality issues would not prevent

14   certification of that class.  *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1239 (9th Cir. 2024).

15   With respect to the Oklahoma Subclass, which consists only of class members impacted by the

16   Kroger breach, the fact that Kroger paid a ransom does not defeat typicality because the same

17   would be true as to all putative class members.  Thus, a defense based on Kroger's ransom would

18   apply equally to the entire Oklahoma Subclass.  It is not unique, so it does make Dawes atypical.

19        Two final points before moving on.  One, Accellion suggests that the risk of identity theft

20   as to these four Plaintiffs is not imminent because their personal data was not found on the dark

21   web.  That is not particularly probative because, even if hackers did not publicly *post* that

22   information, it remains that the hackers *have* that information and could use it at any time.  Two,

23   the Court evaluates standing here under a different theory of injury than it concludes can be

24   applied classwide.  *See infra* Section III.A.2.a.iii.  That does not matter.  For typicality, courts "do

25   not insist that the named plaintiffs' injuries be identical with those of the other class members,

26   only that the unnamed class members have injuries similar to those of the named plaintiffs and

27   that the injuries result from the same, injurious course of conduct."  *Armstrong v. Davis*, 275 F.3d

28   849, 869 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499

1    (2005)).  That is the case here, where all theories of injury stem from the sensitive nature of the

2    personal data exposed and the breaches of Accellion's FTA software.

3        The Court finds that Accellion's arguments on injury do not render Olson, Rodriguez, or

4    Worrick atypical in any way, and it does not render Dawes atypical as to the Oklahoma Subclass.

5                        **ii.    Suits Against Accellion Customers**

6        Accellion asserts that Plaintiffs Becker, Chavez, Galvis, McDole, Dawes, and Olson are

7    atypical because they also served as named plaintiffs in lawsuits filed directly against Accellion

8    customers.  From Accellion's perspective, by filing those other lawsuits, these six Plaintiffs are

9    placing the blame for the data breaches on Accellion's customers rather than Accellion.

10    Ostensibly, Accellion views liability against customers as inconsistent with liability against itself.

11    Not so.  There is no problem with having multiple joint tortfeasors liable for the same injury.  *See*

12    *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1023 (9th Cir. 1985).

13                            *       *       *

14        Typicality issues do not defeat the certification of any proposed class.

15                            **d.    Adequacy**

16        Adequacy differs from typicality in that it focuses on whether a class representative's

17    interests are aligned those of absent class members while typicality focuses on the similarity of

18    claims and defenses.  Adequacy depends on the answer to two questions: "(1) do the named

19    plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the

20    named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Ellis*,

21    657 F.3d 970, 985 (9th Cir. 2011) (citation omitted).

22        Accellion's attacks on adequacy boil down to two main arguments.  First, Accellion argues

23    that Plaintiffs are not sufficiently informed, and do not sufficiently understand the issues in this

24    case, to be adequate representatives.  Second, Accellion claims that Plaintiffs' decision to abandon

25    certain remedies shows that they do not have class members' best interests at heart.  The Court

26    discusses those two arguments in order before turning to any remaining issues surrounding

27    adequacy.

28

United States District Court
Northern District of California

### i.    Knowledge of Case

Lack of knowledge about the case can render a class representative inadequate.  *Giron v. Hong Kong & Shanghai Bank Co.*, No. 2:15-CV-08869, 2017 WL 5495504, at *14 (C.D. Cal. Nov. 15, 2017) (citing *Burkhalter Travel Agency v. Macfarms Int'l, Inc.*, 141 F.R.D. 144, 153 (N.D. Cal. 1991)).  However, the standard for disqualification based on lack of knowledge is extremely high.  "[A] class representative will be deemed inadequate only if 'startlingly unfamiliar' with the case."  *Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 267 (N.D. Cal. 2011) (quoting *Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 611 (N.D. Cal. 2004)).  All that a class representative needs to understand is the action's general "outlines."  *Lubin v. Sybedon Corp.*, 688 F. Supp. 1425, 1462 (S.D. Cal. 1988).  Plaintiffs here easily clear that low bar for knowledge.

Each Plaintiff demonstrated an understanding of the basic contours of this action—that certain software developed by Accellion was breached, exposing private information, and that breach was allegedly due to Accellion's failures to maintain its software.[4]  That understanding is not perfect, but it did not need to be.  After all, class representatives need not be legal or subject matter experts to be adequate.  *See Jimenez v. Menzies Aviation Inc.*, No. 15-cv-02392, 2016 WL 3231106, at *7 (N.D. Cal. June 13, 2016); *In re Northrop Grumman Corp. ERISA Litig.*, No. 06-cv-06213, 2011 WL 3505264, at *14 (C.D. Cal. Mar. 29, 2011) (collecting cases).

The same is true when it comes to a class representative's understanding of the class mechanism and the role that representatives play.  As laypeople, there is no expectation that Plaintiffs "be required to know the 'legal matters' at issue."  *del Campo v. Am. Corrective Counseling Servs., Inc.*, 254 F.R.D. 585, 594 (N.D. Cal. 2008).  So long as a class representative has a basic awareness that she is representing others and does not expressly disclaim any intent to represent the class or portions of the class, there is no adequacy problem.  *See Alberghetti v. Corbis Corp.*, 263 F.R.D. 571, 579 (C.D. Cal. 2010), *aff'd*, 476 F. App'x 154 (9th Cir. 2012).

---

[4] *See* Becker Dep. at 16:14–17, ECF No. 345-4; Chavez Dep. at 16:10–17:1, ECF No. 345-5; Dawes Dep. at 19:18–20:4, ECF No. 345-6; Galvis Dep. at 19:2–20, 137:15–22, ECF No. 345-7; McDole Dep. at 35:5–36:7, ECF No. 345-8; Rodriguez Dep. at 36:7–20, ECF No. 364-4; Worrick Dep. at 19:10–20:3.  Accellion does not claim Moniz lacks knowledge about the case, so the Court does not review his deposition for his knowledge.

United States District Court<br>Northern District of California

1    Based on the requirement that class representatives be willing to represent the class, Dawes

2    is inadequate to represent the Negligence Class. At deposition, he was asked, "Do you know if

3    you're representing people in other states besides Oklahoma?" Dawes Dep. at 28:15–16, ECF No.

4    321-32. Dawes then expressly disclaimed representing anyone outside of Oklahoma, responding

5    with "No, I'm purely representing what happened to me." *Id.* at 18:17–18. His answer is a clear

6    repudiation of his duty to represent those in the Negligence Class. It is a closer question when it

7    comes to the Oklahoma Subclass. Although Dawes seemed to say he was only representing

8    himself and not even putative class members in Oklahoma, he was answering a question about

9    representing class members outside of Oklahoma. In answering, he may have meant only to

10   disclaim representation of non-Oklahomans. Given that disqualification based on imperfect

11   understandings of the representative role are disfavored, the Court finds Dawes to be adequate as

12   to the Oklahoma Subclass. Otherwise, Accellion's arguments about Plaintiffs' knowledge do not

13   render Plaintiffs inadequate.

### ii.    Abandonment of Remedies

15   The fact that Plaintiffs declined to pursue some theories of recovery does not make them

16   inadequate. Class representatives "are authorized to decide matters of litigation strategy, such as

17   which claims to assert or drop, what discovery to take, what motions to file, and so forth." *Koby*

18   *v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1077 (9th Cir. 2017). The decision to pursue, or not,

19   certain remedies falls squarely within that authorization. If Accellion were correct that class

20   representatives are inadequate if they choose not to pursue some remedies or claims, that would

21   effectively impose an obligation upon class representatives to assert every possible claim and

22   remedy no matter how far-fetched or unlikely they are to succeed. That is not how litigation

23   works, and courts have routinely rejected that position. *See Overpeck v. FedEx Corp.*, No. 18-cv-

24   07553, 2022 WL 888441, at *8 (N.D. Cal. Mar. 25, 2022) (collecting cases). After all, "[p]runing

25   unviable elements from one's case is a hallmark of competence, not inadequacy." *Painters &*

26   *Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co.*, 674 F. Supp. 3d 799, 817

27   (C.D. Cal. 2023), *aff'd*, 2025 WL 1683472 (9th Cir. June 16, 2025). As such, Plaintiffs' strategic

28   decision does not render them inadequate.

United States District Court
Northern District of California

1

### iii.    Other Issues

2      Accellion briefly argues that Rodriguez is inadequate due to a prior criminal conviction.

3   *See* Rodriguez Dep. at 20:22–23:25, ECF No. 318-18.  It is true that "prior criminal convictions

4   can show dishonesty and can be a basis to bar an individual from acting as a class representative."

5   *Villanueva v. Liberty Acquisitions Servicing, LLC*, 319 F.R.D. 307, 328 (D. Or. 2017) (quoting

6   *Larson v. Trans Union, LLC*, No. 12-cv-05726-WHO, 2015 WL 3945052, at *12 (N.D. Cal. June

7   26, 2015)).  But evidence of that past criminal conviction must be admissible for that to happen.

8   *Id.*  Rodriguez's convictions are over thirty years old.  Rodriguez Dep. at 21:4–3.  Rodriguez was

9   also released from confinement much earlier than ten years ago.  *Id.* at 22:23–23:2.  As a result,

10  Federal Rule of Evidence 609(b) governs the admissibility of those convictions.  Under that rule,

11  Accellion must show that the convictions' probative value "substantially outweighs its prejudicial

12  effect."  Fed. R. Evid. 609(b)(1).  Given the age of the convictions and the fact that they were

13  relatively minor, Accellion cannot do so.  Rodriguez remains adequate.

14      The same cannot be said of Becker.  As her text messages show, Becker was aware of and

15  motivated by the prospect of receiving a service award as class representative.  Becker Dep. at

16  261:1–9, 265:14–18, ECF No. 353-11.  Of course, it is not automatically disqualifying for a class

17  representative to know that she might receive a service award because that is simply a fact of class

18  actions.  What is concerning here is that Becker appears to be uncommonly motivated by the

19  service award.  For example, Becker wrote to a friend:

20          I will be getting that bag. Unfortunately for UCLA I'm the wrong
            bitch to have their SSN published on the dark web.
21

22  *Id.* at 265:14–16.  This presents a possible conflict with the class because it raises the possibility

23  that she will seek an unfavorable settlement for the purpose of receiving a service award.  *Cf.*

24  *Greer v. Dick's Sporting Goods, Inc.*, No. 2:15-cv-01063, 2019 WL 4034478, at *6 (E.D. Cal.

25  Aug. 27, 2019) ("Indeed, a class representative may be more likely to support a settlement that

26  shortchanges absent class members when he stands to gain a much more significant award.").  It

27  also perpetuates an unfortunate stereotype casting class plaintiffs as those who are more concerned

28  with making a quick buck than vindicating class members' interests.  Becker is inadequate.

*        *        *

In sum, the Court finds Becker to be inadequate to represent any class and Dawes to be inadequate to represent the Negligence Class.[5]

### 2.        Rule 23(b)(3)

#### a.        Predominance

Predominance requires "the common, aggregation-enabling, issues in the case [to be] more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted).  This is not a purely quantitative exercise where courts count up the number of common issues and array them against the individual ones.  Rather, courts give more important questions greater weight than less important ones.  *Ruiz Torres*, 835 F.3d at 1134.  Even if there is only a single common question, it may predominate if it is exceedingly important.  *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir. 2019) (en banc).

Accellion identifies four purportedly individual issues that predominate over common ones: (1) causation, (2) choice of law, (3) injury, and (4) damages.

#### i.        Causation

As a defense, Accellion argues that the actions of its customers were a superseding cause of the data breach.  *See* Restatement (Second) of Torts § 440.  Obviously, the actions of each of the five customers at issue here—UC Regents, Centene, Flagstar, WASAO, and Kroger—are all different, so the analysis of superseding cause will be different as to each.  As a consequence, adjudicating liability in the Negligence Class would require the evaluation of five different sets of facts.  This strips the Negligence Class of "cohesion," and prevents the Court from certifying such a class.  *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011), *abrogated on other grounds by Comcast Corp. v. Behrend*, 569 U.S. 27 (2013); *see also Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1069 (9th Cir. 2014) (no cohesion when there were five different contracts

---

[5] The Court finds proposed class counsel, Girard Sharp LLP and Susman Godfrey L.L.P., to be adequate because they have the experience and resources to zealously advocate on behalf of the proposed classes.

United States District Court
Northern District of California

1    that each required separate analysis), *abrogated on other grounds by Microsoft Corp. v. Baker*,

2    582 U.S. 23 (2017).

3           There is, however, an easy way to solve this problem.  Plaintiffs may simply divide the

4    Negligence Class into subclasses by customer.  Plaintiffs have already proposed customer-specific

5    subclasses as an alternative to its Negligence Class, so the Court will consider only those

6    subclasses from this point on.[6]

7           Apart from the issue of superseding cause, Accellion also contends that it could not have

8    caused any injury to a class member if that class member's personal data had already been

9    exposed in a previous breach.  That obviously cannot be true.  If it were, it would lead to absurd

10   results.  If a plaintiff's data has ever been exposed before, no defendant will ever have the duty to

11   safeguard her data ever again because no subsequent breach could ever cause damage.  Or viewed

12   from a different angle, it would "create a perverse incentive for companies: so long as enough data

13   breaches take place, individual companies will never be found liable." *In re Anthem, Inc. Data*

14   *Breach Litig.*, 162 F. Supp. 3d 953, 988 (N.D. Cal. 2016) (Koh, J.).

15          Separate from the policy implications, though, Accellion's argument misunderstands the

16   harm at issue.  The more often individuals' personal data is exposed, the more readily available it

17   will be to bad actors, and the greater the risk that those individuals will eventually suffer negative

18   consequences like identity theft.  Harms flow from the marginal increase in risk, whether that is in

19   the form of time spent seeking to mitigate the additional risk or otherwise.  So, Accellion's

20   argument really gets more at a damages issue—how much did risk increase and how much is that

21   worth in damages?  Therefore, causation does not defeat predominance.

22                              ii.    **Choice of Law**

23          While there may be a choice of law issue with regard to the Negligence Class, the only

24   remaining classes at issue are the customer-specific subclasses.  Each of those classes are single-

25   state classes, so only a single state's law can apply.  Choice of law does not defeat predominance.

26

27   _____

28   [6] Plaintiffs did not ask the Court to consider any of the state-specific subclasses in these
     circumstances, so the Court will not evaluate any of those subclasses.

### iii.     Injury

As the Court discussed above, risk of future harm is not an injury that can support retrospective damages following the Supreme Court's decision in *TransUnion*. *Supra* Section III.A.1.c.i. That leaves Plaintiffs with just three theories of injury: (1) time spent addressing the data breach; (2) emotional distress; and (3) disclosure of private information.

**Time Spent.** This is a viable theory of injury. *Id.* But there is no way to efficiently determine how much time class members spent remediating the fallout from a data without asking those class members one by one. Some class members may have ignored any warnings about the breach and not have spent any time. Others may have been so worried that they spent inordinate amounts of time trying to secure their accounts. Therefore, a theory of injury based on the time taken to mitigate the effects of a data breach presents individual question. And since Article III injury is a jurisdictional matter going to the Court's very authority, the individual questions about this theory of injury would predominate if Plaintiffs moved forward with it.[7] Plaintiffs cannot pursue this theory of injury on a classwide basis.

**Emotional Distress.** Even more than time spent, emotional distress is an individual question that must be asked of every class member separately. Plaintiffs cannot pursue an emotional distress theory of injury, either.

**Disclosure of Private Information.** Unlike the previous two theories, this theory is viable on a classwide basis. In *TransUnion*, the Supreme Court recognized intangible harms "with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." 594 U.S. at 425. It left unanswered, however, the question of how closely an injury must relate to a common law cause of action before it can support standing under Article III. The sole guidance provided was that courts should "not require an exact duplicate." *Id.* at 433. In trying to

---

[7] In *Olean*, the Ninth Circuit held that courts are not required to exclude every uninjured class member at the class certification stage. 31 F.4th at 669. But even if courts need not determine at that moment whether any given class member has standing, courts still must consider whether the questions that must be answered in order to ultimately determine standing are individual or not. *Id.* Then, courts may consider if individualized questions going to standing and injury predominate.

United States District Court
Northern District of California

1    fill this gap, circuits have split into two camps.  Some require the alleged intangible harm to

2    "satisf[y] each element required to state a common-law cause of action" to qualify as an Article III

3    injury.  *Popa v. Microsoft Corp.*, --- F.4th ----, 2025 WL 2448824, at *4 (9th Cir. Aug. 26, 2025).

4    Others ask only if "the harm experienced by a plaintiff is similar in kind to a harm protected by

5    one of the common-law privacy torts." *Id.*

6         The Ninth Circuit has acknowledged this circuit split, but it has not yet taken a side.  *Id.*  In

7    the absence of binding precedent, the Court concludes the better reading of *TransUnion* is that

8    harms need only be similar in kind to those redressed by common law torts.  That is because

9    *TransUnion* expressly rejected the notion that an "exact duplicate" is required, and taking an

10   element-by-element approach would necessarily require an exact duplicate. 594 U.S. at 433.

11        With that, the Court turns to disclosure of private information.  *TransUnion* specifically

12   called out disclosure of private information as common law cause of action that can support an

13   Article III injury.  *Id.* at 425 (citing *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008)).

14   And the Ninth Circuit has explained that the crux of this cause of action is the disclosure of

15   information that is "*highly offensive* to a reasonable person." *Popa*, 2025 WL 2448824, at *5

16   (quoting Restatement (Second) of Torts § 652D).  The relevant issue for the predominance

17   analysis, then, is whether the offensiveness of the disclosed data can be determined on a common

18   basis.

19        Because each class member may have had different types of information disclosed,

20   offensiveness is not a common question.  But it is also not the type of individual question that

21   defeats predominance.  Once a factfinder settles on which categories of data are offensive and

22   which are not (a common issue not depending on individual circumstances), determining injury

23   becomes a "plug-and-play" exercise in matching up exposed data data elements to those

24   categories.  *Miles v. Kirkland's Stores Inc.*, 89 F.4th 1217, 1226 (9th Cir. 2024).  So, if there is a

25   way to generate a spreadsheet identifying the specific categories of data disclosed by class

26   member, there are no predominance problems.  There is evidence that this can be done at least as

27   to UC Regents and Flagstar.  *See* ECF Nos. 353-23 to -25.  That is enough for the Court to

28   conclude that this theory of injury does not cause individual issues to predominate over common

Case No.: 5:21-cv-01155-EJD

1   ones.  Naturally, if at the end of discovery, it turns out that the other customers (Centene and

2   WASAO) are unable to produce similar spreadsheets, Accellion may move to decertify those two

3   subclasses.

### iv.    Damages

5        Lastly, the Court considers damages.  To certify a Rule 23(b)(3) class, Plaintiffs must

6   demonstrate that "damages are capable of measurement on a classwide basis."  *Comcast*, 569 U.S.

7   at 34.  Not only that, but any damages model "must measure only those damages attributable to

8   [Plaintiffs'] theory."  *Id.* at 35.

9        Seemingly to the contrary, many Ninth Circuit cases hold that individualized damages

10  calculations do not defeat predominance, even in the face of *Comcast*'s instructions.  *E.g.*, *Ruiz*

11  *Torres*, 835 F.3d at 1136; *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir.

12  2015); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).  Taken literally and out of

13  context, these cases might suggest that it is simply irrelevant to class certification if damages are

14  individualized, regardless of how difficult it is to perform those individualized damages

15  calculations.  That is, beyond asking whether damages are tied to a plaintiff's theory, courts

16  should not look at damages at all when assessing predominance.  That cannot be.

17       For one, Rule 23(c)(4) permits courts to certify issue classes that encompass some, but not

18  all, of the issues that a claim raises.  According to the advisory committee, one of the main

19  purposes behind this part of the rule is to permit "adjudication of liability to the class" with class

20  members to come forward later on an individual basis to "prove the amounts of their respective

21  claims," *i.e.*, damages.  Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment.  If

22  damages could never be too individualized to defeat predominance, there would never need to be a

23  liability-only class; if liability were common, damages would follow.  Moreover, *Comcast*

24  requires damages to be "capable of measurement on a classwide basis."  *Comcast*, 569 U.S. at 34.

25  There is no way to read that instruction and conclude that courts must completely turn a blind eye

26  to issues about the individual nature of damages.

27       The Court understands the Ninth Circuit to recognize that damages will often differ among

28  class members.  That level of individualized determination is inherent to damages calculations and

United States District Court
Northern District of California

does not defeat predominance. However, *Comcast*'s command to demonstrate that damages can be measured classwide means that a plaintiff must offer a damages model that can calculate damages systematically and efficiently.

With that in mind, the Court addresses Plaintiffs' proposed damages models.

**Value of Time Spent.** Plaintiffs first propose compensating class members based on how much time they spent mitigating the risk of identity theft in response to the data breaches. This model of damages fails *Comcast* because it is not tied to the sole theory of harm that Plaintiffs may proceed with on a classwide basis. There is little connection between the time spent on mitigation and the offensiveness of the data that was exposed, yet offensiveness is the foundation of the "disclosure of private information" theory. Additionally, trying to determine the exact amount of time each class member spent on mitigation is an intractably individual task that cannot be done in a systematic manner. Plaintiffs cannot rely on this damages model to litigate their class claims.

**Cost of Credit Monitoring.** Next, Plaintiffs suggest that damages can be measured by the cost of credit monitoring required to keep class members safe. This model fails because the Court has stricken Mr. Korczyk's testimony on the issue. Without that testimony, there is no model.

**Lost Value of PII.** Again, any lost value does not tie to the offensiveness of the data exposed, so it is not tied to Plaintiffs' theory.

**Nominal Damages.** The only theory that Plaintiffs can proceed on is nominal damages, which do not depend on individual circumstances and can be awarded whenever actual damages cannot be proved. *See Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996).

*        *        *

In summary, predominance does not defeat class certification, but Plaintiffs are limited to their customer-specific subclasses, the "disclosure of private information" theory of harm, and nominal damages.

### b.    Superiority

Accellion's only argument against superiority is that a class action is not superior because individual issues predominate. That is not a superiority argument. The Court also finds, after

United States District Court
Northern District of California

1    considering the factors enumerated in Rule 23(b)(3), that a class action is superior here.  Based on

2    the complexity of the issues, bringing an individual suit would be a "negative value suit" where

3    the costs of such suit vastly outstrip any potential recovery.  *See Hamilton v. Wal-Mart Stores,*

4    *Inc.*, 39 F.4th 575, 588 n.6 (9th Cir. 2022).  A class action is the only realistic way to seek redress

5    in these circumstances.

6                          **3.      Summary**

7             The Court finds that Plaintiffs have satisfied the requirements for certifying their customer-

8    specific subclasses.  As Plaintiffs indicate that they would prefer a nominal damages class under

9    Rule 23(b)(3) over a liability-only issue class under Rule 23(c)(4), the Court certifies those

10   subclasses under Rule 23(b)(3).  *See* Plf. Supp. Br. at 10–12.

11           **B.      WCPA Subclass**

12           Plaintiffs also propose a WCPA Subclass that is identical to the WASAO Subclass in every

13   way except that the underlying claim is violation of the WCPA.  The reasons for certifying the

14   WASAO Subclass apply with equal force to the WCPA Subclass, so the Court certifies this

15   subclass as well.

16   **IV.    CONCLUSION**

17           The Court **GRANTS** Accellion's motion to strike and **STRIKES** paragraphs 5–8, 13, 15,

18   17, and 19–63 of Mr. Korczyk's report.  The Court also **GRANTS IN PART** and **DENIES IN**

19   **PART** the motion for class certification.  The Court **CERTIFIES** the following classes: UC

20   Regents Subclass (represented by Chavez, Galvis, and McDole), Centene Subclass (represented by

21   Olson), Flagstar Subclass (represented by Moniz), WASAO Subclass (represented by Rodriguez

22   and Worrick), and the WCPA Subclass (represented by Rodriguez and Worrick).  These

23   subclasses are certified only as to the disclosure of private information theory of injury and

24   nominal damages.

25           The parties shall meet and confer and present the Court with a stipulated schedule (or a

26   joint status report setting forth competing proposals) within **twenty-one (21) days** of this Order.

27

28

United States District Court
Northern District of California

1

**IT IS SO ORDERED.**

2

Dated: September 30, 2025

3

4
_____

5

EDWARD J. DAVILA
United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28