Fred Norton (CA SBN 224725)
fnorton@nortonlaw.com
Bree Hann (CA SBN 215695)
bhann@nortonlaw.com
Rebecca Kutlow (CA SBN 333944)
rkutlow@nortonlaw.com
Gil Walton (CA SBN 324133)
gwalton@nortonlaw.com
Heather Bates (CA SBN 337703)
hbates@nortonlaw.com
THE NORTON LAW FIRM PC
300 Frank H. Ogawa Plaza, Suite 450
Oakland, CA 94612
Telephone: (510) 906-4900

Camilo Artiga-Purcell (CA SBN 273229)
camilo.apurcell@Kiteworks.com
ACCELLION, INC.
1510 Fashion Island Blvd, Suite 100
San Mateo, CA 94404
Tel: (415) 515-4724

Attorneys for Defendant
*Accellion, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE ACCELLION, INC. DATA BREACH LITIGATION | Case No. 21-CV-01155-EJD<br><br>**ACCELLION, INC.'S NOTICE OF MOTION AND MOTION FOR CLASS DECERTIFICATION**<br><br>Date: December 17, 2026<br>Time: 9:00 AM<br>Courtroom: 4 – 5th Floor<br>Hon. Edward J. Davila |

**FILED PROVISIONALLY UNDER SEAL - REDACTED VERSION**

**NOTICE OF MOTION FOR CLASS DECERTIFICATION**

PLEASE TAKE NOTICE that on December 17, 2026, at 9:00 AM in the Courtroom of the Honorable Edward J. Davila of the United States District Court for the Northern District of California, located at 280 South 1st Street, San Jose, CA 95113, Defendant Accellion, Inc. will, and hereby does, move the Court pursuant to Rule 23(c)(1)(C) to decertify the UC Regents, Centene, Flagstar, WASAO, and WCPA subclasses, as defined in the Court's September 30, 2025, Order on Class Certification.

This Motion is made on the grounds that individualized issues predominate over common issues as to injury, such that Plaintiffs cannot establish the elements of Rule 23(b)(3) predominance on a classwide basis, warranting decertification under Rule 23(c)(1)(C).

This Motion is based on this notice, the memorandum of points and authorities and declarations submitted with the Motion, all other facts the Court may or should take notice of, all files, records, and proceedings in this case, and any oral argument the Court may entertain.

Dated: August 14, 2026

Respectfully submitted,

THE NORTON LAW FIRM PC

*/s/ Fred Norton*

Fred Norton
Attorneys for Defendant
ACCELLION, INC.

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. FACTS ..... 1

III. LEGAL STANDARD ..... 6

IV. ARGUMENT ..... 6

A. The Flagstar, Centene, and UC Regents Notice Lists, and the WASAO Data Files All Are Insufficient to Prove Classwide Injury ..... 9

B. The Flagstar, Centene, and UC Regents Notice Lists Are Inadmissible. ..... 10

1. There Is No Foundation for the UC Regents, Centene, or Flagstar Notice Lists. ..... 10

2. The Flagstar, Centene, and UC Regents Notice Lists Are Inadmissible Hearsay. ..... 11

3. The Flagstar, Centene, and UC Regents Notice Lists Are Not Business Records. ..... 13

a. The notice lists were not made in the course of a regularly conducted business activity ..... 13

b. The notice lists were not made by someone with knowledge. ..... 14

4. The UC Regents, Centene, and Flagstar Notice Lists Are Not Admissible as Summaries of Voluminous Records. ..... 15

a. The underlying data is inadmissible. ..... 15

b. The underlying data was not produced to Accellion. ..... 15

5. The UC Regents, Centene, and Flagstar Notice Lists Are Not Admissible under FRE 703. ..... 16

C. There Is No Classwide Proof Of Injury For WASAO. ..... 17

V. CONCLUSION ..... 18

# TABLE OF AUTHORITIES

Page(s)

Cases

*Aguirre v. Am. Honda Motor Corp., Inc.*,
2026 WL 608349 (N.D. Cal. Mar. 4, 2026) ........ 7

*Aki v. Univ. of Cal. Lawrence Berkeley Nat'l Lab'y*,
74 F. Supp. 3d 1163 (N.D. Cal. 2014) ........ 12, 15

*Amarel v. Connell*,
102 F.3d 1494 (9th Cir. 1996) ........ 15, 16, 17

*Ambrosio v. Progressive Preferred Ins. Co.*,
154 F.4th 1107 (9th Cir. 2025) ........ 7, 17

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ........ 6, 7

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ........ 7

*Bowerman v. Field Asset Servs., Inc.*,
60 F.4th 459 (9th Cir. 2023) ........ 7

*Campbell v. City of L.A.*,
903 F.3d 1090 (9th Cir. 2018) ........ 6

*Clark v. City of L.A.*,
650 F.2d 1033 (9th Cir. 1981) ........ 13

*Edwards v. First Am. Corp.*,
798 F.3d 1172 (9th Cir. 2015) ........ 7

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ........ 6

*In re Apple iPhone Antitrust Litig.*,
2025 WL 3124160 (N.D. Cal. Oct. 27, 2025) ........ 7, 8, 17

*L.A. News Serv. v. CBS Broad., Inc.*,
305 F.3d 924 (9th Cir. 2002) ........ 12

*Lara v. First Nat'l Ins. Co. of Am.*,
25 F.4th 1134 (9th Cir. 2022) ........ 7

*Lytle v. Nutramax Lab'ys, Inc.*,
114 F.4th 1011 (9th Cir. 2024) .......... 8

*MAO-MSO Recovery II, LLC v. Farmers Ins. Exch.*,
2022 WL 1690151 (C.D. Cal. May 25, 2022) .......... 12, 15

*Marlo v. United Parcel Serv., Inc.*,
251 F.R.D. 476 (C.D. Cal. 2008) .......... 8

*Marlo v. United Parcel Serv., Inc.*,
639 F.3d 942 (9th Cir. 2011) .......... 6

*N.L.R.B. v. First Termite Control Co., Inc.*,
646 F.2d 424 (9th Cir. 1981) .......... 14

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) .......... 8, 9

*Orr v. Bank of Am., NT & SA*,
285 F.3d 764 (9th Cir. 2002) .......... 11

*Paddack v. Dave Christensen, Inc.*,
745 F.2d 1254 (9th Cir. 1984) .......... 13, 14, 16

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) .......... 2, 7, 8, 9

*Rodriguez v. West Publ'g Corp.*,
563 F.3d 948 (9th Cir. 2009) .......... 6

*Sana v. Hawaiian Cruises, Ltd.*,
181 F.3d 1041 (9th Cir. 1999) .......... 13

*Siqueiros v. Gen. Motors LLC*,
676 F. Supp. 3d 776 (N.D. Cal. 2023) .......... 6

*Siqueiros v. Gen. Motors LLC*,
2022 WL 3974752 (N.D. Cal. Aug. 31, 2022) .......... 16

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 8

*Turner v. Apple, Inc.*,
2025 WL 1953697 (N.D. Cal. July 16, 2025) .......... 7, 17

*Villalpando v. Exel Direct Inc.*,
303 F.R.D. 588 (N.D. Cal. 2014) .......... 6

Rules

Fed. R. Civ. P. 23 .......... 6, 8
Fed. R. Civ. P. 23(a)(2) .......... 6
Fed. R. Civ. P. 23(b)(3) .......... 6, 9
Fed. R. Civ. P. 45(c)(1) .......... 18
Fed. R. Evid. 801(c) .......... 12
Fed. R. Evid. 802 .......... 10, 12
Fed. R. Evid. 803(6) .......... 13, 14
Fed. R. Evid. 805 .......... 12
Fed. R. Evid. 807(a)(1) .......... 12
Fed. R. Evid. 901 .......... 9, 10, 17
Fed. R. Evid. 901(b)(1) .......... 11
Fed. R. Evid. 902(11) .......... 11
Fed. R. Evid. 1006 .......... 15, 16, 17
Fed. R. Evid. 1006(b) .......... 15, 16

Other Authorities

31 Wright & Gold, Federal Practice and Procedure: Evidence § 7106, 43 (2000) .......... 11

## I. INTRODUCTION

In this data breach class action, the Court certified subclasses related to each of four licensees of Accellion's File Transfer Appliance (FTA)—UC Regents, Centene, Flagstar, and WASAO—as to the disclosure of private information theory of injury. The Court conditionally certified these subclasses on the premise that (1) the FTA customers could produce spreadsheets identifying specific categories of data about individual class members that was allegedly disclosed in the 2020-2021 criminal attacks on Accellion's FTA, and (2) these categories would allow a factfinder to ascertain whether the information disclosed was sensitive enough to warrant liability under applicable law. The Court noted that if at the end of discovery, it turned out that some FTA customers were unable to produce such spreadsheets, Accellion may move to decertify. Discovery has now closed. It is now clear that Plaintiffs do not have, and cannot obtain, evidence to satisfy the Court's requirements for class certification as to ***any*** subclass. Accordingly, the Court should decertify all five classes as injury cannot be established through common evidence applicable to each subclass, defeating predominance.

## II. FACTS

This case arises from a series of criminal cyberattacks on individual customers' FTA instances in December 2020 and January 2021 that affected multiple Accellion customers. Plaintiffs filed suit seeking to represent classes of individuals whose data allegedly was exposed in the attacks, and moved to certify classes of persons whose data was held by five Accellion customers: The Regents of the University of California ("UC Regents"); Centene Corporation; Flagstar Bank; the Washington State Auditor's Office ("WASAO"); and The Kroger Company.

On September 30, 2025, the Court granted in part Plaintiffs' motion for class certification. Dkt. 391. Specifically, the Court certified UC Regents, Centene, Flagstar, WASAO, and WCPA[1] subclasses only as to the disclosure of private information theory of injury and only for nominal damages. *Id.* at 23. The Court recognized that to demonstrate injury under this theory, Plaintiffs needed to prove the FTA

---

[1] The Court certified a WCPA subclass identical to the WASAO subclass in every way except that the underlying claim is violation of the Washington Consumer Protection Act ("WCPA"). Dkt. 391 at 23. The same reasons for decertifying the WASAO subclass apply to the WCPA subclass.

attacks caused "the disclosure of information that is '***highly offensive*** to a reasonable person.'" *Id.* at 20 (quoting *Popa v. Microsoft Corp.*, 153 F.4th 784, 791 (9th Cir. 2025)) (emphasis added). In conducting its predominance analysis, the Court acknowledged that "[b]ecause each class member may have had different types of information disclosed, offensiveness is not a common question." *Id.* However, the Court found that "if there is a way to generate a spreadsheet identifying the specific categories of data disclosed by class member, there are no predominance problems" as "[o]nce a factfinder settles on which categories of data are offensive and which are not (a common issue not depending on individual circumstances), determining injury becomes a 'plug-and-play' exercise in matching up exposed data elements to those categories." *Id.* But the Court acknowledged that if at the end of discovery, the FTA customers are unable to produce such spreadsheets, Accellion may move to decertify those subclasses. *Id.* at 21.

Discovery has now closed. None of the four subclass customers has produced a spreadsheet identifying the specific categories of data disclosed by class member that would be admissible at trial, and the evidence they have provided makes clear that no such spreadsheet could be generated. Instead, three customers—UC Regents, Centene, and Flagstar—produced only breach notification lists. [redacted] None of these customers have produced the underlying data used to create the summaries nor any witness with the personal knowledge necessary to authenticate them. As for WASAO, it produced no notice list at all.

***Flagstar.*** The only information that Plaintiffs have to prove classwide injury as to the Flagstar subclass is a "Notice List" that Flagstar produced as a spreadsheet. Bates Decl. ¶¶ 2, 4, Ex. 1. No witness was deposed concerning the creation of that spreadsheet—the only person to provide any information about it is Flagstar's Head of Legal Operations, Deanna Dietz, by declaration. Bates Decl. ¶¶ 5-6, Ex. 2. Ms. Dietz attests that "an unauthorized party was able to access ***some*** of Flagstar's information on the Accellion FTA platform." *Id.*, Ex. 2, Dietz Decl. ¶ 2 (emphasis added). Flagstar then engaged outside vendors Kroll and Arete Advisors to (1) confirm which files stored on the FTA had been accessed without authorization, and (2) perform "data mining" on those files to ascertain whether they contained personal identifying information of Flagstar customers or employees. *Id.* ¶¶ 3-4.

Arete and Kroll used unspecified "automated and manual review techniques to search the data." *Id.* ¶ 4. Flagstar, with the assistance of counsel, then compared the resulting data file against its "data warehouse" to create the notice list. *Id.* ¶ 7.

Flagstar did not produce any of the information used to create the notice list—not the FTA files that allegedly were accessed, not the data file that Arete and Kroll created through their data mining efforts, and not the Flagstar "data warehouse" that Flagstar counsel used to create the list itself. Moreover, though Ms. Dietz was part of the Flagstar team that worked to create the Notice List, she states she does "not have first-hand knowledge of how Flagstar, using the data file created by Arete and Kroll, determined which individuals and what personal information should be included in the data file or the Notice List" and she is unaware "of any other current Flagstar employee who was personally involved in the process that Kroll and Arete engaged in to determine whether and what PII was present in the accessed files." *Id.* ¶ 11.

The spreadsheet on which Plaintiffs rely to prove classwide injury for the Flagstar subclass is the Notice List that was generated through the process described above. *Id.* ¶ 9, Bates Decl. ¶¶ 2, 4, Ex. 1.

***Centene.*** The only information that Plaintiffs have to prove classwide injury as to the Centene subclass is a collection of notice lists that Centene produced in spreadsheet form. Bates Decl. ¶¶ 8-18, Exs. 3-10. Again, no witness was deposed concerning the creation of that spreadsheet—the only person to provide any information about it is Centene's Director of Privacy, Brian Deutschmann, by declaration. Bates Decl. ¶ 19, Ex. 11.

Whereas Flagstar's outside contractors made some effort to identify the subset of files hackers allegedly accessed, Deutschmann explained that Centene relied on a list of ***all*** files that were "on the Accellion FTA at the time of the Data Incident." Bates Decl. ¶ 19, Ex. 11, Deutschmann Decl. ¶ 3. Centene then engaged an outside vendor, Consilio, to ascertain whether those files included PII or PHI of Centene members. *Id.* ¶ 4. "Consilio then reviewed this material and consolidated the information into 'Return Files' that were sent to Centene," for use in Centene's investigation of the attack and its process for notifying potentially impacted individuals. *Id.* Centene itself did not do this work but "relied on the service provided by Consilio with the belief that Consilio accurately and correctly performed its work." *Id.* Accordingly, Deutschmann acknowledges that he lacks personal knowledge as

to how Consilio determined whether PII or PHI was present on the FTA for any given individual. *Id.* ¶¶ 7-8.[2] Further, Mr. Deutschmann notes his understanding that "***the Return Files do not contain information about whether the data was accessed or misused by any third party***." *Id.* ¶ 4. (emphasis added).

Centene did not produce any data files that Consilio used to create the notice lists. Bates Decl. ¶ 17. The spreadsheets on which Plaintiffs rely to prove classwide injury for the Centene subclass are the notice lists that were generated through the process described above. *Id.* ¶¶ 8-18, Exs. 3-10.

***The UC Regents.*** The only information that Plaintiffs have to prove classwide injury as to the UC Regents subclass is a [redacted]. Once again, no witness was deposed about the creation of that spreadsheet—the only person to provide any information about it is Molly Greek, Chief Information Officer for the University of California, Office of the President, by declaration. Bates Decl. ¶ 25, Ex. 13. Yet again, the list was prepared with the [redacted]. Bates Decl. ¶ 25, Ex. 13, Greek Decl. ¶ 6. The UC Regents [redacted] *Id.*

The UC Regents also did not produce the underlying data used to create their list. Bates Decl. ¶

[2] Centene produced eight spreadsheets. Deutschmann's "understanding" is that the first four, CENTENE0000001-04, "contain data from a subset of files that are also partly encompassed by a larger set of files reflected in CENTENE0000005-07," which comprises three spreadsheets. Bates Decl. Ex. 11, Deutschmann Decl. ¶ 5. "Because these spreadsheets were prepared by Consilio," Deutschmann has no "personal knowledge as to how or to what extent these datasets overlap." *Id.* While those seven sheets include a column titled "Health Information" populated with "Yes," there is no explanation of what constitutes "Health Information." The eighth sheet is a list of individuals whose Social Security numbers Consilio "determined were present on the Accellion FTA at the time of the Data Incident." *Id.* ¶ 6.

23. The spreadsheet on which Plaintiffs rely to prove classwide injury for the UC Regents subclass is [redacted] that was generated through the process described above. Bates Decl. Ex. 13, Greek Decl. ¶ 6, Bates Decl. ¶ 22, Ex. 12.

***WASAO.*** WASAO, in contrast, provided no spreadsheet or notice list, and instead produced a large volume of files that it collected in an effort to reconstruct what was on the FTA at the time of the attack. As explained by Janel Roper, WASAO's Chief of Staff, WASAO does not have access to the data that was on its FTA instance at the time of the attack. Bates Decl. ¶ 30, Ex. 14, Roper Decl. ¶ 2. Rather, Accellion generated a list of file names that were on the FTA, and WASAO then asked its internal clients (other Washington state government agencies) to send it copies of files with those names in an effort to "reconstruct" what had been on the FTA. *Id.* ¶ 3. Some clients provided files; others provided no files at all and instead opted to conduct their own review of their FTA data and determine what notice, if any, they were required to provide potentially impacted individuals. *Id.* As a result, WASAO "cannot confirm which files were on the FTA at the time of the attack; it has only a list of file names that Accellion provided and ***some*** files that appear to match those file names, which WA SAO's internal clients provided after the fact as part of the breach notification process." *Id.* ¶ 4 (emphasis added). Thus, even if WASAO (or anyone else) were to create a list by extracting data from the files WASAO collected from other state agencies, there is no way to know whether the agencies provided the correct files (as opposed to others, with the same names) or whether the files the other agencies produced had been modified between the time of the attacks and the production date. *Id.*

Compounding the uncertainty of WASAO's files, a large but unquantifiable portion of the data in WASAO's files has been determined to be fraudulent. One of WASAO's internal clients from which it collected data during its internal investigation was the Washington State Employment Security Division (ESD), which had transferred data to WASAO on the FTA in connection with an audit of suspected unemployment fraud. *Id.* ¶ 6. That audit ultimately identified over 191,000 fraudulent imposter unemployment claims, and another 51,000 suspected fraudulent unemployment claims, made using a combination of genuine personal information from Washington residents and data belonging to the fraud perpetrators. *Id.* WASAO "does not know which ESD data transferred using the FTA was genuine and which was fraudulent." *Id.* ¶ 7. Thus, even if WASAO could reconstruct files they still

cannot reliably be attributed to actual class members. Ms. Roper's declaration is unequivocal: "WA SAO cannot know which files were actually on the FTA at the time of the attack, it cannot know whether the malicious actors responsible for the attack actually obtained any files or any particular files that had been stored on the FTA, and with respect to the ESD files on the FTA, WA SAO cannot know what data in the files was genuine as opposed to fraudulent." *Id.* ¶ 8.

None of the five subclasses produced a spreadsheet that satisfies the conditions the Court identified as prerequisites for class certification. What exists in the record are vendor-created notification artifacts, prepared for regulatory compliance purposes, lacking foundation and subject to hearsay objections, that are not admissible, much less sufficient to prove the disclosure of Plaintiffs' or class members' information.

## III. LEGAL STANDARD

"Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982). "A district court may decertify a class at any time." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009). Defendants may move for decertification at or after the close of fact discovery, and at that stage the district court "take[s] a more exacting look at . . . the record." *Campbell v. City of L.A.*, 903 F.3d 1090, 1099 (9th Cir. 2018). "A motion for class decertification is subject to the same standard as a motion for class certification under Federal Rule of Civil Procedure 23." *Siqueiros v. Gen. Motors LLC*, 676 F. Supp. 3d 776, 789 (N.D. Cal. 2023). Accordingly, the resisting party bears the burden of showing the motion to decertify should not be granted by demonstrating the requirements of Rule 23(a) and (b) are met. *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947-48 (9th Cir. 2011).

## IV. ARGUMENT

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." "The predominance test of Rule 23(b)(3) is 'far more demanding' than the commonality test under Rule 23(a)(2)." *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 607 (N.D. Cal. 2014) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997)). Predominance is satisfied only "when the common issues represent a significant

aspect of the case and they can be resolved for all members of the class in a single adjudication." *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1182 (9th Cir. 2015) (cleaned up). "[T]he focus of the predominance inquiry" is whether "a proposed class is 'sufficiently cohesive to warrant adjudication by representation.'" *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (quoting *Amchem*, 521 U.S. at 623).

Where injury cannot be established through classwide proof, the predominance requirement is not satisfied. *See Ambrosio v. Progressive Preferred Ins. Co.*, 154 F.4th 1107, 1112-13 (9th Cir. 2025) (predominance not satisfied where determining whether each individual class member was harmed required an inquiry specific to that person); *Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459, 469-71 (9th Cir. 2023) (class decertified because individual questions going to injury and damages outweighed any common question as to vendor misclassification); *see also Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1138-40 (9th Cir. 2022); *Aguirre v. Am. Honda Motor Corp., Inc.*, 2026 WL 608349, at *6-7 (N.D. Cal. Mar. 4, 2026) (Gilliam, J.) (denying class certification when plaintiff had no classwide evidence capable of establishing injury for the class); *Turner v. Apple, Inc.*, 2025 WL 1953697, at *4 (N.D. Cal. July 16, 2025) (Davila, J.) (denying class certification on predominance grounds when injury had to be assessed on an individual basis); *In re Apple iPhone Antitrust Litig.*, 2025 WL 3124160, at *15-16 (N.D. Cal. Oct. 27, 2025) (Gonzalez Rogers, J.) (decertifying class when plaintiffs did not show injury was capable of being established through a common body of evidence applicable to the whole class).

The Court certified UC Regents, Centene, Flagstar, WASAO, and WCPA subclasses as to the disclosure of private information theory of injury for nominal damages. Dkt. 391 at 23. In conducting the predominance analysis, this Court acknowledged that Plaintiffs' disclosure of private information theory was the only injury theory viable on a classwide basis. *Id.* at 20. The Court noted that "*TransUnion* specifically called out disclosure of private information as [a] common law cause of action that can support an Article III injury. . . . And the Ninth Circuit has explained that the crux of this cause of action is the disclosure of information that is '*highly offensive* to a reasonable person.'" *Id.* (quoting *Popa*, 153 F.4th at 791). Accordingly, the relevant issue for the predominance analysis was "whether the offensiveness of the disclosed data [could] be determined on a common basis." *Id.*

The Court found that "[b]ecause each class member may have had different types of information disclosed, offensiveness is not a common question." *Id.* However, the Court determined that it was not the type of individual question that defeated predominance as "[o]nce a factfinder settles on which categories of data are offensive and which are not (a common issue not depending on individual circumstances), determining injury becomes a 'plug-and-play' exercise in matching up exposed data elements to those categories." *Id.* Thus, the Court found that "if there is a way to generate a spreadsheet identifying the specific categories of data disclosed by class member, there are no predominance problems." *Id.* However, the Court noted that if at the end of discovery, it turns out that customers are unable to produce such spreadsheets, Accellion may move to decertify those subclasses. *Id.* at 21.

Fact discovery, as relevant here, closed on February 27, 2026. The spreadsheets the Court required have not been produced. Plaintiffs have failed to obtain evidence sufficient to identify categories of data purportedly disclosed about members of the UC Regents, Centene, Flagstar, and WASAO subclasses. Indeed, none of the spreadsheets Plaintiffs obtained would even be admissible. Plaintiffs "must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence," and may do so only with "admissible evidence." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,* 31 F.4th 651, 665 (9th Cir. 2022) (en banc). And in any event, "if it is unlikely that a particular piece of common proof will be available or admissible at trial, that possibility weighs against finding that common questions (and common answers) will predominate." *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1025 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1308 (2025). Here, there is no admissible evidence that could establish common proof of injury at trial. Plaintiffs have failed to demonstrate that "injury is 'capable of being established through a common body of evidence, applicable to the whole class'" requiring decertification. *In re Apple iPhone Antitrust Litig.*, 2025 WL 3124160, at *14 (quoting *Olean*, 31 F.4th at 666); *see also Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 484-487 (C.D. Cal. 2008), *aff'd*, 639 F.3d 942 (9th Cir. 2011) (decertifying class when plaintiff had no common proof to show injury).

The same failure of proof independently defeats Article III standing. "Every class member must have Article III standing in order to recover individual damages." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). A class member whose information was never disclosed has suffered no concrete

injury. *See Popa*, 153 F.4th at 791. Because nothing in the record identifies which class members' information was in fact disclosed, class-member standing cannot be resolved on common evidence. Individualized standing inquiries independently defeat predominance and, unlike the evidentiary defects, they go to this Court's jurisdiction. This is not a case about a certified class that happens to contain some uninjured members, *cf. Olean*, 31 F.4th at 669; it is a case in which no admissible common evidence identifies even one class member whose information was in fact disclosed.

Certification also fails Rule 23(b)(3)'s superiority requirement. The subclasses were certified for nominal damages only. Dkt. 391 at 23. A class proceeding that would require a file-by-file, person-by-person inquiry to establish injury, in exchange for nominal damages, is not a superior method of adjudicating this controversy; the burden on the Court, the parties, and absent non-party custodians is wholly disproportionate to anything the class could recover.

**A. The Flagstar, Centene, and UC Regents Notice Lists, and the WASAO Data Files All Are Insufficient to Prove Classwide Injury**

Plaintiffs' disclosure of private information theory requires, first and foremost, disclosure. The crux of the tort is the disclosure of information "***highly offensive*** to a reasonable person," *Popa*, 153 F.4th at 791, and this Court certified the subclasses on that theory and no other. Dkt. 391 at 20, 23. Data that merely resided on an appliance a criminal actor could reach has not been disclosed to anyone. Yet none of the notice lists provide a basis to conclude that any particular class member's data was disclosed to hackers. In the case of Flagstar, the only witness to testify about the notice list says only that hackers were "able to access ***some*** of Flagstar's information on the Accellion FTA platform," Bates Decl. Ex. 2, Dietz Decl. ¶ 2 (emphasis added). And Ms. Dietz has no idea how it was "determined which individuals and what personal information should be included" on the Notice List because that job was delegated to outside contractors. *Id.* ¶ 11. There is no foundation for Plaintiffs' assertion that the Flagstar notice list identifies persons whose data was disclosed. Fed. R. Evid. 901.

As for Centene and the UC Regents, there is not even an effort to ascertain what data (if any) hackers obtained about subclass members. [redacted]. Bates Decl. Ex. 11, Deutschmann Decl. ¶¶ 3-4, Ex. 13, Greek Decl. ¶ 6. [redacted]

[redacted].

Though WASAO has no list, the evidence it provided suffers from the same defects, but worse. WASAO no longer had access to the FTA so it relied on third-party agencies to provide files from their systems to "reconstruct the data that may have been on the FTA at the time of the attack," Bates Decl. Ex. 14, Roper Decl. ¶ 2, and Roper expressly confirms that WASAO "cannot confirm which files were on the FTA at the time of the attack," *id.* ¶ 4. As a result, there is no foundation for Plaintiffs' assertion that any particular WASAO files were on the FTA, and no basis to conclude that any particular subclass member's data was actually disclosed.

This defect is independent of any evidentiary ruling. Even if the Court admitted every notice list in full, the lists would establish only what data was believed to have been present on a customer's FTA—not what any attacker accessed, and not what any attacker took. Presence is not disclosure. Determining whether any individual class member's information was in fact disclosed would therefore require a class-member-by-class-member inquiry that no common evidence in this record can answer. Predominance fails on that ground alone, whatever the Court concludes about admissibility.

**B. The Flagstar, Centene, and UC Regents Notice Lists Are Inadmissible.**

Even if Plaintiffs could overcome these obstacles, the notice lists from Flagstar, Centene, and UC Regents would be inadmissible: there are no witnesses who created the spreadsheets, and no witnesses who can explain how it was determined that a particular class member or a particular data category was included on a list. There is no foundation. Fed. R. Evid. 901. Even if there were a foundation, each list itself is hearsay, and embeds multiple levels of hearsay beneath it. Fed. R. Evid. 802. Exhibit 15 to the Bates Declaration summarizes how each spreadsheet falls short of admissibility for multiple independent reasons, which we explain in greater detail below.

**1. There Is No Foundation for the UC Regents, Centene, or Flagstar Notice Lists.**

Federal Rule of Evidence 901 provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Here, Plaintiffs are the proponents, they claim that the notice lists identify the particular individuals whose information was obtained by hackers and the nature

of the information the hackers obtained. Yet Plaintiffs have no evidence to establish that the notice lists identify information that hackers actually took, and the customer declarants all reject that assertion. Bates Decl. Ex. 2, Dietz Decl. ¶ 11, Ex. 11, Deutschmann Decl. ¶¶ 4, 7-8, Ex. 13, Greek Decl. ¶ 6, Ex. 14, Roper Decl. ¶¶ 5, 8; *see Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 774 n.8 (9th Cir. 2002) ("'[a] document can be authenticated [under Rule 901(b)(1)] by a witness who wrote it, signed it, used it, or saw others do so.'" (quoting 31 Wright & Gold, Federal Practice and Procedure: Evidence § 7106, 43 (2000)). Plaintiffs have no admissible evidence to prove classwide injury.

Plaintiffs also cannot cure these defects by calling a witness at trial, even assuming any witness could be found with the requisite knowledge. Flagstar and Centene, and their witness-declarants, are outside the reach of a Rule 45 subpoena for trial. Bates Decl. ¶¶ 7, 21. UC Regents asserted sovereign immunity in response to discovery subpoenas and has indicated it would do so if subpoenaed at trial, *id.* ¶ 27, and for good measure, [redacted] *Id.*, Ex. 13, Greek Decl. ¶ 6. WASAO (and the agencies that actually produced the copies of files to WASAO) are also outside the reach of a Rule 45 trial subpoena and have stated they would assert sovereign immunity as well. Bates Decl. ¶ 32. In any event, the reach of a trial subpoena does not matter, because no customer has identified a witness—inside or outside this Court's subpoena power—with personal knowledge of how any list was created.

Nor can Plaintiffs cure the foundational defect by certification. A certification under Federal Rule of Evidence 902(11), or under 902(13) or (14) as to the vendors' electronic data, establishes only that a record is what it purports to be and was maintained as the Rule requires. It cannot supply the personal knowledge that Rule 803(6)(A) independently demands, and here every declarant has affirmatively disclaimed that knowledge. Bates Decl. Ex. 2, Dietz Decl. ¶ 11, Ex. 11, Deutschmann Decl. ¶¶ 7-8, Ex. 13, Greek Decl. ¶ 6. A certification signed by a custodian who does not know who built the list, from what data, or by what method proves nothing about the truth of its contents.

### 2. The Flagstar, Centene, and UC Regents Notice Lists Are Inadmissible Hearsay.

The UC Regents, Centene, and Flagstar notice lists also are inadmissible hearsay. Plaintiffs would offer each list as evidence showing what specific class member information was on the

customers' FTAs at the time of the attacks. The spreadsheets are thus unsworn, out-of-court statements offered for the truth of the matter asserted—hearsay. *See* Fed. R. Evid. 801(c); Fed. R. Evid. 802; *Aki v. Univ. of Cal. Lawrence Berkeley Nat'l Lab'y*, 74 F. Supp. 3d 1163, 1174 (N.D. Cal. 2014) (finding spreadsheet listing positions available at lab in February 2012 "constitutes hearsay in that it is an out of court statement used to show what jobs were available at LBNL in February 2012"); *MAO-MSO Recovery II, LLC v. Farmers Ins. Exch.*, 2022 WL 1690151, at *12 (C.D. Cal. May 25, 2022), *aff'd sub nom. MSP Recovery Claims Series LLC v. Farmers Ins. Exch.*, 2023 WL 6633838 (9th Cir. Oct. 12, 2023) (finding spreadsheets of payment data hearsay).

The hearsay problem is compounded by the layers of hearsay statements contained in these records. The customer notice lists are hearsay, but they are not even the statements of the customers. Rather, each [redacted]. Each layer of that process involves an out-of-court statement by a declarant whose identity, knowledge, and methodology are unknown and unreliable. Where a record is the product of multiple out-of-court assertions, each layer must independently satisfy a hearsay exception. Fed. R. Evid. 805. Plaintiffs have the burden of satisfying any applicable exception. *See L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 934 (9th Cir. 2002), *opinion amended on denial of reh'g*, 313 F.3d 1093 (9th Cir. 2002) ("LANS, as the proponent of the evidence, bore the burden of establishing a foundation from which to conclude that the statement was within a hearsay exclusion."). They cannot meet that burden.

Nor does the residual exception save the lists. Rule 807 requires "sufficient guarantees of trustworthiness," assessed on the totality of the circumstances and in light of corroborating evidence. Fed. R. Evid. 807(a)(1). That the lists were generated for breach notification cuts against Plaintiffs, not for them: notification lists are deliberately over-inclusive, they were assembled by unidentified contractors applying undisclosed methodologies, they were prepared with the assistance of counsel in anticipation of litigation, and there is no corroborating evidence of any kind because the underlying data was never produced. Rule 807 is not a vehicle for admitting a record whose reliability no party can test.

**3. The Flagstar, Centene, and UC Regents Notice Lists Are Not Business Records.**

The notice lists do not qualify for admission under the business records exception to the hearsay rule. To establish that exception, the proponent must show that:

(A) the record was made at or near the time by – or from information transmitted by – someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity.

Fed. R. Evid. 803(6). "Business records are admissible 'unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.'" *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1258 (9th Cir. 1984) (quoting Fed. R. Evid. 803(6)). The notice lists fail on both the regular course of business and knowledge requirements, and their circumstances of preparation independently indicate a lack of trustworthiness.

**a. The notice lists were not made in the course of a regularly conducted business activity.**

"For a record to be considered as having been made in the regular course of business it must be 'made pursuant to established company procedures for the systematic or routine and timely making and preserving of company records,' and relied upon by the business in the performance of its functions." *Clark v. City of L.A.*, 650 F.2d 1033, 1037 (9th Cir. 1981) (citations omitted). "[F]or a business record to be admissible, each contributor must act in the regular course of business." *Sana v. Hawaiian Cruises, Ltd.*, 181 F.3d 1041, 1046 (9th Cir. 1999) (courts are "rightfully wary when parties create self-serving documents and seek to offer them as business records" (citing *Paddack,* 745 F.2d at 1258-59)).

The notice lists were not created in the regular course of Flagstar's business as a bank, Centene's business as a healthcare company, or the UC Regents' business as a university. They were created [redacted] Bates Decl. Ex. 2, Dietz Decl. ¶¶ 3, 7, Ex. 11, Deutschmann Decl. ¶¶ 2, 4, Ex. 13, Greek Decl. ¶ 6. There is no evidence that any of these customers regularly audited the contents of their FTA instances as part of their ordinary business operations, and no reason to believe they did. Records created in response to a

specific incident, rather than pursuant to established routine business procedures, do not qualify as business records. *See Paddack,* 745 F.2d at 1258 (audit reports inadmissible as business records where the audit was "ordered in response to the Trustees' suspicion of irregularities" rather than conducted in the ordinary course).

The litigation-anticipation problem is particularly acute here. [redacted]. Bates Decl. Ex. 13, Greek Decl. ¶ 6. [redacted] lack the trustworthiness that justifies the business records exception – the assurance that the record was made for the independent purpose of conducting the business, not for use in court. *See Paddack,* 745 F.2d at 1258-59.

**b. The notice lists were not made by someone with knowledge.**

Even if the made in the regular course of business requirement were satisfied, the notice lists also fail to meet the requirements of FRE 803(6) because Plaintiffs cannot show "the record was made at or near the time by – or from information transmitted by – someone with knowledge." Fed. R. Evid. 803(6)(A). The declarations produced by each customer affirmatively disclaim the knowledge the rule requires.

Mr. Deutschmann, on behalf of Centene, states that "[b]ecause these spreadsheets were prepared by Consilio, I do not have personal knowledge as to how it was determined whether PII was present on the FTA for any given individual." Bates Decl. Ex. 11, Deutschmann Decl. ¶ 7. Deanna Dietz, on behalf of Flagstar, states, "I did not personally perform, nor am I aware of any current Flagstar employees who performed the data mining review process themselves." *Id.*, Ex. 2, Dietz Decl. ¶ 5. [redacted] *Id.*, Ex. 13, Greek Decl. ¶ 6. In short, no witness with personal knowledge of how any of these lists were created has been identified, and discovery is closed. It remains unclear who created the notice lists, how, and whether that person has knowledge of the statements they contain. Accordingly, the notice lists do not meet the requirements of the business records hearsay exception. *See N.L.R.B. v. First Termite Control Co., Inc.*, 646 F.2d 424, 426-30 (9th Cir. 1981), *opinion amended on reh'g sub nom. Nat'l Labl. Rels. Bd. v. First Termite Control Co. Inc.* (9th Cir. Aug. 5, 1981) (finding

documents not admissible as business records when witness lacked knowledge of how the records were prepared).

### 4. The UC Regents, Centene, and Flagstar Notice Lists Are Not Admissible as Summaries of Voluminous Records.

Plaintiffs cannot cure the inadmissibility of the notice lists by offering them as summaries of voluminous records under Federal Rule of Evidence 1006. Rule 1006 provides that "[t]he court may admit as evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court." Before a summary or chart may be admitted, however, the proponent "must establish a foundation that (1) the underlying materials on which the summary exhibit is based are admissible in evidence, and (2) those underlying materials were made available to the opposing party for inspection." *Amarel v. Connell*, 102 F.3d 1494, 1516 (9th Cir. 1996); *see also* Fed. R. Evid. 1006(b) ("[t]he proponent must make the underlying originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place."). The notice lists satisfy neither requirement.

#### a. The underlying data is inadmissible.

Rule 1006 is not an independent route to admissibility. Rather, it is a convenience rule that presupposes the admissibility of the underlying materials. A summary of inadmissible evidence is itself inadmissible. *See Amarel*, 102 F.3d at 1516.

The underlying data here, the forensic files and vendor-compiled datasets from which the notice lists were derived, are inadmissible for the same reasons as the notice lists themselves. They consist of out-of-court statements by unidentified personnel offered to prove that specific categories of personal information belonging to identified individuals were present on the customers' FTA instances at the time of the attacks. *See Aki,* 74 F. Supp. 3d at 1174; *MAO-MSO Recovery II, LLC.*, 2022 WL 1690151, at *12. They were not made during the regular course of business, were prepared in anticipation of litigation, and were created by personnel whose identities and methodologies are unknown. *See* Sections IV.B.3., above.

#### b. The underlying data was not produced to Accellion.

The notice lists independently fail Rule 1006 because the underlying data has never been

produced to Accellion. Rule 1006(b) is unambiguous: the proponent must make the underlying materials available to the opposing party for examination or copying. That requirement exists precisely to allow the opposing party to test whether the summary accurately reflects the underlying data. *See Amarel,* 102 F.3d at 1516 ("[t]he purpose of the availability requirement is to give the opposing party an opportunity to verify the reliability and accuracy of the summary prior to trial"); *Siqueiros v. Gen. Motors LLC*, 2022 WL 3974752, at *8-9 (N.D. Cal. Aug. 31, 2022) (holding summaries were not admissible under FRE 1006 when the underlying documents were not made available to the opposing side noting they would be prejudiced by the inability to effectively cross-examine the witnesses on their methods or test the summaries' reliability). If Plaintiffs intend to rely on the notice lists as summaries of voluminous records, the underlying data from which they were created must first be made available to Accellion to test the accuracy of the summaries. But Plaintiffs failed to obtain this underlying data from Centene, Flagstar, or the UC Regents, and it has never been made available to Accellion. Bates Decl. ¶¶ 3, 17, 23. Accellion never had access to the data or files that were on the FTA. Balonis Decl. ¶ 8, Dkt. 320-3.

Because the underlying data is both inadmissible and unproduced, the notice lists cannot be admitted as Rule 1006 summaries. Accellion and the Court have no way of assessing whether these notice lists are accurate summaries of what was on the FTAs at the time of the breach.

**5. The UC Regents, Centene, and Flagstar Notice Lists Are Not Admissible under FRE 703.**

Nor can Plaintiffs rely on an expert to introduce these notice lists. Federal Rule of Evidence 703 provides that an expert may base an opinion on otherwise inadmissible facts or data if experts in the field would reasonably rely on that type of data in forming an opinion. But the rule has a critical limitation: it permits inadmissible evidence to come in only to explain the basis of the expert's opinion, not prove the truth of what the evidence asserts. *Paddack*, 745 F.2d at 1261-62 ("Rule 703 merely permits such hearsay, or other inadmissible evidence, upon which an expert properly relies, to be admitted to explain the basis of opinion. . . . It does not allow the admission of the reports to establish the truth of what they assert."). Accordingly, the notice lists are not admissible under Rule 703 to prove what data categories were actually disclosed during the FTA attacks. *See id.*

### C. There Is No Classwide Proof Of Injury For WASAO.

Unlike the other three customers, WASAO did not produce a notice list, and so there is no common proof by which Plaintiffs can show injury on a classwide basis. Instead, WASAO produced a hard drive containing files that were the result of its efforts to "reconstruct" what was on the FTA at the time of the attack by asking other state agencies to provide copies of files with names that matched file names Accellion provided. Proving injury for each individual class member would require a file-by-file inquiry to identify each person whose name appears in a file and to assess what specific information was present in the file as to each individual. Such an individualized inquiry defeats predominance and requires decertification. *See, e.g., Ambrosio*, 154 F.4th at 1110-13; *Turner*, 2025 WL 1953697, at *4; *In re Apple iPhone Antitrust Litig.*, 2025 WL 3124160, at *14-16.

Even if Plaintiffs attempt to cure this deficiency on opposition by producing for the first time a spreadsheet they or their expert has created, purporting to summarize the information contained in these files, that summary would be inadmissible. As mentioned above, under FRE 1006, a summary exhibit is only admissible if the proponent establishes that the underlying materials on which it is based are themselves admissible. *Amarel*, 102 F.3d at 1516.

WASAO's underlying data is inadmissible because it cannot be authenticated. Again, Federal Rule of Evidence 901 requires that the proponent "produce evidence sufficient to support a finding that the item is what the proponent claims it is." As stated in WASAO's declaration, WASAO "did not have access to the data that was on its FTA instance at the time of the December 2020 attack. Rather, Accellion provided WA SAO with a list of files that Accellion represented were accessible from the 'about.html' webshell." Bates Decl. Ex. 14, Roper Decl. ¶ 2. WASAO then "requested files with names matching the list Accellion provided from its internal clients in an effort to reconstruct the files that were on the FTA at the time of the attack. Some of these clients provided the data, and others did not." *Id.* ¶ 3. Thus, the files on the hard drive are ***not*** the files that were on the WASAO FTA. They are intended to be copies of files that were collected at a later date, that had names that matched those of files on the FTA. Further, while WASAO produced the files, it is not their source – they come from its agency clients. None of those clients have authenticated the files. As a result, "WA SAO does not know whether the files provided by its internal clients during its January 2021 investigation into the FTA

attack are identical to the files identified by Accellion as being accessible" on the FTA. *Id.* ¶ 5. And if WASAO does not know, neither Plaintiffs, nor the Court, nor the jury have any way of knowing either. Plaintiffs will not be able to call any witness from these agencies at trial to try to fix the problem, as they are in Washington State, outside the 100-mile subpoena scope, have asserted their sovereign immunity privilege, and were not included in any Rule 26 disclosure by Plaintiffs. *See* Fed. R. Civ. P. 45(c)(1); Bates Decl. ¶ 32. Because the underlying files are inadmissible, any summary or chart derived from them is also inadmissible.

Even if these files were admissible, they would not establish that any of Plaintiffs' or the subclass's sensitive information was actually disclosed on a classwide basis. As noted above, a significant portion of these files contain fraudulent data. One of WASAO's internal clients from whom it collected data during its internal investigation into the FTA attack was ESD. Bates Decl. Ex. 14, Roper Decl. ¶ 6. At the time of the FTA attack, WASAO was engaged in an audit of ESD data in connection with allegations of widespread employment fraud, and ESD used the FTA to transfer that data to WASAO. *Id.* WASAO's audit ultimately concluded that a number of the claims were fraudulent, combining genuine personal information from Washington residents with fraudulent information. *Id.* Accordingly, there is no way to confirm whether any of the personal information from the ESD files is genuine or accurate or even pertains to a particular class member. *Id.* ¶ 7. Plaintiffs cannot prove injury on a classwide basis through the use of the WASAO data files.

## V. CONCLUSION

Plaintiffs cannot prove injury on a classwide basis. The only common proof of injury they have is a collection of spreadsheets created by unknown individuals, working for third-party contractors of non-parties to the lawsuit, applying unknown criteria to files Accellion has never seen, to classify the contents of those files as one kind of PII or another, while conceding that no one knows whether the hackers ever accessed, let alone stole, those particular files.

No one knows exactly who created the spreadsheets or how, which renders them inadmissible for lack of foundation. But even if that could be overcome, any assertion that a spreadsheet shows that a customer's FTA contained sensitive PII about a given class member is hearsay upon hearsay upon hearsay, ultimately resting on claims about data that Accellion has never had and that Plaintiffs never

obtained in discovery. The spreadsheets will be inadmissible at trial, and Plaintiffs have no other path to prove injury on a classwide basis. The classes all fail on predominance.

Nor is partial relief appropriate. The defect is identical across every subclass—no admissible common proof that any particular class member's information was disclosed—so no narrowing or redefinition of the classes can cure it. And the last chance for fact discovery was on February 27, 2026. There is no basis to defer decertification so that Plaintiffs may attempt, after the fact, to assemble the record the Court required them to have.

Accordingly, the Court should grant the motion for class decertification of all subclasses.

Dated: August 14, 2026

Respectfully submitted,

THE NORTON LAW FIRM PC

*/s/ Fred Norton*

Fred Norton
Attorneys for Defendant
ACCELLION, INC.